# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **VINCENT DOAN,** | : | |
| | : | |
| **Petitioner,** | : | |
| **v.** | : | **Case No.  00-CV-727** |
| | : | |
| **HAROLD CARTER, WARDEN,** | : | **JUDGE BECKWITH** |
| | : | |
| **Respondent.** | : | **MAGISTRATE JUDGE HOGAN** |

---

## PETITIONER VINCENT DOAN'S TRAVERSE

## PART II

---

Kort Gatterdam (0040434)
KRAVITZ & KRAVITZ, LLC
145 E. Rich St.
Columbus, Ohio 43215
Tel:  (614) 464-2000
Fax:  (614) 464-2002

Counsel for Petitioner

## TABLE OF CONTENT Part II

FIFTH GROUND FOR RELIEF ...................................................................41

PETITIONER WAS DEPRIVED OF HIS FEDERAL CONSTITUTIONAL RIGHTS TO CONFRONTATION, CROSS-EXAMINATION AND A FAIR TRIAL BECAUSE THE TRIAL COURT ALLOWED THE STATE TO ADMIT UNRELIABLE HEARSAY STATEMENTS WHICH DID NOT CONFORM TO THE HEARSAY EXCEPTIONS IN THE RULES OF EVIDENCE. ....................................41

**SEE SECTION 2 OF BRIEF FILED CONCURRENTLY**

SIXTH GROUND FOR RELIEF .................................................................49

PETITIONER WAS DEPRIVED OF HIS DUE PROCESS CLAUSE RIGHT TO A FAIR TRIAL BECAUSE THE TRIAL COURT ALLOWED THE STATE TO ADMIT  REPEATED TESTIMONY ABOUT ALLEGED PRIOR ABUSIVE ACTS BY PETITIONER DOAN AGAINST CARRIE CULBERSON. ...........................................................49

SEVENTH GROUND FOR RELIEF .........................................................53

REPEATED MISCONDUCT OF THE PROSECUTION THROUGHOUT PETITIONER'S TRIAL DEPRIVED HIM OF THE RIGHT TO A FUNDAMENTALLY FAIR TRIAL GUARANTEED BY THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.....................................................................................53

    A.    Repeated introduction of others acts evidence and hearsay. ...................54

    B.    Improper closing argument..................................................54

    C.    Introduction of a photograph of Doan's tattoo........................................55

    D.    Introduction of the photograph of Carrie Culberson. ..............................56

    E.    Miscellaneous misconduct.....................................................57

      F.        Conclusion. ........................................................................................57

EIGHTH GROUND FOR RELIEF ...............................................................58

PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH
AMENDMENT RIGHTS TO CONFRONTATION, CROSS-
EXAMINATION, AND DUE PROCESS WHEN THE STATE COURTS
REFUSED TO ALLOW TRIAL OR APPELLATE COUNSEL TO VIEW
WITNESS STATEMENTS FOR INCONSISTENCIES PRIOR TO
CROSS EXAMINATION AND ON DIRECT APPEAL. ...............................58

NINTH GROUND FOR RELIEF ..................................................................61

PETITIONER WAS DEPRIVED OF HIS FIFTH, SIXTH, AND
FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS AND A
FAIR AND IMPARTIAL TRIAL WHEN MEDIA COVERAGE SO
PERMEATED THE COMMUNITY THAT VENUE SHOULD HAVE
BEEN CHANGED SINCE A FAIR AND IMPARTIAL JURY COULD
NOT BE SEATED AND THE TRIAL COURT'S HANDLING OF VOIR
DIRE ONLY MAGNIFIED THE PREJUDICE...............................................61

      A.        Introduction.............................................................................61

      B.        Caselaw...................................................................................62

      C.        Presumed Prejudice. ..............................................................63

      D.        Actual Prejudice. ....................................................................69

TENTH GROUND FOR RELIEF ..................................................................72

MISCONDUCT BY MEMBERS OF THE JURY DENIED PETITIONER
HIS RIGHTS TO DUE PROCESS UNDER THE FOURTEENTH
AMENDMENT AND HIS RIGHT TO A DETERMINATION BY A
FAIR AND IMPARTIAL JURY UNDER THE SIXTH AND
FOURTEENTH AMENDMENTS. ................................................................72

      A.        Affidavit of Carolyn Evans....................................................72

      B.        Affidavit of Tony Frazier.......................................................72

      C.        Affidavit of Woody Schlicht..................................................73

ELEVENTH GROUND FOR RELIEF..........................................................................75

WHEN THERE IS INSUFFICIENT EVIDENCE TO SHOW PROPER
VENUE AND NO EVIDENCE TO SHOW THAT THE ALLEGED
KIDNAPPING WAS MORE THAN INCIDENTAL TO THE CHARGED
CRIME OF AGGRAVATED MURDER, PETITIONER'S
CONVICTIONS FOR KIDNAPPING AND AGGRAVATED MURDER
ARE NOT SUFFICIENTLY PROVED IN ACCORDANCE WITH THE
DUE PROCESS CLAUSE. ......................................................................................75

TWELFTH GROUND FOR RELIEF..........................................................................77

PETITIONER DOAN WAS DEPRIVED OF HIS SIXTH AND
FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE
ASSISTANCE OF COUNSEL AT TRIAL. .................................................................77

THIRTEENTH GROUND FOR RELIEF.....................................................................79

PETITIONER'S CONVICTIONS ARE INVALID AS A RESULT OF
THE CUMULATIVE EFFECT OF THE CONSTITUTIONAL ERRORS
SET OUT IN GROUNDS ONE THROUGH ELEVEN.................................................79

## FIFTH GROUND FOR RELIEF

**PETITIONER WAS DEPRIVED OF HIS FEDERAL CONSTITUTIONAL RIGHTS TO CONFRONTATION, CROSS-EXAMINATION AND A FAIR TRIAL BECAUSE THE TRIAL COURT ALLOWED THE STATE TO ADMIT UNRELIABLE HEARSAY STATEMENTS WHICH DID NOT CONFORM TO THE HEARSAY EXCEPTIONS IN THE RULES OF EVIDENCE.**

The confrontation clause of the Sixth Amendment, made applicable to the states by virtue of the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400 (1965), provides that "in all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." Sixth Amendment, United States Constitution. The United States Supreme Court has long held the right to confrontation and cross-examination is essential to due process and a fair trial. *Chambers v. Mississsippi*, 410 U.S. 284 (1973); *Olden v. Kentucky*, 488 U.S. 227 (1988); *Kentucky v. Stincer*, 107 S.Ct. 2658 (1987). Cross-examination has been described by the Supreme Court as the "greatest legal engine ever invented for the discovery of the truth." *California v. Green*, 399 U.S. 149 (1970). The Confrontation Clause reflects a preference for face-to-face confrontation at trial. *Id.* at 157. This provision is the embodiment of traditional preferences for testimony of a witness who can be cross-examined and who can be observed face-to-face by the trier of fact. *Mattox v. United States*, 156 U.S. 237, 242-243 (1895). The absence of proper confrontation at trial calls into question the ultimate integrity of the fact-finding process. *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) quoting *Berger v. California*, 393 U.S. 314, 315 (1969).

Ohio Evidence Rule 802, is the **rule** on the admissibility of hearsay evidence. The **rule** states in pertinent part that "[h]earsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly." When deciding whether hearsay is admissible, this Court must not lose

sight of the fact that the Ohio and United States Constitutions and the Ohio Rules of Evidence generally prohibit the introduction of hearsay.

Most recently, the United States Supreme Court examined the constitutional protection of confrontation and confrontation and the prohibition against introduction of hearsay in the case of *Crawford v. Washington*, 124 S.Ct. 1354 (2004). The *Crawford* decision destroys much of the argument made by Respondent and the Ohio Court of Appeals on this issue. The *Crawford* Court overruled *Ohio v. Roberts*, 448 U.S. 56 (1980) and found the *Roberts* notions of whether a statement is reliable "is fundamentally at odds with the right of confrontation." *Id.* at 1370. The Court held that the reliability of the statement must be tested in a particular manner, through the crucible of cross-examination. *Id.* The Court found the *Roberts* "framework is so unpredictable that it fails to provide meaningful protection from even core confrontation violations." *Id.* The unworkability of *Roberts* is demonstrated in this case.

The trial judge allowed the state to present extensive hearsay testimony about prior statements made by Carrie concerning alleged instances where Doan physically abused her. This was prejudicial error requiring reversal because the statements were not admissible under the "present sense impression", "state-of-mind" or "excited utterance" hearsay exceptions in Evid. R. 803 (1), (2), or (3).[1]

First, Tonya Whitten testified that Carrie told her about an incident in August 1996 when Doan held her at gunpoint in his car:

> [S]he (Culberson) said finally he pulled over …and he got out of the car, and she asked what he was doing and he got back in the car and he had a gun and then she said that, He held me there for five – four and a half to five hours… and I just felt like throwing up the whole time…, and it was like torture.…

---

[1]    Defense objections and continuing objection to all of the hearsay testimony discussed herein were made at T. r. 1942, 2027, 2059, 2093, 2112, 2114-2115.

(T.r. 1943-1944).  Whitten said Carrie told her that after Doan finally dropped her off at home, he called and threatened to kill her and kill her family: "So she (Carrie) said she…locked all the windows and locked the doors and she stayed on the couch that night."  (T.r. 1944).  Carrie's statements were made to Whitten in narrative form on August 27, 1996, one or two days after this alleged incident occurred (T.r. 1944).

State's witness Cicely Kukuk was permitted to testify about Carrie's description of an alleged incident where her face was scratched: "She (Carrie) said that Vince had put his hands on her neck and over her mouth and nose, and she got the scratches from her own hands, her own fingernails by trying to get his hand off of her mouth and nose so she could breathe."  (T.r. 2036).  Carrie made these statements to Kukuk the day after the alleged incident occurred (T.r. 2036).

State's witness Desiree Gruber testified about a number of hearsay statements.  First, Gruber testified that Carrie told her Doan gave her a black eye during an argument (T.r. 2078).  Gruber said Carrie would not reveal "at first" how she got the black eye and when she "eventually" did so, Carrie made light of it (T.r. 2078 – 2079).

Gruber also testified that Carrie told her about the incident where Doan allegedly tried to "suffocate" her.  The statements were made after the incident occurred and Gruber had to press Carrie before she would talk about it (T. p. 2080 – 2081).  Gruber then testified that she asked Carrie in January, 1996 about a bruise on her temple and handprints on her neck, but that Carrie refused to talk about it until February, when she told Gruber that Doan did it (T.r. 2081).

Gruber also gave graphic testimony about Carrie's appearance in April 1996: Her face was "grotesquely swollen, her eyes were both swollen…her lips were split, her nose was swollen, her whole face was various colors of black and blue."  (T.r. 2084 – 2085).  When

Gruber questioned her about what happened, Carrie "talked about him (Doan) hitting her, slapping her, throwing her to the ground repeatedly."  (T.r. 2085).  This conversation occurred one to two days after this supposed incident (T.r. 2087).

Finally Gruber was allowed to testify about why Carrie told her she would not leave the area, despite the problems she was having with Doan: "And very softly…she said he (Doan) said… he would hurt them (Carrie's sister Christina and her mother) while they were sleeping." (T.r. 2094).

State's witness Shannon Culberson next testified that she had a conversation with Carrie on Wednesday afternoon, August 28, 1996 in which Carrie said she was "really scared" because Doan "held a gun to my head Monday night….", i.e., two days earlier (T.r. 2146).  This was the second witness allowed to give hearsay testimony of this same incident.

Following that, State's witness Julie Long testified that Carrie told her about the alleged incident where Doan put his hand over her nose and mouth (T.r. 2191).  The State made no attempt to establish any time frame for when Carrie made these statements to Long.  She was the third witness permitted to give hearsay statements about that incident.

Long was then allowed to relate what Carrie told her about an alleged incident in the spring of 1996: "That her and Vince were out and they were…in his Jeep and they ran out of gas, and a fight started and Vince took her and beat her head against the road, against telephone poles.  She said she just remember (sic) him, he just kept hitting her against the pavement." (T.r. 2193).  There was no testimony to establish the time lapse between the incident and Carrie's statement to Long.  Finally, Long was allowed to relate why Carrie said she would not leave Doan: "She was afraid of what he (Doan) would do to her if she left him."  (T.r. 2196).

The State also presented testimony that Carrie filed a charge affidavit against Doan for hitting her with a space heater on the morning of July 28, 1996.  Carrie wrote the affidavit several hours later, after getting hospital treatment and talking with her mother (T.r. 2412 – 2413).  Her testimonial affidavit, State's Exhibit 35, was admitted over a defense hearsay objection (T.r. 2112).

In addition, the State introduced hearsay from other witnesses for which no hearsay exception applies including but not limited to:  Jessica Williams - testifying to what Carrie said to her (T.r. 1421-1427); Vicki Watkins - testifying to what Lori Baker told her (T.r. 1559, 1570, 1576, 1611); Carla Williams - testifying to what Lori Baker told her (T.r. 1802, 1807-1811); and Debbie Culberson - testifying to various statements made by Carrie (T.r. 2423, 2425).  The above hearsay carried no indicia of reliability and was used simply to bolster other witnesses or to further prejudice Doan and portray him as a person with a propensity for violence.

Neither Carrie's oral or written statements were excited utterances.  Under Ohio Evid. R. 803 the declarant must still be under stress and the statements cannot be the result of reflective thought.  Carrie made the statements well after the alleged events and gave them in the form of a coherent narrative. In some instances, her statements were not made until a day or two after the alleged events.  Other statements were not made until weeks or months after the alleged events. Several statements were not spontaneous or reactive, but rather were given reluctantly after being pressed for information. She wrote the charge affidavit hours after the alleged space heater incident -- after having plenty of time to reflect, talk with her mother and obtain treatment.  On several occasions, Carrie repeated statements about the same event to two or three different people at different times.

In several instances, the prosecution made no effort to show the temporal relationship between the alleged events and the time Carrie made statements about them. If there is no evidence that (the declarant) spoke to these witnesses under the domination of nervous excitement, the statements (both oral and written) are not admissible as excited utterances.

Nor were the statements admissible under the state of mind exception.   In *State v. Apanovitch*, 33 Ohio St.3d 19, 21 (1987) the Ohio Supreme Court stated that Evid. R. 803(3) allows witnesses to say that the declarant was fearful or angry or upset.   But witnesses are <u>not</u> allowed to say <u>why</u> the declarant felt that way: "[T]he state of mind exception does not permit witnesses to relate any of the declarant's statements as to why he held a particular state of mind." Further, any testimony under the state-of-mind exception "must point toward the future rather than the past."  *Id.*

Carrie's oral and written statements were not admissible under Evid. R. 803(3).   The statements about **why** she was fearful of Doan were plainly not permissible.   Carrie's statements also pointed to the past, because they described incidents which had already taken place, rather than to the future.   Therefore, admission of the foregoing hearsay testimony about her statements and the charge affidavit were not justified under the state-of-mind exception to the hearsay rule.

Finally, Carrie's statements were not admissible under the present sense impression hearsay exception.   Evid. R. 803(1) allows out of court statements only when they are made contemporaneously or very close in time to the perceived event.   The key to the statement's trustworthiness is the spontaneity of the statement, either contemporaneous with the event or immediately thereafter. Neither her statements nor her affidavit were within the scope of the minimal lapse of time contemplated by the rules of evidence in order for a present sense impression to be admitted as an exception to the hearsay rule.

The State had no physical evidence linking Doan to Carrie's disappearance and/or homicide. No blood, no hair, no fibers, no DNA. The State had no eyewitnesses to the crime, if a crime occurred at all. The admission of hearsay evidence that Doan had a propensity to abuse Culberson, therefore, he did so on the date in question, was the only way the State could obtain a conviction. That is, by use of irrelevant, stale, unreliable and extremely prejudicial evidence, the State allowed the jurors to infer because Doan may have been physically abusive in the past, he likely committed the crimes for which he was charged. The State was able to do this without subjecting the evidence, hearsay, to the rigors of cross-examination.

No testimony was more prejudicial to Doan than having witness after witness present Carrie's hearsay testimony about a multitude of alleged instances where Doan physically abused her. The State's intent was to convince jurors that Doan's alleged abusive propensity culminated in Carrie's killing. The emotional impact of that testimony cannot be minimized.

Although after *Crawford*, reliability is not the test, the hearsay did not meet the guarantees of trustworthiness or reliability that must exist in order for hearsay testimony to be admitted. It did not fall within the firmly rooted hearsay exceptions under Evid. R. 803. Doan was denied his Sixth Amendment right of Confrontation because he could not contest any of the statements. *White v. Illinois,* 502 U.S. 346 (1992). The aforementioned hearsay was not isolated; it was a major portion of the State's case.

Absent the hearsay, there was no physical evidence linking Doan to Carrie's death and the credibility of remaining state's witnesses was suspect at best. This Court cannot find, beyond a reasonable doubt, that the error did not contribute to the verdict therefore, Doan's convictions should be reversed.

The State court findings on this issue are contrary to clearly established caselaw from the United States Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-06, 406 (2000). In the alternative, the state courts decisions applied Supreme Court precedent in an objectively unreasonable manner. The wrongful use of all of the above-described hearsay statements against Doan at trial was prosecutorial misconduct that prejudiced Doan and denied his rights to a fair trial under the Due Process Clause of the Fourteenth Amendment as well as denying Doan his rights of confrontation and cross-examination guaranteed by the Sixth Amendment.

## SIXTH GROUND FOR RELIEF

**PETITIONER WAS DEPRIVED OF HIS DUE PROCESS CLAUSE RIGHT TO A FAIR TRIAL BECAUSE THE TRIAL COURT ALLOWED THE STATE TO ADMIT REPEATED TESTIMONY ABOUT ALLEGED PRIOR ABUSIVE ACTS BY PETITIONER DOAN AGAINST CARRIE CULBERSON.**

A hallmark of the American criminal justice system is the principle that proof that the accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime. State and Federal Courts alike prohibit the introduction of other acts evidence for the purpose of showing propensity to commit crime, especially crimes similar to those which the accused is on trial for. *State v. Curry,* 43 Ohio St.2d 66 (1975); *State v. Hector,* 19 Ohio St.2d 167 (1969); *State v. Griffin,* 142 Ohio App.3d 65 (2001); *Boyd v. United States,* 142 U.S. 450 (1892); *United States v. Bakke,* 942 F.2d 977 (6th Cir. 1991); *United States v. Rudolph,* 403 F.2d 805 (6th Cir. 1968); *McKinney v. Rees,* 993 F.2d 1378 (9th Cir. 1993); *Courtney v. United States,* 390 F.2d 521 (9th Cir. 1968).

"The use of 'other acts' evidence as character evidence is not only impermissible under the theory of evidence codified in the California rules of evidence,… and the Federal Rules of Evidence…, but is contrary to firmly established principles of Anglo-American jurisprudence." *McKinney v. Rees,* 993 F.2d 1378 (9th Cir. 1993) (citations omitted). "Guilt must be found for the crime charged, not because of past crimes." *Jones v. Haskins,* 343 F.Supp. 645, 653 (S.D. OH 1971), *affirmed* 459 F.2d 479 (1972), *cert. denied,* 409 U.S. 990 (1972).

Use of other acts to show conformity or propensity to commit a crime has been prohibited either by statute or caselaw in all states. *Rees,* 993 F.2d at 1381. The Sixth Circuit recently set out four factors for federal courts to consider when reviewing whether the admission of other acts evidence prejudiced a defendant's right to due process and a fair trial.

> They are: (1) the relevancy requirement; (2) Rule 404(b)'s requirement that the evidence be offered for a "proper purpose;" (3) Rule 403's requirement that the court determine that the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) the requirement that, upon request, the trial court must give a limiting instruction on the purpose for which it is admitted. *Huddleston*, 485 U.S. at 691, 108 S.Ct. at 1502.

*United States v. Bakke*, 942 F.2d 977, 981 (6th Cir. 1991).

In addition to the hearsay testimony about alleged prior abuse, the trial judge permitted the prosecution to present non-hearsay testimony about prior instances where Doan allegedly hit Carrie.[2] This was prejudicial error requiring reversal.

State's witness Cicely Kukuk was allowed to testify that: (1) in January or February 1995, Doan called Carrie names, dragged her by the hair and punched her for talking on the phone to another man, (T.r. 2030); (2) that in March 1995, Doan allegedly punched Carrie outside a bar, (T.r. 2033); and (3) that in the "springtime" of 1995, Doan allegedly grabbed Carrie by the hair and smashed her face into the steering wheel of a car (T.r. 2035).

Prosecution witness Cindy Falgner then testified about a January 15, 1996 incident she observed where Doan kicked out the driver's window of Carrie's car, took hold of her hair and then kicked the passenger side of the car after Carrie got out (T.r. 2063 – 2065).

The State was also able to introduce, over objection, other acts testimony from Desiree Gruber which alleged acts began in September, 1995 and ended in July 1996 (T.r. 2078-2097); and Debbie Culberson which alleged acts began in April, 1996 and ended in July, 1996 (T.r. 2401-2416).

---

[2]    Defense counsel objected and asked for a ruling on its admission.  T.r. 1301.  The prosecution submitted a Memorandum, T.r. 1311, arguing that prior acts were admissible to show "the effect the acts had on the victim" and to show that Doan had to "control women and…show them who is boss."  The judge overruled the objection and counsel entered a continuing objection to all such testimony.  T.r. 1314.

The testimony about these prior acts should not have been allowed. Evid. R. 404(B) incorporates a strict standard for admissibility. Showing "the effect the acts had on the victim" as the State argued below, is not one of the permissible purposes in either Evid. R. 404(B) or R.C. 2945.59. Using prior acts testimony to show that Doan killed Carrie because he "had to control women and show them who's boss" was using a bad character trait to prove conduct, which is prohibited by Evid. R. 404(B) and R.C. 2945.59. The prior acts covered by Kukuk's testimony (18 months prior to Culberson's disappearance) and Falgner's testimony (8 months prior) were too remote in time to be relevant: Further, the prior acts testimony in this case was too remote in time to be of sufficient probative value to outweigh the danger of unfair prejudice. The evidence had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 113 S.Ct. 1710 (1993).

The most compelling proof of the prejudicial impact of this improper evidence and argument is *de hors* the record. This proof comes from the jury itself. Subsequent to Doan's trial, Court TV broadcast a special, "Trial Story – Missing" about the Culberson case, which it had covered throughout the trial. In this broadcast, juror spokesperson Kathleen Jachimowicz stated as follows: "When we (the jurors) heard all the testimony about how Vince treated Carrie, every single one of those witnesses had the same stories, they all backed each other up, they all said how awful he treated her and they also said how polite he could be at the same time, and we believed them." *Mot. for Leave & Second Amend. Pet., Ex. T.* This quote from jury spokesperson Jachimowicz, *de hors* the record, clearly demonstrates how prejudicial and influential the prosecution's improper prior acts evidence was in the jury's decision to convict Doan of Culberson's murder. Use of this evidence was prosecutorial misconduct that prejudiced

Doan and denied his right to a fair trial under the Due Process Clause. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639 (1961).

The State court findings on this issue are contrary to clearly established caselaw from the United States Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-06, 406 (2000). In the alternative, the state courts decisions applied Supreme Court precedent in an objectively unreasonable manner. The misuse of prior acts testimony at Doan's trial carried the possibility that he may be convicted not so much for what is proven concerning the crime *sub judice*, but for what he is shown to have committed on some other occasion. Doan's conviction must be reversed because there is a reasonable possibility that this testimony contributed to his conviction. The impact of this error and other erroneously admitted prior acts evidence was not simply an erroneous evidentiary ruling. It so infected the trial that it denied Doan his right to a fundamentally fair trial as guaranteed by the Due Process Clause of the Fourteenth Amendment. *Lundy v. Campbell*, 888 F. 2d 467 (6th Cir. 1989).

## SEVENTH GROUND FOR RELIEF

**REPEATED MISCONDUCT OF THE PROSECUTION THROUGHOUT PETITIONER'S TRIAL DEPRIVED HIM OF THE RIGHT TO A FUNDAMENTALLY FAIR TRIAL GUARANTEED BY THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.**

Misconduct of the prosecution at trial may be so prejudicial as to amount to a denial of a fair trial. *Berger v. United States*, 295 U.S. 78, 88 (1935). Where the prosecutor misstates facts, refers to evidence outside the record, interjects his or her personal belief that a defendant is guilty, or appeals to the passions of jurors, there is a serious infringement upon the role of the jury as fact finder and determiner of guilt or innocence; and therefore a violation of defendant's due process rights. *United States v. Bess*, 593 F.2d 749, 755 (6th Cir. 1979). The question is "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). See also *Angel v. Overberg*, 682 F.2d 605 (6th Cir. 1982).

The purpose and scope of closing argument must be considered in light of the prosecutor's special duty and function as the government's representative. *Id.* A prosecutor, although permitted a degree of latitude, especially in closing argument, may strike hard blows but not foul ones. *Id.* at 88. A prosecutor must exercise extreme caution in making questionable comments because a jury is likely to view the prosecutor much more favorably than defense counsel since a prosecutor is cloaked with the authority of the government. A closing argument can infect the trial with unfairness where it implicates specific trial rights of the accused. *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985); *Bess*, 593 F.2d at 755.

The relevant question is whether the prosecutorial misconduct was so egregious as to render the trial fundamentally unfair "to a degree tantamount to a due process violation." *Washington v Hofbauer*, 228 F.3d 689, 707 (6th Cir. 2000); *Darden v. Wainwright*, 477 U.S. 168,

181 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The Sixth Circuit has previously reviewed the prosecutorial misconduct issue under the totality of the circumstances. *Hofbauer*, 228 F.3d at 707; *Angel*, 682 F.2d at 608.

As set forth below, there were numerous instances of prosecutorial misconduct in evidence and argument at Doan's trial.

**A.     Repeated introduction of others acts evidence and hearsay.**

Despite the fact that there was no physical evidence and no body, the goal of the State was to try Doan for other acts he had allegedly committed against Carrie in the hopes that the jury would believe that since he beat her in the past, he killed her on August 29, 1996. Using other acts to show propensity is clearly improper and constitutes prosecutorial misconduct. Doan here incorporates the arguments made in the Fifth and Sixth Grounds for Relief.

**B.     Improper closing argument.**

In the initial portion of his closing argument (T.r. 3208-3232), the prosecutor repeatedly asked the jury to speculate and assumed facts that were not testified to or in evidence at trial. (T.r. 3216, lines 20-25; T.r. 3217, lines 1-3; T.r. 3218, lines 9-15; T.r. 3219, lines 22-25; T.r. 3220, lines 1-3; T.r. 3225, lines 1-9; T.r. 3227, lines 14-19). In the rebuttal portion of the State's closing, the prosecutor injected his personal beliefs to the jury, assumed facts not in evidence, and even made a religious reference to the jury. (T.r. 3286, lines 1-5; T.r. 3287, lines 1-5; T.r. 3288, lines 22-23; T.r. 3294, lines 8-12; T.r. 3322, lines 18-22; T.r. 3324, lines 14-25).

It is reversible error and contrary to the Code of Professional Responsibility for an attorney to allude to matters not supported by the evidence, express his personal belief or opinion or to make improper suggestions or insinuations. *Berger*, 295 U.S. at 88.

The prosecutor also repeatedly expressed his opinion about the credibility of the witnesses who believed they saw Carrie or her automobile. Especially in a small community like Clinton County where virtually every juror knew the prosecutor, his comments were particularly prejudicial. It was their elected prosecutor telling the citizens of the jury what he believed about the defense case and what happened to Carrie.

Defense counsel failed to object to much of the prejudicial closing argument. However, the issue can and was considered under Crim. R. 52 as plain error. [3] (See also *Maupin* analysis, *supra*.) Further, the trial court has a duty to sua sponte intervene if counsel abuses his privilege during opening or closing arguments. *Snyder v. Standford*, 15 Ohio St.2d 31 (1968). Had the trial court taken appropriate action, the jury would not have been prejudiced against Doan.

**C.    Introduction of a photograph of Doan's tattoo.**

State's Exhibit 30A was a photograph of Doan's tattoo depicting the grim reaper (T.r. 1549). A larger picture of the tattoo was shown to the jury and to State's witness Vicki Watkins, but the smaller photo went to the jury room. Although the State claimed the tattoo photo was necessary to show identification, (T.r. 1546-1548, 2487-2489), its use was prosecutorial misconduct.

The photo was taken without the consent of Doan or his lawyers, without a court order, without a warrant and was improper. Det. Edwards took the tattoo photographs with at least three other officers present to coerce Doan into complying with his demand (T.r. 97-107). Edwards failed to notify Doan's attorneys even though he admitted he interrupted their meeting with Doan so they could covertly take the photographs (T.r. 101-102).

---

[3]    In the alternative, counsel's failure to object constitutes ineffective assistance of counsel. See Twelfth Ground for Relief

In addition, the facts show the photograph had no legitimate purpose except to prejudice the jury. The State introduced the photograph to show Doan was a bad person with an evil tattoo on his body. The identification argument was spurious. Watkins knew Doan so it was not necessary to show her a tattoo so she could identify him. Also, Watkins testified the tattoo was on Doan's **left** shoulder, the only shoulder she could see when looking out the bedroom window (T.r. 1545, 1549). Edwards, however, testified it was on Doan's **right** shoulder (T.r. 106). Thus, the tattoo did not establish identification, it established misidentification.

**D.     Introduction of the photograph of Carrie Culberson.**

The State also introduced State's Exhibit 20, a photograph of Carrie after she had been purportedly beaten by Doan (T.r. 2405). The exhibit was introduced and shown to the jury by the State's most sympathetic witness, Debbie Culberson (T.r. 2405). The defense objected repeatedly to the introduction of the photograph but ultimately all the trial court did was require a smaller photograph (St. Ex. 20A) to go to the jury (T.r. 2403, 2405, 2485, 2645, 3149).

The photograph was not relevant to an issue in the trial. Doan was on trial for allegedly kidnapping and killing Carrie, not for allegedly beating her months earlier. The alleged beating occurred in April, 1996, over four months before Carrie disappeared, and was too remote in time to have evidentiary value.

Any probative value was outweighed by the prejudicial effect of the photograph. What the jury saw was a huge blow up (approximately two feet by three feet) of the battered face of Carrie Culberson and Debbie Culberson crying when she was handed the picture (T.r. 2403-2404). The introduction of the photograph was calculated to incite the passion and sympathy of the jurors. The fact that a smaller picture went to the jury room is of no consequence. The

damage was done when the oversized photograph was paraded in front of the jury while Ms. Culberson wept on the stand.

**E.    Miscellaneous misconduct.**

In addition to the aforementioned acts of misconduct, the prosecution also failed to notify the court and defense counsel when it knew its witnesses testified inconsistent with their pretrial statements (see statement of Billie Jo Brown and other witness statements); failed to turn over a statement made by a key prosecution witness, Vicki Watkins, until trial (T.r. 1629-1630); did not turn over the results of a failed voice stress analyzer test given to Vicki Watkins until after cross-examination at trial (T.r. 1614-1630); and gratuitously introduced a form of sexism through argument and its witnesses throughout the trial that "Baker" women were supposed to do what the "Baker" men told them to do (T.r. 1713-1716, 3222, 3301-3302, 3307). These acts and omissions by the State also served to deny Doan a fair trial and should result in reversal of his convictions.

**F.    Conclusion.**

The State court findings on this issue are contrary to clearly established caselaw from the United States Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-06, 406 (2000). In the alternative, the state courts decisions applied Supreme Court precedent in an objectively unreasonable manner. The cumulative effect of the repeated acts of prosecutorial misconduct prejudiced Doan and denied his rights to a fair trial under the Due Process Clause of the Fourteenth Amendment. For all these reasons, when considering the totality of the misconduct in this case, this Court must reverse Doan's convictions pursuant to the United States Constitution.

## EIGHTH GROUND FOR RELIEF

**PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO CONFRONTATION, CROSS-EXAMINATION, AND DUE PROCESS WHEN THE STATE COURTS REFUSED TO ALLOW TRIAL OR APPELLATE COUNSEL TO VIEW WITNESS STATEMENTS FOR INCONSISTENCIES PRIOR TO CROSS EXAMINATION AND ON DIRECT APPEAL.**

Ohio R. Crim. P. 16(B)(1)(g) provides for a review by the court and parties of a witness's pretrial statement after that witness has testified at trial. The rule also allows defense counsel to use the statement if inconsistencies exist between the statement and trial testimony.

Trial counsel filed a motion prior to trial seeking all witness statements. It was the prosecutor who argued to the Court that *State v. Daniels*, 1 Ohio St.3d 69 (1982) allows **only the trial court** to review the witness statements after the witness testifies (T.r. 127). The prosecutor went on to state that: "those statements are pretty clear that they go in camera once an individual testifies, and the **Court** then will review those statements….and those statements then would all be provided to the **Court** following the testimony of those individual witnesses" (T.r. 209-210, emphasis added). After the State's argument, the trial court denied Defendant's motion and a procedure was set up (as argued by the state) where the trial court would review the statements, determine if inconsistencies existed, and then give the inconsistent portions to defense counsel (See Response to June 10, 2003 Magistrate's Order, Exhibit 9, trial court's entry October 14, 1998). In a post trial "correction" however, the court retroactively changed an entry which had stated the procedure was that only the judge could review the witness statements.

It is the State that successfully argued to the trial court, prior to trial, that only the judge could review the statements. The trial court agreed and defense counsel was forced to abide by the ruling despite their earlier motion and request to review the statements (T.r. 198-200). That is why the trial court's October 14, 1998 entry was accurate and the March 26, 1999 corrective

entry was simply an end around by the State to try and correct reversible error after the State finally realized what the law was on this subject. There is nothing in the trial court's March 26, 1999 entry which suggests it had some revelation that caused it to rethink the accuracy of the October 14, 1998 entry, which the Court reviewed and voluntarily signed. [4]

Defense counsel had virtually no use of witness statements for cross-examination or review and no ability to argue why portions of a statement were inconsistent because counsel was never provided the statements. With the exception of one small portion of a statement by Lori Baker, defense counsel never saw or participated in the review of any witness statement or grand jury testimony. Whether inconsistencies existed was determined solely by the trial court without the benefit of review or argument by trial counsel.

On November 13, 1998, the Court of Appeals permitted appellate counsel to review the witness statements so inconsistencies could be argued on appeal. However, after numerous pleadings filed by the State, the Court of Appeals ultimately reversed itself, denied appellate counsel the opportunity to see the witness statements and ordered the witness statements sealed. (See Response to June 10, 2003 Order, Exhibits 10-23) The history on this issue alone shows the concerted effort on the part of the prosecution and state courts to deny Doan due process of law.[5]

After Doan's trial, his new attorneys obtained a copy of a prior statement by prosecution witness Billie Jo Brown. Brown's statement was obtained as a result of a related civil action that Culberson's mother filed against Doan. Brown's prior statement contained numerous inconsistencies from her trial testimony. First, at trial, Brown testified the man she saw was

---

[4]    Even if defense counsel did not make a proper request, the statements must be examined in light of Doan's claim that defense counsel was ineffective. (See Twelfth Ground for Relief)

[5]    It is unclear whether the sealed exhibits have made it to this Court. If not, Doan requests that this Court Order Respondent to transmit the sealed witness statements to the Court for an in camera review. Doan also requests the opportunity to review the statements and to supplement this ground for relief if additional inconsistencies are found.

wearing a muscle shirt and shorts. She made no mention of a hat. In her statement however, Brown said the man she saw had on a T-shirt, jeans, and a ball hat.

Second, at trial Brown said the incident happened on Wednesday, August 28, 1996 into early morning August 29, 1996. In her statement, she did not know whether the incident happened on Tuesday, August 27, 1996 or Wednesday, August 28, 1996.

Third, at trial Brown testified the man said "I told you next time I'd kill you, you fucking bitch" (implying that this time was the next time). In her statement, Brown says the man told the women that he was going to kill her "the next time."

Fourth, at trial Brown testified to hearing tires squealing and when she next looked out, the red car was gone but the black Mustang was still there. In her prior statement, however, she said that the black Mustang did leave about one half hour later, thus making it **impossible** for Doan to have kidnapped and held Culberson hostage in her red car while he was simultaneously driving his own car approximately one half hour later.

None of these inconsistencies were given to defense counsel to use in cross-examination and thus, the jury was unable to properly evaluate Brown or any other witness's testimony and credibility. As Brown was supposedly the last person to see Carrie, these inconsistencies are extremely important and would have affected the outcome of the trial. The trial court's failure to allow defense counsel to have the tools to conduct a proper confrontation and cross-examination of the State's witnesses deprived Doan of his Federal Constitutional right to due process. *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Kentucky v. Stincer*, 107 S.Ct. 2658 (1987).

As Brown's statement shows, the trial court's failure to allow defense counsel to examine the statements of prosecution witnesses prior to cross-examination denied Doan his rights to Due Process, confrontation and cross-examination under the Sixth and Fourteenth Amendments. The

State court findings on this issue are contrary to clearly established caselaw from the United States Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-06, 406 (2000).   In fact, there is no analysis at all by the court of appeals, just a conclusion unsupported by the facts of the case. In the alternative, the state courts decisions applied Supreme Court precedent in an objectively unreasonable manner.  For these reasons, this Court must reverse Doan's convictions pursuant to the United States Constitution.

## NINTH GROUND FOR RELIEF

**PETITIONER WAS DEPRIVED OF HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS AND A FAIR AND IMPARTIAL TRIAL WHEN MEDIA COVERAGE SO PERMEATED THE COMMUNITY THAT VENUE SHOULD HAVE BEEN CHANGED SINCE A FAIR AND IMPARTIAL JURY COULD NOT BE SEATED AND THE TRIAL COURT'S HANDLING OF VOIR DIRE ONLY MAGNIFIED THE PREJUDICE.**

**A.      Introduction.**

Sometime between the evening hours of August 28, 1996 and the early morning hours of August 29, 1996, Carrie Culberson disappeared from her home in rural Blanchester, Ohio.  Just hours after her disappearance, a massive search began.  Her status dominated the local media. Media from larger cities like Dayton and Cincinnati swooped down on the small town of Blanchester and followed every move of this captivating story.  Carrie's disappearance received national media attention the likes of which had never been seen before in quiet, rural, Clinton County.

Carrie's mother, Debra Culberson, was splashed all over the newspaper and national television shows asking for her daughter's safe return.   The community bonded together to organize searches with the police, vigils, posters, reward funds, and anything else they could do to try and bring Carrie back or find out what had happened to her.

Once word was leaked that Doan, Carrie's boyfriend, was the prime suspect, every aspect of his and his family's life was dissected in the media. The community turned their anger towards Doan and his family.

Despite the pretrial publicity, the trial court refused to change venue. The record contains the following items supporting a finding that venue should have been changed: newspaper articles, television tapes and affidavits, Nielsen TV stipulation and ratings. (See Exhibits submitted with Respondent's Return of Writ and Respondent's Response to June 10, 2003 Order, Exhibits 24-29)

In addition, the voir dire shows the effect the pretrial publicity had on the jurors. The trial court magnified the prejudice by refusing to allow individual voir dire on pretrial publicity and knowledge of the parties or potential witnesses. As a result, jurors were poisoned by thoughts and feelings of other jurors and sentiments expressed by prospective jurors who never sat on the jury because they knew a witness or a party. Defense counsel was further limited due to fear that probing questions would elicit damaging statements about the guilt of their client to other jurors who were present to listen. In addition, the prosecution was allowed wide latitude in voir dire of prospective jurors but the defense was restricted. The State was permitted to do what it wanted in voir dire while the defense was unable to test the prospective juror's knowledge, biases, or predispositions.

**B.    Caselaw.**

The Sixth Amendment to the United States Constitution guarantees to the accused a public trial by an **impartial** jury. *In re Murchison*, 349 U.S. 133, 136 (1955). The Fifth Amendment guarantees that no man shall be deprived of life, liberty, or property, without due process of law. The Supreme Court of the United States has given practical meaning and

definition to these Constitutional provisions in the landmark decisions of *Irvin v. Dowd*, 366 U.S. 717 (1961); *Rideau v. State of Louisiana*, 373 U.S. 723 (1963); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

The Supreme Court reaffirmed the *Sheppard* principles in *Patton v. Yount*, 467 U.S. 1025, 1031 (1984), where the Court held:  "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial **should not be believed**."  (Emphasis added).

In Ohio, venue is controlled by Crim.R. 18(B) and R.C. 2901.12.  Pursuant to Crim.R. 18(B) a party may move for a change of venue "when it appears that a fair and impartial trial cannot be held in the court in which the action is pending."  R.C. 2901.12 is worded similarly to Crim.R. 18 as to motioning the court for a change of venue.

When reviewing whether a trial court should have changed venue, there are two inquiries for this Court to make.  The first is to determine whether, due to the pretrial publicity, there is a presumption of prejudice such that the trial court should not have attempted to seat a jury. *Rideau,* 373 U.S. 723; *Shepherd*, 384 U.S. at 351-351; *Patton,* 467 U.S. at 1031; *Estes v. Texas*, 381 U.S. 532, 542-543 (1965).  In such cases, the trial court cannot rely upon the claims of jurors that they can be fair and impartial.  *Id.*  The second inquiry is whether the seated jury could remain impartial in the face of the negative pretrial publicity, and the measures that were taken to ensure a fair and impartial panel.  *Patton*, 467 U.S. at 1031, 104 S.Ct. at 2891; *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991).

## C.    Presumed Prejudice.

For the reasons that follow, the negative publicity leading up to Doan's trial made it impossible to seat a fair and impartial tribunal.

As an initial matter, the trial court failed to consider the presumption of prejudice inquiry, contrary to *Rideau* and its progeny.  In its July 2, 1997 entry on motions filed by the defense, the trial court held that it would rule on the motion for change of venue if it becomes apparent that a fair and impartial jury could not be seated (T.d. 169, p.3).  The trial court did not consider whether the pretrial publicity had so tainted the venire that seating a jury would be improper, thus, no discretion was exercised.  Therefore, this Court should review the pretrial publicity de novo instead of determining whether the trial court abused its discretion.

### Newspaper Articles[6]

According to the last census figures, there are approximately 35,415 residents in Clinton County.  As of 1994, there were 19,403 registered voters.  The residents of Clinton County obtain information from a variety of sources.  As to print media, the residents receive local news from the Wilmington News Journal as well as a variety of smaller community newspapers such as the Blanchester Star Republican.  The Wilmington News Journal has a circulation rate of 7358 (T.r. 6/30/98 hrg., Exhibit 1).  In addition, Clinton County residents receive newspapers from the Cincinnati Enquirer and Cincinnati Post.  Both papers cover the Clinton County area and report on stories from Clinton County.

The parties agreed to the inclusion of the newspaper articles from the aforementioned newspapers for review by the state courts.  (T.r. 6/30/98 hrg., Exhibits 2, 3A, 3B, 3C, 9).  The articles cover the period of time from Carrie Culberson's disappearance through the finding of guilt in Doan's trial phase.

From the moment Carrie Culberson disappeared, the story appeared on the front page of the Wilmington News Journal.  A popular girl in high school, speculation was rampant on what

---

[6]    Doan requests that all news articles and television tapes and affidavits be delivered to this Court for review.  The articles, tapes and affidavits are on file in the Clinton County Courthouse.

had happened to Carrie.  Initially, the focus was not only on Carrie's disappearance but how her mother, Debra Culberson, was coping with the fact that the daughter might be deceased.  The newspaper articles played on the emotions of the community as all readers could relate to anguish facing Debra Culberson.

Searches were organized, vigils were held, and all the citizens of Clinton County were affected by the fact that Carrie had not returned.  Debra Culberson often became the center of attention, appearing on such shows as "Montel Williams" and "The Oprah Winfrey Show" as well as local television stations.  Carrie's disappearance was featured on "Inside Edition" in February, 1997 (See "Culberson to be featured on 'Inside Edition,' 2/18/97 News Journal).  This pattern would continue throughout the proceedings as the newspapers were always careful to include a comment or piece about the sympathetic Debra Culberson.  Several times, bodies were found in Southern Ohio or nearby Kentucky and the newspapers speculated on whether the remains were those of Carrie.

Not long after Carrie's disappearance, hints were dropped as to who the key suspect was.  Headlines about the dropping of assault charges filed against Doan by Carrie before her disappearance were obvious innuendo's that Vincent Doan was the key suspect.  The search of Doan's father's junkyard, the allegation that "suspect material" had been found and the allegation that a cadaver dog had "hit" on the property were all calculated to turn public opinion against Doan ("Culberson probe focuses on farm," 12/31/97 News Journal).

It came as no great surprise then when Doan was indicted for kidnapping in March, 1997.  The photograph accompanying the "Doan indicted for kidnapping" articles epitomizes the hysteria atmosphere surrounding Carrie's disappearance (See 3/22/97 News Journal Article: "Doan indicted for kidnapping").  Numerous cameras can be seen turned towards Debra

Culberson who herself used the occasion to hold a press conference after the prosecutor had held his own press conference. The double teaming of Doan throughout the pretrial proceedings, the "alleged facts" coming from the prosecution and the sympathy to Carrie's mother, served to fatally poison the jury pool.

All the articles related to Carrie's disappearance and Doan's prosecution were front page in the Wilmington News Journal. They were often front page of the Metro Section of the Cincinnati Newspapers. The articles are too numerous to go over in the limited space of this Traverse, however, some of the more prejudicial headlines and text include:

**Culberson probe focuses on farm—Suspect material found in freezer buried on farm**

**Doan still at large**

**Justice for Carrie march in Blanchester set for Saturday**

**Witness puts Doan with Culberson on same night Blanchester woman disappeared—He punched her in face, record says (E, W)[7]**

**Papers cast doubt that cop saw missing woman's car—documents filed by prosecution**

**Psychic claims Culberson no longer alive**

**Blanchester shares worry of missing woman**

**Records suggest Doan's motive (Enq.)**

**Doan must remain in jail till July trial (E)**

**Witness saw Doan covered with blood—The night Culberson reportedly disappeared, according to court records (W, E)**

**Doan had no alibi then, but does now**

**Culberson evidence outlined (P)**

**Court TV plans to cover Doan trial—Courthouse security increased**

**Culberson case notoriety making it hard to pick jury (P)**

---

[7]      W = *Wilmington News Journal*; E – *Cincinnati Enquirer*; P = *Cincinnati Post*

**'Everybody knows everybody' at trial (P)**

**Witness heard Doan threaten Culberson—On night she disappeared**

**Doan 'smeared' with blood last August**

**Fizer:Sisters threatened, 'scared'—Doan wanted to borrow car ramp Aug.29**

The aforementioned are just a sample of the headlines that appeared in the newspapers. The text of the articles portrayed Vincent Doan s a jealous and abusive boyfriend who had a motive to kill Carrie and who was covered in blood on the night she disappeared. In addition, the newspapers regularly showed pictures of Doan in prison garb and with shackles. The newspapers also frequently carried photos of Debra Culberson complete with her comments on the proceedings or recent developments in the case. This is the type of print media the jurors had been inundated with prior to trial.

**Television Coverage**

Television coverage came from the two large cities closest to Clinton County, Cincinnati and Dayton. Television stations from both areas reach Clinton County residents. The market share of those stations is included in a sealed exhibit filed with this Court titled "Stipulation and protective order concerning use of Nielsen Media Research, Inc. documents and information." (Def. Ex. 8, 6/30/97 hrg.).[8] The market share information provided to this Court by Nielsen TV reflects that the Dayton and Cincinnati stations have different shares and ratings, but, importantly, they are able to saturate the Clinton County viewing market.

The television coverage was equally prejudicial to Doan. Each of the stations covered the Doan story repeatedly. Many of the times the Doan case was the first item reported. Doan submitted to the state courts tapes from several of the television stations (Exhibits 4, 5, 7A-7F).

---

[8]     Counsel for Doan will be motioning this Court for an Order that this sealed exhibit be transmitted to the District Court.

The tapes contain several stories run by the station on the Doan case. Also, Doan has submitted affidavits from several television stations as to how frequently they ran the Doan story. The affidavits indicate the Doan story ran several hundred times during the course of the one year since Carrie Culberson disappeared. In addition to local television, the case carried National significance as Debra Culberson appeared on talk shows and Court TV covered both the trial and penalty phase.

The media did not subside or lessen just prior to trial. In fact, the curious timing of the prosecution dismissing the kidnapping indictment just days before trial and indicting Doan for aggravated murder, served to increase the exposure the case already had received. Since trial began only six weeks after the aggravated murder indictment, the jury pool was exposed to a much greater deal of publicity that would normally occur when a long delay follows an indictment. As such, jurors received almost daily reports on the status of the case in the days leading up to the trial.

It would have been impossible for the jurors to put aside the tidal wave of publicity streaming towards convicting Doan. In fact, a newspaper articles post trial opined: "**Culberson—Doan top story in '97." (W)**. Potential jurors could not be expected to be remain objective in the face of the sympathetic mother and the alleged evil boyfriend. They could not refrain from seeing Carrie Culberson buttons, taking part in marches and vigils, and demanding justice for Carrie.

Under similar circumstances, the Eleventh Circuit Court of Appeals in *Coleman v. Kemp*, 778 F.2d 1487, 1538 (11th Cir. 1985), held that under the totality of the circumstances the defendant could not received a fair trial and the trial court should have changed venue. Based upon the caselaw previously cited, and the evidence that the community was fixated on the Doan

case, it was the trial court's duty to change venue to a county that had not prejudged Doan's guilt. The failure to do so deprived Vincent Doan of his State and Federal Constitutional rights to a fair and impartial jury and to due process of law.

### D.    Actual Prejudice.

If this Court does not find "presumed prejudice," this Court must determine whether the trial court abused its discretion in finding the jury selected in the instant case could remain impartial despite the pretrial publicity. *Patton*, 467 U.S. at 1031, 104 S.Ct. at 2891; *Mu'Min v. Virginia*, 500 U.S. 415,427 (1991). A review of the voir dire is necessary.

Not only were the prospective jurors subjected to enormous publicity prior to trial, but then during voir dire they were able to hear other juror's biases or see other's removed due to their inability to be fair and impartial. They were able to see that many prospective jurors knew several potential witnesses and members of the prosecution team. The trial court's procedure prejudiced Doan in two ways. First, it allowed jurors to expand their knowledge of the case through other's responses which made it even more likely that Doan's jury was predisposed to finding him guilty based on what they knew of the case before trial. Second, it led jurors to understand that their knowledge of the case, witnesses, or prosecution was not enough to have them removed from the case. Jurors became sensitized to what they had to say in order to remain a potential juror. When combined with the knowledge every juror already brought with them about the Doan case, the procedure allowing "group knowledge" denied Doan the right to a fair trial.

The first panel had three persons who eventually sat on Doan's jury (Spurling, Maher, D. Johnson) (T.r. 231 - 348). Every juror in the first panel knew about the case and had seen media coverage of the case (T.r. 239). Several jurors saw Doan speak on television (T.r. 278-281).

Other jurors admitted to talking about the case among family and friends or hearing rumors about the case around town (T.r. 248 - 249, 294 - 295, 299 - 300).

Two jurors knew Carrie or her family (T.r. 240).  Several jurors knew members of the prosecution team well (T.r. 247, 249 - 250, 273, 292).  One juror who eventually sat on Doan's jury opined that it **might not be fair to have him on the jury** based on what he saw or read (T.r. 281).  Two other jurors who did not sit on the jury had the same opinion (T.r. 281).  At least three jurors were excused from the first panel because they could not be fair impartial (T.r. 246-247, 249, 251).  In addition, some jurors knew potential witnesses in the case.

The second panel was similar (T.r. 348 - 566).  All of the jurors had seen or heard something about the case either from the media or through friends and family (T.r. 365-366, 405).  It is important to note that when the trial court asked a similar question just moments earlier, not all the jurors raised their hands (T.r. 354).  Several jurors knew Carrie or her mother, three lived near her residence, one knew Doan, four knew persons in the prosecutor's office, and at least thirty-five potential witnesses were known to the jurors (T.r. 354 – 392).  At least six prospective jurors saw Doan on television, three heard him speak, many knew the prosecutor, one juror's daughter was a potential State's witness, and one prospective juror's grandson was related to the Culberson's (T.r. 400 – 465).

The above examples were not isolated incident.  Many jurors were removed due to an inability to be fair and impartial, knowledge of witnesses parties, or their attorneys.  The small town atmosphere was obvious in the voir dire.  Prospective juror Maynard's comment epitomizes the effect of the publicity: "Everywhere you look its all around.  If you open up the front page of the paper its right there, if you turn on the news its there." (T.r. 850).

Virtually every juror had seen or heard some, if not many, media reports of the case. Virtually every juror had discussed the case amongst friends and family. All the jurors were able to hear the extent of their fellow juror's knowledge of the case. Despite all they were exposed to, most jurors heard the speech from the trial court and prosecution that it was their duty to be fair and impartial so they said the magic words that would allow them to remain prospective jurors. Despite all they had seen, read, and heard, jurors were lead to say the publicity did not affect them enough to become unfair and partial. The trial court's acceptance of such statements despite the obvious evidence to the contrary was improper.

The pervasive effect of the pre-trial publicity on the local community; the trial court's denial of Doan's request for change of venue; and the restrictions on voir dire denied Doan his rights to due process and a fair trial by an impartial jury as guaranteed by the Sixth and Fourteenth Amendments. The State court findings on this issue are contrary to clearly established caselaw from the United States Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-06, 406 (2000). In the alternative, the state courts decisions applied Supreme Court precedent in an objectively unreasonable manner. The record reveals that Doan could not receive a fair trial in Clinton County, therefore, the trial court's refusal to change venue denied Doan his Federal Constitutional right to a fair and impartial jury and his convictions must be reversed.

## TENTH GROUND FOR RELIEF

**MISCONDUCT BY MEMBERS OF THE JURY DENIED PETITIONER HIS RIGHTS TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AND HIS RIGHT TO A DETERMINATION BY A FAIR AND IMPARTIAL JURY UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.**

Newly discovered evidence also shows the state did not have sufficient evidence to convict Doan.

**A.    Affidavit of Carolyn Evans.**

A few months after Culberson disappeared, a close friend of Culberson told Carolyn Evans that on the night of August 28th, 1996, Culberson was angry with Doan because he was seeing someone else. *Mot. for Leave and Second Amend. Pet., Ex R.* Ms. Evans affidavit states that Culberson was looking for a man who drove a black truck and belonged to the Eagles Club. This evidence corroborates the trial testimony of defense witness Bonnie Davis, who stated that Culberson was last seen arguing with and pointing her finger at a man who Davis assumed was Doan, then running to and getting into a black pick-up truck parked at the corner opposite Davis's house, while Doan took off in the opposite direction. It also supports Officer Nichols affidavit that Billie Jo Brown told him there was possibly a third car in front of Doan's house. Evans also was told that in the week just prior to her disappearance, Culberson had a local man, a preacher's son, do work on her car and needed the car to be ready the following week (the week she disappeared) because she was going to Florida. This evidence supports Doan's contention that Culberson was not killed but rather simply left town to start a new life elsewhere.

**B.    Affidavit of Tony Frazier.**

Frazier is a cousin of Doan who was staying at Doan's home on the date of an alleged incident in July, 1996 which the prosecution made much of at Doan's trial, where Doan supposedly hit Culberson in the head with a space heater. According to Frazier, that was not

what happened.  *Mot. for Leave and Second Amend. Pet., Ex S.*  Rather, Culberson hit her head on a extruding piece of metal guardrail on the back porch of Doan's house.

When the State fails to present sufficient evidence to prove all the elements of the offenses charged beyond a reasonable doubt, any resultant conviction violates due process. *Tibbs v. Florida*, 457 U.S. 31 (1982); *Jackson v. Virginia*, 443 U.S. 307 (1979).  When evaluating a claim challenging the sufficiency of the evidence, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  The affidavits of Ms. Evans, Officer Nichols and Mr. Frazier demonstrate the lack of sufficient evidence to convict Doan, beyond a reasonable doubt, of the aggravated murder of Carrie Culberson.  A conviction that is not supported by sufficient evidence violates the Due Process Clause of the Fourteenth Amendment and cannot stand.

In addition, if this Court should find that the evidence of Mitchell Epperson being released from jail early, having a pending charge at the time he testified against Doan and being offered reward money if he testified against Doan, is not prosecutorial misconduct, it constitutes newly discovered evidence, material to Doan's guilt.

The failure to allow Doan a new trial based on the aforementioned evidence would violate the Due Process Clause of the Fourteenth Amendment.  *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979).

**C**.    **Affidavit of Woody Schlicht.**

The jury in Doan's case was sequestered during its trial phase deliberations.  Members of the jury were placed at the local Ameri-Host Inn.

Jurors must deliberate collectively, as a body, in the jury room. They must not discuss the case outside the confines of those collective deliberations in the jury room.

Two jurors in Doan's case engaged in discussions outside of deliberations. Woody Schlict, a guest at the Ameri-Host while the jurors were staying there, was at the front desk when he saw two jurors. According to Schlict, the two jurors were talking about Doan's case. (Respondent's Response to June 10, 2003 Order, Exhibit 1, Motion for New Trial)

Schlict described one of the jurors he saw as wearing a tattoo on his right arm and glasses, about 55 – 60 year old. The other juror was also an older man, balding and thin with glasses. Schlict heard one juror tell the other that a verdict of "guilty would be for the best." *Id. at Ex I.*

This juror's attempt to influence the other juror to vote "guilty" was misconduct. Doan was prejudiced by this jury misconduct and denied his rights to due process and a fair and impartial jury determination of his guilt as guaranteed by the Sixth and Fourteenth Amendments.

The State provided no evidence to refute Schlict's affidavit. Despite this unrefuted evidence, the trial court failed to hold an evidentiary hearing while the issue was fresh in everyone's mind. Defendant is entitled to a fair and impartial jury. *Irvin v. Dowd*, 366 U.S. 717 (1961). It is apparent; the jury was conducting its deliberations outside the jury room and may have been influenced by outside parties (Deputies). This is not a fair and impartial jury. The failure to at the very least hold a hearing deprived Doan of his right to due process and the right to a fair and impartial jury guaranteed by the Ohio and United States Constitutions. [9]

---

[9]    Respondent's citation to the court of appeals opinion, as with the Second, Third and Fourth Grounds for Relief, is irrelevant because Petitioner was not required to exhaust state remedies, therefore, the opinions of the state courts on the post conviction issues are immaterial.

The State court findings on this issue are contrary to clearly established caselaw from the United States Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-06, 406 (2000). In the alternative, the state courts decisions applied Supreme Court precedent in an objectively unreasonable manner.

## ELEVENTH GROUND FOR RELIEF

**WHEN THERE IS INSUFFICIENT EVIDENCE TO SHOW PROPER VENUE AND NO EVIDENCE TO SHOW THAT THE ALLEGED KIDNAPPING WAS MORE THAN INCIDENTAL TO THE CHARGED CRIME OF AGGRAVATED MURDER, PETITIONER'S CONVICTIONS FOR KIDNAPPING AND AGGRAVATED MURDER ARE NOT SUFFICIENTLY PROVED IN ACCORDANCE WITH THE DUE PROCESS CLAUSE.**

In order to sustain a conviction for aggravated murder during the commission of a kidnapping, the State had to prove venue beyond a reasonable doubt. The State had to prove at least one element of the charged offenses was committed in Clinton County. *R.C. §2901.12(G)* Since there was no evidence to show where Culberson met her death,[10] Clinton County venue was not proved for the element of murder in R.C. 2903.01(B). Since venue is an element of the offense and the State did not present sufficient evidence of venue, Doan's convictions cannot stand. *Tibbs v. Florida*, 457 U.S. 31 (1982); *Jackson v. Virginia*, 443 U.S. 307 (1979); *In Re Winship*, 397 U.S. 358, 364 (1970).

Clinton County's only connection to this case was that Carrie was last seen fighting with Doan in Blanchester in the early morning hours of August 29, 1996. However, this was insufficient to show the kidnapping element of aggravated murder. Billie Jo Brown testified that the last thing she saw was Carrie breaking free and running away from Doan. No one was there when Brown next looked outside. She heard car tires squealing and noticed that Doan's car was

---

[10]    In this Ground for Relief, Doan will assume for purposes of argument only that Carrie is dead and that her death was a homicide.

still parked in front of his house.  Only Carrie's car was gone and Doan's was gone in the next half hour (T.r. 1491 – 1492, statement of Billie Jo Brown).

A kidnapping cannot be shown from Brown's testimony without inferring (1) that Doan caught Culberson again after she got away and (2) that he drove away with her in her car against her will and held her against her will while going back to retrieve his car.  Making one inference from another inference is illegal under Ohio law, as the trial court instructed jurors (T.r. 3375). Multiple inferences do not constitute proof beyond a reasonable doubt that a kidnapping occurred in Blanchester.  Since no evidence shows where Carrie was killed, and there was not sufficient evidence of a kidnapping in Blanchester, the state did not prove beyond a reasonable doubt that venue was proper in Clinton County.

There also was not sufficient evidence to prove the crime of kidnapping separate from the underlying crime of murder.  R.C. §2941.25 prohibits multiple convictions for allied offenses of similar import.  This statute embodies the protection of The Double Jeopardy Clause of the Fifth Amendment.  *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  The state must prove that restraint or movement of the victim is more than merely incidental to the underlying crime of murder and that the kidnapping was committed with separate animus.  *State v. Logan*, 60 Ohio St. 2d 126 (1979).

Carrie may or may not have been restrained for a significant period of time.  She may or may not have been removed from one location to another while she was still alive.  Since the evidence did not show one way or the other the state did not prove prolonged restraint, secretive confinement or substantial movement separate from that which would have been incidental to the murder.

The State court findings on this issue are contrary to clearly established caselaw from the United States Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-06, 406 (2000). In the alternative, the state courts decisions applied Supreme Court precedent in an objectively unreasonable manner. Conjecture cannot substitute for proof beyond a reasonable doubt. The Due Process Clause of the Fourteenth Amendment requires the state to adduce evidence sufficient to prove, beyond a reasonable doubt, every essential element of the crime charged. Doan's convictions on aggravated murder and kidnapping are not supported by legally sufficient evidence as guaranteed by the Due Process Clause of the Fourteenth Amendment. *Jackson* 443 U.S. 307.

## TWELFTH GROUND FOR RELIEF

**PETITIONER DOAN WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.**

A criminal defendant has the right to the assistance of counsel pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10, of the Ohio Constitution. In order to show counsel was ineffective, the defendant must show trial counsel's performance was deficient and that the deficient performance prejudiced the accused. *Strickland v. Washington*, 466 U.S. 668 (1984). "The defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland,* 466 U.S. at 694.

Doan's trial attorneys made the following unreasonable errors and/or omissions that prejudiced Doan:

A.    Defense counsel did not initially object to a civil jury instruction which allowed the jury to find Doan guilty on less than proof beyond a reasonable doubt (T.r. 3331). See First Ground

for Relief. It is unreasonable for defense counsel to allow the state to obtain a conviction on less than proof beyond a reasonable doubt. Had trial counsel not requested such an instruction or had counsel objected to it initially, there is a reasonable probability the result of the trial would have been different.

**B.**    Assuming for purposes of argument that defense counsel failed to request to participate in the review of witness statements prior to cross-examination pursuant to Ohio R. Crim. P. 16(B)(1)(g), *see* Eighth Ground for Relief *supra*, then counsel's failure to know the Criminal Rules and the related decisions was unreasonable and prejudiced Doan for a number of reasons. First, Doan was deprived of the benefit of having defense counsel, as an advocate familiar with the whole case, to argue to the trial court why a statement was inconsistent. Second, Doan was forced to rely on the trial court's memory and lack of complete knowledge of the case to determine whether he would be provided his constitutional right to cross-examination. If the statement of Billie Jo Brown is any indication, *see* Eighth Ground for Relief *supra*, there were likely numerous inconsistencies in state's witness statements that could have been used or argued to the trial court if counsel had made the proper request under Ohio R. Crim. P. 16(B)(1)(g).

**C.**    Trial counsel failed to object to prosecutorial misconduct in closing argument. See Seventh Ground for Relief. This failure was unreasonable and prejudicial because the jury was given latitude by the prosecutor's argument to speculate how Carrie Culberson died when the state presented no evidence to prove how or if she died. The popular local prosecutor, known by many of the sitting jurors, was permitted to give his opinion of the credibility of the defense witnesses. Had defense counsel objected, there is a reasonable probability the result of the trial would have been different.

**D**.     Trial counsel failed to renew the Crim. 29(A) motion at the end of the defense case. Counsel's failure to raise such an obvious motion at the end of the defense case was deficient performance.  There is no strategic reason not to move the trial court to dismiss a charge or charges against the defendant prior to or after submission of the case to the jury. Had defense counsel renewed the Rule 29 motion at the end of the defense case, there is a reasonable probability that some or all of the charges against him would have been dismissed on grounds of insufficient evidence.  See Eleventh Ground for Relief, *supra*.

**E**.     The State court findings on this issue are contrary to clearly established caselaw from the United States Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 405-06, 406 (2000).  In the alternative, the state courts decisions applied Supreme Court precedent in an objectively unreasonable manner.   Doan was prejudiced by the unreasonable errors and omissions of his trial attorneys as described in the foregoing subsections A – D.  There is a reasonable probability that had counsel not performed in such a deficient manner the result of Doan's trial phase proceedings would have been different.  Doan was denied his Sixth and Fourteenth Amendment rights to the effective assistance of counsel.

## THIRTEENTH GROUND FOR RELIEF

## PETITIONER'S CONVICTIONS ARE INVALID AS A RESULT OF THE CUMULATIVE EFFECT OF THE CONSTITUTIONAL ERRORS SET OUT IN GROUNDS ONE THROUGH ELEVEN.

While standing alone, each of the constitutional claims specified in Doan's petition requires the granting of habeas relief, the cumulative effect of the constitutional violations set out in this petition compromised the fundamental fairness of Doan's trial.

The totality of these multiple constitutional violations had a substantial and injurious effect on the fairness of the process that produced Doan's convictions in violation of his rights under the Sixth and Fourteenth Amendments. *Brecht*, 113 S.Ct. 1710.

Respectfully submitted,

/s/ Kort Gatterdam
Kort Gatterdam (0040434)
KRAVITZ & KRAVITZ, LLC
145 E. Rich St.
Columbus, Ohio 43215
Tel:  (614) 464-2000
Fax:  (614) 464-2002

Counsel for Petitioner

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 30, 2004, he electronically filed the foregoing Petitioner Vincent Doan's Traverse with the Clerk of Court using the CM/ECF system which will send notification of such filing to Stuart Cole, Assistant Attorney General, 150 East Gay St., Columbus, Ohio 43215.

/s/ Kort Gatterdam
Kort Gatterdam