IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Dale Beckett,

   Petitioner     Case No. 3:01CV7374

  vs.

James Haviland, Warden,

   Respondent    **OPINION AND ORDER**

POTTER, J.:

   This action is before the Court on Dale Beckett's petition for writ of habeas corpus pursuant to 28 U.S.C. §2254, respondent's answer, and petitioner's traverse. Petitioner is currently incarcerated at Allen Correctional Institution in Lima, Ohio.

   As an initial matter, the Court finds that petitioner was afforded a full and fair hearing in state court and that the petition may be resolved from the record. Therefore, an evidentiary hearing is not required. *Townsend v. Sain*, 372 U.S. 293 (1963), *Amos v. Scott*, 61 F.3d 333, 346 (5th Cir. 1995); Rule 8 of Rules Governing § 2254 Proceedings. For the reasons hereinafter stated, petitioner's habeas petition is conditionally granted.

   On September 30, 1996, the grand jury in Lucas County, Ohio, returned an indictment charging petitioner with one count of murder, a violation of Ohio Revised Code §2903.02, with a firearm specification. After a jury trial, petitioner was found guilty as charged and was sentenced to a term of 15 years to life imprisonment. In addition, he was sentenced to a consecutive term of three

2

years for the firearm specification.  Respondent's Exhibit B.

Petitioner filed a timely appeal in the Sixth District Court of Appeals, raising three assignments of error that are not at issue in this habeas proceeding.  *See* Respondent's Exhibit H.  However, his appeal was stayed pending the resolution of a motion for new trial filed by petitioner on October 20, 1997.  Respondent's Exhibit I.

In his motion for new trial, petitioner alleged that his constitutional rights were violated as a result of prosecutorial misconduct.  Specifically, he alleged that he was denied a fair trial as a result of the prosecutor (1) knowingly and willingly presenting false testimony, (2) failing to disclose the fact that a promise was made to the state's primary witness, and (3) failing to correct testimony that he knew to be false.  *See* Respondent's Exhibits J, K, L.  The trial court denied the motion for new trial on July 27, 1998, and petitioner appealed.

The Court of Appeals consolidated the appeal of petitioner's conviction and the appeal of the denial of the motion for new trial.  Respondent's Exhibit R. Petitioner's appellate brief set forth ten assignments of error which included issues raised by the denial of the motion for new trial as well as issues included in and supplementing the original appellate brief.  *See* Respondent's Exhibit S.  However, only the fifth and sixth assignments of error are relevant to the claim at issue in the instant habeas petition and are set forth as follows:

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR NEW TRIAL BASED [ON] MISCONDUCT ON THE PART OF THE

3

> STATE IN FAILING TO DISCLOSE ITS
> AGREEMENT WITH MR. WILLIAMS.
>
> APPELLANT IS ENTITLED TO A NEW TRIAL
> BASED [ON] MISCONDUCT ON THE PART [OF
> THE] PROSECUTION IN ITS OFFERING INTO
> EVIDENCE TESTIMONY IT KNEW OR SHOULD
> HAVE KNOWN WAS PERJURED.

*Id.* at 3. On March 3, 2000, the Court of Appeals affirmed the judgment of the trial court. Respondent's Exhibit V. Although petitioner sought further review by the Ohio Supreme Court, his appeal was summarily dismissed on June 14, 2000, as not involving any substantial constitutional question. Respondent's Exhibit C1.

During the pendency of his direct appeal, petitioner filed a motion for relief from judgment wherein he asked the trial court to reopen his motion for new trial. Respondent's Exhibit E1. The trial court granted the State's motion to dismiss, and petitioner appealed. Petitioner's appeal remained pending until September 1, 1999, the date on which the Ohio Supreme Court summarily dismissed the appeal. Respondent's Exhibit O1.

On February 14, 2000, petitioner filed a second motion for new trial. The trial court denied the motion on May 9, 2000, and petitioner did not appeal.

On May 10, 2000, petitioner filed an application for reopening his appeal pursuant to Ohio Rule of Appellate Procedure 26(B). Petitioner argued that appellate counsel was ineffective due to his failure to raise eight additional assignments of error in his appeal. Respondent's Exhibit T1. The Court of Appeals denied the application; and on August 30, 2000, the Ohio Supreme Court

4

dismissed his appeal as not involving any substantial
constitutional question. Respondent's Exhibits U1 and Y1.

Petitioner filed his federal habeas petition on
July 16, 2001, alleging as follows:[1]

> Ground One:  The prosecution's failure
> to disclose its agreement with its
> principal witness, Matthew Williams,
> denied Mr. Beckett the right to a fair
> trial under the Fifth and Fourteenth
> Amendment[s] to the United States
> Constitution.
>
> Supporting FACTS: At Mr. Beckett's
> trial, Matthew Williams, currently
> serving a prison sentence, was the only
> witness who testified that Mr. Beckett
> said he killed the victim and connected
> Mr. Beckett with the murder weapon.
> The prosecution asked if Mr. Williams
> was made any promises in connection
> with his testimony and he denied it.
> Mr. Williams later submitted an
> affidavit that recanted this testimony
> and admitted he was promised a
> favorable recommendation to the parole
> board if he implicated Mr. Beckett. He
> admitted providing false, rehearsed
> testimony. In a new trial motion on
> the matter, Mr. Williams refused to
> testify by asserting his Fifth
> Amendment privilege. A detective
> admitted that he had made promises to
> Mr. Williams in exchange for his
> testimony. The promise was never
> disclosed to the defense or submitted
> to the jury. But for the testimony of
> Matthew Williams, there is a great

---

[1] Petitioner also alleged a second ground for
relief. However, he subsequently filed a motion to
withdraw the second ground which this Court granted on
February, 28, 2002.

5

likelihood Mr. Beckett would not have
been convicted of murder.

Petition, p. 4-5.  In his answer, respondent argues that
petitioner's claim is barred by the one-year limitation
period applicable to habeas petitions.   In addition,
respondent contends that petitioner's claim is without
merit.

The limitation period, with certain exceptions not
applicable in the case sub judice, begins to run from "the
date on which the judgment became final by the conclusion
of direct review or the expiration of the time for seeking
such review."  28 U.S.C. § 2244(d)(1)(A).  However, "[t]he
time during which a properly filed application for State
post-conviction or other collateral review with respect to
the pertinent judgment or claim is pending shall not be
counted toward any period of limitation under this
subsection."  28 U.S.C. § 2244(d)(2).  In addition, the
Sixth Circuit has held that:

> A state petition for post-conviction or
> other collateral review that does not
> address one or more of the grounds of
> the federal habeas petition in question
> is not a review "with respect to the
> pertinent judgment or claim" within the
> meaning of 28 U.S.C. § 2244(d)(2), and
> therefore does not toll the one-year
> AEDPA statute of limitations."

*Austin v. Mitchell*, 200 F.3d 391, 395 (6th Cir. Dec. 28,
1999).

In support of his statute of limitations argument,
respondent contends that petitioner's direct appeal
concluded on June 14, 2000, the date on which the Ohio
Supreme Court dismissed his appeal.  Relying on *Austin*, he

6

further argues that petitioner's application for reopening of his direct appeal does not toll the limitation period under § 2244(d)(2) since it did not address a claim raised in his habeas petition. Since the instant habeas petition was not filed until July 16, 2001, respondent contends that it is barred by the one-year limitation period.

Respondent's argument is erroneous in two respects. First, for purposes of § 2244(d)(1)(A), judgment is not final and the limitations period does not begin to run until after the time for filing a petition for writ of certiorari to the United States Supreme Court has expired. See *Isham v. Randle*, 226 F.3d 691, 695 (6th Cir. 2000); *Smith v. Bowersox*, 159 F.3d 345, 348 (8th Cir. 1998), *cert. denied*, 525 U.S. 1187 (1999); *Flanagan v. Johnson*, 154 F.3d 196, 197 (5th Cir. 1998); *Moore v. Hawley*, 7 F. Supp. 2d 901, 903 (E.D. Mich. 1998). In the case *sub judice*, petitioner's judgment was not final until September 12, 2000, the date on which time expired for filing a petition for writ of certiorari after the Ohio Supreme Court dismissed his appeal. Thus, his habeas petition was filed well within the one-year limitation period.

In addition, respondent errs in relying on *Austin* in arguing that petitioner's application to reopen his appeal cannot toll the limitation period. The holding in *Austin* was an interpretation of the tolling provision of § 2244(d)(2), which addresses tolling relating to state post-conviction or other collateral review. The Sixth Circuit has clearly stated that an application to reopen a direct appeal is part of the direct review and, therefore, that there is no need to analyze whether it fulfills the

7

requirements of § 2244(d)(2). *Bronaugh v. Ohio*, 235 F.3d 280, 285-86 (6th Cir. 2000). Instead, § 2244(d)(1)(A) is the relevant limitations provision. *Id*. Nevertheless, the limitation period is tolled only for the time in which the application is actually pending in the Ohio courts. *Id*. at 286. In any event, it is clear that petitioner timely filed his federal habeas petition. Thus, the Court turns to the merits of his claim.

Initially, the Court notes that a federal court is prohibited from granting a writ of habeas corpus on a claim adjudicated on the merits in state court, unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As the Supreme Court explained, "clearly established Federal law, as determined by the Supreme Court of the United States" refers to the holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state-court decision. *Williams v. Taylor*, 120 S. Ct. 1495, 1523 (2000). The Court also explained that a state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law

8

or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Id.* The Court further explained that an "unreasonable application" of federal law occurs when "the state court identifies the correct legal principle from this Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A federal court may grant a habeas petition if the state court's application is "objectively unreasonable" and not "simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly." *Id.* at 1521-22; *see also Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000).

Petitioner claims that he was denied a fair trial as a result of the prosecution's failure to disclose to the defense and to the jury its agreement with the state's witness, Matthew Williams. Specifically, the prosecutor failed to disclose the fact that he and Toledo Police Sergeant Steven Forrester promised to write a letter to the parole board attesting to Williams' cooperation in petitioner's prosecution and did not correct testimony elicited by him from Williams that no promises were made. This claim was raised in petitioner's first motion for new trial and was argued on appeal in the state court.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government is required to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. Impeachment evidence falls within the *Brady* rule. *Giglio v. United States*, 405 U.S. 150, 154 (1972). In *United States v. Bagley*, 473 U.S.

667, 678 (1985), the Supreme Court made it clear that a
failure to disclose impeachment evidence to the defense
must be material in the sense that it deprives the
defendant of a fair trial. In this respect, the Supreme
Court explained that "evidence is material only if there is
a reasonable probability that, had the evidence been
disclosed to the defense, the result of the proceeding
would have been different. A 'reasonable probability' is
a probability sufficient to undermine confidence in the
outcome." *Id.* at 682.

However, where a prosecutor knowingly fails to
disclose that testimony used to convict a defendant was
false, a stricter standard of materiality is applied.
Reversal is required if there is "any reasonable likelihood
that the false testimony could have affected the judgment
of the jury." *United States v. Agurs*, 427 U.S. 97, 103
(1976). The Supreme Court has treated "'reasonable
likelihood' as synonymous with 'reasonable possibility' and
thus ha[s] equated materiality in the perjured-testimony
cases with a showing that suppression of the evidence was
not harmless beyond a reasonable doubt." *Strickler v.
Greene*, 527 U.S. 263, 299 (1999)(citing *Bagley*, 473 U.S. at
678-80).

In ruling on the motion for new trial, the trial
court set forth petitioner's claim as follows:

> The defendant asserts that he was
> denied a fair trial and his due process
> rights were violated by the State's
> failure to disclose that a promise was
> made to Mr. Williams in exchange for
> his testimony at trial and,
> resultantly, Mr. Williams' perjury when

10

> asked whether he was promised anything
> for his testimony."

Respondent's Exhibit N, p. 4. The trial court first found
that a promise to write a letter to the parole board
documenting Mr. Williams' cooperation is the type of
"'marginal benefit' which would not have induced Mr.
Williams' testimony" and does "not rise to the level of a
'promise' as contemplated in *Giglio.*" *Id.* at 7. Citing
*Giglio* and *Bagley*, the court then stated

> Assuming arguendo that a statement that
> a letter or letters would be sent to
> the parole board documenting Mr.
> Williams' cooperation in the Beckett
> case could be considered a "promise"
> and therefore should have been
> disclosed[,] . . . reversal is required
> "only if the [undisclosed] evidence is
> material in the sense that its
> suppression undermines confidence in
> the outcome of the trial, i.e. 'only if
> there is a reasonable probability that,
> had the evidence been disclosed to the
> defense, the result of the proceeding
> would have been different.'"

*Id.* at 8. The court found that the materiality
determination "'depends upon the likelihood that the
disclosure of the agreement would have affected the jury's
assessment of [Williams'] credibility.'" *Id.* (internal
citation omitted). In making this determination, the court
found as follows:

> A review of testimony of Matthew
> Williams establishes that his
> credibility was aggressively challenged
> by the defense. Counsel for the
> defendant cross examined Mr. Williams
> in detail concerning 1) his testimony
> before the Lucas County Grand Jury and

11

> his statements made to Sergeant
> Forrester; 2) his failure to contact
> people prior to the homicide, when he
> claimed he had heard Phil Spivey and
> the defendant discussing killing Ronald
> Cunningham; 3) his statement to
> Detective Forrester that the defendant
> told him that he had ordered Mr.
> Cunningham to put his hands in his
> pockets and then shot the victim once
> in the head; 4) his ability to
> personally speak with the defendant
> when both of them were incarcerated in
> the Ohio Department of Rehabilitations
> and Corrections; 5) the fact that there
> was another suspect in the murder of
> Ronald Cunningham, and; 6) numerous
> other matters relative to the
> credibility of Matthew Williams.

*Id.* at 9. The trial court then reviewed the testimony and
evidence at trial and found as follows:

> The record is unrefuted that Mr.
> Williams independently contacted the
> Toledo Police and told them the detailed
> facts concerning the defendant's
> admission that he had committed the
> murder of Ronald Cunningham **before** the
> authorities indicated that they would
> send a letter to the parole board.
> Further, the details of Mr. Williams'
> testimony is corroborated by independent
> witnesses and physical evidence at the
> scene of the homicide.
>     This Court finds that when one
> examines the "considerable amount of
> impeachment evidence presented against
> [Matthew Williams] as well as the
> independent corroboration of [Matthew
> Williams'] testimony, [this court] is
> persuaded that the nondisclosure in this
> case could not have affected the result
> and does not, therefore, compel [the
> granting of the motion for new trial]."

12

*Id.* at 12-13. The trial court did not specifically address petitioner's claim that the prosecutor had failed to correct testimony that he knew was false.

The Court of Appeals found that the determination of whether or not to grant the motion for new trial is a matter within the discretion of the trial court, and that its ruling would not be disturbed on appeal without a showing of an abuse of discretion; that is, a showing "that the decision was unreasonable, arbitrary, or unconscionable." Respondent's Exhibit V, p. 18-19. With respect to petitioner's claim that the prosecution failed to correct Williams' false testimony, the appellate court found that the claim "was not raised below and, therefore, is waived for purposes of appeal." *Id.* at 21. Applying a plain error standard, the court further found that the claim "has no merit since the trial court held that Williams' recantation was not credible and we affirmed that decision in the prior assignment of error." *Id.*

With respect to petitioner's claim that the prosecution failed to disclose its agreement with Williams to the defense, the appellate court agreed that "any type of consideration promised by the prosecutor in exchange for a witness testimony must be disclosed to the defense because of its possible effect on credibility." Respondent's Exhibit V, p. 22. Nevertheless, the court found as follows:

> The trial court concluded, however, that even though the prosecution should have disclosed its promise to the defense, a new trial was not warranted in this case because there was no reasonable probability that the jury would have acquitted appellant if it had known of the promise and believed

13

> that Williams was not credible. The
> testimony of Eaton, Gordon, Pierson, and
> McNeal and the physical evidence
> presented were sufficient on their own
> to support appellant's conviction.
> Williams' testimony merely corroborates
> or supplements the other evidence
> presented. It was not the "linchpin of
> the State's case" as appellant suggests.
> Therefore, we find that the trial court
> did not abuse its discretion by denying
> appellant's motion for a new trial.

*Id.* at 22-23.

First, the Court addresses the appellate court's finding that petitioner waived his claim as it relates to the prosecutor failing to correct false testimony due to the stated reason that petitioner failed to raise the claim in the trial court. The state court's enforcement of a state procedural sanction foreclosing review of a federal constitutional claim does not bar this Court from hearing such a claim unless this Court first finds "that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). While Ohio procedural rules require a defendant to raise a claim at the earliest opportunity to do so, it is clear that petitioner complied with this rule after learning of Williams' recantation by raising his claim in his motion for new trial in the trial court. *See* Respondent's Exhibit K, p. 2; Exhibit L, unnumbered p. 5-6; Exhibit N, p. 4. Thus, this Court finds that petitioner's claim is not procedurally defaulted and it may consider the merits of that claim. The fact that the trial court did not specifically address the claim does not alter this finding.

14

To the extent that the state appellate court addressed the merits of petitioner's claim in its plain error review, the Court finds that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The Court of Appeals found that petitioner's claim relating to the prosecutor's failure to correct false testimony had no merit since "the trial court held that Williams' recantation was not credible and we affirmed that decision in the [fourth] assignment of error."[2]  Respondent's Exhibit V. p. 21. However, the trial court clearly found that the prosecutor had promised that "a letter would be written to the parole board documenting Mr. Williams' cooperation in [petitioner's] prosecution." Respondent's Exhibit N, p. 7. In addition, it was clearly stated in the trial court opinion that Williams testified at trial that he had been offered no promises and was being given no special treatment in exchange for his testimony. *Id.* at 2. The trial court subsequently addressed Williams' recantation of his trial testimony and found that his recantation was not credible. While this finding may be reasonable with respect to Williams' sworn statement that he had no knowledge of petitioner's involvement in the crime, *see* Respondent's Exhibit J, Williams' Affidavit, in light of the court's findings earlier in its opinion, it is clear that William's

---

[2]    The Court notes that petitioner's fourth assignment of error argued that in light of Williams' statement in his affidavit that he had no prior knowledge of petitioner having any involvement in the murder for which he stands convicted, a new trial should be granted. *See* Respondent's Exhibit S, p. 17-21.

15

testimony that he had been offered no promises and was given no special treatment was false. It was an unreasonable determination of the facts for the appellate court to conclude otherwise based on the trial court's opinion.

Although the Court of Appeals found that the prosecutor should have disclosed its promise to the defense, it further found no reasonable probability that the jury would have acquitted petitioner if it had known of the promise. Respondent's Exhibit V, p. 22. The court reasoned that, even if the jury found that Williams was not credible, "the testimony of Eaton, Gordon, Pierson, and McNeal and the physical evidence presented were sufficient on their own to support [petitioner's] conviction" and that Williams' testimony "was not the 'linchpin of the State's case' as [petitioner] suggests." *Id.* at 23. For the reasons that follow, this Court finds the state court's decision contrary to clearly established federal law, as determined by the Supreme Court, and finds that the decision was based on an unreasonable determination of the facts.

First, the state court failed to apply the stricter materiality standard applicable in cases where a prosecutor knowingly fails to disclose that testimony used to convict a defendant was false. Application of that standard required reversal if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103. As explained above, the "reasonable likelihood" standard has been equated with "a showing that suppression of the evidence was not harmless beyond a reasonable doubt."

16

*Strickler*, 527 U.S. at 299 (citing *Bagley*, 473 U.S. at 678-80).

In addition, the state court improperly employed a sufficiency of the evidence test in finding no reasonable probability that the jury would have acquitted petitioner if it had known of the promise and believed that Williams was not credible. In *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995), the Supreme Court held that a materiality determination "is not a sufficiency of evidence test." The Court explained that "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* Rather, a defendant need only show "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

To the extent that the appellate court's opinion can be read as finding that the testimony of Eaton, Gordon, Pierson, and McNeal, as well as the physical evidence, was so overwhelming that the jury would have convicted petitioner even if it did not find Williams' testimony credible or, in other words, that the failure to correct his false testimony was harmless beyond a reasonable doubt, the opinion is based on an unreasonable determination of the facts. Initially, the Court notes that no physical evidence from the crime scene links petitioner to the murder. Evidence at the scene indicated that the body of the victim, Ronald Cunningham, was found laying face down with his hands in his pockets in a vacant lot at Prospect Avenue near Detroit Avenue, in Toledo, Ohio. Cunningham had no money on

17

him and was killed by a gunshot wound to the neck. The
estimated time of death was sometime after midnight and
before 8:30 A.M. on February 17, 1996. Respondent's Exhibit
V, p. 3-4. Neither a bullet nor a shell casing was found at
the scene and the State's witnesses could not identify the
size of the murder weapon. Trial Tr. p. 468, 495. However,
both the coroner and the forensic specialist speculated that
the murder weapon was more likely a large caliber weapon,
i.e. a .32 or .38 caliber. *Id.* at 471, 495.

At trial, Ouida Gordon, Cunningham's girlfriend,
testified that Cunningham used and sold cocaine and that he
and petitioner were very friendly with each other. *Id.* at
328, 349. She testified that Cunningham sold not only
cocaine at the location where his body was found, but also
"soap," a substance that looks like cocaine but is not. *Id.*
at 343-44. Gordon testified that approximately one week
before the murder, petitioner went to the mission where
Cunningham was staying because Cunningham owed him some
money. Gordon testified that Cunningham gave petitioner
$10.00 and planned to pay the balance the next day after
selling his food stamps. *Id.* at 338-39. She also testified
that petitioner was wearing a jacket belonging to Cunningham
when he went to the mission. *Id.* at 339. Gordon further
testified that Cunningham and petitioner resolved their
money situation and that she was unaware of any other
problems or disagreements between the two men. *Id.* at 340,
345. Finally, Gordon testified that on February 16, the day
before he was killed, Cunningham was acting nervous; he told
her that he owed James Spivey from Our Car Wash money for

18

drugs, having incurred the debt on February 15.  *Id.* at 336-37, 346-47.

Anthony Pierson testified that both Cunningham and petitioner frequently came to his house.  He testified that Cunningham and petitioner had a heated argument on his porch regarding money Cunningham owed to petitioner for drugs. *Id.* at 586-87.  He stated that the men came to an agreement that Cunningham would sell some food stamps in order to pay petitioner.  *Id.* at 587.  The day after the argument, petitioner came to Pierson's looking for Cunningham and took a coat that belonged to Cunningham.  At that time, Pierson told petitioner that he could probably find Cunningham at the mission.  *Id.* at 592-93.  Pierson also testified that Cunningham and petitioner resolved their conflict regarding the drug money. *Id.* at 612.  Pierson further testified that in mid-January, 1996, he was riding in petitioner's car with him when petitioner lifted an armrest and Pierson saw a .25 caliber semi-automatic pistol.  *Id.* at 603.  When Pierson asked about the gun, petitioner told him that he would always have one.  *Id.* at 604.  However, Pierson did not know if the gun was functional.  *Id.* at 613.  Pierson also testified that he heard a gunshot around 4:25 A.M. on February 17, 1996, that came from the Detroit/Prospect area. *Id.* at 607.

Norma Eaton testified that she knew Cunningham but that she did not know petitioner, Pierson, or Williams.  She testified that she left her home at 3:00 A.M. on February 17, 1996.  She testified that she walked back and forth in front of Lincoln School on Foster and Detroit Avenue until 5:00 A.M. waiting for a "date" to go to "dinner."  *Id.* at

19

626, 629. During that time, she saw Sheila McNeal standing one block farther down the street. Eaton testified that between 4:00 A.M. and 4:30 A.M. she heard a gunshot coming from the area of Prospect Street. *Id.* at 630. A couple seconds later, she saw a man run through the field between Prospect and Foster. *Id.* 630, 634. She called out to the person asking him if he wanted a date. She testified that he stopped and turned to look at her, but then ran toward the school parking lot. *Id.* at 630-31. Eaton also testified that a streetlight shone on him and described him as "thick" and "stocky" and wearing a black leather hat with a "bib" and a black leather coat. *Id.* at 631. At the time, she did not relate the gunshot to the person she saw. *Id.* at 660. She identified petitioner at trial as the person she had seen that night.

Sheila McNeal testified that during the early morning hours of February 17, 1996, she was "hanging out" a few blocks from Prospect Street. Around 4:00 A.M. she heard a gunshot. *Id.* at 537-39. She had seen Norma Eaton standing on the corner at Foster Street. About five seconds after she heard the gunshot, she heard Eaton say, "Hey, you want a date?" *Id.* at 543, 545. However, McNeal did not see the person to whom Eaton was speaking. *Id.* at 545. Later, near dawn, she saw a man at a telephone booth across from Lincoln School. She was unable to identify the man at trial and testified that she was unable to identify the man from a photo array shown to her earlier by Detective Forrester. *Id.* at 545, 554.

The physical evidence introduced at trial included Exhibits 15 and 16 which Detective Forrester identified as

20

the coat and hat recovered from a closet in the home of petitioner's girlfriend.  *Id.* at 699-700.  Eaton testified at trial that Exhibits 15 and 16 are similar to the coat and hat worn by the man she saw the night of the murder.  *Id.* at 643, 664-65.  As indicated earlier, no bullet or shell casing was found at the scene of the murder.  The significance of a shell casing was explained by Detective Culpert from the Toledo Police Scientific Investigation Unit.  He testified that finding a shell casing at the scene would suggest the use of a semi-automatic weapon rather than a revolver that retains the empty shell casing inside the cylinder of the firearm.  *Id.* at 509.

The foregoing evidence, without more, indicates only that petitioner was in the area at the time a shot was heard the morning Cunningham was murdered.  Although Gordon and Pierson both testified regarding an argument Cunningham and petitioner had over a drug debt, their testimony related to the same argument and both stated that the men had resolved their dispute shortly thereafter.  While Pierson testified that he had seen a .25 caliber semi-automatic pistol in petitioner's car approximately one month before the murder, no bullet or shell casing was found and both the coroner and the forensic specialist had speculated that the murder weapon was a larger caliber gun.  The failure to find any shell casing suggests that a semi-automatic weapon was not used.  It was the testimony of Matthew Williams that provided the most incriminating evidence.

Williams was in prison on a parole violation at the time of the trial.  While in prison, he contacted Detective Forrester stating that he had information about

Cunningham's murder.  His testimony at trial was summarized by the Court of Appeals as follows:

> He testified that appellant stopped him about 1:00 p.m. on February 14 or 15, 1996, and followed Williams to a car wash to talk to him.  When Williams got into appellant's car, appellant and Phil, the owner of the car wash, were already in the car.  Phil was telling appellant that he wanted Cunningham dead for messing up something concerning drugs and money.  Phil was trying to describe Cunningham for appellant because appellant did not know him.  As they were talking, Cunningham came out of a nearby convenience store. Appellant got out of the car and started walking toward Cunningham and then returned to the car and said "Don't worry about it.  That nigger dead." Phil then gave appellant half an ounce of crack cocaine as a partial payment. Appellant never did talk to Williams about what appellant had said he wanted to talk to Williams about.
>
> Appellant called Williams again on February 21, 1996 about 10:00 or 10:30 a.m. asking for some drugs.  During the conversation, he said, "Ain't nobody got to worry about that one thing no more." When Williams inquired further what that meant, appellant said, "that nigger, Phil, he dead. *** I mean, not Phil." Williams arranged to meet appellant that evening to give him some drugs.  When Williams approached his house around the appointed time, he saw someone crouched down low beside the house.  Williams yelled at the person who then ran. Williams got in his car and chased the person.  He saw a car leaving the alley without its lights on and followed it. When he caught up with the car, he found out it was appellant.  Appellant said that Williams had scared him because he

22

thought Williams was the police. Williams never did give appellant any drugs. (as revised)[3]

Williams returned to prison on a parole violation four days later. Williams saw appellant again in prison. Williams questioned appellant about the rumors on the street that he killed Cunningham. Appellant stated that he would kill his mother for the right price. Appellant admitted that he was coming home one night and saw Cunningham. Appellant stopped Cunningham, made him put his hands in his pockets, and then shot him in the head. Williams testified that he first heard about Cunningham having his hands in his pockets from appellant; but, on cross-examination, admitted that it was general knowledge in the neighborhood. Appellant also admitted to Williams that he was hanging around Williams' house that evening in February intending to rob the man Williams was going to hook him up with to buy drugs. Appellant intended to shoot the man because appellant knew that the man was not the type to just give up anything. Appellant admitted that he was going to shoot Williams too. After hearing that, Williams called Detective Forrester to tell him that appellant had admitted to killing Cunningham.

Respondent's Exhibit V, p. 6-7.

This Court finds that the state court's determination that Williams' testimony "was not the 'linchpin of the State's case'" is unreasonable. Williams' testimony provided not only a motive but also an admission

---

[3]  This paragraph was revised in the state appellate court's Decision and Judgment Entry dated April 17, 2000. *See* Respondent's Exhibit X, pp. 2-3.

23

of guilt. The only other testimony connecting petitioner to
the murder was the fact that he knew Cunningham and that he
was in the area at the time a gunshot was heard the morning
of the murder. Having reviewed all of the testimony, the
Court finds that Williams' false testimony that he received
no promises or favorable treatment in exchange for his
testimony was not harmless beyond a reasonable doubt. It is
clear that Williams believed a letter to the Parole Board
was of great value to him as evidenced by his letter to the
prosecutor when he believed the prosecutor had failed to
send the letter. *See* Respondent's Exhibit J, attachment 1.
As the Supreme Court explained, "[t]he jury's estimate of
the truthfulness and reliability of a given witness may well
be determinative of guilt or innocence, and it is upon such
subtle factors as the possible interest of the witness in
testifying falsely that a defendant's life or liberty may
depend." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The
Court finds that Williams' false testimony "could reasonably
be taken to put the whole case in such a different light as
to undermine confidence in the verdict." *Kyles*, 514 U.S. at
435. Accordingly, the Court finds petitioner's claim well
taken and orders that a writ of habeas corpus conditionally
issue unless the State of Ohio grants petitioner a new trial
within ninety days.

THEREFORE, for the foregoing reasons, good cause
appearing, it is

ORDERED that the petition for writ of habeas
corpus be, and hereby is, CONDITIONALLY GRANTED; respondent
shall release petitioner from further custody unless
petitioner is granted a new trial within ninety (90) days

24

from the date of this order or, if appealed, from the date
on which this order becomes final.

s/ John W. Potter
Sr. United States District Judge