# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

————————————————

Vincent Doan,
      Petitioner

    vs                          Case No. 1:00cv727
                                    (Beckwith, J.; Hogan, M.J.)

James Haviland,[1]
      Respondent

————————————————

## REPORT AND RECOMMENDATION

————————————————

      Petitioner is a prisoner in state custody at the Southern Ohio Correctional Facility in Lucasville, Ohio.  Petitioner is represented by counsel, who has filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on petitioner's behalf.  This matter is before the Court on the petition, respondent's return of writ and submissions in response to this Court's Order of June 10, 2003, petitioner's "traverse" briefs, respondent's "Update Of Authorities," and the transcript of the challenged state criminal proceedings.  (*See* Docs. 1, 22, 50, 56, 57, 58).

## Factual And Procedural Background

      On June 4, 1997, petitioner was indicted by the Clinton County, Ohio, grand jury on one count of aggravated murder as defined in Ohio Rev. Code § 2903.01(A) with two specifications; one count of aggravated murder as defined in Ohio Rev. Code § 2903.01(B) with three specifications; and four counts of kidnapping as defined in Ohio Rev. Code § 2905.01.  (*See* Doc. 22, Ex. 1).  After a trial before a jury, petitioner was

———————————————————

[1] In the petition, petitioner properly named as respondent Harold Carter, who was then Warden of the Southern Ohio Correctional Facility (SOCF), where petitioner is incarcerated. However, since the time petitioner instituted this action, Harold Carter was replaced by James Haviland as SOCF's Warden.  Because James Haviland is the individual who currently has custody of petitioner, the caption of this case is hereby changed to reflect the proper party respondent.  *See* Rule 2, Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254.

found guilty of three kidnapping counts, aggravated murder as defined in Ohio Rev. Code § 2903.01(B) and one of the three attached specifications charging him with committing the aggravated murder while "committing or attempting to commit, or while fleeing immediately after committing or attempting to commit Kidnapping." (*See id.,* Ex. 2). On November 20, 1997, petitioner was sentenced to "life imprisonment without parole" for the aggravated murder offense and to a nine (9) year term of imprisonment for Kidnapping. (*See id.,* Ex. 3).

With the assistance of counsel, petitioner filed a direct appeal to the Ohio Court of Appeals, Twelfth Appellate District, raising among other claims, the following assignments of error:

**First Assignment Of Error:** Doan was deprived of his right to due process under the Fifth and Fourteenth Amendments when the trial court gave the jury an improper, misleading, and confusing instruction which lessened the State's burden of proof for a conviction.

**Second Assignment Of Error:** The trial court erred to the prejudice of Doan by admitting into evidence, over objection, hearsay testimony that Doan had physically abused or threatened [the victim,] Carrie Culberson.

**Third Assignment Of Error:** The trial court erred to the prejudice of Doan's constitutional rights to due process in admitting, over his objection, evidence of alleged prior acts involving physical abuse of Carrie Culberson.

**Fourth Assignment of Error:** Doan was denied his state and federal constitutional rights to due process and a fair trial when the trial court refused to allow defense counsel access to inconsistent witness statements pursuant to Crim. R. 16(B)(1)(g).

**Fifth Assignment of Error:** Media coverage of Carrie Culberson's disappearance and Doan's indictment for her murder so permeated the Clinton County region that the trial court's failure to change venue denied Doan his Fifth, Sixth, and Fourteenth Amendment rights to a fair and impartial trial.

**Sixth Assignment of Error:** Misconduct by the prosecutor denied Doan's rights as guaranteed by Article I, Section 10 of the Ohio Constitution and

2

the Fifth and Fourteenth Amendments to the United States Constitution.

\*\*\*\*

**Eighth Assignment of Error:**  Doan was deprived of his Sixth and Fourteenth Amendment rights to the effective assistance of counsel at trial.

\*\*\*\*

**Tenth Assignment of Error:**  Doan's convictions of aggravated (felony) murder in Count II and his convictions of kidnapping in Counts III, V, and VI are not supported by sufficient evidence.

**Eleventh Assignment of Error:** The Court of Appeals['] denial of Doan's . . . ability to review witness statements pursuant to Crim. R. 16(B)(1)(g), deprived Doan of his state and federal constitutional rights to due process, equal protection, the right to counsel and effective assistance of appellate counsel.

(*Id.*, Ex. 5).  On February 28, 2000, the Court of Appeals affirmed the trial court's judgment.  (*Id.,* Ex. 8).  In its Opinion, the court made findings of fact, which are presumed correct under 28 U.S.C. § 2254(e)(1),[2] regarding the incident that resulted in petitioner's conviction and sentence:

> The events leading to appellant's convictions occurred on August 28 and 29, 1996.  In the summer of 1996, Clarissa Ann Culberson aka Carrie Culberson was playing in a coed volleyball league in Morrow, Ohio.  The league played every Wednesday night including Wednesday, August 28, 1996. Jessica Williams and Tonya Whitten, friends of Culberson and members of the volleyball team, picked Culberson up at her house at 6:30 p.m.

---

[2]28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Petitioner has neither cited nor presented any evidence to rebut the Ohio court's factual findings quoted herein. Therefore, petitioner has not demonstrated by clear and convincing evidence that such findings are erroneous.

Culberson had at most five dollars that evening. They arrived at the bar where they were to play volleyball at approximately 7:30 p.m. Appellant, Culberson's boyfriend, then arrived in his black Mustang. Appellant and Culberson had a conversation in which Culberson kept shaking her head "no." Culberson told appellant that he could not go home with her because she needed to drive Whitten and Williams home because they were intoxicated. Culberson had planned to say this to avoid driving home with appellant. In response to Culberson's statement that she needed to drive, appellant told Williams "[y]ou don't need her to take you home, do you."

At approximately 11:15 p.m. on August 28, 1996, Williams, who was in her vehicle with Culberson, drove by appellant's house. Appellant's vehicle was there. Williams, at Culberson's request, drove by appellant's house a second time. At approximately 11:30 p.m., Culberson was dropped off at her home. A few minutes later, Kim Lannerd, a neighbor of the Culbersons, witnessed Culberson leaving in her red Honda CRX.

On August 29, 1996, at approximately 12:30 a.m. to 12:45 a.m., appellant was seen chasing Culberson in the front yard of Billie Jo Brown. Brown lived across the street from the Doan home. Her address was in the village of Blanchester, Clinton County, Ohio. Brown had seen appellant across the street that summer, but did not know him by name. Brown recalled seeing Culberson visit appellant "a couple times a week" and that Culberson drove a "little red car." At trial, Brown identified the red Honda CRX that Culberson had been driving.

Brown heard voices in the yard and looked out her bedroom window. Unable to see what was occurring, Brown then looked out her living room window. She could see Culberson's vehicle with the driver's door open. Brown next looked out the kitchen window and witnessed "[a] young woman and a gentleman in my yard and they had loud voices and she's running from him." Brown testified that Culberson was asking for help. At this time, Brown did not know Culberson's name, but at trial, she identified Culberson from a picture. Brown witnessed Culberson trip in Brown's front yard and appellant catch her, grab her by the arm, swing her around and punch her in the face. Brown testified that the man chasing Culberson stated "I told you the next time I'd kill you, you fucking bitch."

4

Brown witnessed Culberson struggling and screaming for help. She managed to get away temporarily and ran behind a car in Brown's driveway. Brown went to wake her husband. She heard squealing tires. The consistent evidence at trial was that appellant routinely "peeled out" when driving his black Mustang and would squeal his tires. When Brown returned, Culberson's vehicle, appellant and Culberson were gone. Appellant's black Mustang was parked in front of his house. Brown identified appellant as the man chasing Culberson in her yard.

Jeff Warren, a friend of appellant, lived in Marathon, Clermont County, Ohio. Warren testified that on August 29, 1996, at approximately 1:00 a.m., appellant was tapping at his bedroom window. Appellant told Warren he wanted to use the phone and Warren agreed. Appellant stated he "was out of gas." Appellant never asked Warren for gasoline or any help, except for the use of his phone.

Appellant next appeared at the home of his half-brother, Tracey Baker. Tracey Baker lived on Supinger Street in the village of Blanchester, Clinton County, Ohio. At the Baker home that evening were Tracey Baker; Lori Baker, who had divorced Tracey Baker, but was living with him; Vicki Watkins, Lori's twin sister; the Bakers' son and daughter; and Watkins' four children. Watkins was staying at the Baker home that evening. Watkins testified she "wasn't supposed to be there" because Tracey Baker did not allow Watkins to stay overnight. Watkins went to sleep at approximately 10:30 p.m. to 11:00 p.m. and planned to leave early for work the next morning.

Watkins was awakened at 3:15 a.m. when she heard a knock on the back door adjacent to the window in the bedroom in which she was sleeping. A light was "on the side of the [back] door." Watkins could see appellant outside. Watkins identified appellant's "grim reaper" tattoo located on his shoulder. Watkins could see appellant was wearing "light colored jeans," but no shirt. Appellant "looked dirty, grungy looking" with "messed up" hair.

Appellant knocked again and Lori Baker opened the door. Appellant asked if Tracey Baker, his half-brother, was home and Lori Baker replied that he was home. Appellant entered the Baker home and shut the door. Soon

after, Watkins heard appellant and Tracey Baker talking on the deck and appellant "giggle." About one-half hour later, at approximately 3:45 a.m., appellant and Tracey Baker left in Tracey Baker's truck.

Lori Baker recounted the same events as Watkins from her personal observations. When Lori Baker opened the back door for appellant, she testified that appellant was wearing only jeans and had blood on his chest, arm and [jeans]." Lori Baker described the blood as "smeared" and "covered on." Appellant had his head down and looked "distraught" and "real strange looking." Appellant asked for Tracey Baker. Lori Baker motioned to the bedroom.

Appellant entered the Bakers' bedroom. Lori Baker heard the shower running. Tracey Baker asked Lori Baker for garbage bags. The shower stopped running and appellant appeared looking "a lot better" and fully clothed. Appellant and Tracey Baker left with seven garbage bags and a gun.

Tracey Baker and appellant returned to the Baker home at approximately 6:00 a.m. Earlier in the morning, Lori Baker had taken Watkins to work and went back to bed. When Tracey Baker and appellant returned, Lori Baker got out of bed. Lori Baker gave Tracey Baker bleach and a scrub brush for appellant to use. Lori Baker washed Tracey Baker's clothes, but observed blood on them before washing them. Lori also observed Tracey wipe what appeared to be blood off his boots. Appellant took another shower. Appellant and Tracey sat on the couch for approximately ten to fifteen minutes looking "pale" and "real quiet."

Appellant left for work at approximately 6:20 a.m. Tracey Baker told Lori Baker that "the police would be coming," but not for the marijuana plants that Tracey Baker was growing at the Baker home. Nevertheless, Tracey Baker told Lori Baker to get rid of the marijuana plants.

At approximately 4:00 p.m., at the Baker home, appellant asked Lori Baker if he could borrow her car. The car had a full tank of gas and was messy. At approximately 6:00 p.m., Lori Baker went by Priscilla Doan's house [appellant's mother] to exchange vehicles with appellant. Lori Baker could see appellant's vehicle. A sheet was on the back seat and the seat was

"damp." Lori Baker could see "a smear of something and a hunk of something" adjacent to the door. Appellant did not return Lori Baker's vehicle until the next morning. Appellant told Lori Baker he had been looking for Culberson and had "passed out" from drinking. Lori Baker's vehicle had been cleaned, but smelled from alcohol. The gas tank was empty.

A few days later, on the Baker's deck, appellant was upset, pulled his shirt over his head and stated that "I can't imagine holding someone and – hurting someone and holding her till she died."

After appellant's arrest, he was incarcerated with Mitchell Epperson. Epperson and appellant were discussing "girls cheating on us." Appellant stated that "when they do that you can't let them get away with it, you can't let them walk on you, you got to make them pay." Appellant also told Epperson that "he would lay awake at night and think of a hundred different ways to kill her before he did it."

On Thursday, August 29, 1996, Tonya Whitten spoke to appellant about where Culberson "might have gone." Appellant told Tonya Whitten to ask "the little boys" Culberson "ran around with." Robert Shelton II testified that, at approximately 3:00 p.m. on August 29, 1996, appellant told him that he wanted car ramps to "cover something up."

Ben Lunsford, Jr., a Patrol Deputy with the Clermont County Sheriff's Department, went to the Baker property on about September 3, 1996 to assist the Blanchester Police Department in a search. Lunsford noticed a small pond on the property. Lunsford went back on September 4, 1996 with a search warrant. It was a hot, sunny day. Lunsford got dried dirt on his pants from the area adjacent to the pond. The day before, Lunsford had no dirt on his pants. The inference is that someone had been in the pond between Lunsford's two visits and the dirt adjacent to the pond had been disturbed. Brian Edwards of the Clinton County Sheriff's Office testified that the pond was drained the afternoon of September 4, 1996. Edwards observed "what appeared to be footprints that led into the pond from a path and then another set that was leading out of the pond."

The evidence at trial showed appellant had a violent and controlling

relationship with Culberson up to the night of the kidnapping and murder. Brian and Tonya Whitten own a fitness and tanning business in Blanchester. On Tuesday, August 27, 1996, Culberson was tanning when appellant arrived. Appellant was "edgy" and "aggravated." Appellant told Brian Whitten that he and Culberson had spent a day at the lake that weekend. Appellant told Brian Whitten that "I don't know why that fucking bitch was in there tanning. We spent all day at the lake and I'm red."

On the morning of Thursday, August 29, 1996, appellant called the Whitten's fitness and tanning business. Brian Whitten testified that appellant called often. Appellant would call, and if Culberson was not there, he would call again or stop by. This pattern was repeated numerous times. However, when Culberson was not there that day, appellant never called back or visited the Whittens' business ever again.

On Tuesday, August 27, 1996, Culberson told Tonya Whitten that on the prior Sunday appellant and Culberson had gone to lunch. On the way back, appellant pulled over and removed a gun from the trunk. Whitten testified that appellant held Culberson at gunpoint for four and one-half to five hours. Appellant told Culberson that "you think I'm a big joke, and I'll show you how big a joke I am, I'm not going to go to jail ***." The reference to jail was a pending charge in the Clinton County Municipal Court against appellant for an incident (detailed later) in which appellant hit Culberson over the head with a space heater. Later, on the phone, Whitten stated appellant told Culberson "he was going to kill her and her family."

Culberson told Tonya Whitten about an incident between her and appellant in July 1996. Culberson went to appellant's home to tell him she was going to "something like" a Tupperware party. Appellant told Culberson she was not going and began "throwing things in his room." Appellant then hit Culberson in the head with a space heater. Culberson was bleeding badly. Appellant then followed Culberson home. In Culberson's presence, appellant called Culberson's mother "a fat bitch."

Cicely Kukuk, Culberson's best friend, testified at the trial. In the winter of 1995, Culberson was living with Kukuk. Culberson received a phone call from another "gentleman caller" when appellant was present. Appellant apparently picked up the phone in the kitchen while Culberson was in the

bedroom.  After the conversation, appellant called Culberson a "fucking bitch."  Appellant pulled Culberson's hair, punched her in the eye and "drug her through the bedroom."  Appellant said he was going to look for the person who called.  Appellant told Kukuk if she called the police she "would be sorry."

In March 1995, outside of a bar, appellant punched Culberson in the side of her body.  In the spring of 1995, appellant "smashed [Culberson's] face into [a] steering wheel."  Appellant told Culberson that "[Culberson and Kukuk] were laughing at him and he didn't appreciate it."  In the summer of 1996, appellant scratched Culberson's face and bruised her neck by putting his hands on her neck and over her mouth and nose.

Georgia Falgner testified about an incident between appellant and Culberson on or about January 15, 1996.  Falgner was driving home f[rom] work and witnessed appellant kicking a vehicle.  Falgner noticed Culberson in the vehicle and that appellant had broken the driver's side window.  Appellant was holding Culberson by her hair.  Falgner asked Culberson if she needed help and Culberson told her to call the police.  Appellant screamed at Falgner to "get the fuck out of here or you're next."

Desiree Gruber owns a salon in Wilmington.  Culberson worked there from September 1995 until her last day of work on August 22, 1996.  Culberson was taking time off to study for an upcoming nursing exam.  After approximately two weeks, Culberson came into work with a black eye, which Culberson told Gruber was caused by appellant.  In April 1996, Culberson came to work with "her face grotesquely swollen, her eyes both swollen, but one was swollen almost shut, her lips were split, her nose was swollen, her whole face was various colors of black and blue."  Culberson also had bruises on her back.  Culberson told Gruber appellant caused all these injuries.

In May 1996, outside the salon, appellant "grabbed Carrie by her upper arms and he picked her up and slammed her against the trunk, and then he let go and he stepped back."  On or about August 17, 1996, after the previously described space heater incident, Gruber offered to hide Culberson somewhere out of town and offered her money to help her leave.  Culberson declined because she believed appellant would hurt her family.

Gruber also testified that appellant called Culberson at least twice daily at the salon when she worked.  Appellant called the salon before Culberson arrived for every shift, but never more than twenty-five minutes before her scheduled shift.  On Thursday, August 29, 1996, Culberson was scheduled to work from 2:00 until 6:00 p.m.  Appellant broke this pattern by calling at 11:30 a.m. and 12:00 p.m.  Gruber was "stunned."  Appellant never called the salon again.

Julie Long testified that appellant tried to suffocate Culberson on Thanksgiving in 1995.  In approximately April 1996, appellant and Culberson got in a fight.  Appellant "beat [Culberson's] head against the road [and] against telephone poles."

In appellant's defense, a series of witnesses were presented who purported to see Culberson after the murder was to have occurred.  Appellant argued at trial that Culberson may have left town.  Gabrielle Jones testified that she saw Culberson on August 29, 1996 between 11 and 11:30 a.m. in her vehicle with the car packed full of clothing.  Helen Hedrick, her sister, Nancy Jane Cecil, and Patricia Lille testified they picked up a hitchhiker on August 31, 1996.  They dropped her off at the Green Valley convenience store.  They later believed it was Culberson after seeing her picture on a television news program.  Catherine Hackney testified she conversed with appellant outside the store where she worked, "68 First Stop" in Williamsburg.  Tina Haight claimed to see someone she believed was Culberson at a gas station.  Haight testified she had taken a correspondence class in "private investigations."  Mary Louise Danbury testified that on September 5, 1996, while driving in Williamsburg, she saw a woman driving a red Honda CRX with four digits of the license plate being "R-O-L-4," but could not identify Culberson.  Danbury testified she had "low vision" in her left eye.

Tammie Brummett testified that she saw Culberson on September 6, 1996 on Mad River Road between Owensville and Hillsboro walking with a suitcase.  Brummett testified that Culberson had no marks on her face.  Charles Sharp testified that on September or October 10, 1996, he saw Culberson's license plate "ROL-402" on a rear plate.  He spent four hours searching Blanchester for the vehicle without success.  He testified that the female in the car had a "similar" face to Culberson, but different hair.  Amy

10

Rene Brewer testified that she might have seen Culberson in a vehicle on April 20, 1997. Patty K. Brewer, whose husband is a distant relative of the Bakers, thought she saw someone who looked like the picture of Culberson at her place of work.

Phyllis Lunsford, who owns a tire shop, testified that on May 16, 1997 a man drove to the shop with a red Honda CRX with Culberson's license plate number on the front plate. The man had a tire repaired and paid in cash. He did not take a receipt. She had heard the license plate number that morning on television.

Kenneth Lancaster of the Norwood Police Department testified that on May 16, 1997 at approximately 4:00 a.m., he witnessed a vehicle approaching him "from the opposite direction at a quick rate of speed." He ran license plate "R-O-L-4-0-2." Lancaster read the number off the front license plate. The evidence later showed Culberson never put the front license plate on her vehicle. The front license plate was recovered, in pristine condition, from the Culberson home. Lancaster testified at trial that his identification must have been mistaken.

Appellant also presented an alibi. Betty Baker, appellant's stepmother, testified that appellant called the Baker home at 1:00 a.m. on August 29, 1996. Betty Baker testified that at some point between 1:00 and 2:00 a.m., appellant was sleeping on the couch. Lawrence Baker, appellant's father, testified that appellant called from Jeff Warren's home at about 1:00 a.m. on August 29, 1996. Lawrence Baker testified that he saw appellant sleeping at approximately 1:30 a.m. to 2:00 a.m.

Culberson's body was never recovered. After August 28, 1996, all activity on Culberson's bank account, which was overdrawn, ceased. There was no credible evidence presented that Culberson planned to leave her home in Blanchester.

(*Id.,* pp. 1-14).

Petitioner's counsel sought leave to appeal to the Ohio Supreme Court, asserting in eight propositions of law essentially the same claims set forth above, *see supra* pp. 2-3, that were raised on direct appeal to the Ohio Court of Appeals. (*See id.*, Ex. 10). On

July 19, 2000, the Ohio Supreme Court denied petitioner leave to appeal and dismissed the appeal "as not involving any substantial constitutional question." (*Id.,* Ex. 12).

Both before and during the pendency of his direct appeal, petitioner also pursued other state remedies. On September 20, 1997, before the sentence was imposed, petitioner's counsel filed a motion for new trial, which was denied on October 31, 1997. (*Id.,* Exs. 13, 15). On December 3, 1997, after the imposition of sentence, petitioner's counsel filed a second motion for new trial regarding one remaining claim of jury misconduct during deliberations. (*Id.,* Ex. 16). Based on the parties' agreement, the motion was held in abeyance pending petitioner's "possible submission of a timely petition for post conviction relief and/or additional claims to the motion for new trial." (*Id.,* Ex. 17). On December 31, 1998, petitioner's counsel filed a third motion for new trial and petition for post-conviction relief with the Clinton County Common Pleas Court. (*Id.,* Exs. 18, 19). Thereafter, petitioner's counsel filed a corrected affidavit in support of the post-conviction petition on January 21, 1999, and an amended post-conviction petition on January 26, 1999. (*Id.,* Exs. 20-21).

In the new trial motion, petitioner renewed his claim of jury misconduct during deliberations and also alleged generally that the prosecutor failed to disclose material exculpatory evidence to the defense in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). (*Id.,* Ex. 18). In his amended post-conviction petition, petitioner alleged in the first eight grounds that the prosecution suppressed certain specified exculpatory and impeachment evidence material to the issue of petitioner's guilt, which individually and collectively amounted to a due process violation. (*Id.,* Ex. 21, pp. 6-25). Petitioner also asserted that his trial counsel's failure to investigate and raise the *Brady* issues at trial amounted to ineffective assistance; that he was denied a fair trial by the prosecutor's misconduct and trial court's error in allowing prejudicial, inadmissible hearsay and prior acts evidence; and that "new evidence" demonstrates petitioner's aggravated murder conviction is not supported by sufficient evidence. (*Id.,* pp. 25-31).

On August 29, 2001, the Clinton County Common Pleas court denied petitioner's post-conviction petition and new trial motion. (*See id.,* Ex. 29). In its decision, the court denied many of petitioner's claims in part because they could have been raised at trial or on direct appeal and thus were barred from review on res judicata grounds. (*See id.*). With the assistance of his counsel, petitioner appealed to the Ohio Court of Appeals, Twelfth Appellate District, which issued a decision affirming the trial court's judgment on June 28, 2002. (*Id.,* Ex. 35). It appears petitioner sought leave to appeal further to the Ohio Supreme Court. *See State v. Doan,* No. 2002-1389, 2002 WL 32576175 (Ohio

Aug. 9, 2002) (Memorandum in Support of Jurisdiction of Defendant-Appellant, Vincent Doan). Apparently, on October 30, 2002, the Ohio Supreme Court denied petitioner leave to appeal and refused to accept the appeal for review. *State v. Doan,* 777 N.E.2d 277 (Ohio 2002).

On August 31, 2000, while petitioner's state post-conviction petition was pending before the Clinton County Common Pleas Court for ruling, counsel who represented petitioner in the state direct appeal and post-conviction proceedings filed the instant habeas corpus petition on petitioner's behalf. He asserts thirteen grounds for relief:

**Ground One:** Petitioner was deprived of his right to due process and the right to a fair trial, under the Fifth and Fourteenth Amendments, when the trial court gave the jury an improper, misleading, and confusing instruction which lessened the State's burden of proof for a conviction. The trial court's errors are structural, not subject to harmless error analysis.

**Ground Two:** The State violated . . . petitioner's rights under the Due Process Clause of the Fourteenth Amendment and the right to counsel clause of the Sixth Amendment by suppressing favorable evidence material to the issue of his guilt.

**Ground Three:** Petitioner's convictions were obtained in violation of his federal constitutional rights because, considered collectively, the State suppressed material exculpatory evidence.

**Ground Four:** The government's failure to disclose material impeachment and exculpatory evidence rendered petitioner's counsel unable to provide effective assistance of counsel at his trial in violation of petitioner's rights under the Sixth and Fourteenth Amendments.

**Ground Five:** Petitioner was deprived of his federal constitutional rights to confrontation, cross-examination and a fair trial because the trial court allowed the State to admit unreliable hearsay statements which did not conform to the hearsay exceptions in the Rules of Evidence.

**Ground Six:** Petitioner was deprived of his Due Process Clause right to a fair trial because the trial court allowed the State to admit repeated testimony about alleged prior abusive acts by petitioner Doan against Carrie

13

Culberson.

**Ground Seven:**   Repeated misconduct of the prosecution throughout petitioner's trial deprived him of the right to a fundamentally fair trial guaranteed by the Due Process Clause of the Fourteenth Amendment.

**Ground Eight:** Petitioner was denied his Sixth and Fourteenth Amendment rights to confrontation, cross-examination, and due process when the state courts refused to allow trial or appellate counsel to view witness statements for inconsistencies prior to cross examination and on direct appeal.

**Ground Nine:**  Petitioner was deprived of his Fifth, Sixth, and Fourteenth Amendment rights to due process and a fair and impartial trial when media coverage so permeated the community that venue should have been changed since a fair and impartial jury could not be seated and the trial court's handling of voir dire only magnified the prejudice.

**Ground Ten:**   Misconduct by members of the jury denied petitioner his rights to due process under the Fourteenth Amendment and his right to a determination by a fair and impartial jury under the Sixth and Fourteenth Amendments.

**Ground Eleven:**  When there is insufficient evidence to show proper venue and no evidence to show that the alleged kidnapping was more than incidental to the charged crime of aggravated murder, petitioner's convictions for kidnapping and aggravated murder are not sufficiently proved in accordance with the Due Process Clause.

**Ground Twelve:** Petitioner Doan was deprived of his Sixth and Fourteenth Amendment rights to the effective assistance of counsel at trial.

**Ground Thirteen:**  Petitioner's convictions are invalid as a result of the cumulative effect of the constitutional errors set out in Grounds One through [Twelve.]

(Doc. 1, pp. 6, 8, 20, 21, 23, 24, 27, 28, 30, 31, 32, 34).

Respondent has not argued, nor does it appear, that this case triggers any statute

14

of limitations concerns. Because the state post-conviction remedy had not been fully exhausted prior to the filing of the instant action, this case did initially pose an exhaustion issue. Petitioner's counsel argued, however, that the exhaustion requirement should be excused on the ground that "the state trial court has unduly delayed its ruling on Petitioner Doan's postconviction claims." (Doc. 2, p. 5). Although it was recommended that the petition be dismissed without prejudice on exhaustion grounds (*see* Doc. 8), the district judge remanded the matter for consideration of the petition on the merits based on the "finding that Petitioner has constructively exhausted his state court remedies because of the state's unjustified, unreasonable delay in acting upon his post-conviction petition." (Doc. 15, p. 5). In any event, at this juncture, any exhaustion concerns have been rendered moot, because the post-conviction matter eventually proceeded through the state courts and concluded on October 30, 2002 when the Ohio Supreme Court issued its final Order in that case denying petitioner leave to appeal. (*See supra* p. 13).

In the return of writ, respondent has argued that some of petitioner's claims for relief, which were considered barred from review as res judicata in the state post-conviction proceedings, are subject to dismissal on waiver grounds. (Doc. 22, Brief, p. 18). "[I]n the interest of caution," respondent has also addressed the merits of each of petitioner's grounds for relief. (*See id.*).

## OPINION

### A. Petitioner Is Not Entitled To Relief Based On His Claim Alleged In Ground One That An Improper Jury Instruction Deprived Him Of A Fair Trial

In Ground One of the petition, petitioner alleges he was denied a fair trial when the jury was instructed about the requirements for making inferences in accordance with Ohio's standard civil jury instructions. Petitioner contends the giving of the civil instruction effectively reduced the State's higher, "beyond a reasonable doubt" burden of proof, which is required as a matter of due process for obtaining a criminal conviction. (Doc. 1, pp. 6-7). This claim, which was presented by petitioner on appeal to both the Ohio Court of Appeals and Ohio Supreme Court, is subject to review on the merits.

It appears from the record that the challenged instruction was given in response to defense counsel's request for the jury to be instructed that it was not permitted to draw one inference from another inference when presented with circumstantial as opposed to direct evidence. (*See* Vol. 16, Tr. 3157-58). The jury was first instructed as follows in

15

accordance with Ohio Jury Instruction (OJI) 5.10, which is applicable to civil cases:[3]

> To infer or to make an inference is to reach a reasonable conclusion of fact which you may but you are not required to make from other facts which you find have been established by direct evidence. Whether an inference is made rests entirely with you. You may infer a fact or facts or reach a reasonable conclusion about a fact or facts only from other facts or circumstances that have been proved by the greater weight of the evidence, but you may not infer a fact or facts, or make inferences - just a second - you may infer a fact or facts or reach a reasonable conclusion about a fact or facts only from other facts or circumstances that have been proved by a greater weight of the evidence, but you may not infer a fact or facts, or make inferences or reach a conclusion about a fact or facts from a speculative or remote basis that has not been established by a greater weight of the evidence.

(Vol. 17, Tr. 3330-31).

Defense counsel did not initially object to this instruction, except to point out in a sidebar conference that the jury instruction he had requested was not given as he "did not hear the [judge] say that [the jury] could not make one inference from another" inference. (*Id.,* Tr. 3354). After the prosecutor responded by asking the court "not to give any further instruction on this since it has already been done," the court overruled the objection. (*Id.*).

Later, on the third day of deliberations, the jury asked the trial court to reread its

---

[3]Petitioner contends that although defense counsel initially requested the instruction on inferences, it was the prosecution that brought the improper civil instruction to the trial court's attention. (*See* Doc. 1, p. 6). An attorney for the State did provide the cite to the civil instruction to the court as petitioner has alleged. (*See* Vol. 16, Tr. 3158-59). However, it appears from the record that the State's attorney may only have been trying to assist defense counsel, who appeared to be having difficulty locating his proposed instruction on inferences because he was unable to decipher the instruction cite reference given in a document or case that was then being perused by all those in attendance at the jury instruction conference. (*See id.*). Moreover, when defense counsel belatedly realized the problem with using the civil instruction and requested that a corrected instruction be given, he took full responsibility for proposing the wrong instruction and never suggested that the prosecution contributed in any way to the "mistake." (*See* Vol.17, Tr. 3376-79).

instructions regarding direct and circumstantial evidence. (*Id.,* Tr. 3374). In response to this request, the trial court re-instructed the jury about the requirements for drawing inferences as follows:

> To infer or to make an inference is to reach a reasonable conclusion of fact which you may but you are not required to make from other facts which you find have been established by direct evidence. Whether an inference is made rests entirely with you. You may not make an inference upon an inference. You may infer a fact, or facts, or reach a reasonable conclusion about a fact or facts only from other facts or circumstances that have been proved by the greater weight of the evidence, but you may not infer a fact, or facts, or make inferences, or reach a conclusion about a fact, or facts, from a speculative or remote basis that has not been established by the greater weight of the evidence.

(*Id.,* Tr. 3375).

Immediately after the jurors left the courtroom to continue their deliberations, defense counsel asserted objections to the use of the civil instruction and requested that a corrected instruction applicable to criminal cases be given to the jury or a mistrial declared. (*See id.,* Tr. 3376-85). The trial court overruled these requests. (*Id.,* Tr. 3380, 3383-84). In so ruling, the court reasoned: "I think the Jury is well aware since Day One of this trial that the burden of proof is beyond a reasonable doubt. . . . And I don't think any instruction I've given them has deviated from giving them an impression that there is any lesser burden of proof than beyond a reasonable doubt." (*Id.,* Tr. 3383).

Petitioner challenged the trial court's ruling on direct appeal. The Ohio Court of Appeals, which was the only state appellate court to issue a reasoned decision addressing the question, made findings of fact, which are presumed correct, *see supra* p. 3 n.2, and ruled in relevant part as follows:

> . . . .Before deliberations, the parties' counsel and the trial judge reviewed the state of Ohio's submitted jury instructions. In order to supplement the definition of circumstantial evidence in the jury instructions, counsel for appellant suggested a "cautionary instruction" about jurors drawing an inference upon an inference. The court agreed to the jury instruction. . . .

This jury instruction was from Ohio Jury Instructions 5.10 and is a civil jury

17

instruction. The instruction improperly included the "greater weight of the evidence" burden of proof and was given in error. See, generally, *In re Winship* (1970), 397 U.S. 358 . . . (in order to find a defendant guilty of a crime, every element of the crime must be proven beyond a reasonable doubt). During the third day of deliberation, the jury requested this particular instruction read back to them. The erroneous instruction was again read to the jury. Appellant's counsel, realizing the mistake, then objected to the instruction.

In determining whether the erroneous jury instruction[] was prejudicial, we look to the jury instructions as a whole. . . . The question is did the instructions, as a whole, correctly convey the concept of reasonable doubt to the jury. . . . If they did, the erroneous instruction can be considered harmless error.

We have reviewed the instructions given to the jury in their entirety. At the beginning of the jury instructions, the jury was told that "[t]he defendant must be acquitted unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense as charged in the indictment." In the next two paragraphs, "reasonable doubt" is properly defined for the jury and was not amplified in an unconstitutional manner. The erroneous "weight of the evidence" jury instruction follows. Later in the instructions, the venue instruction gives the beyond a reasonable doubt burden of proof. In completing the reading of the jury instructions, the trial court read the elements of the counts against appellant. The standard of proof, "beyond a reasonable doubt," was read an additional twenty-seven times.

Although the "greater weight of the evidence" jury instruction was in error, the correct standard of proof, beyond a reasonable doubt, was properly defined for the jury and that standard was repeated throughout the jury instructions. The beyond a reasonable doubt standard of proof was emphasized by both parties' counsel and the trial court during voir dire. We find the error did not prejudice the jury deliberations and therefore, appellant's constitutional right to a fair trial. . . .

(Doc. 22, Ex. 8, pp. 15-17) (citations to state cases omitted).

18

Under the applicable standard of review set forth in 28 U.S.C. § 2254(d), petitioner is not entitled to relief in this federal habeas corpus proceeding unless the state court's adjudication of his constitutional claim resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d); *see also Williams v. Taylor,* 529 U.S. 362, 402-03 (2000) (O'Connor, J., writing for majority on this issue); *Harris v. Stovall,* 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied,* 532 U.S. 947 (2001); *Harpster v. Ohio,* 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied,* 522 U.S. 1112 (1998). A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court under § 2254(d)(1) if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams,* 529 U.S. at 405-06 (O'Connor, J.); *Harris,* 212 F.3d at 942.

An "unreasonable application" of Supreme Court precedent occurs (1) if the state court identifies the correct legal standard but unreasonably applies it to the facts of the case, or (2) if the state court either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams,* 529 U.S. at 407-08 (O'Connor, J.). Under § 2254(d)(1)'s "unreasonable application" clause, a federal habeas corpus court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411 (O'Connor, J.); *see also McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000); *Harris,* 212 F.3d at 942. The reasonableness inquiry is an objective one; it does not involve a subjective inquiry into whether or not reasonable jurists would all agree that the state court's application was unreasonable. *Williams,* 529 U.S. at 409-10 (O'Connor, J.); *see also Washington v. Hofbauer,* 228 F.3d 689, 698 (6th Cir. 2000); *Harris,* 212 F.3d at 942-43. Moreover, the writ may issue only if the application is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee,* 229 F.3d at 510, 512 (citing *Williams,* 529 U.S. at 412).

It is well-settled under Supreme Court case-law that errors in jury instructions in a state criminal trial generally are not reviewable in a federal habeas corpus proceeding unless they deprived the petitioner of a fundamentally fair trial and due process of law.

*See Henderson v. Kibbe,* 431 U.S. 145, 154 (1977); *see also Estelle v. McGuire,* 502 U.S. 62, 72 (1991). Before a federal court may overturn a state conviction based on an error in the jury instructions, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146 (1973). Therefore, the question on federal habeas review of a state conviction is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle,* 502 U.S. at 72 (quoting *Cupp,* 414 U.S. at 147); *see also Henderson,* 431 U.S. at 154.

Here, petitioner essentially claims that the instruction on inferences, which was given on two occasions to the jury, amounted to a constitutional violation because it effectively deprived petitioner of his due process right to have the State prove its case beyond a reasonable doubt. (*See* Doc. 56, p. 12). Petitioner contends the instructional error amounted to a "structural defect" that is not subject to harmless error analysis. (*Id.,* p. 10).

The Due Process Clause requires the State to prove beyond a reasonable doubt every element necessary to constitute the charged offense. *In Re Winship,* 397 U.S. 358, 363-64 (1970); *see also Sullivan v. Louisiana,* 508 U.S. 275, 277-78 (1993). This "bedrock, 'axiomatic and elementary' [constitutional] principle," prohibits the State from utilizing jury instructions "that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Francis v. Franklin,* 471 U.S. 307, 313 (1985) (quoting *In re Winship,* 397 U.S. at 363). "The prohibition protects the 'fundamental value determination of our society,' given voice in Justice Harlan's concurrence in *Winship,* that 'it is far worse to convict an innocent man than to let a guilty man go free.'" *Id.* (quoting *In re Winship,* 397 U.S. at 372 (Harlan, J., concurring)). The Supreme Court has clearly established that in determining whether a constitutional violation has occurred, the reviewing court must not consider the challenged instruction "in artificial isolation," but rather in the context of the instructions as a whole and the trial record. *Cupp,* 414 U.S. at 146-47; *see also Victor v. Nebraska,* 511 U.S. 1, 5 (1994) ("[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, . . . the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.... Rather, *'taken as a whole,* the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.'" ) (emphasis added) (quoting *Holland v. United States,* 348 U.S. 121, 140 (1954)); *Estelle,* 502 U.S. at 72; *Binder v. Stegall,* 198 F.3d 177, 179 (6th Cir. 1999) ("The Due Clause requires only that the instruction not lead

the jury to convict on a lesser showing than 'reasonable doubt' and, *when taken as a whole,* adequately conveys the 'concept' of reasonable doubt.") (emphasis added), *cert. denied,* 530 U.S. 1247 (2000).  As the Supreme Court stated in *Francis,* 471 U.S. at 315:

> If a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense, the potentially offending words must be considered in the context of the charge as a whole. Other instructions might explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption.

The "reasonable juror" standard of review espoused above in *Francis* no longer is used in determining whether the instructions as a whole properly conveyed the State's "reasonable doubt" burden of proof.  *See O'Neal v. Morris,* 3 F.3d 143, 145 (6th Cir. 1993), *vacated on other grounds,* 513 U.S. 432 (1995), *aff'd on remand,* 64 F.3d 663 (table), No. 92-3763, 1995 WL 492945 (6th Cir. Aug. 16, 1995), *cert. denied,* 516 U.S. 1132 (1996); *see also Victor,* 511 U.S. at 6.  By the time of petitioner's trial and conviction in 1997, it was well-settled under Supreme Court case-law that the constitutional inquiry instead turns on "'whether there is a reasonable likelihood that the jury . . . applied the challenged instruction in a way' that violates the Constitution." *O'Neal,* 3 F.3d at 145 (quoting *Estelle,* 502 U.S. at 72 & n.4); *see also Victor,* 511 U.S. at 6 (holding in case involving challenge to "reasonable doubt" instruction that the "constitutional question . . . is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard").

If the reviewing court decides that the alleged instructional error violated due process, the inquiry does not end.  In the usual case, the habeas petitioner will not be entitled to relief unless the instructional error also had a "substantial and injurious effect or influence in determining the jury's verdict."  *See, e.g., Calderon v. Coleman,* 525 U.S. 141, 145-47 (1998); *O'Neal v. McAninch,* 513 U.S. 432, 435-36 (1995); *see also Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993) (applying ▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬.  Under this "harmless error" standard, if upon review of the entire record, the court is convinced that "the error did not influence the jury, or had but slight effect," the conviction must stand.  *O'Neal,* 513 U.S. at 436-38; *Kotteakos,* 328 U.S. at 764.  On the other hand, if the court "is left in grave doubt" and "cannot say, with fair assurance, after

21

pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," the court must find that the error had a substantial influence on the jury and the conviction cannot stand. *O'Neal,* 513 U.S. at 436-38; *Kotteakos,* 328 U.S. at 765.

Only in a "very limited class of cases," *Neder v. United States,* 527 U.S. 1, 8 (1999) (and cases cited therein), will a constitutional error be deemed a "structural defect" which affects "the framework within which the trial proceeds" and thus defies analysis by "harmless-error standards." *Sullivan,* 508 U.S. at 281 (quoting ═══ ═══════════════). The existence of structural defects results in the automatic reversal of a conviction because they infect the entire trial process. *Brecht,* 507 U.S. at 629-30; *see also Sullivan,* 508 U.S. at 281-82. In *Sullivan,* the Supreme Court held that the "[d]enial of the right to a jury verdict of guilt beyond a reasonable doubt is certainly [a structural defect], the jury guarantee being a 'basic protectio[n]' whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function." *Sullivan,* 508 U.S. at 281 (quoting *Rose v. Clark,* 478 U.S. 570, 577 (1986)). In that case, the Court concluded the constitutionally defective "beyond-a-reasonable-doubt" instruction at issue qualified as a structural error requiring automatic reversal of the petitioner's conviction, because the "error consist[ed] of a misdescription of the burden of proof, which vitiate[d] *all* the jury's findings." *Id.* (emphasis in original). The Court explained that in light of the gravity of the instructional error, "the essential connection to a 'beyond a reasonable doubt' factual finding" could not be made by the jury, and therefore the reviewing court could "only engage in pure speculation–its view of what a reasonable jury would have done. And when it does that, 'the wrong entity judge[s] the defendant guilty.'" *Id.* (quoting *Rose,* 478 U.S. at 578). To date, the Supreme Court has refused to extend the *Sullivan* "structural defect" holding beyond "the extraordinary gravity of the error at issue in that case," *Herrington v. Edwards,* 178 F.3d 1294 (table), No. 97-3542, 1999 WL 98587, at **7 (6th Cir. Jan. 26, 1999), *cert. denied,* 527 U.S. 1049 (1999), to cover less egregious jury instruction errors that do not rise to the level of "vitiat[ing] *all* the jury's findings." *See, e.g., Mitchell v. Esparza,* 540 U.S. 12, 16-17 (2003); *Neder,* 527 U.S. at 10-15 (involving failure to instruct on an element of the crime charged).

Here, contrary to petitioner's contention, the instructional error alleged by petitioner does not qualify as a "structural defect" and, therefore, is subject to harmless error review. In contrast to *Sullivan,* petitioner does not challenge the instructions that were given defining the State's "beyond a reasonable doubt" burden of proof, or the numerous instructions that followed clearly stating with respect to each charged offense

that the State was required to prove beyond a reasonable doubt every element of the offense before petitioner could be found guilty on that count. (*See* Vol. 17, Tr. 3329-30, 3336, 3338, 3339, 3343-51). Rather, he challenges only the instructions addressing "circumstantial evidence," specifically as they pertained to when the jurors were permitted to make reasonable inferences from facts established by direct evidence. (*See id.,* Tr. 3330-31, 3375). These instructions, allowing but not requiring the jurors to infer facts from other facts proved by the State under the less burdensome, "greater weight of the evidence" standard, arguably created an ambiguity about the State's burden of proof. However, when viewed in the context of the instructions as a whole, they did not rise to the level of a "misdescription of the burden of proof, which vitiate[d] *all* the jury's findings." *Sullivan,* 508 U.S. at 281.

In addressing the issue on direct appeal, the Ohio Court of Appeals properly followed Supreme Court precedent when it considered the challenged jury instruction, found to have been made "in error," in the context of "the jury instructions as a whole." *See supra* pp. 18, 20-21. The state appellate court also correctly understood its analysis entailed consideration of the question whether "the instructions, as a whole, correctly convey[ed] the concept of reasonable doubt to the jury." *See supra* pp. 18, 21. It appears, however, that the state court did not engage in the two stages of inquiry clearly established by Supreme Court case-law, *see supra* pp. 21-22, by (1) first determining whether the instructional error violated due process based on the "reasonable likelihood" that the error caused the jury to convict on a lesser showing than proof beyond a reasonable doubt; and (2) if so, only then proceeding to the second "harmless error" inquiry as to whether or not the constitutional violation had a substantial and injurious effect in determining the jury's verdict. *Cf. Calderon,* 525 U.S. at 145-47. Instead, the state court appears to have collapsed the separate due process and "harmless error" analyses into one standard of review when it concluded that the erroneous instruction did not prejudice the jury deliberations, and thus constituted mere "harmless error," essentially because the instructions as a whole correctly conveyed the concept of reasonable doubt to the jury. *See supra* pp. 18-19.

Although the Ohio Court of Appeals did not engage in the two-stage inquiry clearly established by Supreme Court case-law, this Court nevertheless concludes that the state court's decision neither is "contrary to" nor involves an unreasonable application of such precedents. First, the court did not arrive at a conclusion opposite to that reached by the Supreme Court on a question of law; nor did it decide the case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams,* 529 U.S. at 405-06 (O'Connor, J.). Indeed, there is no Supreme Court case directly on point to the

case at hand. The most analogous Supreme Court cases are those involving ambiguous or potentially misleading instructions regarding the State's burden of proof, which as the state appellate court recognized, will be upheld as constitutional as long as the instructions, taken as a whole, correctly conveyed the concept of reasonable doubt to the jury. *See supra* pp. 18, 21, 23; *see also Victor,* 511 U.S. at 5-6; *accord Rogers v. Howes,* 64 Fed.Appx. 450, 455-56 (6th Cir. Apr. 30, 2003), *cert. denied,* 540 U.S. 896 (2003). In answering this question, the state court engaged in a "harmless error" analysis and did not specifically consider whether or not it was reasonably likely that the jury understood the instructions to allow conviction based on a lesser burden of proof than "beyond a reasonable doubt." However, by the same token, the state court ultimately concluded in accordance with the standards set forth in these analogous Supreme Court cases that the erroneous reference to the civil "greater weight of the evidence" standard in the instructions on inferences did not mislead the jury because the instructions, when viewed as a whole, correctly conveyed the concept of reasonable doubt to the jury. In any event, such a conclusion comports with the well-established "harmless error" standard discussed above, *see supra* pp. 21-22, because in so holding, the state court essentially determined that the instructional error did not have a "substantial and injurious effect or influence" on the jury's verdict.

In addition, the Ohio Court of Appeals' adjudication of the jury instruction issue does not involve an unreasonable application of the applicable Supreme Court precedents discussed above, *see supra* pp. 20-22, and is based on a reasonable determination of the facts in light of the record evidence. As the state court found, the jury was instructed from the very beginning that petitioner was "presumed innocent until his guilt is established beyond a reasonable doubt" and "must be acquitted unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense as charged in the indictment." (Vol. 17, Tr. 3329). The court went on to properly define the "reasonable doubt" standard and the degree of proof required to meet that standard. (*Id.,* Tr. 3329-30). When instructing the jury further about the elements of each charged offense, as well as each specification, the court repeatedly and consistently stated that the State was required to prove every element of the offense or specification beyond a reasonable doubt before petitioner could be found guilty of the charge. (*See id.,* Tr. 3336, 3338-39, 3343-47, 3349-51). In concluding its instructions on the specific charges, the court reiterated:

> If you find that the State failed to prove beyond a reasonable doubt any one
> or more of the essential elements of any one or more of the offenses charged
> in the separate counts of the indictment or the specifications your verdict

must be Not Guilty as to such offense or offenses according to your findings.

If you find that the State proved beyond a reasonable doubt each of the essential elements of any one or more of the offenses charged in the separate counts in the indictment, or the specifications, your verdict must be Guilty as to such offense or offenses according to your findings.  The charges set forth in each count in the indictment and each specification constitutes separate and distinct matters.   You must consider each count and specification separately, and you must state your finding as to each count and specification uninfluenced by your verdict as to any other count or specification.

(*Id.,* Tr. 3351).

The reasonable doubt burden of proof was the only standard that was defined and set out for the jury to apply in determining whether or not the State had proven the essential elements of each offense and specification charged against petitioner. Unfortunately, the instructions on inferences improperly referred to the civil "greater weight of the evidence" standard, which created a potential for juror confusion. However, in contrast to the instructions on reasonable doubt, the court did not provide any explanation to the jury as to what the phrase "greater weight of the evidence" means and, specifically, whether and how it differs from the "reasonable doubt" standard.  In light of the instructions that were repeatedly and consistently given requiring the State to prove the charged offenses beyond a reasonable doubt under a standard that was correctly and expressly defined by the court, and in the absence of any instruction defining or otherwise explaining the "greater weight of the evidence" standard, it is reasonably likely that the jury did not interpret the passing references to the civil standard as permitting a finding of guilt based on a lesser showing by the State than proof "beyond a reasonable doubt."

In any event, even assuming the jury could have interpreted "greater weight of the evidence" as setting forth a different, less stringent burden of proof for the State to meet, it was reasonable for the Ohio Court of Appeals to conclude that the few vague references to the civil standard in an instruction merely permitting the jury within its discretion to draw inferences from facts established by direct evidence amounted to "harmless error" only.  As the state appellate court understood,  given the numerous jury instructions and statements by defense counsel,  the prosecutor and the court throughout the trial

25

proceedings explicitly and consistently conveying to the jury in mandatory terms that the State *must* prove every essential element of the charged offenses beyond a reasonable doubt before petitioner could be found guilty, it is highly doubtful the fleeting references in the permissive inference instructions to facts established by the "greater weight of the evidence" had a prejudicial effect on the jury's deliberations. *Cf. Smith v. Pliler,* 278 F.Supp.2d 1060, 1076-78 (N.D. Cal. 2003) (instruction under California law allowing the jury to infer that the defendant had a disposition to commit the charged domestic violence offense based on proof established by a preponderance of the evidence that he committed a prior act of domestic violence did not relieve the State of its reasonable doubt burden of proof in light of the "numerous times the jury was instructed and told that petitioner could be convicted of the charged offenses only if it found him guilty beyond a reasonable doubt"); *Griffey v. Hubbard,* No. C 01-3483 FMS, 2004 WL 941234, at *6-7 (N.D. Cal. Apr. 29, 2004) (unpublished) (instruction under California law allowing permissive inference by the jury that the defendant was likely to commit the charged sexual offense based on proof established by a preponderance of the evidence that he committed a prior sexual offense did not violate due process, because the "other instructions and the remainder of the record clarified the potentially misleading instructions and cured any unconstitutional ambiguity;" in particular, the district court found that the state court's mandatory instruction properly requiring the state to prove the defendant's guilt beyond a reasonable doubt trumped the discretionary instruction permitting but not requiring an inference that defendant had a disposition to commit sexual offenses); *Schroeder v. Lewis,* No. C 01-3722MMC(PR), 2003 WL 22768415, at *6-8 (N.D. Cal. Nov. 20, 2003) (unpublished) (similarly upholding the constitutionality of an instruction under California law allowing permissive inference of defendant's disposition to commit the charged sexual offense from proof established by a preponderance of the evidence of his commission of a prior sexual offense); *Sterling v. Roe,* No. C 01-03809 WHA, 2002 WL 826807, at *11-17 (N.D. Cal. Apr. 21, 2002) (unpublished) (instruction under California law allowing permissive inference of defendant's disposition to commit charged domestic violence offense from proof established by a preponderance of the evidence that he had committed a prior offense involving domestic violence did not violate due process, because "there was no reasonable likelihood that [the] jury construed [the instruction] as allowing them to short-circuit the other, proper instructions going to consideration of all the evidence and the government's burden of proof"), *aff'd on other grounds,* 60 Fed.Appx. 54 (9th Cir. Feb. 26, 2003), *cert. denied,* 540 U.S. 877 (2003).

Accordingly, in sum, the Court concludes that contrary to petitioner's contention, his claim of constitutional error in the jury instructions is subject to "harmless error"

review, like the one conducted by the Ohio Court of Appeals in this case. Moreover, although the Ohio Court of Appeals may have confused the separate "due process" and "harmless error" stages of inquiry clearly established by the Supreme Court in the applicable precedents discussed above, *see supra* pp. 21-22, by collapsing them into one standard of review, the state court's adjudication of petitioner's due process claim nevertheless neither is contrary to nor involves an unreasonable application of such precedents. Therefore, petitioner is not entitled to habeas corpus relief based on his claim alleged in Ground One that he was denied a fair trial when the trial court improperly referred to the civil burden of proof in its instructions to the jury about the requirements for making inferences.

**B. Petitioner Is Not Entitled To Relief Based On His Claims Alleged In Grounds Two Through Four That The State Suppressed Evidence In Violation Of His Rights To Due Process And Effective Assistance Of Counsel**

In Ground Two of the petition, petitioner alleges that the State violated his Fourteenth Amendment right to due process and Sixth Amendment right to counsel by suppressing the following "favorable evidence material to the issue of his guilt": (1) evidence that would have impeached State witness Billie Jo Brown, who testified at trial that she saw petitioner hitting the victim at 12:30 a.m. in her front yard on the night the victim disappeared; (2) evidence of "prior inconsistent statements" by State witness Lori Baker, who testified at trial that petitioner came to her home around 3:15 a.m. on the night the victim disappeared "with blood smeared on his body;" (3) evidence that a prosecutor promised State witnesses Lori Baker and Vicki Watkins that they would not be prosecuted if they gave investigators incriminating information about petitioner's involvement in the alleged crimes; (4) evidence that the victim told a friend she wanted to leave town and start a new life somewhere else; (5) evidence "contradicting key aspects of the testimony of [State] witnesses Lori Baker and Vicki Watkins;" (6) evidence that would have impeached State witness Brian Edwards, a police detective employed by the Clinton County Sheriff's Office, who testified at trial that he suspected the victim's body was initially concealed in a pond at a junkyard owned by petitioner's father; (7) evidence that State witness Vicki Watkins was given a "voice stress analyzer" test during the police investigation and had been hypnotized "to refresh her recollection of a conversation she claimed to have overheard between Petitioner and his brother ... in the early morning hours of August 29, 1996;" and (8) evidence that the prosecution made certain promises to jailhouse informant Mitchell Epperson in exchange for his testimony against petitioner. (Doc. 1, pp. 8-19). In Ground Three, petitioner contends that, when "considered collectively," these alleged violations amount to error of constitutional

27

magnitude. (*Id.*, p. 20). He claims further in Ground Four that he was denied his Sixth Amendment right to effective assistance of counsel because the State's "suppression of material exculpatory evidence interfered with defense counsel's ability to make independent decisions about how to conduct Petitioner's defense and denied Petitioner the right to subject the prosecution's case to meaningful adversarial testing;" alternatively, petitioner argues that to the extent "any of the . . . exculpatory and impeachment evidence discussed in the Second Ground for Relief could have been discovered by defense counsel or was discovered by defense counsel, then defense counsel's performance was unreasonably deficient and prejudicial to Petitioner for failure to investigate and present such evidence to the jury." (*Id.,* pp. 20-21).

As an initial matter, petitioner presented the claims alleged in Grounds Two through Four to the state courts for the first time in his petition for post-conviction relief filed with the Clinton County Common Pleas Court on December 31, 1998. (*See* Doc. 22, Ex. 19). In ruling on the eight allegations of error asserted in Ground Two, the Common Pleas Court found that five of the claims could have been raised on direct appeal and, therefore, were barred from review under the state res judicata doctrine. (*See id.,* Ex. 29, First, Second, Fifth, Sixth and Eighth Claims). The Ohio Court of Appeals agreed that some of these claims were barred by res judicata. (*Id.,* Ex. 35, pp. 7-8, 12). Respondent contends that petitioner has waived such claims due to his procedural default in failing to raise them on direct appeal, which was relied on by the state courts as an "adequate and independent state ground" for denying relief. (*See id.*, Brief, p. 18). Respondent's argument may have merit. However, because the state courts also alternatively addressed petitioner's claims on the merits and because petitioner has asserted an "actual innocence" argument in response to respondent's waiver defense that entails consideration of the underlying merits of such claims, the Court will assume without deciding that petitioner has not waived any of the allegations of error asserted in Ground Two and will proceed to address Grounds Two through Four on the merits.

As the last state court to issue a reasoned decision addressing the numerous claims alleged in Grounds Two through Four, the Ohio Court of Appeals made the following findings of fact, which are presumed correct, *see supra* p. 3 n.2, and ruled in relevant part as follows:[4]

_____

[4]Petitioner contends in a "traverse" brief that "any findings of fact or conclusions of law by the state [courts] denying [his] post conviction and new trial motions are irrelevant and are not entitled to a presumption of correctness," because it was previously determined in this case that petitioner had "constructively exhausted his state post conviction and motion for new trial

. . . .Doan's first nine claims for relief are based on alleged *Brady* violations.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland* (1963), 373 U.S. 83, 87. . . . "The evidence is material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley* (1985), 473 U.S. 667, 682. . . . Both exculpatory and impeachment evidence fall within the *Brady* rule. *Bagley,* 473 U.S. at 676, . . . citing *Giglio v. United States* (1972), 405 U.S. 150, 154. . . .

Doan's first ground for relief alleges that the state suppressed evidence that would have aided him in impeaching Billie Jo[] Brown's testimony. This evidence includes: (1) the affidavit of former Blanchester Police Officer W. Daniel Nichols, Jr., in which Nichols averred that Brown could not "positively identify" Doan when presented with a photo array that included his picture; (2) Brown's September 1, 1996 statement to Nichols, wherein Brown stated the man she saw fighting with Culberson was of medium build, and was wearing a ball hat, a T-shirt and jeans, which, Doan asserts, conflicts with Brown's trial testimony that the man fighting with Culberson was wearing a muscle shirt and shorts; and (3) Nichols' affidavit testimony in which he stated that he met Brown "at some point" after she had given him her statement, and Brown told him that the prosecution told her not to talk with anyone about the case. Doan argues that there is a reasonable probability that disclosure of this evidence would have led to a different outcome in his trial. We disagree with this argument.

---

remedies due to the delay by the state courts in considering [his] pleadings." (Doc. 56, pp. 5-6). The Court rejects petitioner's position, which has not been supported by any citations to cases or other authorities. Since April 2002, when the Court determined that petitioner had "constructively exhausted" his state court remedies, the state trial and appellate courts issued decisions which resulted in the final adjudication of the claims alleged by petitioner in his post-conviction petition and new trial motions. The Court is not persuaded that it should abandon the comity considerations underlying the statutory standards set forth in 28 U.S.C. § 2254(d) and (e)(1) of according deference to state court decisions and subject petitioner's claims, which ultimately were addressed by the state courts in this case, to de novo review.

First, Brown's trial testimony showed that she was capable of identifying Doan at the time she saw him punch Culberson in the face in Brown's front yard, at approximately 12:30 a.m., on August 29, 1996. Brown lived across the street from Doan, and she saw him every day during the summer of 1996. On one occasion, Brown even admonished Doan to slow down when he was backing his automobile out of his driveway because children were playing in the street. Brown saw Culberson drive up to Doan's house at least a couple of times a week during the summer, and she and Culberson would wave to one another. When Doan punched Culberson in the face, Brown could see both of them clearly because there was a full moon that night, and there is a street light in Brown's front yard. The only matter of significance that Brown did not know about Doan and Culberson to enable her to identify them was their names.

Second, . . . any inconsistencies between Brown's September 1, 1996 statement concerning what Doan was wearing on the night of Culberson's disappearance and her trial testimony on that subject, were minor. And Doan fails to point out that Brown qualified her trial testimony regarding what Doan was wearing by stating, "Shorts and a muscle shirt, *I think.*" (Emphasis added.) Given the evidence showing that Brown was able to recognize Doan by sight, any minor inconsistency between her trial testimony and her previous statement would have had little, if any, impact on the jury's decision.

Third, the issue of whether the prosecution told Brown or any of its witnesses not to talk to Doan or his investigators was raised prior to Doan's trial. The trial court held a hearing on the matter, at which Brown and other witnesses testified. Brown testified that the prosecution told her that she could speak with Doan and his investigators if she wanted to, but did not have to speak with them if she did not. The trial court found that the prosecution told all witnesses it was their decision whether to talk to Doan's investigators. . . .

In his second ground for relief, Doan alleges the prosecution failed to disclose Lori Baker's "self-contradictory and inconsistent statements" made prior to her trial testimony on the subject of whether she saw any blood on Doan when he came to her door at 3:15 a.m., on August 29, 1996. Doan argues Lori's trial testimony that Doan was "covered in blood" was in

contradiction with statements she had made earlier to the prosecutor in two interviews in November 1996. In those interviews, Lori told the prosecutor she did not see blood on Doan when he came to her house on the night of Culberson's disappearance. Doan also asserts the state was obligated to disclose Detective Brian Edward's investigative report, which states Lori denied that Doan had been to her house on the night of Culberson's disappearance.

Assuming arguendo that the state was obligated to provide Doan with Edward's investigative report, we conclude that if that report, and the other evidence which Doan cites in support of this claim for relief, had been disclosed to the defense, there is no reasonable probability that the outcome of Doan's trial would have been different. The jury was made aware that Lori initially told the police and prosecutor that she did not see any blood on Doan when he came to her house in the early morning hours of August 29, 1996. At trial, Lori admitted lying to Edwards and the prosecutor on the subject. The jury could not have been surprised to learn that Lori was conflicted about telling law enforcement officials that Doan was "covered in blood" when he arrived at her house on the night of Culberson's disappearance. Doan was Lori's brother-in-law, and she and Doan had an affair. Because the jury was aware that Lori had initially lied about whether Doan was covered in blood, it could not have been surprised to learn that she had lied about it more than once. . . .

Doan's third ground for relief alleges that the prosecution suppressed evidence of a "promise, deal or bargain" it reached with Lori Baker. Citing memoranda written by Detective Brian Edwards, Doan asserts that when law enforcement officials told Lori she would not be prosecuted if she did not lie to them, they were implicitly threatening to prosecute her if she did not give them information they could use to prosecute him.

Initially, the evidence does not support Doan's assertion of an implicit threat of prosecution. Furthermore, the issue of whether Lori or Vicki were promised anything in return for their testimony was raised at Doan's trial; both of them denied that they had been. Additionally, even if the evidence cited by Doan in support of this ground for relief was not disclosed to the defense, there is no reasonable probability that its disclosure would have led to a different outcome in Doan's trial. The jury was aware that Lori had

31

initially lied to the prosecutor and police, and then changed her story. The jury chose to believe her anyway. There is no reasonable probability that the evidence cited by Doan would have changed their minds. . . .

In his fourth ground for relief, Doan alleges the state failed to disclose a witness statement from Mandy Bogan, one of Culberson's customers at the nail salon where she worked. Bogan stated she heard Culberson say she (Culberson) ought to "just leave everything behind and start over." Bogan also told police that Culberson had told her that she knew someone, possibly named "Frisch," who had rental properties out of town, which Culberson talked about renting. Doan alleged that this statement supports his theory that Culberson was not murdered, but simply decided to leave town.

We conclude there is no reasonable probability that if Bogan's statement had been disclosed to the defense, the result of Doan's trial would have been different. Among other things, the defense presented a number of witnesses who testified to having seen Culberson or her car after the time she was murdered, in support of their theory that Culberson had not been murdered, but, instead, had simply decided to leave town. Bogan's testimony would have been merely cumulative to that evidence. . . .

In his fifth ground for relief, Doan alleges the state failed to disclose the statements of Christa Lynn Pendleton and Karrie Donovan. Pendleton stated that while driving to work on Glady Road in Clermont County at 3:12 a.m., on August 29, 1996, she saw a man and a woman walking along the roadside and had to swerve to miss them. Doan alleges that Pendleton's description of the woman "closely matches" Culberson's, while Pendleton's description of the man "generally fits" his own. Donovan stated she saw a man and woman at a junkyard between 1:00 a.m. and 3:00 a.m., on August 30, 1996. Doan contends Donovan's description of the woman matches Culberson's, while her description of the man could be anyone. Doan contends that if the state had disclosed this evidence, it would have made a different outcome reasonably probable. We disagree with this argument.

****

. . . [T]here is no reasonable probability that the outcome of Doan's trial would have been different if this information had been disclosed to the

defense because Pendleton's and Donovan's descriptions of the man and woman they saw were nonspecific and general in nature.

In his sixth ground for relief, Doan asserts the state failed to disclose evidence of past disciplinary actions taken against Detective Edwards for lying to his supervisor and abusing sick time; Doan argues this evidence could have been used to impeach Edwards. . . .

. . .[T]here is no reasonable probability that disclosure of this information would have led to a different outcome in Doan's trial. Among other things, the incident in Edwards' career to which Doan refers occurred approximately ten years prior to the time of Doan's trial. . . .

In his seventh ground for relief, Doan argues the state failed to disclose that Vicki Watkins had been hypnotized prior to trial, to refresh or enhance her recollection. However, this court has already found that Vicki's statements under hypnosis were not significantly different from her pre-hypnosis statements. *State v. Baker,* Clinton App. No. CA2000-08-018, 2001-Ohio-8700. Therefore, there is no reasonable probability that disclosure of this evidence would have led to a different outcome in Doan's trial.

Doan further argues in this claim for relief that the prosecution failed to disclose that it administered voice stress tests to all of its witnesses. But the disclosure of this evidence would not have created a reasonable probability of a different outcome at his trial. The results of lie detector tests are not admissible unless both parties stipulate to their admissibility. . . . To the extent Doan would argue that the results of the voice stress tests could have led to the discovery of admissible evidence that would have assisted his defense, the Ohio Supreme Court has rejected that argument as being too speculative. . . .

In his eighth ground for relief, Doan alleges the state failed to disclose evidence that could have been used to impeach Mitchell Epperson. In support of this allegation, Doan presented the affidavit testimony of Epperson, himself, who stated that an investigator from the prosecutor's office "promised" him that he would be paid $10,000 from a reward fund established on Culberson's behalf if he testified against Doan and Doan was convicted. Doan also alleges that the prosecutor failed to disclose that

Epperson was released two months early from his sentence for violating probation, due to his cooperation in the prosecution of Doan.

On Doan's direct appeal, this court found that Doan's "near-confession" to Epperson was "devastating proof" of Doan's guilt. . . .  However, we also found that testimony from several other witnesses constituted devastating proof of Doan's guilt, including the testimony of Lori Baker, Vicki Watkins, and Billie Jo[] Brown, as did Doan's "near confession" on the deck of the Baker home, shortly after Culberson was found missing, in which Doan pulled his shirt over his head and stated, "I can't imagine *** hurting someone and holding her till she died." . . . Thus, even if the evidence Doan cites had been disclosed to the defense, there is no reasonable probability that the outcome of Doan's trial would have been different. . . .

(*Id.,* Ex. 35, pp. 5-15) (state case citations omitted).

The Ohio Court of Appeals went on to conclusorily reject petitioner's claim that his eight grounds for relief under *Brady*, "when considered collectively, creates a reasonable probability that the outcome of his trial would have been different."  (*Id.,* p. 15).  The court further concluded that petitioner could not prevail on his ineffective assistance of counsel claim stemming from the alleged *Brady* violations; the court reasoned that under the applicable standard of review enunciated in *Strickland v. Washington,* 466 U.S. 686 (1984), petitioner was unable to show he was "prejudiced by the state's failure to disclose the evidence discussed in his first eight grounds for relief or by his counsel's failure to obtain that evidence, because there is no reasonable probability that disclosure of the evidence would have led to a different outcome in Doan's trial."  (*Id.,* pp. 15-16).

Under the applicable standard of review discussed above, *see supra* pp. 19-20, set forth in 28 U.S.C. § 2254(d), this Court concludes that the Ohio Court of Appeals' adjudication of petitioner's *Brady* claims alleged in Grounds Two and Three, as well as its adjudication of petitioner's ineffective assistance of counsel claim alleged in Ground Four, neither is contrary to nor involves an unreasonable application of clearly established federal law as determined by the Supreme Court and is based on a reasonable determination of the facts in light of the record evidence.

With respect to the claims alleged in Grounds Two and Three, the state court correctly identified and applied the proper standard of review clearly established by the

34

Supreme Court in *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny. The Supreme Court determined in *Brady* that the prosecution is required under the Fourteenth Amendment's Due Process Clause to disclose evidence in its possession that is both favorable to the accused and material to guilt or punishment. *Brady,* 373 U.S. at 87; *see also United States v. Bagley,* 473 U.S. 667, 674 (1985). *Brady* did not create a broad constitutional right of discovery in a criminal case, but rather is premised on "the avoidance of an unfair trial to the accused," *Brady,* 373 U.S. at 87. *Bagley,* 473 U.S. at 675 & n.6-7. Therefore, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *Id.* at 675.

To establish a *Brady* violation, it must be shown that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the suppressed evidence was material to guilt or punishment, "irrespective of the good faith or bad faith of the prosecution." *Moore v. Illinois,* 408 U.S. 786, 794-95 (1972); s*ee also Brady,* 373 U.S. at 87; *Bowling v. Parker,* 138 F.Supp.2d 821, 880 (E.D. Ky. 2001), *aff'd,* 344 F.3d 487 (6th Cir. 2003), *cert. denied,* 125 S.Ct. 281 (2004). As the Ohio Court of Appeals stated (s*ee* Doc. 22, Ex. 35, p. 5), evidence is deemed "material" under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the trial. *Id.* "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109-10 (1976). This standard for determining materiality focuses on the defendant's guilt or innocence, rather than on the impact of the undisclosed evidence on the defendant's ability to prepare for trial. *United States v. Phillip,* 948 F.2d 241, 249 (6th Cir. 1991) (citing *Agurs,* 427 U.S. at 112 n.20), *cert. denied,* 504 U.S. 930 (1992).

As the Ohio Court of Appeals also recognized (*see* Doc. 22, Ex. 35, p. 5), impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule. *Bagley,* 473 U.S. at 676. Impeachment evidence is considered "evidence favorable to the accused" because the jury's assessment of the reliability and truthfulness of a given witness may well be determinative of the defendant's guilt or innocence. *Id.*; *see also Giglio v. United States,* 405 U.S. 150, 153 (1972). On the other hand, evidence that tends to inculpate the defendant or that is neither facially exculpatory nor impeaching does not fall under *Brady*'s proscription. *United States v. Simpson,* 901 F.2d 1223, 1228 (5th Cir. 1990); *United States v. Comosona,* 848 F.2d 1110, 1115 (10th Cir. 1988); *cf. Agurs,* 427

U.S. at 112 n.20; *Phillip,* 948 F.2d at 250.

In this case, the state court of appeals reasonably applied *Brady* in determining that there was no reasonable probability that the result of the trial would have been different if the State had disclosed the eight items of evidence claimed to have been wrongfully suppressed.

Petitioner's first claim stems from the alleged suppression of evidence obtained from former Blanchester Police Officer W. Daniel Nichols, Jr., during the police investigation of Culberson's disappearance, which would have served to impeach the trial testimony of State witness Billie Jo Brown. As the Ohio Court of Appeals found (*see* Doc. 22, Ex. 35, p. 6), petitioner bases his claim on the following evidence attached to his state post-conviction petition: (1) Nichols' affidavit of December 28, 1998, wherein he states that the day after he interviewed Brown "about her knowledge of what happened the night Ms. Culberson allegedly disappeared," he presented a six-picture "photo array" to Brown that included petitioner's photograph, from which "Ms. Brown could not positively identify the person she saw fighting in her yard that night;" (2) Brown's September 1, 1996 written statement to Nichols describing the victim's assailant as "wearing a T-shirt and jeans;" and (3) Nichols' affidavit statement that he saw Brown "at some point after she gave her statement when [he] was working a security detail," who informed him "she was told by the prosecution not to talk to anyone about the case." (*Id.,* Ex. 19, attached Exs. A-B; *see also* Doc. 1, pp. 8-9; Doc. 56, pp. 22-24).

It was reasonable for the Ohio Court of Appeals to conclude that there was no reasonable probability that disclosure of this evidence would have led to a different outcome in petitioner's trial. First, as the state court pointed out (*see id.,* Ex. 35, p. 8), contrary to petitioner's contention reflected in Nichols' affidavit, it was determined as a factual matter after a pretrial evidentiary hearing that the prosecution did not advise certain State witnesses, including Brown, that they could not talk to anyone about the case, but rather that it was the witnesses' decision whether or not to talk to other investigators. (*See* Vol. 1, Tr. 159; Doc. 22, Ex. 29, p. 3). In any event, without more, this general allegation of misconduct by the prosecution does not pertain to and thus does not serve to undermine the reliability of Brown's eyewitness testimony about the events she observed the night of the victim's disappearance. Second, as the Ohio Court of Appeals found (*see* Doc. 22, Ex. 35, pp. 7-8), there were only minor inconsistencies between Brown's September 1, 1996 police statement and her trial testimony regarding the altercation she observed in her front yard the night the victim disappeared. On July 22, 1997, Brown testified at trial that she thought the victim's attacker was wearing shorts and a muscle shirt, which differed from her September 1, 1996 police statement that he

was wearing jeans and a T-shirt.  This discrepancy revealing a lapse in memory about a minor detail can easily be justified given the nearly one-year passage of time between the events in question and petitioner's trial.  Brown's trial testimony about the events observed by her on the night of August 28-29, 1996 comported in all other respects with her September 1, 1996 police statement.  It, therefore, was reasonable for the state appellate court to conclude that if the jury had been informed of the minor inconsistency between Brown's police statement and her qualified trial testimony nearly one year later about one detail observed by her on the night of August 28-29, 1996, such information would have had little if any impact on the jury's assessment of Brown's credibility and reliability as an eyewitness.

More troubling is the issue of the "photo array" that Nichols allegedly presented to Brown soon after he took her statement on September 1, 1996.  Because Nichols has averred that Brown was unable to "positively identify" petitioner from that array, such evidence would have served to cast doubt on Brown's in-court identification of petitioner as the victim's attacker.  Nevertheless, it was reasonable for the Ohio Court of Appeals to conclude that there was no reasonable probability that disclosure of this evidence would have led to a different outcome in petitioner's trial.  As the state court pointed out, Brown was capable of identifying petitioner as Culberson's assailant on the night of August 28-29, 1996 based on her prior contacts with both  petitioner, who lived across the street from her, and Culberson, who visited petitioner a couple of times a week at his home during the summer.  (*See id.,* pp. 6-7).  Moreover, even assuming the undisclosed "photo array" evidence would have undermined the reliability of Brown's in-court identification of petitioner, it is highly unlikely that the jury would have reached a different conclusion about the identity of the victim's assailant given numerous witnesses' testimony describing petitioner's stormy, abusive relationship with Culberson and Brown's unrefuted testimony identifying petitioner as her neighbor and Culberson as the woman she observed being attacked in her front yard on the night of August 28-29, 1996.

Petitioner's second *Brady* claim is based on the alleged suppression of State witness Lori Baker's statements in interviews with police investigators and assistant prosecutor Richard Moyer, which were "self-contradictory and inconsistent" with her trial testimony that she saw blood "smeared" on petitioner's arms, chest and pants when he came to her home around 3:15 a.m. on the night of the victim Carrie Culberson's disappearance.  (Doc. 1, pp. 9-11; Doc. 56, pp. 24-27; *see also* Vol. 9 Tr. 1673).  Apparently, in a November 7, 1996 interview, Baker failed to mention seeing blood on petitioner; in a November 12, 1996 interview, she "affirmatively denied" that there was

blood on petitioner; and when questioned by police detective Brian Edwards on Friday, August 30, 1996, she said that she did not know anything about Culberson and denied that petitioner had been to her house the night Culberson disappeared. (*See id.*). As the Ohio Court of Appeals found (*see* Doc. 22, Ex. 35, p. 9), Baker testified on several occasions at trial that she initially lied or refused to say anything about the events she witnessed on the night of Culberson's disappearance. (*See* Vol. 9 Tr. 1703, 1707-09, 1715-18, 1728, 1733-35, 1742-43, 1745-48, 1755-57, 1769-70). Indeed, although she stated that she was lying at the time, Baker specifically admitted that when she was interviewed by Moyer, she informed him that when Diana Shelton, the wife of Deputy Sheriff Tim Shelton, had asked her whether she saw petitioner "all covered in blood" the night Culberson disappeared, she told Shelton "no." (*Id.,* Tr. 1745-48). It appears from the record that most, if not all, of the allegedly "suppressed" evidence was in fact available to and used by the defense in an effort to undermine Baker's credibility at petitioner's trial. (*See id.,* Tr. 1726-27, 1733-34, 1742-48, 1754-57, 1769-70). In any event, it was reasonable for the Ohio Court of Appeals to conclude that there was no reasonable probability that the outcome of the trial would have been different if additional prior contradictory and inconsistent statements by Baker concerning the events she witnessed on August 29, 1996 had been disclosed. Baker explained that she lied at first because of her relationship with Tracey Baker and petitioner and her fear of saying anything that would incriminate them. (*See id.,* Tr. 1715-17). It is highly doubtful that any additional evidence indicating Baker may have lied on a few more prior occasions than those reflected in the trial transcript would have had any effect on the jury in determining the reliability and credibility of Baker's testimony against petitioner.

In his third claim, petitioner alleges the State withheld evidence that State witnesses Lori Baker and Vicki Watkins were promised they would not be prosecuted if they implicated petitioner in Culberson's disappearance/murder; petitioner claims such evidence would have served to impeach Baker's and Watkins' trial testimony against him. (Doc. 1, pp. 11-12; Doc. 56, pp. 27-28). The only evidence that petitioner's counsel has cited in support of this claim is the following statement contained in a "Memorandum of Interview" on November 7, 1996 at the prosecutor's office with Baker and Watkins: "Moyer [the assistant prosecutor] reassured Lori and Vick[i] that they would not be charged unless they flat-out lied to us. Moyer then pointed out a couple of lies that Lori had already told and she admitted some and that she wouldn't hold anything back in the future." (Doc. 1, Ex. C). The Court agrees with the Ohio Court of Appeals' finding that the evidence does not support petitioner's allegation that an "implicit threat of prosecution" was made. (*See* Doc. 22, Ex. 35, p. 10). In any event, it was reasonable for the state court to conclude "[t]here is no reasonable probability that the evidence cited by

Doan would have changed [the juror's] minds." (*Id.*). Indeed, if disclosed, such evidence reasonably could have been considered by the jury as bolstering these witnesses' trial testimony. A reasonable juror could have found from this evidence that the witnesses' prior inconsistent but exculpatory statements to the police actually were "lies" while their subsequent incriminating statements reflected in their trial testimony about the events they witnessed the night Culberson disappeared relayed the true story. Therefore, the evidence effectively would have undermined the defense strategy of using Baker's and Watkins' prior inconsistent statements to create doubts in the jurors' minds about the veracity of their trial testimony.

Petitioner's fourth *Brady* claim is based on the allegation that the State failed to disclose a witness statement from Mandy Bogan, one of the victim's nail salon customers. (Doc. 1, pp. 12-13; Doc. 56, pp. 28-29). According to a Clinton County Sheriff's Office "Report of Investigation" issued September 11, 1996, Bogan told Detective Brian Edwards on September 4, 1996 that on one occasion Culberson commented that "maybe the only way out [of her abusive relationship with petitioner] was to just leave everything behind and start over;" Bogan further stated that Culberson "also mentioned that she knew a person [possibly named 'Frisch'] that had rental properties and talked about calling to see about one of them." (Doc. 1, Ex. E). Petitioner contends this evidence is exculpatory because it could have been used by the defense to refute the State's theory that Culberson was murdered and to support the defense theory that she "was not killed, but rather chose to leave town and not return." (Doc. 1, p. 13; Doc. 56, p. 29). It was reasonable, however, for the Ohio Court of Appeals to conclude that such evidence failed to satisfy the *Brady* materiality standard based on the fact that "Bogan's testimony would have been merely cumulative" to the testimony of numerous defense witnesses who testified they saw a woman matching Culberson's description and/or her car, a red Honda CRX with license plate number ROL-402, after her "disappearance" the night of August 28-29, 1996. (*See* Doc. 1, p. 4; Vol. 13, Tr. 2512-98; Vol. 14, Tr. 2601-2796; Vol. 15, Tr. 2802-63).

In his fifth claim, petitioner alleges the State withheld the witness statements of Christa Lynn Pendleton and Karrie Donovan, which would have contradicted "key aspects" of Lori Baker's and Vicki Watkins' trial testimony. (Doc. 1, pp. 13-14; Doc. 56, pp. 29-31). Pendleton, who lives on Blanchester Road in Fayetteville, Ohio, averred in her statement that when she was driving to work on Thursday, August 29, 1996 at 3:12 a.m., around the same time Watkins and Baker witnessed seeing petitioner at Baker's home, she observed a man and a woman walking on the left side of Glady Road; that she had to swerve her car to avoid hitting the woman; that the woman, who "had long brown

hair," was "walking slumped over" and "was wearing a dark long sleeved shirt with light colored shorts" and no shoes; and that the man "was approx. 5'11" in height, weighed "approx. 175-180 lbs.," and was wearing a black shirt and baseball hat. (Doc. 1, Ex. G). Donovan, who lives in Blanchester, Ohio, averred in her statement that when she was driving home between 1:00 and 3:00 a.m. on Friday, August 30, 1996, after watching a movie with Pendleton, she saw a man and a woman at a junk yard on Hunt Road in Clermont County; that the woman was "slender," had "long dark hair," and was wearing "light color[ed] . . . shorts;" and that the man was average in size. (*Id.,* Ex. H). The Ohio Court of Appeals found that these statements were made available to petitioner at the time of his trial when Blanchester police officers complied with subpoenas issued by defense counsel requiring them to disclose "any and all sightings of *** Culberson." (Doc. 22, Ex. 35, p. 12). Petitioner has not provided any evidence, and certainly not "clear and convincing" evidence, to rebut the presumption of correctness to be accorded this factual finding. *See supra* p. 3, n.2. In any event, even assuming these statements were withheld as petitioner contends, the Ohio Court of Appeals' determination that "there is no reasonable probability that the outcome of Doan's trial would have been different if this information had been disclosed . . . because Pendleton's and Donovan's descriptions of the man and woman they saw were nonspecific and general in nature" constitutes a reasonable application of the *Brady* materiality standard. In addition, this Court is concerned that the statements made by acknowledged friends may be suspect given the similarity in the two witnesses' testimony regarding their separate sightings while driving in the early morning hours of August 29, 1996 and August 30, 1996 of a similarly-described man and woman at the side of the road. Even assuming such statements constitute credible evidence, as discussed above with respect to Mandy Bogan's witness statement, *see supra* pp. 39-40, they are merely cumulative to the testimony of the numerous defense witnesses who testified at trial that they saw a woman fitting Culberson's description and/or her car after the date and time petitioner allegedly killed Culberson.

Petitioner contends as his sixth *Brady* claim that the State failed to disclose evidence of a past disciplinary action taken against State witness Brian Edwards for lying to his supervisor and abusing sick time, which could have been used to impeach Edwards' trial testimony against petitioner. (Doc. 1, pp. 14-15 & Ex. I; Doc. 56, pp. 31-32). Petitioner has not provided any evidence to rebut the presumption of correctness to be accorded the Ohio Court of Appeals' factual finding that contrary to the allegation that such evidence was suppressed, "any information concerning Edwards' employment history was available to defense counsel prior to Doan's trial" (Doc. 22, Ex. 35, p. 12). *See supra* p. 3 n.2. In any event, the state court reasonably applied *Brady* when it further

determined that "there is no reasonable probability that disclosure of this information would have led to a different outcome in Doan's trial" because of, among other things, the ten-year lapse in time between the employment disciplinary matter and petitioner's trial. (*See* Doc. 22, Ex. 35, p. 13).

Petitioner's seventh claim of a *Brady* violation is based on the State's alleged failure to disclose that during the police investigation (1) Vicki Watkins, along with all other State witnesses, was given a "voice stress analyzer" test for veracity, and (2) Watkins was hypnotized to refresh her recollection of events she witnessed at her sister's home in the early morning hours of August 29, 1996. (Doc. 1, pp. 15-16; Doc. 56, pp. 32-34). First, after viewing the videotape of Watkins' March 9, 1997 hypnosis, this Court agrees with the Ohio Court of Appeals' conclusion that Watkins' "statements under hypnosis were not significantly different from her pre-hypnosis statements" regarding the events she witnessed the night of March 28-29, 1996. (*See* Doc. 22, Ex. 35, p. 13; *see also State v. Baker,* No. CA2000-08-018, 2001 WL 1218888, at *5-6 (Ohio Ct. App. Oct. 15, 2001) (unpublished)). Before she was hypnotized, Watkins specifically recalled seeing petitioner knocking on Baker's door at 3:15 a.m. on August 29, 1996; that at that time, she noticed petitioner's "grim reaper" tattoo and that he looked "grungy;" that when her sister answered the door, she heard petitioner ask to see his brother; that a while later, she heard petitioner and Tracey Baker leave the house; and that she next heard someone get into Baker's truck and drive away. Indeed, petitioner concedes that Watkins' memory was hypnotically refreshed only with respect to two details: (1) "that she heard Petitioner give a little giggle while he was standing with Tracey [Baker] on the patio;" and (2) "that she knew Tracey left with Petitioner that morning because she could hear Tracey's boots as he walked." (*See* Doc. 1, p. 15; Doc. 56, pp. 32-33). It is highly doubtful that the jury would have found either of these minor details of any importance in determining petitioner's guilt or innocence.

Petitioner contends that "several statements" Watkins made during the course of her hypnosis session could have been used to impeach her trial testimony. (Doc. 1, p. 16; Doc. 56, p. 33). In support of this argument, petitioner cites only to a "statement that [Watkins] could tell the person at the door was Doan by the tattoo on his left shoulder (Doan's tattoo is on his *right* shoulder. . .) and the fact that she considered a discussion with her sister, Lori Baker, about 'parting Carrie out' to have been completely 'harebrained.'" (*Id.*). However, after watching the videotape of the hypnosis session, this Court finds that contrary to petitioner's assertions, Watkins did not identify petitioner based on his tattoo when she saw him knocking on her sister's door at 3:15 a.m. on August 29, 1996 and never said she observed a tattoo on petitioner's left as opposed to

his right shoulder, but rather only that she noticed the tattoo on "his shoulder." Finally, Watkins' reference to a "harebrained" conversation with her sister a little later that morning about what petitioner and Tracey Baker may have done to Culberson is of little, if any, impeachment value given that both Watkins and Baker were unaware at that time that Culberson actually had disappeared that night. Therefore, it was reasonable for the Ohio Court of Appeals to conclude in accordance with the *Brady* materiality standard that there was "no reasonable probability that the disclosure of this evidence would have led to a different outcome in Doan's trial." (*See* Doc. 22, Ex. 35, p. 13).

Petitioner also is unable to prevail on his claim of a *Brady* violation based on the alleged non-disclosure of evidence that Watkins and other State witnesses underwent "voice stress analyzer" tests for veracity. As an initial matter, petitioner has not shown such evidence, inadmissible under state law absent stipulation of the parties, was subject to disclosure at all. *See King v. Trippett,* 192 F.3d 517, 522 (6th Cir. 1999) (citing *Wood v. Bartholomew,* 516 U.S. 1, 5-6 (1995)). In any event, the evidence that did come out at trial regarding Watkins' test results appears to be inculpatory, not exculpatory in nature, as it tends to support Watkins' testimony that she was lying when she first told the police she knew nothing that would assist them in their investigation of Culberson's disappearance. (*See* Vol. 9, Tr. 1606-07, 1612-14, 1620, 1629). Moreover, as the Ohio Court of Appeals held (*see* Doc. 22, Ex. 35, pp. 13-14), to the extent petitioner argues "the results of the voice stress tests could have led to the discovery of admissible [material] evidence that would have assisted his defense," his claim is simply too speculative for the Court to conclude as required under *Brady* that a reasonable probability exists that the result of petitioner's trial would have been different if such test results had not been withheld.

Petitioner's eighth *Brady* claim involves the State's alleged suppression of evidence that would have impeached State witness Mitchell Epperson, who testified at trial about certain incriminating statements made by petitioner when the two men were incarcerated in the same jail after petitioner's arrest. (Doc. 1, pp. 17-19; Doc. 56, pp. 34-39). Specifically, Epperson testified that on or about November 23, 1996, when they were talking together about "girlfriends cheating on you," petitioner stated: "[W]hen they do that you can't let them walk on you, you got to make them pay." (Vol. 12, Tr. 2316). Epperson further testified:

> [Petitioner] asked me if I would lie awake at night and think about my girl and I said, yes, I would, you know, for a while and, you know, he brought up, he said, that he would lay awake at night and think of a hundred

different ways to kill her before he did it.

(*Id.,* Tr. 2317).  Epperson did not say anything to authorities about his conversation with petitioner until January 3, 1997.  (*Id.,* Tr. 2322).  He stated that no time was taken off his sentence in exchange for his bringing this information to the attention of the police; he said: "I was scheduled to be released from the Hamilton County Jail on January 27th, that's when I was released was January 27th."  (*Id.*).   On cross-examination, Epperson reiterated that he "did not receive any time off my sentence," did not "ask . . . for anything," and made no deal in exchange for his testimony against petitioner.  (*Id.,* Tr. 2327).

In support of his claim of a *Brady* violation, petitioner relies primarily on an affidavit by Epperson, which was notarized on March 3, 1999, giving a different account of Epperson's dealings with the prosecutor prior to his testifying against petitioner.  In the affidavit, Epperson avers that after he gave his statement to the police about his conversations with petitioner and decided to testify before the grand jury, he asked William Hidy, an investigator for the Clinton County Prosecutor's Office, whether he would be "eligible for [a] reward" he had seen advertised in the Cincinnati Enquirer if he testified before the grand jury.[5]  (Doc. 1, Ex. N, ¶¶ 2-12).  Hidy responded, "yes, I don't see why not" and that Epperson would have to "go through [the prosecutor's] office" to collect the reward.  (*Id.,* ¶ 12).  Similar assurances were given by Hidy to Epperson after petitioner was indicted regarding Epperson's trial testimony against petitioner.  (*See id.,* ¶¶ 14, 17-18).   Epperson states that after he testified against petitioner at trial and petitioner was convicted and sentenced, he made repeated phone calls and sent letters to the prosecutor's office over a one and one-half year period in an effort to collect his reward, and received "no response."  (*Id.,* ¶¶ 20-25).   In February 1999, the victim's mother, Debbie Culberson, called Epperson and told him "the reward had not been awarded yet" and that "Mr. Peelle [of the Prosecutor's Office] is handling the distribution of the reward."  (*Id.,* ¶ 26).

Epperson also avers that at the time he testified against petitioner, he was wanted on an outstanding felony burglary charge and that he "understood that [he] would not be arrested" then.  (*Id.,* ¶ 27).  After he was arrested for the felony on August 7, 1997, he

---

[5]It appears from the record that the reward referred to by petitioner was a $10,000 reward "offered by the Culberson family and/or Clinton County law enforcement authorities for information leading to the arrest and conviction of anyone responsible for the murder of Carrie Culberson."  (*See* Doc. 1, Ex. O).

saw a note in his file at the Norwood police station "to hold off arresting me until after I testified." (*Id.,* ¶¶ 28, 30). It appears from the court file that investigator Hidy appeared as a witness in that matter, when Epperson entered a guilty plea to the burglary charge. (Doc. 1, Ex. S). Epperson was sentenced to a one-year prison term in that case. (*Id.*).

Finally, petitioner argues that Epperson's release on January 27, 1997 from prison, where he was incarcerated for a probation violation, "was approximately two months earlier than he should have been released," which indicates his "sentence was shortened in return for implicating Petitioner." (Doc. 1, p. 18 & Ex.Q).

The evidence submitted by petitioner is favorable to the defense to the extent it would have served to directly impeach Epperson's trial testimony that his sentence was not shortened, he had not asked for "anything" and no deals were made in exchange for his testimony against petitioner. Moreover, such evidence suggests that Epperson may have had a selfish motive for testifying against petitioner, which would have been a factor for the jury to consider in assessing the truthfulness or reliability of his testimony against petitioner. As the Ohio Court of Appeals pointed out (*see* Doc. 22, Ex. 35, p. 14), it had found on direct appeal that petitioner's "'near-confession' to Epperson was 'devastating proof' of [petitioner's] guilt." Nevertheless, the state court's ultimate determination that the *Brady* materiality standard had not been met was reasonable. As the court explained, the testimony of several other State witnesses, including Lori Baker, Vicki Watkins, and Billie Jo Brown, also constituted "devastating proof" of petitioner's guilt. (*See id.*). In particular, Lori Baker testified as follows about another "near confession" made to her by petitioner a few days after Culberson's disappearance:

Q. What did [Vincent Doan] say to you while you were sitting on the deck [outside your house the weekend following August 29, 1996]?

A. Well, he was upset and he had – he was sitting on the right of me, and we was sitting outside on the deck, and he was pulling his shirt up over his head, and he said, I can't imagine holding someone and – hurting someone and holding her till she died.

(Vol. 9, Tr. 1705-06; *see also* Doc. 22, Ex. 35, p. 14). In addition to Baker's, Watkins' and Brown's eyewitness testimony directly implicating petitioner in Culberson's disappearance and murder the night of August 28-29, 1996, numerous other witnesses testified about petitioner's escalating acts of violence against Culberson as his abusive relationship with her progressed into that final week of August 1996. Therefore, even

assuming, *arguendo,* that the impeachment evidence against Epperson was suppressed and, if disclosed, would have discredited Epperson's trial testimony, it was reasonable for the state court to conclude that there is no reasonable probability that the result of petitioner's trial would have been different given all the other evidence presented at trial constituting "devastating proof" of petitioner's guilt.

In Ground Three of the petition, petitioner alleges that when collectively considered, the eight *Brady* claims individually addressed above, *see supra* pp. 36-45, amount to a due process violation. (*See* Doc. 1, p. 20; Doc. 56, p. 40). This Court disagrees. Upon review of each of petitioner's individual claims, it appears that in only one instance the jury arguably could have been influenced by the disclosure of evidence alleged to have been withheld by the State. Only petitioner's eighth claim involving the alleged suppression of impeachment evidence against Mitchell Epperson has raised any concern about the possibility that the non-disclosed evidence could have served to undermine the credibility or reliability of a State witness's testimony. However, as discussed above in addressing that claim, *see supra* pp. 44-45, the Ohio Court of Appeals reasonably determined under *Brady* that in light of several other State witnesses' "devastating" testimony against petitioner, there is no reasonable probability the outcome of the trial would have been different if the impeachment evidence had been disclosed. Therefore, even when petitioner's *Brady* claims are considered collectively, petitioner is unable to demonstrate he was denied due process by the State's alleged withholding of evidence from the defense.

In Ground Four of the petition, petitioner claims that he was denied his Sixth Amendment right to effective assistance of counsel because either (1) the State's suppression of evidence interfered with his trial counsel's ability to adequately prepare and present a defense, or (2) his trial counsel reasonably should have discovered the non-disclosed evidence prior to trial or should have presented any such evidence in its possession to the jury. (Doc. 1, pp. 20-21; Doc. 56, pp. 40-41). In addressing this claim, the Ohio Court of Appeals correctly identified and applied the proper standard of review that was clearly established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984). (*See* Doc. 22, Ex. 35, pp. 15-16). As the state court understood, in order to establish a Sixth Amendment violation under *Strickland*, the petitioner must demonstrate: (1) his attorney made such serious errors he was not functioning as the "counsel" guaranteed by the Sixth Amendment; and (2) his attorney's deficient performance prejudiced the defense by undermining the reliability of the trial result. *See Strickland,* 466 U.S. at 687.

Under the first prong of the *Strickland* test, petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *See id.* at 688. Judicial scrutiny of counsel's performance must be highly deferential, and a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight" and to evaluate the challenged conduct from counsel's perspective at the time of the conduct. *Id.* at 689. In determining whether or not counsel's performance was deficient, the Court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *See id.*

In order to satisfy the second "prejudice" prong of the *Strickland* test, petitioner must show that a "reasonable probability" exists that, but for his counsel's errors, the result of the trial and appeal proceedings would have been different. *See id.* at 694. Petitioner has met his burden if he shows that the result of his trial would "reasonably likely have been different absent the errors." *See id.* at 695.

The Court need not examine the question of whether counsel's performance was deficient before addressing the question of whether petitioner was prejudiced by counsel's performance. The Court may dispose of an ineffective assistance of counsel claim by finding that petitioner has made an insufficient showing on either ground. *See id.* at 697.

Here, the Ohio Court of Appeals reasonably determined that petitioner had not shown he was denied effective assistance of counsel based on the *Brady* claims previously alleged by him, because he failed to satisfy the second "prejudice" prong of the *Strickland* test. As discussed above in addressing Grounds Two and Three, *see supra* pp. 36-45, the Ohio Court of Appeals reasonably concluded that petitioner had failed to demonstrate a "reasonable probability" that the result of his trial would have been different if the alleged *Brady* material, considered both individually and collectively, had been disclosed. Therefore, it was also reasonable for the state court to determine that petitioner was not denied effective assistance of counsel on the basis of such *Brady* claims, because it was not reasonably likely that the result of petitioner's trial would have been different if (1) the State had not engaged in the alleged suppression of evidence, or (2) defense counsel had discovered and presented such evidence at trial.

Accordingly, in sum, this Court concludes that the Ohio Court of Appeals' adjudication of petitioner's *Brady* claims alleged in Grounds Two and Three neither is contrary to nor involves an unreasonable application of well-settled federal law

46

established by the Supreme Court in *Brady* and its progeny. In addition, the state appellate court's adjudication of petitioner's ineffective assistance of counsel claim alleged in Ground Four, which is based on the *Brady* claims alleged in Grounds Two and Three, also neither is contrary to nor involves an unreasonable application of the applicable standard of review enunciated by the Supreme Court in *Strickland*. Therefore, petitioner is not entitled to habeas corpus relief based on the claims alleged in Grounds Two through Four of his petition.

### C.  Petitioner Is Not Entitled To Relief Based On His Claim Alleged In Ground Five That The Admission Of Certain Hearsay Evidence Violated His Rights Under The Confrontation Clause

In Ground Five of the petition, petitioner claims he was denied his right guaranteed by the Sixth Amendment's Confrontation Clause to cross-examine the witnesses against him when, in violation of Ohio R. Evid. 803(1), (2) or (3), the trial court allowed "extensive hearsay testimony about statements by [the victim] Carrie Culberson concerning alleged instances where Petitioner physically abused her." (Doc. 1, pp. 21-23; *see also* Doc. 57, pp. 41-48). This claim was presented by petitioner on appeal to both the Ohio Court of Appeals and Ohio Supreme Court, and is thus subject to review on the merits.

Petitioner specifically challenges Culberson's "hearsay" statements that were introduced into evidence through the testimony of State witnesses Tonya Whitten, Cicely Kukuk, Desiree Gruber, Shannon Culberson, Julie Long, Jessica Williams and Debbie Culberson. (*See* Doc. 57, pp. 42-44). He also contends that Culberson's "testimonial affidavit" introduced into evidence as State's Exhibit 35, which accused petitioner of hitting her with a space heater on July 28, 1996, constitutes inadmissible hearsay evidence. (*Id.*, p. 45). Finally, petitioner claims that the State improperly admitted hearsay statements made by State witness Lori Baker through the testimony of State witnesses Vicki Watkins and Carla Williams. (*Id.*).

As the last state court to issue a reasoned decision rejecting this claim of constitutional error, the Ohio Court of Appeals made findings of fact, which are presumed correct, *see supra* p. 3 n.2, and ruled in relevant part as follows:

> In his second assignment of error, appellant argues he was prejudiced by the admission of various hearsay statements. The trial court found these statements, detailed in the discussion below, were admissible under an

exception to the hearsay rule.

. . . .Absent an abuse of discretion and a showing of material prejudice, a trial court's ruling on the admissibility of evidence will be upheld. . . .

Hearsay is defined as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C). Hearsay is generally not admissible in evidence unless the evidence meets one of the recognized exceptions to the hearsay rule. Evid. R. 802. Evid. R. 803(2) allows the admission of hearsay under the "excited utterance" exception, which is defined as:

> A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

An excited utterance is one in which the declarant was under the excitement of a startling event and, therefore, the statement was not the product of reflection.... The Supreme Court of Ohio has stated that:

> There is no *per se* amount of time [between the occurrence and the statement] after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement . . . may *not* be a result of reflective thought. . . .

> Therefore the passage of time between the statement and the event is relevant but not dispositive of the question.

****

Tonya Whitten testified to what Culberson told her about being held by appellant, who had a gun, for three and one-half to four hours in August 1996. Culberson told Whitten about this event on Tuesday morning, August 2[7], 1996. The event happened either the prior evening or Sunday evening. We find, considering the harrowing nature of the event, the trial court was within its discretion to admit this evidence as an excited utterance. We find

48

the testimony of Shannon Culberson about the same event similarly admissible. Of course, the testimony of appellant's statements to Culberson are admissible as admissions of a party-opponent.

Kukuk, Culberson's best friend, testified Culberson told her, the day after the incident, about the scratches to her face and neck inflicted while appellant tried to suffocate her. Considering our deferential standard of review, we also find this statement admissible as an excited utterance. The testimony by Julie Long about the suffocation incident did not include a time frame between the statement by Culberson and the incident. Thus, it should not have been admitted as an excited utterance. However, the testimony added nothing to Kukuk's testimony and was not materially prejudicial. Gruber also testified about the suffocation incident. Such testimony was also improperly admitted, but this testimony also added substantially nothing to Kukuk's testimony.

Gruber testified about Culberson's appearance in April 1996, including Culberson's grotesquely swollen face, swollen eyes and nose, split lips and black and blue face. This description is not hearsay because it is not a statement. It was simply Gruber's personal observation. Gruber stated that Culberson told her, one or two days after the incident, that Doan had hit Culberson and thrown her to the ground causing these injuries. Based upon our standard of review, we find this statement admissible as an excited utterance. Even if not admissible, we do not find the statement materially prejudiced appellant's right to a fair trial. Culberson's statement to Gruber that her black eye was caused by appellant was not admissible as an excited utterance because the time frame between the statement and the incident was never established. However, Gruber personally witnessed the black eye and her description of the black eye was admissible. In light of the overall admissible evidence of appellant's violent behavior toward Culberson, we find the admission of Culberson's statement to Gruber concerning the black eye did not materially prejudice appellant's right to a fair trial.

Gruber testified that Culberson related to her that she could not leave town because Doan would hurt Culberson's family. This statement attacked the defense's theory that Culberson may have left town and was still alive. Thus, the statement was not admitted for the truth of the matter and is not hearsay. Instead, the statement shows why, based upon Culberson's

impression of the situation, Culberson would not have left Blanchester. Similar testimony by Long is admissible for the same reason.

The testimony by Long about appellant hitting Culberson against the pavement and telephone poles did not have a time frame. Therefore, without that foundation, it should not have been admitted as an excited utterance. However, in light of the overall evidence in this case, particularly the myriad of other admissible demonstrations of appellant's violent behavior toward Culberson, as well as admissible statements of appellant threatening Culberson, this error did not materially prejudice appellant['s] right to a fair trial.

An affidavit, state exhibit 35, was written by Culberson several hours after the space heater incident. We find the trial court was within its discretion to admit the affidavit as an excited utterance. In any event, we also find much of the affidavit duplicative to other testimony. Culberson told appellant, in Debbie Culberson's presence, almost immediately after the incident that appellant was only concerned about getting in trouble and was making up a story. Those statements are admisssible as excited utterances. That testimony, combined with Debbie Culberson's personal witnessing of Culberson's injuries, conveys the gist of the event, i.e., appellant caused Culberson, by his violence, to bleed from her head. In addition, appellant's ludicrous explanation of her injury, admissible as a statement of a party-opponent, that Culberson "had fallen on a pole" is more evidence of appellant protecting himself. Finally, appellant admitted to Debbie Culberson that he slapped Culberson, but denied punching her. This statement is also admissible as a statement of a party-opponent.

We also note that, with regard to the hearsay we found improperly admitted, the most incriminating evidence in this case concerns the night of the crime. For example, the testimony of Lori Baker and Watkins, which the jury chose to believe, was devastating proof of appellant's guilt. With regard to the kidnapping counts, the same can be said of Brown's testimony. Appellant's near-confessions on the deck of the Baker home and to Epperson were similarly devastating proof of guilt.

Appellant also argues that due to the erroneous admission of hearsay, he was denied the right to cross-examine witnesses against him as guaranteed by the

Confrontation Clause of the Sixth Amendment to the United States Constitution. However, in *White v. Illinois* (1992), 502 U.S. 346, 357, ... the United States Supreme Court held that evidence admitted under a "firmly rooted" hearsay exception is sufficient for Confrontation Clause purposes. As we have already concluded the admission of all the out-of-court statements raised in appellant's brief were within the trial court's discretion and/or did not materially prejudice appellant receiving a fair trial, the mandates of the confrontation clauses of the Ohio and United States Constitutions have been satisfied.

(Doc. 22, Ex. 8, pp. 17-23) (footnotes and state case citations omitted).

The Sixth Amendment's Confrontation Clause, made applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Constit. VI; *see also Ohio v. Roberts,* 448 U.S. 56, 62-63 (1980). The right of confrontation and cross-examination is considered "an essential and fundamental requirement" for a fair trial. *Barber v. Page,* 390 U.S. 719, 721 (1968) (quoting *Pointer v. Texas,* 380 U.S. 400, 405 (1965)). A primary purpose of the Confrontation Clause was to prevent depositions or ex parte affidavits from being used against the accused in lieu of "a personal examination and cross-examination of the witness in which the accused has the opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *California v. Green,* 399 U.S. 149, 157-58 (1970) (quoting *Mattox v. United States,* 156 U.S. 237, 242-43 (1895)).

A literal interpretation of the Confrontation Clause would require the exclusion of any hearsay statement made by a declarant not present or otherwise available for cross-examination at trial. *Bourjaily v. United States,* 483 U.S. 171, 182 (1987) (citing *Roberts,* 448 U.S. at 63). However, such a reading of the Clause "would abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme." *Roberts,* 448 U.S. at 63. Rather, the Clause's goal of ensuring "face-to-face confrontation at trial," *Roberts,* 448 U.S. at 63, must be harmonized with the "societal interest in accurate factfinding, which may require consideration of out-of-court statements." *Bourjaily,* 483 U.S. at 182. Therefore, "from the earliest days of [its] Confrontation Clause jurisprudence," the Supreme Court has "consistently held that the Clause does not necessarily prohibit the admission of hearsay statements against a criminal defendant,

51

even though the admission of such statements might be thought to violate the literal terms of the Clause." *Idaho v. Wright,* 497 U.S. 805, 813 (1990) (citing *Mattox,* 156 U.S. at 243, and *Pointer,* 380 U.S. at 407); *see also Maryland v. Craig,* 497 U.S. 836, 847-48 (1990). While recognizing that "hearsay rules and the Confrontation Clause are generally designed to protect similar values," the Supreme Court has been careful not to equate the two concepts, finding that the Confrontation Clause prohibits "the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." *Wright,* 497 U.S. at 814 (and cases cited therein).

At the time of petitioner's state trial and direct appeal proceedings, the Supreme Court's well-established decision in *Roberts* set forth the "'general approach' for determining when incriminating statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause." *Id.* In *Roberts,* which involved the admission of out-of-court statements made during a prior judicial proceeding, the Supreme Court held that "in the usual case (including cases where prior cross-examination has occurred)," the Confrontation Clause mandates both (1) that the prosecutor demonstrate the unavailability of the declarant under the "rule of necessity" established "in conformance with the Framers' preference for face-to-face accusation," and (2) that the hearsay statements bear adequate "indicia of reliability" to be deemed sufficiently trustworthy to be used in a prosecution. *Roberts,* 448 U.S. at 65-66; *see also White v. Illinois,* 502 U.S. 346, 354 (1992); *United States v. Inadi,* 475 U.S. 387, 393-94 (1986).

In *Roberts,* the Supreme Court noted that a "demonstration of unavailability ... is not always required," as for example in *Dutton v. Evans,* 400 U.S. 74 (1970), where the Court "found the utility of trial confrontation so remote that it did not require the prosecution to produce a seemingly available witness." *Roberts,* 448 U.S. at 65 n.7. Utilizing this rationale, the Supreme Court refused in subsequent cases to extend the unavailability requirement to cases involving out-of-court statements made by a co-conspirator in the course of the conspiracy, *see Inadi* 475 U.S. at 394-99, as well as "hearsay testimony regarding spontaneous declarations and statements made in the course of receiving medical care," *see White,* 502 U.S. at 355-56 (involving challenge to the admission of a child sexual assault victim's hearsay statements).[6]

_____

[6]In this case, the Ohio Court of Appeals noted in addressing the federal constitutional issue that the Confrontation Clause contained in Ohio's Constitution is stricter than the federal provision, because in contrast to the Supreme Court's holding in *White,* out-of-court statements by an alleged child abuse victim are inadmissible unless the victim is also "unavailable." (Doc.

In *Roberts,* the Supreme Court further held that where the challenged evidence falls within a "firmly rooted" hearsay exception, "[r]eliability can be inferred without more" for purposes of satisfying the reliability requirement of the Confrontation Clause. *Roberts,* 448 U.S. at 66; *see also White,* 502 U.S. at 355 n.8; *Wright,* 497 U.S. at 816; *Bourjaily,* 483 U.S. at 182-83. Because "'hearsay rules and the Confrontation Clause are generally designed to protect similar values,' . . . *Green,* 399 U.S. [at 155,] and 'stem from the same roots,' *Dutton ...,* 400 U.S. [at 86]," and because of "the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements," no independent inquiry into the reliability of the out-of-court statement is required in such a situation. *Wright,* 497 U.S. at 817; *Bourjaily,* 483 U.S. at 182-83 (quoting *Roberts,* 448 U.S. at 66). Moreover, even if the out-of-court statement does not fall within a firmly rooted hearsay exception, Confrontation Clause reliability standards are satisfied as long as the statement is supported by a showing of "particularized guarantees of trustworthiness" based on the totality of circumstances "that surround the making of the statement and that render the declarant particularly worthy of belief." *Wright,* 497 U.S. at 816-17, 819 (quoting *Lee v. Illinois,* 476 U.S. 530, 543 (1986)); *see also Roberts,* 448 U.S. at 66.

The Supreme Court has refused to adopt a "mechanical test" for determining "particularized guarantees of trustworthiness." *Wright,* 497 U.S. at 822. However, the Supreme Court has identified certain factors derived from state and federal cases that courts may consider in making this determination.         include the spontaneity and consistent repetition of the statement, the mental state of the declarant and the lack of motive to fabricate. *Id.* at 821-22. "These factors are, of course, not exclusive, and courts have considerable leeway in their consideration of appropriate factors." *Id.* at 822. Courts, however, are prohibited from relying on evidence corroborating the truth of a hearsay statement as a factor in determining whether the statement bears "particularized guarantees of trustworthiness." *Id.* "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Id.* Instead, the presence of corroborating evidence "more appropriately indicates that any error in admitting the statement might be harmless, rather than that any basis exists for presuming the declarant to be trustworthy." *Id.* at 823 (footnote omitted).

---

22, Ex. 8, pp. 22-23 n.5). The court went on to conclude, however, that "[s]ince unavailability is not an issue in this case, the confrontation clauses of both the Ohio and federal constitutions are satisfied by an out-of-court statement falling under a 'firmly rooted' hearsay exception." (*Id.*).

This Court concludes that the standards discussed above that were established by the Supreme Court in *Roberts* and its progeny, *see supra* pp. 52-54, govern the resolution of the Confrontation Clause issues raised by petitioner in this case. As petitioner points out in his "traverse" brief (Doc. 57, p. 42), the Supreme Court recently overruled *Roberts* to the extent it permits the admission of "testimonial" hearsay into evidence upon a showing of the witness's unavailability and a "mere finding" that the hearsay contains sufficient indicia of reliability in cases where the defendant was not afforded a prior opportunity to cross-examine the witness. *See Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 1363-69 (2004). However, as discussed above, *see supra* pp. 19-20, under the applicable standard of review set forth in 28 U.S.C. § 2254(d), the federal habeas court must assess the propriety of the state court's identification and application of "clearly established federal law" in light of the Supreme Court holdings in existence at the time of the relevant state court decision. *See Lockyer v. Andrade,* 538 U.S. 63, 71-72 (2003); *cf. Dorchy v. Jones*, 320 F.Supp.2d 564, 572 (E.D. Mich. 2004) (holding that because *Roberts* was controlling law at the time of the petitioner's state direct appeal, the federal habeas court "must determine whether the [state] Court of Appeals' decision is contrary to, or an unreasonable application of, that decision"); *Brown v. Uphoff,* 381 F.3d 1219, 1223-24 & n.4 (10th Cir. 2004) (same), *petition for cert. filed,* No. 04-7593 (U.S. Dec. 3, 2004).[7]

---

[7]In any event, the courts that have decided the question have been unanimous in finding that *Crawford* does not apply retroactively to cases on collateral review. *See, e.g., Brown,* 381 F.3d at 1225-27; *Evans v. Luebbers,* 371 F.3d 438, 444 (8th Cir. 2004), *petition for cert. filed,* No. 04-7106 (U.S. Oct. 28, 2004); *Hiracheta v. Attorney General,* 105 Fed.Appx. 937, 938 (9th Cir. Aug. 12, 2004) (not published in Federal Reporter); *Haymon v. New York,* 332 F.Supp.2d 550, 557 (W.D.N.Y. 2004); *Garcia v. United States,* No. 04-CV-0465, 2004 WL 1752588, at *2-4 (N.D.N.Y. Aug. 4, 2004) (unpublished); *Wheeler v. Dretke,* No. Civ.A. 404CV026Y, 2004 WL 1532178, at *1 n.1 (N.D. Tex. July 6, 2004) (unpublished); *cf. Dorchy,* 320 F.Supp.2d at 572-73 (citing *Murillo v. Frank,* 316 F.Supp.2d 744, 748-50 (E.D. Wis. 2004)). Moreover, *Crawford*'s holding is limited to "testimonial" hearsay, loosely defined as "ex parte in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," *Crawford,* 124 S.Ct. at 1364. *United States v. Lopez,* 380 F.3d 538, 546 n.6 (1st Cir. 2004), *petition for cert. filed,* No. 04-7325 (U.S. Nov. 17, 2004); *Leavitt v. Arave,* 383 F.3d 809, 830 n.22 (9th Cir. 2004); *McKinney v. Bruce,* No. 02-3248-JAR, 2004 WL 1730326, at *6 (D. Kan. July 29, 2004) (unpublished). All but one of the hearsay statements challenged in this case were non-testimonial in nature. The victim's affidavit accusing petitioner of hitting her with a space heater on July 28, 1996, which was admitted into evidence as State's Exhibit 35, was testimonial. However, as discussed *infra* pp. 61-62, the affidavit was properly admitted into evidence not as hearsay to prove that the July 28, 1996 incident occurred, but to prove as charged in the indictment that petitioner kidnapped the victim

In this case, the Ohio Court of Appeals did not consider petitioner's claims asserted herein challenging the introduction of certain hearsay statements made by State witness Lori Baker that were introduced through the testimony of State witnesses Vicki Watkins and Carla Williams. However, these claims do not trigger any concerns under the Confrontation Clause because the hearsay declarant, Lori Baker, testified at petitioner's trial and was subjected to unrestricted cross-examination by defense counsel. *See United States v. Owens,* 484 U.S. 554, 560 (1988) (where a hearsay declarant is present at trial and subject to unrestricted cross-examination, the "traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements" of the Sixth Amendment); *see also Crawford,* 124 S.Ct. at 1369 n.9 ("[W]e reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. . . . The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.").

With respect to petitioner's remaining claims challenging the admission of the victim Carrie Culberson's hearsay statements, the Court points out as an initial matter that to the extent petitioner contends he is entitled to relief because the Ohio Court of Appeals erred in finding many of the challenged statements were properly admitted into evidence under Ohio's hearsay rules, he raises an issue of state law only which is not cognizable in this federal habeas proceeding. *See Estelle*, 502 U.S. at 67-68 (it is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law." 28 U.S.C. §2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle,* 502 U.S. at 68. Therefore, under the standard of review set forth in 28 U.S.C. § 2254(d) and discussed above, *see supra* pp. 19-20, this Court's review is limited to consideration of the question whether the state court's adjudication of the federal Confrontation Clause issue resulted in a decision that is contrary to or involves an unreasonable application of clearly established federal law as determined by the Supreme Court in *Roberts* and its progeny. In addition, even if this

---

"with the purpose to hinder, impede, or obstruct a function of government," and murdered her "for the purpose of escaping detection, apprehension, trial or punishment for another offense" or "to prevent her testimony in any criminal proceeding." (*See* Doc. 22, Ex. 1). Moreover, as further discussed *infra* p. 62, even assuming the affidavit constituted inadmissible "testimonial" hearsay, its admission did not have a prejudicial effect on the jury's verdict.

Court finds the state court improperly determined the constitutional issue under 28 U.S.C. § 2254(d), petitioner is not entitled to habeas corpus relief unless the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht,* 507 U.S. at 637; *see also O'Neal,* 513 U.S. at 445; *cf. Delaware v. Vans Arsdall,* 475 U.S. 673, 684 (1986) (harmless error analysis applies to Confrontation Clause violations).

As the Ohio Court of Appeals recognized (*see* Doc. 22, Ex. 8, p. 23 n.5), the victim's "unavailability" was not at issue in this case. Therefore, the question presented here is whether, as required under *Roberts,* the victim's challenged hearsay statements bear adequate "indicia of reliability" to be deemed sufficiently trustworthy to be used in a prosecution, or otherwise fail to trigger concerns under the Confrontation Clause. *Roberts,* 448 U.S. at 65-66.

Petitioner first challenges the admission of hearsay statements made by Carrie Culberson to Tonya Whitten and Shannon Culberson, Carrie's cousin, about an incident that occurred a few days before Carrie's disappearance. Carrie reported that on the evening of Monday, August 26, 1996,[8] petitioner, who had a gun, "held" her in his car for four and one-half to five hours. (*See* Vol. 10, Tr. 1942-44; Vol 11, Tr. 2145-46). The Ohio Court of Appeals found that the statement made to Whitten on the morning of Tuesday, August 27, 1996, and the statement made to Shannon Culberson around 1:00 p.m. on Wednesday, August 28, 1996, were both admissible under the "excited utterance" exception to Ohio's hearsay rule. (Doc. 22, Ex. 8, p. 19). Because under the Supreme Court's *White* decision, "spontaneous declarations," or statements "offered in a moment of excitement–without the opportunity to reflect on the consequences of one's exclamation," fall within a "firmly rooted" exception to the hearsay rule, the state appellate court went on to conclude that the victim's hearsay statements about the August 26, 1996 incident satisfied the Confrontation Clause's reliability requirement. (*Id.,* pp. 22-23). This conclusion is not "contrary to" and indeed is in accord with the holding in *Roberts* discussed above, *see supra* p. 53, that where the challenged evidence falls within a "firmly rooted" hearsay exception, "reliability can be inferred without more." *Roberts,* 448 U.S. at 66. A closer question is presented as to whether the Ohio Court of Appeals' determination involves a reasonable application of the applicable Supreme Court

---

[8]Although the Ohio Court of Appeals indicated in its decision that the incident may have occurred on Sunday, August 25, 1996 (*see* Doc. 22, Ex. 8, p. 19), the record evidence clearly and convincingly demonstrates that the incident took place on the evening of Monday, August 26, 1996. (*See, e.g.,* Vol. 11, Tr. 2002, 2015, 2146).

precedents. This Court is troubled by the fact that no testimony was elicited at trial by the prosecutor from either Whitten or Shannon Culberson regarding Carrie Culberson's emotional state when she offered the challenged hearsay statements, other than that she was "really scared." (*See* Vol. 10, Tr. 1942-44; Vol. 11, Tr. 2145-46). In the absence of evidence indicating that Carrie was upset, excited or highly emotional at the time she made those statements, the Court has concerns about whether the statements were "spontaneous" enough to be classified as falling within the "firmly rooted" hearsay exception contemplated by the Supreme Court in *Roberts* and *White*, sufficient to give rise to the inference of reliability under the Confrontation Clause.

Despite these concerns, the Court nevertheless concludes that at least with respect to the statements made by Carrie Culberson to Tonya Whitten, "particularized guarantees of trustworthiness" were shown from the totality of circumstances, which provide "sufficient assurance that the statement[s] [are] trustworthy and that cross-examination would be superfluous." *See Wright,* 497 U.S. at 820. It appears from the record that Tonya Whitten was the first person Culberson spoke with on the morning after she was purportedly held captive by petitioner for four and one-half to five hours in his car.[9] Given the harrowing, traumatic nature of that incident occurring only hours earlier, it is highly doubtful that Culberson spoke to Whitten, apparently the first person she saw after the ordeal, without at least some if not a high degree of feeling, spontaneity or lack of reflection about the consequences of her words. Culberson described the incident as "torture" and said more than once that she "felt like throwing up the whole time" she was "held" by petitioner, who was armed with a gun. (Vol. 10, Tr. 1943-44). According to Whitten's husband, who also saw Culberson that morning, Culberson "seemed quiet," "didn't really look or act normal" and was not her usual "bubbly self." (*Id.*, Tr. 1898-99). Culberson also indicated to Whitten that she was scared. (*See id.,* Tr. 1944). This evidence regarding Culberson's troubled state of mind weighs against the possibility that her statements at that time were the result of "fabrication, coaching, or confabulation." *Wright,* 497 U.S. at 820. Moreover, the circumstances surrounding Culberson's statements to Whitten do not even remotely suggest that Culberson had any motive to fabricate the story against petitioner. Indeed, if Culberson had such a motive, it is likely she would have responded in the affirmative when Whitten asked her if petitioner was holding the gun at

---

[9]Carrie Culberson's mother testified that when she left for work between 8:00 and 8:30 a.m. on August 27, 1996, Carrie was asleep on the couch in the living room of their home. (Vol. 13, Tr. 2416, 2418-19). Whitten testified that Carrie came into her fitness and tanning salon "probably between 9:00 and 10:00 a.m." that morning. (Vol. 10, Tr. 1941). None of the other witnesses who testified at trial reported that they saw or had any opportunity to speak with Carrie before Whitten did on the morning of August 27, 1996.

her head during the time she was held captive by him.  Instead, Culberson said "no, he just was sitting there and he had it in his lap."  (Vol. 10, Tr. 1943).

Culberson's statements to her cousin on August 28, 1996 were made after Culberson had more time to reflect on and recover from the events that had occurred a couple of days earlier.  However, Culberson still indicated that she was "really scared."  (Vol. 11, Tr. 2146).  Moreover, except with respect to one point, her statements to her cousin about the events that occurred the night of August 26, 1996 were consistent with the statements she made soon after the incident to Tonya Whitten.  The only conflict between the two statements is that in contrast to her response to Whitten's direct question as to how petitioner was holding the gun, Culberson told her cousin that petitioner "held a gun to my head Monday night."  (*Id.*).  Although this one statement to her cousin regarding how the gun was held lacks sufficient guarantees of trustworthiness to satisfy the Confrontation Clause's reliability requirement, it concerned a minor detail which this Court finds had little if any impact on the jury's verdict in this case.

Petitioner next challenges the admission of hearsay statements made by Carrie Culberson to Cicely Kukuk, Julie Long, and Desiree Gruber, regarding scratch marks and bruises she received in a "suffocation incident."  Kukuk testified that a day after the incident, which Kukuk stated occurred in the summer of 1996, Culberson told her that petitioner "had put his hands on [Culberson's] neck and over her mouth and nose, and she got the scratches from her own hands, her own fingernails by trying to get his hand off her mouth and nose so she could breathe."  (Vol. 11, Tr. 2036).  Long testified that around Thanksgiving of 1995, Culberson said that petitioner had tried to suffocate her by holding her down and holding her nose and mouth and that she had scraped her face, leaving two scars, as she tried to get his hand off of her.  (*Id.,* Tr. 2191-92).  Finally, Gruber testified that sometime between November and December of 1995, Culberson came to work with a "series of scratches down her face," and that after some prodding, said that petitioner had put his hands over her mouth and nose to stop her from talking during an argument they were having, and indicated by way of her broken nails that she received the scratch marks when trying to get petitioner's hands off of her so that she could breathe.  (*Id.,* Tr. 2080-81).

The Ohio Court of Appeals found that only Kukuk's testimony was admissible as an "excited utterance" under Ohio's hearsay rules, which satisfied the Confrontation Clause's reliability requirement because it fell within a "firmly rooted" hearsay exception, and that the other improperly admitted hearsay was not prejudicial because it "added nothing to Kukuk's testimony."  (*See* Doc. 22, Ex. 8, pp. 19-20, 22).  As with the

hearsay statements discussed above regarding the August 26, 1996 incident, *see supra* p. 57, this Court has concerns about whether Kukuk's hearsay testimony falls within a "firmly rooted" hearsay exception as contemplated by the Supreme Court in *Roberts* and *White* given that the prosecutor failed to elicit any testimony from Kukuk, or indeed the other two witnesses, regarding Culberson's emotional state when she offered the challenged statements. The Court has additional concerns because Kukuk testified that the "suffocation incident" occurred in the summer of 1996, whereas Long and Gruber stated the incident happened sometime in the late fall of 1995. Moreover, unlike Tonya Whitten's detailed testimony regarding the August 26, 1996 incident, there is insufficient information in the record about the circumstances surrounding Culberson's statements to Kukuk to adequately assess whether particularized guarantees of trustworthiness exist that provide sufficient assurance such statements are worthy of belief and that cross-examination would be superfluous. *See Wright,* 497 U.S. at 820.

Despite these concerns, the Court finds that particularized guarantees of trustworthiness have been shown from the totality of circumstances surrounding Culberson's statements to Gruber about a similar, if not the same, incident. Gruber testified that Culberson came into the salon where she worked on an off-work day to get "a full set of sculptured nails" she claimed had broken off while she was scratching her face in her sleep. (Vol. 11, Tr. 2079-80). When Gruber refused to accept that explanation for the series of scratches she observed on Culberson's face, Culberson initially "backed away" and only after further questioning finally told Gruber that she had had an argument with petitioner. (*Id.,* Tr. 2080). According to Gruber, the conversation continued as follows:

> . . . .I said, what happened to your hands and what happened to your face? And she said, well, he wanted me to stop talking, he wanted me to shut up.... And she said, well, he put his hands over my mouth to make me shut up but he didn't realize that he had my nose and mouth covered and I couldn't breathe. I said, so you're telling me he tried to suffocate you. She said, no, no, he just didn't know. . . . I said, you broke your nails on your own face, didn't you? And she looked down at the floor.

(*Id.,* Tr. 2080-81). Given the state of Culberson's nails when she came into the salon, it can be inferred that the incident had taken place quite recently. Moreover, the Court is persuaded that Culberson's statements to Gruber are particularly worthy of belief and were not the result of "fabrication, coaching, or confabulation," *Wright,* 497 U.S. at 820, in light of the fact that Culberson was initially reluctant to talk about what happened or

to implicate petitioner and only after further prodding told Gruber about the incident while still making excuses for his behavior.

In any event, even assuming all the hearsay statements regarding the "suffocation incident" should not have been admitted into evidence, such evidence had little to no impact on the jury's verdict when weighed with all the other evidence that was properly admitted at trial regarding petitioner's abusive relationship with Culberson and, even more specifically, his involvement in Culberson's "disappearance" on the night of August 28-29, 1996. It, therefore, was reasonable for the Ohio Court of Appeals to conclude with regard to the hearsay found to be "improperly admitted," that such error was harmless as "the most incriminating evidence in this case concerns the night of the crime," which constituted "devastating proof of [petitioner's] guilt." (*See* Doc. 22, Ex. 8, p. 22).

On a third matter, petitioner challenges the admission of Desiree Gruber's "graphic testimony" about Culberson's appearance in April 1996 when she came to work to pick up a payroll check with a "grotesquely swollen" face, her lips "split," and "her whole face . . . various colors of black and blue," which Culberson told Gruber was caused by petitioner's "hitting her, slapping her, [and] throwing her to the ground repeatedly." (Vol. 11, Tr. 2084-88). It appears the same incident was the subject of another hearsay statement also challenged by petitioner, which was made by Culberson to Julie Long in "approximately April" of 1996, to the effect that Culberson "and [petitioner] were out and they were . . . in his Jeep and they ran out of gas, and a fight started and [petitioner] took her and beat her head against the road, against telephone poles . . . [and] kept hitting her against the pavement." (*Id.,* Tr. 2193). Petitioner, however, has not attacked the testimony of Debbie Culberson, Carrie's mother, relaying essentially the same information about this incident, as well as the substance of a follow-up conversation between Carrie's parents and petitioner in which petitioner first stated that Carrie had bounced up and hit her head on the top of the Jeep but later said, "I just slapped her." (*See* Vol. 13, Tr. 2405-09). The Ohio Court of Appeals correctly found that Gruber's testimony describing Culberson's appearance in April 1996 was not hearsay and was "simply Gruber's personal observation." (*See* Doc. 22, Ex. 8, p. 20). Moreover, any error in admitting Culberson's statements to Gruber and Long regarding the incident that resulted in her injuries did not have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht,* 507 U.S. at 637, as they were merely cumulative to Debbie Culberson's unchallenged testimony about the events she witnessed on the day the incident occurred in April 1996.

Petitioner further challenges a hearsay statement made by Carrie Culberson to

Desiree Gruber regarding another prior incident of abuse, which occurred in the fall of 1995 approximately two weeks after Culberson began working as a "nail tech" at Gruber's salon. According to Gruber's testimony, Culberson came to work with a "rather large black eye," and that when Gruber asked "who had done this to her," Culberson at first did not say anything, but eventually stated petitioner was responsible for the injury inflicted during an argument. (Vol. 11, Tr. 2078-79). The Ohio Court of Appeals correctly determined that Gruber's description of the black eye she personally observed was admissible as non-hearsay. (*See* Doc. 22, Ex. 8, p. 20). Moreover, as discussed above in addressing the hearsay evidence admitted regarding the "suffocation incident," *see supra* p. 60, it was reasonable for the Ohio Court of Appeals to conclude that "[i]n light of the overall admissible evidence of [petitioner's] violent behavior toward Culberson" and the "devastating proof of his guilt" on the night of the crime, "the [erroneous] admission of Culberson's statement to Gruber concerning the black eye did not materially prejudice [petitioner's] right to a fair trial."

With respect to yet another instance of prior abuse, petitioner challenges the admission of Culberson's hearsay statement contained in an affidavit charging petitioner with hitting her with a space heater on July 28, 1996. It appears from the record that the prosecution introduced the statement into evidence as State's Exhibit 35 not to prove the truth of the matter asserted in the statement, but rather to prove as charged in the indictment that petitioner kidnapped and killed Culberson to keep her from testifying in the criminal case that ensued from the filing of that affidavit. (*See* Vol. 10, Tr. 1843-44, 1848, 1850-51; Vol. 13, Tr. 2413-14; *see also* Doc. 22, Ex. 1). Treating the statement as hearsay, the Ohio Court of Appeals concluded that the "trial court was within its discretion to admit the affidavit as an excited utterance" and that, in any event, "much of the affidavit [was] duplicative to other testimony." (Doc. 22, Ex. 8, p. 21). There is evidence in the record reasonably supporting the Ohio court's determination that the affidavit statement fell within a "firmly rooted" hearsay exception sufficient to give rise to the inference of reliability under *Roberts* and *White*. (*See id.,* p. 22). Specifically, Debbie Culberson testified that Carrie was "mad, still" and "still upset and not feeling well" when she arrived at the Blanchester Police Department a few hours after the incident occurred and made her statement. (Vol. 13, Tr. 2413). In any event, as the Ohio Court of Appeals reasonably found, the "gist of the event" was conveyed to the jury through Debbie Culberson's unchallenged testimony. (*See id.,* Tr. 2410-12). Therefore, even assuming, *arguendo,* the affidavit should not have been admitted into evidence, the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht,* 507 U.S. at 637; *O'Neal,* 513 U.S. at 445.

Petitioner also challenges as inadmissible hearsay (1) Culberson's statement to Desiree Gruber on or about August 17, 1996 that she would not leave the area to get away from petitioner because petitioner had told Culberson he would hurt her mother and sister while they were sleeping (Vol. 11, Tr. 2094-95); (2) Culberson's statement to Julie Long that she "was afraid of what [petitioner] would do to her if she left him" (*id.,* Tr. 2196); and (3) Culberson's statement to her mother that she would not leave town to get away from petitioner because she wanted to be see her younger sister "through all" the experiences of high school (Vol. 13, Tr. 2425-26). The Ohio Court of Appeals found that these types of statements did not constitute inadmissible hearsay, because they were not admitted for the truth of the matter asserted, but rather to rebut the defense's evidence in support of its theory that Culberson may have left town and was still alive. (*See* Doc. 22, Ex. 8, pp. 20-21). The statements thus fail to trigger any concerns under the Confrontation Clause. In any event, as the Ohio Court of Appeals apparently recognized (*see id.,* p. 22), any error in admitting these statements did not have a "substantial and injurious effect or influence in determining the jury's verdict" given the "devastating proof" of petitioner's guilt and involvement in Culberson's "disappearance" on the night of August 28-29, 1996.

Finally, petitioner challenges Jessica Williams' testimony regarding certain statements Carrie Culberson made to her earlier on the night Carrie disappeared (Vol. 8, Tr. 1421-27), as well as Debbie Culberson's testimony that Carrie told her in the late afternoon of August 28, 1996 that she was "going to [petitioner's] house and if I'm not back in an hour come looking for me" (Vol. 13, Tr. 2423); Debbie testified that Carrie did return within an hour after she left the house. The Ohio Court of Appeals did not address these specific claims. However, the statements challenged here were not particularly prejudicial and only served to show the state of the victim's feelings and thoughts about petitioner on the evening the charged crimes occurred. Therefore, it is extremely doubtful that they had a substantial effect or influence on the jury's verdict, particularly when weighed with the significantly more incriminating evidence that was introduced at trial of petitioner's direct involvement in Culberson's "disappearance."

Accordingly, in sum, this Court has considered each of petitioner's Confrontation Clause challenges and has found that (1) some of petitioner's claims fail to trigger concerns under the Confrontation Clause; (2) the Ohio Court of Appeals' adjudication of certain other claims neither is contrary to nor involves an unreasonable application of the applicable Supreme Court precedents in existence at the time of the state appellate court's decision; and (3) any errors that were committed in admitting various hearsay statements did not have a "substantial and injurious effect or influence" on the jury in reaching its

verdict as required under *Brecht*. Therefore, petitioner is not entitled to habeas corpus relief based on his claim alleged in Ground Five that the admission of certain specified hearsay statements violated his Sixth Amendment right to cross-examine witnesses against him.

### D. Petitioner Is Not Entitled To Relief Based On His Claim Alleged In Ground Six That He Was Denied A Fair Trial When The Trial Court Allowed The State To Introduce Evidence Of His Prior Abusive Acts Against The Victim

In Ground Six of the petition, petitioner contends he was denied a fair trial when the trial court improperly allowed the prosecution to introduce "non-hearsay testimony about prior instances where Petitioner allegedly hit Carrie" Culberson. (Doc. 1, pp. 23-24; *see also* Doc. 57, pp. 49-52). This claim, which was presented by petitioner to the Ohio appellate courts on direct appeal, is subject to review on the merits.

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing the claim. Without citing federal constitutional standards or case-law, the court concluded that although Ohio R. Evid. 404(B) prohibits the admission of evidence of a criminal defendant's prior bad acts "to prove [his] character . . . in order to show that he acted in conformity therewith," the past abuse evidence was properly admitted in this case under that rule to show petitioner's "motive for kidnapping and murdering Culberson was control."[10] (Doc. 22, Ex. 8, pp. 23-24). The court reasoned in relevant

---

[10]Ohio R. Evid. 404(B) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This state evidentiary rule is codified in Ohio Rev. Code § 2945.59 as follows:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

part as follows:

> We have reviewed each and every statement of past abuse admitted at trial which appellant questions in his brief. All of these statements show appellant's need to physically and psychologically control Culberson and their relationship. . . . In some cases, appellant directly threatened Culberson's life. The evidence showed, not only through his threats and physical abuse, but by his obsessive calling of her place of work and the Whittens' business, as well as his statements to Epperson once arrested, that appellant wished to control Culberson.

> . . . .We recognize some of these statements and/or acts occurred up to eighteen months prior to the murder. However, all the testimony concerning prior acts is part of the continual pattern of physical and psychological abuse which shows appellant would resort to violence in order to control Culberson. We find all of the statements concerning prior acts were admitted within the discretion of the trial court to show appellant's motive for kidnapping and murdering Culberson. In addition, some of appellant's prior actions, most notably the prior act of holding Culberson at gunpoint for three and one-half to four hours, shows his intent to kidnap and murder Culberson on the night of the crime. . . .

(*Id.,* pp. 24-25) (state case citation omitted).

In this federal habeas corpus proceeding, the state court's ruling on the admission or exclusion of evidence under state law is not open to challenge unless it is determined that the state court committed an error which rendered the trial so fundamentally unfair as to amount to a denial of due process. *Serra v. Michigan Dep't of Corrections,* 4 F.3d 1348, 1354 (6th Cir. 1993) (and cases cited therein), *cert. denied,* 510 U.S. 1201 (1994); *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir. 1988); *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir.), *cert. denied,* 464 U.S. 951, 962 (1983); *cf. Estelle,* 502 U.S. at 67-68 (similarly involving a claim brought on federal habeas review of a state conviction challenging the admission of "other acts" evidence). The rule against using evidence of other crimes to infer bad character or propensity to commit the charged offense has been found to be "so deeply embedded in our jurisprudence as to assume *almost* constitutional proportions." *Garceau v. Woodford,* 275 F.3d 769, 775 n.3 (9th Cir. 2001) (quoting Fed. R. Evid.

404(a), advisory committee note (1972)) (emphasis added), *judgment vacated on other grounds,* 538 U.S. 202 (2003); *see also Sims v. Stinson,* 101 F.Supp.2d 187, 196-97 (S.D.N.Y. 2000) (and cases cited therein), *aff'd,* 8 Fed. Appx. 14 (2nd Cir. Mar. 28, 2001). The United States Supreme Court explained the basis for excluding propensity evidence under the common law as follows:

> Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. . . . The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Michelson v. United States,* 335 U.S. 469, 475-76 (1948); *see also Old Chief v. United States,* 519 U.S. 172, 181 (1997) ("Generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged" constitutes "unfair prejudice" under Fed. R. Evid. 403). Although such evidence has the potential for prejudice, it is generally not excluded when it is particularly probative in showing intent, an element of the crime, identity, malice, motive, a system of criminal activity or when the defendant has raised the issue of character or has testified and the State impeaches him. *Spencer v. Texas,* 385 U.S. 554, 560-61 (1967). The possibility of prejudice is outweighed by the validity of the State's purpose. *Id.* at 561. The defendant's interests are protected by limiting instructions and the trial judge's discretion to exclude particularly prejudicial evidence despite its admissibility. *Id.*

The Supreme Court has expressly refused to decide whether a state law would violate the Fourteenth Amendment's Due Process Clause if it permitted the use of "prior crimes" evidence to show propensity to commit a charged crime. *See Estelle,* 502 U.S. at 75 n.5 (1991); *see generally United States v. Castillo,* 140 F.3d 874, 880 (10th Cir. 1998); *cf. Pliler,* 278 F.Supp.2d at 1074-75; *Klueger v. Lavigne*, No. 00-10410-BC, 2004 WL 45522, at *4 (E.D. Mich. Jan. 6, 2004) (unpublished) (citing *Dowling v. United*

*States,* 493 U.S. 342, 352-53 (1990)).  Moreover, to date, the Supreme Court has not decided whether the admission of prior acts for permissible purposes without a limiting instruction violates due process.  *Garceau,* 275 F.3d at 774-75; *Pliler,* 278 F.Supp.2d at 1075.  However, there are a few Supreme Court cases that provide guidance to state courts in adjudicating fair trial claims stemming from the admission of "other acts" evidence.

In *Spencer*, the Supreme Court ruled that admission of prior conviction evidence did not run afoul of the Due Process Clause when limiting instructions were given and the valid state purpose of enforcement of a habitual offender statute was served. *Spencer,* 385 U.S. at 563; *see also Marshall v. Lonberger,* 459 U.S. 422, 438 n.6 (1983) (reaffirming *Spencer*). The *Spencer* Court noted that in joint trials, i.e., when several co-defendants are jointly tried or when one defendant is charged with multiple offenses in one trial, evidence submitted on one crime may influence the jury on a different charge. *Spencer,* 385 U.S. at 562.  Yet, the joinder procedure is justified because "the jury is expected to follow instructions in limiting this evidence to its proper function" and because of the convenience of a single trial.  *Id.*  The *Spencer* Court pointed out that in *Michelson,* which did not involve a constitutional claim, the Court approved of the government's cross-examination of a defense witness about the defendant's prior conviction because "limiting instructions on this subject are no more difficult to comprehend or apply than those upon various other subjects."  *Id.* at 563 (quoting *Michelson,* 335 U.S. at 485).

In *Estelle,* the Supreme Court denied habeas corpus relief and held that the Due Process Clause was not offended by the admission of evidence of prior injuries to an infant for the purpose of proving an element of second degree murder, specifically, that defendant's killing of his infant daughter was an intentional act and not an accident. *Estelle,* 502 U.S. at 68-70.  The Court rejected the petitioner's claim that the trial court's jury instruction regarding the proper use of the injury evidence, *see* 502 U.S. at 67 n.1, could reasonably likely be misinterpreted by the jury as authorizing the use of propensity evidence; the Court reasoned that the trial court guarded against such a misinterpretation by specifically advising the jury that the evidence could not be considered to prove that defendant "is a person of bad character or that he has a disposition to commit crimes." *Id.* at 74-75.

In *Dowling*, a federal prisoner was convicted of robbing a bank, while wearing a ski mask and carrying a small pistol.  At his trial, the government introduced evidence that defendant, similarly masked and armed, had entered a home approximately two

weeks after the bank robbery.[11] *Dowling,* 493 U.S. at 344-45. The government stated that it introduced this evidence for purposes of strengthening the identification of the defendant as the bank robber. *Id.* at 345. The Third Circuit ruled the evidence was inadmissible under Fed. R. Evid. 403 and 404, but that the error was harmless under the less stringent harmless-error standard than that established in *Chapman v. California,* 386 U.S. 18 (1967), for constitutional errors given that the district court's "mistake was merely evidentiary and not of constitutional dimension." *Id.* at 346-47. The Supreme Court, faced with the question whether the admission of the other acts testimony offended the Constitution and therefore required application of the more stringent *Chapman* harmless-error standard, affirmed the Third Circuit's decision; the Court held the introduction of the testimony did not offend the due process test of "fundamental fairness," in significant part because of the limiting instructions provided by the judge and of the fact that the testimony "was at least circumstantially valuable in proving petitioner's guilt." *Id.* at 352-53.

Here, the Court concludes that the Ohio Court of Appeals' adjudication of petitioner's claim challenging the admission of his prior acts of abuse neither is contrary to nor involves an unreasonable application of these Supreme Court precedents. Because petitioner denied any involvement in the crimes charged and indeed questioned whether any crime had been committed at all, it was reasonable for the Ohio Court of Appeals to find that the evidence of petitioner's prior abuse of the victim was admissible as probative of issues critical to the case, such as petitioner's motive and intent. In addition, the trial court gave the following limiting instruction to ensure the evidence would not be improperly considered by the jury:

> Evidence has also been received about the commission of acts other than the offenses with which the Defendant is charged in this trial. That evidence was received only for a limited purpose. It was not received and you may not consider it to prove the character of the Defendant in order to show that he acted in conformity with that character. If you find that the evidence of other acts is true and that the Defendant committed them, you may consider that evidence only for the purpose of deciding whether it proves a) the absence of mistake or accident[,] b) the Defendant's motive, opportunity,

---

[11]The witness homeowner testified that she struggled with and unmasked the intruder, whom she identified as the defendant in the bank robbery trial. 493 U.S. at 344-45. Although petitioner was charged with burglary and other offenses based on the home intrusion incident, he was acquitted of those charges prior to the federal bank robbery trial. *Id.* at 345.

intent, or purpose, preparation or plan to commit the offense charged in this trial, or c) knowledge of circumstances surrounding the offense charged in this trial, or d) the identity of the person who committed the offense in this trial. That evidence cannot be considered for any other purpose.

(Vol. 17, Tr. 3334-35). Given the trial court's limiting instruction and the significant probative value of the prior abuse evidence on the issues of motive and intent, as well as the other limited purposes identified by the trial court in its instruction, the Ohio Court of Appeals could reasonably conclude in accordance with the Supreme Court's decisions in *Spencer, Estelle* and *Dowling* that the admission of such "other acts" evidence was proper and certainly did not rise to the level of a due process violation. *Cf. Pliler,* 278 F.Supp.2d at 1074 (stating that the state appellate court had "reasonably concluded" the admission of evidence of petitioner's prior acts of violence and stalking against the murder victim was proper as "relevant to the volatile nature of" their relationship and "probative of issues critical to the case: [petitioner's] intent and motive"); *Smith v. Roe,* 232 F.Supp.2d 1073, 1088 n.12 (C.D. Cal. 2002) (noting that "separate and apart from establishing the petitioner's propensity to commit domestic violence," evidence of petitioner's prior acts of domestic violence directed at the murder victim was "admissible without offending due process" as tending "to establish facts of consequence relevant to an element of the charged murder . . .–namely, petitioner's intentional doing of an act with malice aforethought that resulted in the victim's death").

The Court is further persuaded that petitioner is not entitled to habeas corpus relief because it is clear from the record that the Ohio courts understood their discretion was limited by Ohio R. Evid. 404(B)'s proscription against the admission of "other acts" evidence in order to show the defendant's propensity to commit the charged acts. As discussed above, *see supra* p. 66, the Supreme Court has declined to reach the constitutional issue in cases involving the arguably closer questions of whether due process is violated by a state law allowing propensity evidence or the admission of prior acts for permissible purposes without a limiting instruction. Because there is no clearly established Supreme Court precedent holding due process concerns are even implicated in such closer cases, it cannot be said under the applicable standard of review set forth in 28 U.S.C. § 2254(d) that the Ohio courts' decision to allow the "other acts" evidence in accordance with the proscriptions set forth in Ohio R. Evid. 404(B), and solely for the limited purposes listed by the trial court in its instructions to the jury, is contrary to and involves an unreasonable application of clearly established federal law as determined by the Supreme Court. *Cf. Hamilton v. McLemore*, No. 01-10121-BC, 2004 WL 1765483, at *7 (E.D. Mich. July 9, 2004) (unpublished) (the state appellate court's error in

admitting evidence of the petitioner's prior drunken driving conduct was not contrary to or an unreasonable application of Supreme Court precedent, because the "Supreme Court has declined to hold that similar 'bad acts' evidence is so extremely unfair that its admission violates fundamental conceptions of justice"); *see also Pliler,* 278 F.Supp.2d at 1074-75 (state appellate court's decision finding no abuse of discretion by the trial court in allowing evidence of prior acts of domestic violence by petitioner against the murder victim under a California statute, which permits "otherwise inadmissible" domestic violence propensity evidence in domestic violence cases, "was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent," because as the Ninth Circuit stated in *Garceau,* the Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes"); *Roe,* 232 F.Supp.2d at 1087-88 (same).

Accordingly, the Court concludes petitioner is not entitled to habeas corpus relief based on his claim alleged in Ground Six that he was denied a fair trial when, as qualified by its limiting instruction to the jury, the trial court allowed the State to introduce evidence of petitioner's prior acts of abuse against the victim.

**E.  Petitioner Is Not Entitled To Habeas Relief Based On His Claim Alleged In Ground Seven That The Prosecutor's Misconduct Deprived Him Of A Fair Trial**

In Ground Seven of the petition, petitioner alleges that the prosecutor's misconduct deprived him of his right to a fair trial guaranteed by the Fourteenth Amendment's Due Process Clause.  Petitioner specifically claims that the prosecutor engaged in the following acts of misconduct:  (1) he improperly introduced the "other acts" and hearsay evidence challenged in Grounds Five and Six of the petition; (2) in closing arguments, he "repeatedly asked the jury to speculate and assumed facts" that were not in evidence, "injected his personal beliefs to the jury," made an improper "religious reference," and "repeatedly expressed his opinion about the credibility of the witnesses who believed they saw Carrie or her automobile;" (3) he improperly introduced into evidence a photograph showing petitioner's "grim reaper" tattoo; (4) he improperly introduced into evidence a photograph taken of the victim after she was "purportedly beaten" by petitioner in April 1996; and (5) under the label of "miscellaneous misconduct," he failed to notify the court and defense counsel of inconsistent pretrial witness statements, failed to turn over a statement by State witness Vicki Watkins until trial, failed to disclose the results of a failed voice stress analyzer test given to Watkins until after her cross-examination at trial,

and "gratuitously introduced a form of sexism through argument and . . . witnesses . . . that 'Baker' women were supposed to do what the 'Baker' men told them to do."  (Doc. 1, pp. 23-26; Doc. 57, pp. 53-57).

Petitioner presented this claim to the Ohio appellate courts on direct appeal.  The Ohio Court of Appeals, which was the only state court to issue a reasoned decision addressing the matter, analyzed the claim under the following test established by the Ohio Supreme Court in *State v. Smith,* 721 N.E.2d 93, 112 (Ohio 2000): "The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused."  (Doc. 22, Ex. 8, p. 29).  Citing the Supreme Court's decision in *Smith v. Phillips,* 455 U.S. 209, 219 (1982), the court pointed out that "[t]he analysis must be centered on 'the fairness of the trial, not the culpability of the prosecutor.'" (*Id.*).

Turning to petitioner's specific allegations of misconduct, the Ohio Court of Appeals first rejected petitioner's claim of misconduct based on the improper introduction of "other acts" and hearsay evidence, because it had "already addressed the substantive law concerning the admission of the 'other acts' evidence and hearsay statements" that had been raised by petitioner in other assignments of error and had found no merit to such claims.  (*Id.*).  The court ruled on petitioner's remaining allegations of misconduct in relevant part as follows:

> Appellant argues that during closing argument the prosecutor improperly referred to evidence outside the record, asked the jury to speculate and interjected his personal opinion.  Since trial counsel did not object to these statements, we review these statements for plain error.  Crim.R. 52(B)....
>
> We have reviewed every statement appellant alleges was improper.  We find the statements seek to have the jury to draw reasonable inferences from the evidence.  The "religious reference" to which appellant refers merely analogizes the historical betrayal of Jesus Christ and Julius Caesar to the betrayal of Culberson by appellant.  There is nothing in closing arguments that could possibly be considered plain error. . . .
>
> The admission of the photograph of appellant's "grim reaper" tattoo was not error.  The evidence removed any question about Watkins' testimony, which identified appellant being on the deck at the Baker home.  Considering appellant's trial counsel['s] attempt to attack Lori Baker's and Watkins'

credibility, it was reasonable to allow the prosecution to ensure Watkins'
identification was beyond question. . . .

Appellant argues the prosecutor committed misconduct by admitting state
exhibit 20, an approximately two-by-three foot photograph of Culberson
after she had been beaten by appellant. The photograph was admitted
during the testimony of Debbie Culberson. The photograph was part of the
"other act" evidence we have found was properly admitted in evidence. A
much smaller photograph was given to the jury for deliberation and
probably would have sufficed at trial. Nevertheless, the trial court has wide
latitude on such an issue and we find no abuse of discretion. Even assuming
the photograph was admitted in error, we do not find the photograph
affected the fundamental fairness of the trial.

Appellant lists alleged "miscellaneous misconduct" by the prosecutor. The
record indicates the prosecution told the trial court that an out-of-court
statement by Vicki Watkins was turned over when discovered. Nothing in
the record indicates that the prosecution was deliberately withholding
discovery. In any event, the statement was reviewed by the trial court for
Crim.R. 16(B)(1)(g) purposes. The failure to turn over the failed voice
stress analyzer test given to Watkins had no demonstrable effect on the
outcome of the trial. The reference that "Baker women" do what "Baker
men" tell them was a reasonable effort, supported by Lori Baker's
testimony, to explain why Lori Baker initially did not reveal what she knew
about the crime.

We do not find any prosecutorial misconduct that prejudiced the outcome
of appellant's trial. . . .

(*Id.,* pp. 29-31).

In this case, the Ohio Court of Appeals correctly recognized that as stated in *Smith
v. Phillips,* 455 U.S. 209, 219 (1982), "[t]he touchstone of due process analysis in cases
of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the
prosecutor." The scope of federal habeas corpus review of prosecutorial misconduct
claims is narrow, as the federal court does not sit as an appellate court with supervisory
power to rectify general trial errors. *Donnelly v. DeChristoforo,* 416 U.S. 637, 642
(1974). Although preliminarily the court confronted with a prosecutorial misconduct

claim must determine whether the challenged conduct was improper, a finding of impropriety is not sufficient in itself to amount to a due process violation. *See, e.g., Darden v. Wainwright,* 477 U.S. 168, 179-80 (1986). Where no specific constitutional right is alleged to have been infringed by the prosecutor's conduct, a prosecutorial misconduct claim is one of ordinary trial error, which does not rise to the level of a constitutional violation unless the misconduct "so infected the trial with unfairness as to render the resulting conviction a denial of due process." ▬▬▬ ▬▬▬ ▬▬▬ ▬▬▬ ("Even if the prosecutor's conduct was 'undesirable or even universally condemned,' this Court can only provide relief if the [conduct was] so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process violation.")▬▬▬▬▬▬

Factors to be considered in weighing whether a prosecutor's misconduct amounts to a due process violation are: (1) the degree to which the misconduct has a tendency to mislead the jury and to prejudice the accused, *see Darden,* 477 U.S. at 182, and *Young,* 470 U.S. at 12; (2) whether the misconduct is isolated or extensive, *see Donnelly*, 416 U.S. at 646; (3) whether the misconduct is deliberate, *see id.* at 647; (4) whether the prosecutor manipulated or misstated the evidence, *see Darden,* 477 U.S. at 182, and *Berger v. United States,* 295 U.S. 78, 84-85 (1935), *overruled on other grounds by Stirone v. United States,* 361 U.S. 212 (1960); (5) the strength of the competent proof to establish the guilt of the accused, *see Darden,* 477 U.S. at 182; (6) whether the misconduct was objected to by defense counsel, *see id.* at 182-183 & n. 14, and *Young,* 470 U.S. at 13; and (7) whether a curative instruction was given by the trial judge, *see Darden,* 477 U.S. at 182. *See also Farmer v. Hofbauer,* 1 Fed.Appx. 372, 377-78 (6th Cir. Jan. 10, 2001) (not published in Federal Reporter); *Givens v. Yukins,* 238 F.3d 420 (table), No. 98-2429, 2000 WL 1828484, at **6-7 (6th Cir. Dec. 5, 2000) (unpublished); *Gordon v. Kelly,* 205 F.3d 1340 (table), No. 98-1905, 2000 WL 145144, at **7 (6th Cir. Feb. 1, 2000) (unpublished); *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir.) (citing *Serra,* 4 F.3d at 1355), *cert. denied,* 522 U.S. 1001 (1997).

Furthermore, as discussed above, *see supra* pp. 21-22, 56, in this federal habeas corpus proceeding challenging a state conviction, the Court may not grant relief based on a constitutional trial error committed during the state trial unless that error "had a substantial and injurious effect or influence in determining the jury's verdict." *See Calderon,* 525 U.S. at 145 (quoting *Brecht,* 507 U.S. at 637, which in turn relied on *Kotteakos* standard). Any constitutional error based on a claim of prosecutorial misconduct must meet the *Brecht* standard to warrant habeas corpus relief. *Gordon, supra*, 2000 WL 145144, at **12; *Hensley v. McGinnis,* 188 F.3d 507 (table), No. 98-

1675, 1999 WL 685932, at **3-4 (6th Cir. Aug. 25, 1999) (unpublished).

In light of these standards, petitioner is unable to prevail on his first claim of prosecutorial misconduct, which is based on the admission of the "other acts" and hearsay evidence challenged in Grounds Five and Six of the petition. As the Ohio Court of Appeals similarly concluded, because petitioner has not demonstrated he is entitled to habeas corpus relief based on the underlying merits of the claims alleged in Grounds Five and Six, he cannot claim entitlement to relief due to any error by the prosecutor in seeking to introduce the "other acts" and hearsay evidence challenged in those grounds.

With respect to petitioner's claim challenging the prosecutor's closing argument, which was not objected to at trial, this Court has reviewed each of the statements petitioner has cited as exceeding the bounds of propriety.[12] The Ohio Court of Appeals essentially found that most of the challenged remarks were not improper, because contrary to petitioner's contention, they merely sought "to have the jury draw reasonable inferences from the evidence." The Court agrees with this determination as it relates to petitioner's claim that the prosecutor "asked the jury to speculate and assumed facts" not in evidence. In any event, even assuming the prosecutor went too far in suggesting inferences that could be drawn from certain evidence, it is unlikely that the jury would have been misled by those suggestions, which were vague at best, to make any findings of guilt based on mere speculation. The trial court gave specific instructions to the jury as to when reasonable inferences could be made from facts established by direct evidence presented at trial, which further reduced the possibility of prejudice resulting from the prosecutor's remarks.

To the extent petitioner alleges that the prosecutor "interjected his personal beliefs"

---

[12]A strong argument can be made that petitioner has waived his claim challenging the prosecutor's closing argument because the Ohio Court of Appeals clearly and expressly relied on petitioner's violation of Ohio's contemporaneous objection rule when it reviewed the prosecutor's closing argument only for "plain error" due to defense counsel's failure to lodge an objection at trial. *See, e.g., Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001); *Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir. 2000) (citing *Paprocki v. Foltz,* 869 F.2d 281, 284-85 (6th Cir. 1989)), *cert. denied,* 532 U.S. 989 (2001); *cf. Taqwiim v. Johnson,* 229 F.3d 1154 (table), No. 99-3425, 2000 WL 1234322, at **3 (6th Cir. Aug. 22, 2000) (unpublished) (citing and quoting *State v. Brown,* 528 N.E.2d 523, 534 (Ohio 1988) ("Error that is not specifically objected to at trial is waived.")), *cert. denied,* 531 U.S. 1089 (2001). However, because respondent has not raised a waiver defense with respect to this claim, it is addressed here on the merits.

to the jury, the challenged comments were not sufficiently egregious to have prejudicially affected the jury's verdict.  Moreover, as the Ohio Court of Appeals reasonably concluded, the challenged "religious reference" made by the prosecutor did not amount to error of constitutional magnitude.  The prosecutor merely cited the betrayal of Julius Caesar by Brutus and of Jesus by Judas as "two very historical" examples of betrayal. (Vol. 17, Tr. 3322).  Although he went on to argue that the victim was also betrayed and that "that chapter of betrayal will always be written in the Culberson family history," the prosecutor was careful to point out that this case of betrayal "is not nearly as proportionately significant as the first two." (*Id.*).  Finally, there is no merit to petitioner's claim that he was denied due process because the prosecutor "repeatedly expressed his opinion about the credibility of [defense] witnesses" who testified that they saw the victim or her car after the time she was allegedly killed.  Contrary to petitioner's contention, the prosecutor did not engage in improper conduct.  During rebuttal in response to defense counsel's closing argument, he merely argued that these witnesses lacked credibility based on reasonable inferences that could be drawn from the evidence, which rendered them suspect as witnesses or otherwise exposed weaknesses or discrepancies in their testimony. (*See* Vol. 17, Tr. 3285-97).  *See United States v. Francis,* 170 F.3d 546, 551 (6th Cir. 1999) (citing *United States v. Veal,* 23 F.3d 985, 989 (6th Cir. 1994)).

Petitioner next challenges the admission of two photographs, which he contends were unduly prejudicial because they incited the jury's passions and sympathies against him.  With respect to petitioner's claim challenging the introduction of the photograph of petitioner's "grim reaper" tattoo, it was reasonable for the Ohio Court of Appeals to find that the admission of the photograph was "not error" and thus failed to trigger any concerns about the fairness of petitioner's trial.  As the state court reasonably concluded, and contrary to petitioner's contention that the "photograph had no legitimate purpose except to prejudice the jury" (*see* Doc. 57, p. 56), the photograph was introduced to remove any doubt about Watkins' identification of petitioner as the person she saw knocking on the Bakers' door in the early morning hours of August 29, 1996.  It is extremely doubtful that the jury would have considered the photograph for any purpose other than to determine whether Watkins' testimony, which was vehemently attacked by defense counsel at trial, was to be believed.

With respect to petitioner's claim challenging the introduction of a photograph taken of the victim in April 1996 after an alleged beating by petitioner, it was also reasonable for the Ohio Court of Appeals to conclude that it was within the trial court's discretion to allow the photograph as part of the "other acts" evidence found to be

properly admitted at trial, *see supra* pp. 63-69, and that any error in its admission did not "affect[] the fundamental fairness of the trial." It is conceded that the photograph, which apparently caused Debbie Culberson to cry during her trial testimony, is likely to have evoked some degree of sympathy from the jurors. However, the Court is convinced that the jury was not misled by such "other acts" evidence to convict petitioner out of passion and without regard to the evidence on the murder and kidnapping charges that arose from a separate incident occurring four months later. Indeed, the record demonstrates that the jury's verdicts were not the product of any passions or sympathies allegedly generated from its viewing of the challenged photographs. Instead, given that the jury acquitted petitioner on some of the charges brought against him and recommended a life sentence instead of the death penalty, it appears that the verdicts were based on the jurors' rational assessment of all the evidence that was properly introduced at trial.

Finally, the Ohio Court of Appeals' resolution of the various allegations of "miscellaneous misconduct" was reasonable. First, with respect to petitioner's claim regarding the prosecutor's failure to disclose certain inconsistencies between various State witnesses' pretrial statements and trial testimony, the Court assumes petitioner is referring to the pretrial witness statements claimed in Ground Two of the petition to have been withheld by the State in violation of *Brady*. As discussed above in addressing those claims, *see supra* pp. 36-39, any inconsistencies contained in the pretrial statements, which were not available to and used by the defense at trial, would have had little if any impact on the jury's assessment of the State witnesses' credibility and reliability as eyewitnesses to the events they observed the night of August 28-29, 1996. Second, no clear and convincing evidence has been presented to rebut the Ohio Court of Appeals' finding, which is presumed correct, *see supra* p. 3 n.2, that the pretrial statement made by State witness Vicki Watkins in fact was disclosed by the prosecution when it was discovered. It further appears that any evidence arguably favorable to the defense that was contained in Watkins' pretrial statement came out at trial. (*See* Vol. 9, Tr. 1605-15, 1627-29). Third, as discussed above in addressing petitioner's *Brady* claim alleged in Ground Two stemming from the alleged suppression of Watkins' voice stress analyzer test results, *see supra* p. 42, no showing has been made that the test results would have had any impact on the jury in favor of petitioner. Fourth, the Court agrees with the Ohio Court of Appeals' determination that the prosecutor's references to the "Baker" women doing what the "Baker" men tell them constituted a "reasonable effort" to explain why Lori Baker initially lied to police investigators about her knowledge of the events that took place on the night of August 28-29, 1996. In any event, even assuming the references amount to a "form of sexism" as petitioner contends, no showing has been made even remotely indicating they prejudicially affected or influenced the jury's verdict.

Accordingly, in sum, this Court concludes that the Ohio Court of Appeals' adjudication of petitioner's prosecutorial misconduct claims neither is contrary to nor involves an unreasonable application of the relevant Supreme Court precedents, and is based on a reasonable determination of the facts in light of the record evidence. Therefore, petitioner is not entitled to habeas corpus relief based on his due process claim alleged in Ground Seven of the petition.

## F. Petitioner Is Not Entitled To Habeas Relief Based On His Claim Alleged In Ground Eight That The State Courts' Refusal To Allow His Trial And Appellate Counsel Access To Witness Statements Violated His Constitutional Rights

In Ground Eight of the petition, petitioner claims that his Sixth Amendment right to confront witnesses and his Fourteenth Amendment right to due process were violated "when the state courts refused to allow [his] trial or appellate counsel to view witness statements for inconsistencies prior to cross examination and on direct appeal." (Doc. 1, pp. 27-28; Doc. 57, pp. 58-61).

It appears from the record presented that petitioner's trial counsel filed a motion pursuant to Ohio R. Crim. P. 16(B)(1)(g) prior to trial for "all previous statements of all potential witnesses" to be made available by the State to the trial court "so that the Court, then, at the end of each witness's testimony . . . has the ability to review those statements to see whether or not the testimony of the witness was consistent with those statements." (Vol. 1, Tr. 125). In arguing his position, counsel stated in relevant part:

> The government thinks that we want to get into the secrecy of the Grand Jury proceeding. We don't. We want the Court to have available all statements by any potential witnesses so when that witness finishes their testimony, the government can't say, well, Judge, the witness testified before the Grand Jury but we did not type that up. *We do not expect to see those transcripts but we expect the Court to see them or at least have them available*, and we're trying to eliminate a classic excuse by the government for by-passing that.
>
> *We'd also, in addition, ask the Court be provided with all previous statements of all potential witnesses, not for our benefit but for the Court's benefit*. . . .

(*Id.,* Tr. 124-25) (emphasis added).

The prosecutor responded to this argument as follows:

. . . .[I]f I understand the position that the Defense now takes, it is to merely make the written or typed testimony of each of the Plaintiff's witnesses, whether Grand Jury or whether they were statements given during the course of the investigation to law enforcement officers or investigators in writing, to make those available to the Judge *in camera* following the testimony of each individual witness. If that's the case then the State intends to have those in typed or written form, or as they were provided to law enforcement for the *in camera* inspection of the Court.

(*Id.,* Tr. 125). The court then granted petitioner's Ohio R. Crim. P. 16(B)(1)(g) motion to the extent the State was willing to make "these statements available at the appropriate time so the Court can review them." (*Id.,* Tr. 125-26).

Without lodging any objection to this ruling on his Ohio R. Crim. P. 16(B)(1)(g) motion, defense counsel moved on to discuss another request under Ohio R. Crim. P. 16(B)(1)(c), which apparently was not contained in his original motion, for a court order requiring the prosecuting attorney to permit the defendant to inspect the "police reports in this case" and "any statements of any witnesses" on the ground that they were "material to the preparation of the defense." (*Id.*, Tr. 126-27). The prosecutor opposed this motion, arguing that as long as it does not contain *Brady* material, "[o]ur investigative work product does not have to be turned over." (*Id.,* Tr. 128-29). The prosecutor argued further that under Ohio R. Crim. P. 16(B)(1)(c):

. . . .[I]f we intended to use any of the [witness] statements as evidence then we would turn those over in their entirety, but we will call witnesses in to testify. The statements will not be used as documents for evidence, therefore, they don't get disclosed. They are subject [instead] to your *in camera* inspection [under Ohio R. Crim. P. 16(B)(1)(g)].

(*Id.,* Tr. 129-30).

The court did not rule on petitioner's Ohio R. Crim. P. 16(B)(1)(c) request at that time. Oral arguments were again later heard on the matter. (*See id.,* Tr. 197-200; Vol. 2, Tr. 208-210). The prosecutor maintained that the State was not required under that rule to disclose non-*Brady* witness statements to the defense, but rather under Ohio R. Crim. P. 16(B)(1)(g), the statements "would all be provided to the Court following the

testimony of those individual witnesses" for *in camera* review.  (Vol. 2, Tr. 209-10).
After hearing the parties' arguments, the trial court overruled petitioner's Ohio R. Crim.
P. 16(B)(1)(c) motion for disclosure of all witness statements to the defense.  (*Id.,* Tr.
218).   A written order, which followed the court's ruling on the record, stated:
"Defendant's Motion to Disclose Witness Statements Prior to Trial is overruled.   All
witness statements will be provided to the Court pursuant to Criminal Rule 16(B)(1)(g)."
(Doc. 50, Ex. 12, Judgment Entry, ¶ 33).

    Petitioner asserted a claim on direct appeal that he was denied his constitutional
right to due process because the trial court refused "to allow defense counsel access to
inconsistent witness statements pursuant to Crim. R. 16(B)(1)(g)."  (Doc. 22, Ex. 5, pp.
15-18).  In a post-trial Entry filed October 14, 1998 for the purpose of submitting to the
Ohio Court of Appeals "all the statements and grand jury testimony it was given prior to
the testimony of the State's witnesses," the trial court stated:

> . . .[T]o the extent there is any confusion in the record, it is the recollection
> of this Court, and the parties, that counsel for Mr. Doan requested to review
> the statements of the State's witnesses prior to cross-examination.  This
> Court ruled that it would review the statements first and the defense would,
> after the witness testified, be permitted to use those portions of the
> statements that this Court found to be inconsistent with the witness's trial
> testimony.

(Doc. 50, Ex. 9).  Apparently, the trial court issued another entry on March 26, 1999,
changing its previous entry as follows:

> It is the finding of this Court, as well as its recollection, that defense counsel
> *** did not request to review the statements of the State's witnesses prior
> to cross-examination, but rather requested the Court to review these
> statements and bring to their attention any discrepancies between the
> testimony of the State's witness and that witness' prior written or recorded
> statement pursuant to Criminal Rule 16(B)(1)(g).

(*See id.,* Ex. 22, p. 2).

    Based on the trial court's original Entry, the Ohio Court of Appeals at first ordered
the witness statements submitted to it by the trial court "unsealed" for the purpose of
permitting petitioner's appellate counsel access to the statements "to determine whether

78

there were prejudicial inconsistencies between the witness statements and the testimony at trial." (*See id.,* Ex. 15; Ex. 10, p. 2). However, after the trial court issued its subsequent Entry on March 26, 1999, the Court of Appeals granted the State's motion for reconsideration and denied petitioner's motion to unseal the witness statements for the reason that "it appears that appellant's trial counsel elected to let the trial court review prior statements by witnesses who testified at trial for inconsistencies." (*Id.,* Ex. 22). Petitioner, therefore, asserted an additional claim on direct appeal that he was denied his right to due process and effective assistance of counsel on appeal based on the state court's refusal to allow his appellate counsel access to the witness statements under Ohio R. Crim. P. 16(B)(1)(g). (*See* Doc. 22, Ex. 5, p. 39).

Without addressing the federal constitutional issues, the Ohio Court of Appeals rejected petitioner's claims of error on direct appeal as follows:

Crim.R. 16(B)(1)(g) provides, in relevant part, that:

> Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of such inconsistencies, if any, between the testimony of such witnesses and the prior statement.

In interpreting this paragraph of Crim.R. 16(B)(1)(g), the Supreme Court of Ohio has held that, upon timely motion by the defendant, attorneys for all parties must be given the opportunity to review out-of-court witness statements for "any perceived inconsistencies between the testimony of the witness and the prior statement." *State v. Daniels* (1982), 1 Ohio St.3d 69, syllabus. However, appellant's trial counsel elected to have the trial court review any potentially inconsistent statements. . . . Therefore, the trial court's action w[as] not in error because, unlike *Daniels,* a timely motion to personally review the statements was never made. Appellant argues for reversal based on plain error. Crim.R. 52(B). However, plain error allows for review where a timely objection to an alleged trial court error was never made. *Id.* In this case, the trial court merely complied with trial counsel's request to have the trial court review potentially inconsistent out-of-court statements of testifying witnesses. . . .

(Doc. 22, Ex. 8, pp. 25-26).[13]

As an initial matter, to the extent petitioner claims he was denied his right established by the Ohio Supreme Court in *Daniels* to personally review witness statements subject to the trial court's *in camera* inspection under Ohio R. Crim. P. 16(B)(1)(g), he raises an issue of state law only which is not cognizable in this federal habeas proceeding. *See supra* p. 56; *see also* 28 U.S.C. § 2254(a); *Pulley,* 465 U.S. at 41; *Estelle,* 502 U.S. at 67-68. This Court's review is limited to consideration of the question whether petitioner was entitled under the federal Constitution to personally review witness statements for inconsistencies prior to cross-examination of State witnesses and for direct appeal purposes. Because the Ohio Court of Appeals failed to address the federal constitutional issues raised by petitioner, such claim is subject to de novo review. *See Maples v. Stegall,* 340 F.3d 433, 436-37 (6th Cir. 2003) (relying on the Supreme Court's recent decision in *Wiggins v. Smith,* 539 U.S. 510 (2003), wherein the Court conducted a de novo review of the portion of petitioner's claim not considered by the state courts, without applying 28 U.S.C. § 2254(d)'s standard of reasonableness or giving any deference to the state courts); *see also Davis v. Secretary for Dep't of Corrections,* 341 F.3d 1310, 1312 (11th Cir. 2003).

In this case, petitioner alleges both his Sixth Amendment right to confront witnesses and his Fourteenth Amendment right to due process were violated by the state courts' refusal to disclose State witnesses' pretrial statements to him. In *Pennsylvania v. Ritchie,* 480 U.S. 39 (1987), the Supreme Court was faced with similar claims. In that case, a defendant convicted of various sexual offenses against his daughter contended he was denied his Sixth and Fourteenth Amendment right to discover favorable evidence when the trial court refused to order disclosure of a state agency's records regarding its investigation of defendant's suspected abuse of his children, which were deemed privileged under a state statute. *See id.,* 480 U.S. at 43-46. A plurality of the Court analyzed petitioner's claim only by reference to "Fourteenth Amendment precedents addressing the fundamental fairness of trials" and specifically rejected the argument that such claim was subject to review under the Sixth Amendment's Confrontation Clause,

---

[13]As noted above with respect to one of petitioner's prosecutorial misconduct claims, *see supra* pp. 73-74 n.12, an argument can be made that petitioner has waived his claim challenging the state courts' refusal to disclose witness statements because the Ohio Court of Appeals clearly and expressly reviewed the claim only for "plain error" due to defense counsel's procedural default in failing to request to personally inspect the statements during trial. However, because respondent similarly has not raised a waiver defense with respect to this claim, it is addressed here on the merits.

which "only protects a defendant's trial rights, and does not compel the pretrial production of information that might be useful in preparing for trial." *Id.* at 52-56 & n.9.

As discussed above in addressing Ground Two of the petition, *see supra* p. 35, it is well settled that the government is obligated under the Due Process Clause to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. *Id.* at 57 (citing *Brady*, 373 U.S. at 87). However, a "defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [State's] files." *Id.* at 59; *see also Weatherford v. Bursey,* 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one."). In *Ritchie,* 480 U.S. at 59 (footnote omitted), the Supreme Court explained:

> Although the eye of an advocate may be helpful to a defendant in ferreting out information, . . . this Court has never held–even in the absence of a statute restricting disclosure–that a defendant alone may make the determination as to the materiality of information. Settled practice is to the contrary. In the typical case where a defendant makes only a general request for exculpatory material under *Brady* . . ., it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.

The Supreme Court recognized that disclosure of otherwise privileged records may be required in certain circumstances based on a "plausible showing" by defendant that they contain relevant information both material and favorable to his defense. *See id.* at 57-58 & n.15. The Court held, however, that the interest of ensuring a fair trial would be fully protected by requiring the files to be "submitted only to the trial court for *in camera* review." *Id.* at 60. The Court reasoned:

> Although this rule denies [defendant] the benefits of an "advocate's eye," we note that the trial court's discretion is not unbounded. If a defendant is aware of specific information contained in the file . . ., he is free to request it directly from the court, and argue in favor of its materiality. Moreover, the duty to disclose is ongoing; information that may be deemed immaterial upon original examination may become important as the proceedings

progress, and the court would be obligated to release information material to the fairness of the trial.

*Id.*

In his opinion concurring in part and concurring in the judgment, Justice Blackmun disagreed with the plurality to the extent it was his view "there might well be a confrontation violation if, as here, a defendant is denied pretrial access to information that would make possible effective cross-examination of a crucial prosecution witness. *Id.* at 61-62. However, Justice Blackmun went on to state: "I am able to concur in the Court's judgment because, in my view, the procedure the Court has set out for the lower court to follow on remand is adequate to address any confrontation problem." *Id.* at 65. In so concluding, he pointed out:

> Under the Court's prescribed procedure, the trial judge is directed to review the . . . file for "material" information. . . . This information would certainly include such evidence as statements of the witness that might be used to impeach her testimony by demonstrating any bias towards [the defendant] or by revealing inconsistencies in her prior statements. When reviewing confidential records in future cases, trial courts should be particularly aware of the possibility that impeachment evidence of a key prosecution witness could well constitute the sort whose unavailability to the defendant would undermine confidence in the outcome of the trial. . . . [T]he trial court's obligation to review the confidential record for material information is ongoing. Impeachment evidence is precisely the type of information that might be deemed to be material only well into the trial, as, for example, after the key witness has testified.

*Id.* at 65-66.

Here, petitioner has not demonstrated that his constitutional rights were violated by the state courts' rulings pertaining to his discovery requests. First, the prosecutor was expressly ordered by the trial court to disclose all exculpatory evidence in the State's possession to the defense. (*See* Doc. 50, Ex. 12, Judgment Entry, ¶ 7). Indeed, this Court has rejected petitioner's specific claims that certain evidence, including allegedly inconsistent pretrial statements made by key State witnesses, were improperly withheld from him in violation of *Brady*. (*See supra* pp. 27-45). Therefore, petitioner has not established that the denial of his motion for disclosure of witness statements implicates

any due process concerns under *Brady*.

Second, it appears that contrary to petitioner's contention, defense counsel did not request to personally review the witness statements submitted by the prosecutor to the trial court for *in camera* inspection pursuant to Ohio R. Crim. P. 16(B)(1)(g) "[u]pon completion of a witness' direct examination at trial." Petitioner's request for disclosure of witness statements was made only pursuant to a motion for pretrial discovery pursuant to Ohio R. Crim. P. 16(B)(1)(c), which provides in pertinent part that "[u]pon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy . . . papers, documents, or copies or portions thereof, available to or within the possession, custody or control of the state, and which are material to the preparation of the defense." However, Ohio R. Crim. P. 16(B)(2) expressly provides: "Except as provided in subsections (B)(1)(a), (b), (d), (f), and (g), this rule does not authorize the discovery or inspection of . . . statements made by witnesses or prospective witnesses to state agents." This provision makes it clear that the prosecution is not obligated to produce any witness statements, which do not fall into the category of *Brady* material or co-defendant statements, except as provided in Ohio R. Crim. P. 16(B)(1)(g). *See State v. Boyce,* No. 98-CA-95, 1999 WL 959180, at *3 (Ohio Ct. App. Aug. 6, 1999) (unpublished); *see also State v. Buhrman,* No. 96 CA 145, 1997 WL 566154, at *8-9 (Ohio Ct. App. Sept. 12, 1997) (unpublished) ("With the exception of [Ohio R. Crim. P. 16(B)(1)(g)], witness statements are not discoverable under Criminal Rule 16."), *appeal dismissed,* 687 N.E.2d 473 (Ohio 1997). Therefore, the trial court did not err in denying petitioner's request under Ohio R. Crim. P. 16(B)(1)(c) for pretrial discovery of witness statements, and ordering instead that "[a]ll witness statements will be provided to the Court pursuant to Criminal Rule 16(B)(1)(g)." *Cf. State v. Scudder,* 643 N.E.2d 524, 531 (Ohio 1994) (defendant was not entitled to "*pretrial* release of [witness] statements under Crim.R. 16(B)(1)(g), which governs the procedure for release of a witness's inconsistent prior written or recorded statements *after* the witness has testified on direct examination at trial"), *cert. denied,* 515 U.S. 1164 (1995); *State v. Lane,* 358 N.E.2d 1081, 1088 (Ohio 1976) ("Where a prosecution witness is not a co-defendant, a trial court does not err in refusing to compel discovery of prior statements and grand jury testimony given by said witness."), *vacated on other grounds,* 438 U.S. 911 (1978); *State v. Stidham,* No. 9-106, 1982 WL 5745, at *3 (Ohio Ct. App. Dec. 30, 1982) (unpublished) (affirming denial of motion under Ohio R. Crim. P. 16(B)(1)(c) for disclosure of prospective prosecution witness statement).

Contrary to petitioner's contention, it further appears from the record that upon defense counsel's request, the trial court engaged in an *in camera* review of prior

statements made by State witnesses Vicki Watkins and Lori Baker after their direct examination at trial "with the defense attorney and prosecuting attorney present and participating." (*See* Vol. 9, Tr. 1613-16, 1619-36, 1649-50, 1726). At various points in their colloquy, defense counsel indicated that he had knowledge of, if not direct access to, any inconsistencies contained in those statements. (*See id.,* Tr. 1614, 1622, 1628, 1629, 1632, 1633-34). It appears from the present record that the trial court complied with its duty under Ohio R. Crim. P. 16(B)(1)(g) to determine whether inconsistencies between the witnesses' statements and trial testimony existed and, if so, to provide the statements to the defense attorney for use in cross-examination of the witnesses as to the inconsistencies. Even assuming, *arguendo,* that the trial court failed to follow the procedures prescribed by state law, the procedure utilized in this case comported with due process under the standards enunciated in *Ritchie*. As in *Ritchie,* petitioner's right to a fair trial was fully protected by the trial court's *in camera* review of witness statements to determine if any inconsistencies existed for impeachment purposes on an ongoing basis as the trial progressed. The court's discretion was not unbounded as defense counsel actively participated in the discussion of the statements subject to *in camera* inspection and was free to request specific information contained in the statements and to argue in favor of its materiality.

Finally, to the extent petitioner's counsel may not have specifically requested to personally review certain witness statements and thus may not have been provided access to those statements, petitioner has not made a "plausible showing" that any such non-disclosed evidence was material and favorable to the defense. Petitioner cites only Billie Jo Brown's prior statement, which he claims he obtained after his conviction "as a result of a related civil action" that the victim's mother filed against him. (*See* Doc. 57, p. 59). It appears from the record that petitioner's trial counsel had some knowledge of information contained in Brown's prior statement, which was included in a search warrant affidavit disclosed to him. In fact, during trial, petitioner's counsel argued that the prior statement was inconsistent with Brown's trial testimony under Ohio R. Crim. P. 16(B)(1)(g), but the trial court determined there was no inconsistency. (*See* Vol. 9, Tr. 1637-40). In any event, as discussed above in addressing petitioner's *Brady* claim alleged in Ground Two, which was based on the State's alleged suppression of Brown's prior statement, the discrepancies between Brown's pretrial statement and trial testimony were "minor" and "would have had little if any impact on the jury's verdict." *See supra* p. 37. Therefore, petitioner has not persuaded this Court that any failure to disclose Brown's or other witnesses' pretrial statements to petitioner's trial or appellate counsel rises beyond mere speculation to the level of error of constitutional dimension.

Accordingly, this Court concludes petitioner has not demonstrated he is entitled to habeas relief based on the constitutional claim alleged in Ground Eight challenging the state courts' refusal to allow him access to State witness pretrial statements.

## G.  Petitioner Is Not Entitled To Habeas Relief Based On His Claim Alleged In Ground Nine That He Was Deprived Of A Fair And Impartial Jury Due To Extensive Pretrial Publicity And Improper Handling Of Jury Voir Dire

In Ground Nine of the petition, petitioner contends he was denied his constitutional right to a fair and impartial jury trial as a result of the trial court's refusal to grant a change of venue due to extensive pretrial publicity and its improper handling of the voir dire of potential jurors.  (Doc. 1, pp. 28-29; *see also* Doc. 57, pp. 61-71).  These claims were presented by petitioner to the state courts on direct appeal in two assignments of error and are thus subject to review.

The Ohio Court of Appeals, which was the last state court to render a reasoned decision addressing the merits of the claims asserted in petitioner's fifth and seventh assignments of error, made findings of fact, which are presumed correct, *see supra* p. 3 n.2, and ruled in relevant part as follows:

> In the fifth assignment of error, appellant argues that pretrial publicity deprived appellant of his Sixth Amendment right to an impartial jury trial . . . as well as his Fifth Amendment right to not be deprived of liberty without due process of law.  We disagree.
>
> The disappearance of Culberson, speculation that appellant was the prime suspect and his subsequent arrest, indictment and trial was heavily covered in the local media in and around Clinton County.  The record reflects numerous articles concerning the case in the Wilmington News Journal and community newspapers such as the Blanchester Star Republican.  In addition, this case was covered in the Cincinnati Enquirer and the Cincinnati Post, both of which circulate in Clinton County.  Television coverage of this case from local Dayton and Cincinnati stations permeated Clinton County.  The case also apparently received national attention on television programs such as Montel Williams, Inside Edition and Oprah Winfrey.
>
> Appellant moved for a change of venue, which was overruled by the trial court after completion of voir dire.  Crim.R. 18(B) provides that a change

of venue is appropriate where "a fair and impartial trial cannot be held in the court in which the action is pending." R.C. 2901.12(K), a section of the criminal venue statute, contains substantively identical language. The trial court has discretion in determining whether to grant a motion for change of venue and "appellate courts should not disturb the trial court's [venue] ruling *** unless it is clearly shown that the trial court has abused its discretion." . . .

In relatively "rare" cases, adverse pretrial publicity can be so pervasive that a presumption of prejudice exists. . . . However, it is settled that "pretrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial." *Nebraska Press* [*Ass'n v. Stuart,* 427 U.S. 539, 554 (1976)]. Appellant argues the pretrial publicity was so pervasive in the venue of Clinton County that a presumption of prejudice in the jury panel should have been found.

Voir dire is the best method for determining whether, despite pretrial publicity, a fair and impartial jury can be obtained in the local community.... We have carefully reviewed the voir dire. Every member of the jury pool, without exception, which stated he or she was unable to divorce his or her preconceived notions about the case from the evidence was dismissed. The overwhelming majority of the jury pool was familiar with the case. However, most of the jury pool could recall little of the television coverage. A typical potential juror had seen appellant's face on television, but could recall nothing he said on television. We do not believe a presumption of prejudice can be shown in this case. Moreover, as detailed in the seventh assignment of error, the voir dire was appropriately conducted. The trial court acted within its discretion in overruling the motion for a change of venue. . . .

****

[With respect to the seventh assignment error challenging how voir dire was conducted,] . . . [a]bsent an abuse of discretion, the trial court's decision on how to conduct voir dire will not be reversed. Appellant argues the trial court abused its discretion by questioning potential jurors in groups, rather than individually, about pretrial publicity. The voir dire included individual questioning of jurors, but pretrial publicity was not discussed during

86

individual questioning, which centered on the penalty phase of the trial.

Appellant's argument is that, by not individually questioning each potential juror about pretrial publicity, appellant's trial counsel was restricted from asking detailed question[s] because counsel risked poisoning other members of the jury pool. However, the Supreme Court of Ohio has held individual questioning of potential jurors is not required in a capital case....

Appellant argues it was error to allow the prosecution more latitude in voir dire than the defense counsel. The prosecution was allowed to review the indictment and the elements of the offenses which were to be at issue during the trial. We find the trial court was within its discretion to allow the prosecution to review the charges with potential jurors. This review did not include any improper discussion of the evidence. By contrast, defense counsel repeatedly asked jurors if they believed Culberson was alive. This was clearly improper and objections were properly sustained. The comparison appellant seeks to draw is a non sequitur.

Appellant argues that his trial counsel was prevented from asking the jury if they would be unfairly influenced by "other acts" evidence. Having reviewed the portion of the transcript appellant cites in his brief, the trial court never prevented appellant's counsel from asking potential jurors if they would be unfairly influenced by other acts evidence. The question asked by appellant's trial counsel to a potential juror was "if you were on trial and if that is what the charges were wouldn't you want to be tried just on something that happened that day?" The trial court found the question improper because the crime can be "on or about" a certain day. After listening to appellant's trial counsel['s] explanation that he was seeking to question jurors about "other acts" evidence, the trial court sustained an objection because of the phrasing of the question. Appellant's trial counsel decided not to ask further questions on the subject. It is clear appellant's counsel was given the opportunity to ask further questions.

The voir dire was conducted within the sound discretion of the trial court. The decisions rendered by the trial court during voir dire were not unreasonable, unconscionable or arbitrary. The seventh assignment of error is overruled.

(Doc. 22, Ex. 8, pp. 26-28, 32-34) (state case citations and footnote omitted).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury." The right, held applicable to the states through the Fourteenth Amendment's Due Process Clause, requires that a defendant be provided a fair trial by a panel of impartial, "indifferent" jurors whose verdict is based on the evidence developed at trial. *Irvin v. Dowd,* 366 U.S. 717, 722 (1961). The right does not mandate a new trial every time a juror has been placed in a potentially compromising situation or that jurors be totally ignorant of the facts and issues involved as "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips,* 455 U.S. 209, 217 (1982); *see also Murphy v. Florida,* 421 U.S. 794, 800 (1975). The constitutional requirement of impartiality is satisfied if the jury is "capable and willing to decide the case solely on the evidence before it." *Smith,* 455 U.S. at 217.

By the time of petitioner's trial and conviction in 1997, the Supreme Court had clearly established two standards–the "actual prejudice" standard and the "presumed prejudice" standard–to guide courts considering the issue whether a change of venue is necessary to ensure an impartial jury as required by the Constitution. *See Nevers v. Killinger,* 169 F.3d 352, 362 (6th Cir.), *cert. denied,* 527 U.S. 1004 (1999).[14] Under the "presumed prejudice" standard, extensive adverse pretrial publicity amounting to a "huge wave . . . of public passion" can create such a presumption of prejudice in a community that jurors' assurances of their impartiality should not be believed. *Mu'Min v. Virginia,* 500 U.S. 415, 429 (1991); *see also Patton v. Yount,* 467 U.S. 1025, 1031, 1333 (1984) (quoting *Irvin,* 366 U.S. at 728); *Murphy,* 421 U.S. at 798-99. The cases where the Supreme Court has presumed prejudice in the face of juror attestation to the contrary are few and, indeed, "can only be termed extraordinary." *DeLisle v. Rivers,* 161 F.3d 370, 382 (6th Cir. 1998) (en banc) (citing *Murphy,* 421 U.S. at 798-99), *cert. denied,* 526 U.S. 1075 (1999). "[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself" to create such a presumption. *Dobbert v. Florida,* 432 U.S. 282, 303 (1977); *see also Murphy,* 421 U.S. at 799; *DeLisle,* 161 F.3d at 382 ("it is beyond question that mere knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits,

---

[14]The Sixth Circuit later abrogated *Nevers,* but only to the extent the court employed a subjective inquiry rejected by the Supreme Court in *Williams,* 529 U.S. at 409-10 (O'Connor, J.), in assessing the reasonableness of the state court's application of clearly established federal law. *See Harris,* 212 F.3d at 942-43; *see also supra* p. 19.

does not in and of itself raise a presumption of jury taint").

The "presumed prejudice" category of cases is represented by *Rideau v. Louisiana,* 373 U.S. 723 (1963); *Estes v. Texas,* 381 U.S. 532 (1965); and *Sheppard v. Maxwell,* 384 U.S. 333 (1966). *See Nevers,* 169 F.3d at 362; *see also Murphy,* 421 U.S. at 798-99; *Ritchie v. Rogers,* 313 F.3d 948, 952 (6th Cir. 2002), *cert. denied,* 540 U.S. 842 (2003). In those cases, the influence of the news media, either in the community at large or the courtroom itself, was found to have "pervaded the proceedings." *Murphy,* 421 U.S. at 799. As the Court in *Murphy* explained in examining the specific facts of those cases:

> In *Rideau,* the defendant had "confessed" under police interrogation to the murder of which he stood convicted. A 20-minute film of his confession was broadcast three times by a television station in the community where the crime and the trial took place. In reversing, the Court did not examine the *voir dire* for evidence of actual prejudice because it considered the trial under review "but a hollow formality"–the real trial had occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras.
>
> The trial in *Estes* had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, *Sheppard* arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob.

*Id.*; *see also Nevers,* 169 F.3d at 362-63. The Sixth Circuit observed in *Nevers*: "Since *Murphy,* the Supreme Court has not applied the 'trial setting inherently prejudicial' standard of *Rideau, Estes,* and *Sheppard,* presumably because the 'televised interrogation/confession in a smaller community' and the 'tabloid-esque, carnival atmosphere' instances have not arisen. We think that the holdings in those cases are limited to their facts." *Nevers,* 169 F.3d at 363.

In the second category of cases, where there is no evidence of a "trial atmosphere . . . utterly corrupted by press coverage" as found in *Rideau, Estes,* and *Sheppard,* the

Court must utilize the "actual prejudice" standard and examine the totality of the circumstances to determine whether the accused was deprived of a fair and impartial jury by pretrial publicity. *Dobbert,* 432 U.S. at 303; *Murphy,* 421 U.S. at 799; *see also Irvin,* 366 U.S. at 723. Under the "actual prejudice" standard, "pretrial publicity that would inherently prejudice the jury pool can be discerned only by reviewing both the extent and nature of the publicity *and* the responses of the prospective jurors in voir dire." *Nevers,* 169 F.3d at 363 (citing *Irvin*) (emphasis in original). Although under this standard the jurors' assurances that they would remain impartial are not dispositive of the issue, the defendant must make some showing from which actual juror bias or prejudice may be inferred to raise the presumption of partiality. *See Murphy,* 421 U.S. at 800; *see also Smith,* 455 U.S. at 215-17; *Irvin,* 366 U.S. at 723.

In a highly publicized case that does not involve "presumed prejudice," a "searching voir dire of the prospective jurors is the primary tool to determine if the impact of publicity rises to [the] level" of actual prejudice. *Ritchie,* 313 F.3d at 962. Indeed, the Supreme Court has held that "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois,* 504 U.S. 719, 729 (1992). "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Id.* at 729-30 (quoting *Rosales-Lopez v. United States,* 451 U.S. 182, 188 (1981) (plurality opinion)). A court's restrictions on voir dire inquiries are thus "subject to the essential demands of fairness." *Id.* at 730 (quoting *Aldridge v. United States,* 283 U.S. 308, 310 (1931)); *cf. Mu'Min,* 500 U.S. at 425-26 ("To be constitutionally compelled, . . . it is not enough that questions [about the content of the publicity to which jurors have been exposed] might be helpful [in assessing juror impartiality]. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair.").

However, by the same token, "the adequacy of voir dire is not easily the subject of appellate review." *Rosales-Lopez,* 451 U.S. at 188. At this stage of the trial, the trial court must determine the impartiality and credibility of the potential jurors by relying on its "own evaluations of demeanor evidence and of responses to questions." *Id.* On appellate review, it is difficult to "second-guess" the conclusions of the judge who actually heard and observed the prospective jurors. *Id.* In light of these concerns, the Supreme Court has stressed that the trial court must be accorded "wide discretion . . . in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." *Mu'Min,* 500 U.S. at 427; *see also Rosales-Lopez,* 451 U.S. at 189 ("Because the obligation to impanel an impartial jury lies in the first instance

with the trial judge, and because he must rely largely on his immediate perceptions, [trial] judges have been accorded ample discretion in determining how best to conduct the voir dire."). The Supreme Court reasoned further in *Mu'Min*:

> Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense. The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. The trial court, of course, does not impute his own perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire.

*Mu'Min,* 500 U.S. at 427. In *Mu'Min,* which involved a highly publicized case, the Supreme Court found no constitutional error in the trial court's denial of individual voir dire or its refusal to allow prospective jurors to be questioned about the specific contents of news reports. *See id.* at 431-32 (stating that in prior cases requiring the subject of possible racial bias to be "covered" in voir dire, "we have been careful not to specify the particulars by which this could be done" and, more specifically, that "[w]e did not, for instance, require questioning of individual jurors about facts or experiences that might have led to racial bias"); *see also Ritchie,* 313 F.3d at 961-62 & n.13.

In addition, on federal habeas corpus review of a state conviction, this Court's review is further limited to the extent the trial judge's determination of juror impartiality is a finding of fact entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). *See supra* p. 3 n.2; *see also Patton,* 467 U.S. at 1036-38; *Williams v. Bagley,* 380 F.3d 932, 944 (6th Cir. 2004); *DeLisle,* 161 F.3d at 382 (citing *Irvin,* 366 U.S. at 723, *Patton,* 467 U.S. at 1031, and *Mu'Min*, 500 U.S. at 428, the court stated "[o]ur standard of review in this *habeas* proceeding does not permit us to substitute our view of possible juror bias for the state court's view; we may overturn the state court's findings of juror impartiality if those findings are manifestly erroneous.") (emphasis in original). Because such a determination is largely one of credibility, and thus demeanor, the finding of the trial court is entitled to "special deference." *Patton,* 467 U.S. at 1038.

In this case, the Ohio Court of Appeals first rejected petitioner's claim that the pretrial publicity was so pervasive in the venue of Clinton County, where petitioner was tried, that a presumption of prejudice in the jury panel should have been found as in *Rideau, Estes,* and *Sheppard.* (*See* Doc. 22, Ex. 8, pp. 27-28). The court reached this

conclusion after reviewing the examination of the prospective jurors during voir dire to determine whether prejudice existed in the community where the offense occurred, which would have prevented petitioner from obtaining a fair and impartial jury there. (*See id.,* p. 28).  Although the state court relied primarily on state case-law in addressing petitioner's claim challenging the trial court's denial of his motion for change of venue based on prejudicial pretrial publicity, it appears the state standard utilized is analogous to the "actual prejudice" standard employed by the Supreme Court in *Irvin*, *Murphy* and *Dobbert.*

The state court did not contravene or unreasonably apply clearly established Supreme Court precedent in rejecting petitioner's claim of "presumed prejudice."  *See supra* pp. 19-20; 28 U.S.C. § 2254(d); *Williams,* 529 U.S. at 402-03 (O'Connor, J.).  As the Sixth Circuit held in *Nevers, Rideau* is "not applicable to this case because *Rideau* is limited to its facts: a televised jail-house interrogation of a defendant, in which he confessed to a robbery/kidnapping/murder that he had committed only the previous night, seen by over one-third of the community's residents . . . less than two months before his trial."  *Nevers,* 169 F.3d at 365; *accord DeLisle,* 161 F.3d at 384 (rejecting petitioner's claim that the non-televised dissemination of his confession created a presumption of prejudice under *Rideau*, because "it was only 'the *televising* of a defendant in the act of confessing to a crime' that the *Rideau* Court held 'was inherently invalid under the Due Process Clause of the Fourteenth Amendment'") (quoting *Estes,* 381 U.S. at 538) (emphasis added in *DeLisle*).  Moreover, upon review of the record of publicity presented by petitioner (*see* Doc. 57, Addendum) and the transcript of the trial proceedings, there is no indication that petitioner's trial took place under "the conditions of total chaos that prevailed in *Estes* and *Sheppard*" and which "drove those decisions."  *DeLisle,* 161 F.3d at 384-85; *accord Nevers,* 169 F.3d at 365-66.

The Court concedes, as the Ohio Court of Appeals found, that the press coverage of Culberson's disappearance, the criminal investigation that targeted petitioner as the "prime suspect," and petitioner's subsequent arrest, indictment and trial, was extensive. However, the fact there was extensive pretrial publicity is insufficient, standing alone, to justify a finding that petitioner's criminal trial was utterly corrupted by press coverage.  *See Dobbert,* 432 U.S. at 301-03.  Moreover, it appears upon review of the transcript of the voir dire proceedings, that the general public sentiment arising from the well-publicized incident was not such that a mob-like, carnival or circus atmosphere existed with respect to petitioner's particular trial.  Therefore, the facts do not suggest this case falls within the category of "extraordinary" or "utterly corrupting circumstances" for imputing partiality to jurors who explicitly and firmly stated they

could try the case fairly and without a predisposition to convict. *Cf. DeLisle,* 161 F.3d at 386.

Here, the trial court did not rule on petitioner's motion for change of venue until after the voir dire proceedings concluded. After hearing counsel's arguments, the court denied the motion as follows, apparently based on the finding that no "actual prejudice" had been shown:

> Well, the Court has listened to the questions that have been propounded to all the Jurors by both the State of Ohio and the Defense. The questions were rather exhaustive, the jury selection process has lasted over four days. I've listened to the answers of each juror, I've observed them as they've made these answers, and at this point in time I feel all jurors that are presently in the jury pool have indicated that they could be fair and impartial jurors, that they can make any decision that they were requested to make solely upon the evidence and testimony that comes from the witness stand here in the Courtroom and that they all would follow the Court's instructions. For those reasons the Court is going to overrule your motion for a change of venue.

(Vol. 7, Tr. 1242-43). On direct appeal, the state appellate court properly examined the voir dire transcript to determine whether actual prejudice existed in the community that prevented the impanelment of an impartial jury. Although the court relied on state law and thus did not refer to the "actual prejudice" standard under clearly established Supreme Court precedent, its determination that the trial court did not abuse its discretion in overruling petitioner's motion for a change of venue neither is contrary to nor involves an unreasonable application of such precedent. *See supra* p. 19; 28 U.S.C. § 2254(d); *Williams,* 529 U.S. at 407-08 (O'Connor, J.).

As the Ohio Court of Appeals found (*see* Doc. 22, Ex. 8, p. 28), although the record reflects that the "overwhelming majority" of prospective jurors had read or heard something about the case, "most of the jury pool could recall little of the television coverage" or significant details about the case discussed in the media reports. (*See, e.g.,* Vol. 2, Tr. 277-80; Vol. 3, Tr. 405-06, 441; Vol. 4, Tr. 654-55, 666-74, 790-93, 829-30; Vol. 5, Tr. 932; Vol. 6, Tr. 1013-17, 1054-56, 1065, 1077-78). Indeed, upon review of the trial transcript, it appears most prospective jurors indicated they could render a decision based solely on the evidence presented at trial free of any influence from the media coverage of the case. (*See, e.g.,* Vol. 2, Tr. 241, 270, 281-82, 285-86, 366, 394;

Vol. 3, Tr. 440, 497; Vol. 4, Tr. 616, 726, 789-90, 793-94; Vol. 5, Tr. 850-51, 932-33, 957-58; Vol 6, Tr. 1017-18, 1054-56, 1077, 1129).   As the state appellate court further found (*see* Doc. 22, Ex. 8, p. 28), "[e]very member of the jury pool, without exception, wh[o] stated he or she was unable to divorce his or her preconceived notions about the case from the evidence presented was dismissed" from the pool.  (*See, e.g.*, Vol. 2, Tr. 254; Vol. 3, Tr. 482-84, 500, 590, 591-93, 595-96; Vol. 4, Tr. 726, 730-31, 733-35; Vol. 5, Tr. 966-67).  All persons who were ultimately selected to serve on the jury assured the trial court after extensive questioning by the court and both parties' counsel that they could decide the case impartially and fairly based upon the evidence.

Petitioner challenges the procedure that was utilized by the trial court in conducting the voir dire.  Petitioner specifically contends that the trial court's procedure of examining prospective jurors about pretrial publicity without allowing for individual voir dire was improper, and that the "trial court allowed the State to indoctrinate the jurors during the voir dire while refusing to permit the defense similar latitude."  (Doc. 1, p. 29).

Upon review of the voir dire proceedings, this Court concludes that the procedure utilized by the trial court in conducting the voir dire on the subject of pretrial publicity met the "essential demands of fairness," *Morgan,* 504 U.S. at 729, and was adequate to provide the judge with sufficient information to make a determination as to whether or not the impact of such publicity rose to the level of "actual prejudice," *Ritchie,* 313 F.3d at 962.  The prospective jurors were all asked during the voir dire whether they had been exposed to pretrial publicity and whether the reports they had seen or heard could influence their decision about petitioner's guilt or innocence.  Without revealing the details of their specific knowledge of the case , the prospective jurors who indicated that they could not be fair and impartial as a result of their exposure to pretrial publicity were dismissed from the jury pool.  Moreover, prospective jurors who indicated they saw certain media reports were individually questioned during the group voir dire as to their level of exposure.  No details of these reports were discussed or otherwise brought out in this group questioning.  When one prospective juror indicated that she could recall what petitioner had said in a television interview, counsel were permitted to explore the matter further outside the presence of the other jurors in an individual voir dire so that a determination could be made as to whether such exposure prejudiced the juror.  (*See* Vol. 5, Tr. 931-33).  Contrary to petitioner's contentions in his "traverse" brief (*see* Doc. 57, p. 69), the jurors did not expand their knowledge of the case through others' responses, because the matter of the influence of pretrial publicity was discussed only generally before the group and was explored specifically when necessary during

individual voir dire. In addition, there is no evidence in the record even remotely supporting petitioner's outrageous contention that jurors responded to questions untruthfully based on others' responses in order to remain in the jury pool.

Finally, as the Ohio Court of Appeals reasonably found (*see* Doc. 22, Ex. 8, pp. 32-33), there is no merit to petitioner's claim that the trial court permitted the State to indoctrinate the jury while the defense was not permitted "similar latitude." Contrary to petitioner's contention, the jury pool was not presented with a one-sided view of the case favoring the State's position. Both defense counsel and the prosecution were given wide latitude in the questioning of the prospective jurors. This Court agrees with the Ohio court's determination that the prosecutor did not engage in "any improper discussion of the evidence" and that objections were properly sustained with respect to certain "clearly improper" questions that were posed by defense counsel. This Court further finds that the Ohio court's ultimate determination that the "voir dire was conducted within the sound discretion of the trial court" was reasonable, particularly in light of the Supreme Court's admonition that "ample discretion" must be accorded the trial judge in determining how best to conduct voir dire. *See Mu'Min,* 500 U.S. at 427; *Rosales-Lopez,* 451 U.S. at 189.

Accordingly, in sum, upon review of the voir dire proceedings, the Court concludes that the trial court acted well within its wide discretion in conducting voir dire and further defers to and presumes correct the state trial court's determination of juror impartiality in this case. Petitioner has failed to demonstrate the existence of presumed or actual juror bias based on the extensive pretrial publicity involved in this case, or that the voir dire was conducted in a manner that violated the due process guarantee of fundamental fairness. Therefore, petitioner is not entitled to relief based on his claim alleged in Ground Nine that he was denied a fair and impartial jury trial.

### H. Petitioner Is Not Entitled To Habeas Relief Based On His Claim Alleged In Ground Ten Of Juror Misconduct

In Ground Ten of the petition, petitioner alleges that misconduct by members of the jury deprived him of his rights to due process and a determination by a fair and impartial jury under the Sixth and Fourteenth Amendments. (Doc. 1, p. 30; *see also* Doc. 57, pp. 73-75).[15]

―――――――――――――――――

[15]Petitioner also argues in his "traverse" brief discussing Ground Ten that "[n]ewly discovered evidence," in the form of affidavits from Carolyn Evans, Tony Frazier and Mitchell

Petitioner's claim, which is based on the Affidavit of Woody Schlicht, was first presented by petitioner in his post-verdict motion for new trial filed December 3, 1997 with the Clinton County Common Pleas Court. (*See* Doc. 22, Ex. 16). In the affidavit, Schlicht stated that he was staying at the Ameri-Host hotel, where the jury was sequestered during trial phase deliberations and that he overheard a conversation between two of the jurors at the front desk. (*Id.*). Schlicht reported that he overheard a juror saying, "Guilty would be for the best," and that he saw jurors "talking to Deputies in the halls by the pool and at the front desk." (*Id.*). The Common Pleas Court denied petitioner's new trial motion, stating only that "the Defendant has not provided any evidence of such weight that a different result would be reached at a second trial." (*See id.*, Ex. 29). On further review, however, the Ohio Court of Appeals addressed petitioner's claim on the merits in relevant part as follows:

> The trial court's determination as to whether to grant a new trial will only be reversed if the trial court abused its discretion. . . . An abuse of discretion implies that the trial court's decision is unreasonable, arbitrary or unconscionable. . . . The "long-standing" rule in this state is that judgment will not be reversed based upon juror misconduct unless prejudice to the complaining party is shown; prejudice will not be presumed. . . .
>
> Here, Doan has not shown how he was prejudiced by the alleged juror misconduct, nor can we discern any from Schlic[h]t's affidavit. Schlic[h]t's affidavit does not state how he knew the persons he overheard talking were actually jurors in the Doan case, nor does it state how he knew they were actually discussing Doan's case and not some other trial. Additionally, the fact that the jurors and deputies were talking to each other does not show there was juror misconduct. Deputies and jurors talk to each other during trials by necessity. And there was no evidence presented showing the jurors and deputies discussed the Doan case. In light of these circumstances, the trial court did not abuse its discretion by overruling Doan's motion for new trial.

(*Id.*, Ex. 35, pp. 18-19).

---

Epperson, "shows the state did not have sufficient evidence to convict" him. (Doc. 57, pp. 72-73). Petitioner did not assert this argument in the petition and, therefore, it will not be considered by this Court.

As discussed in addressing petitioner's claim alleged in Ground Nine, *see supra* p. 88, the constitutional standard of fairness set forth in the Fourteenth Amendment's Due Process Clause requires that a defendant be tried by a panel of impartial, "indifferent" jurors. *Murphy,* 421 U.S. at 799 (quoting *Irvin,* 366 U.S. at 722). Due process does not require a new trial every time a juror has been placed in a potentially compromising situation, as it is "virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith,* 455 U.S. at 217. Rather, "[w]hen a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury, due process requires that the trial court take steps to determine what the effect of such extraneous information actually was on that jury." *Bagley,* 380 F.3d at 945 (quoting *Nevers,* 169 F.3d at 373); *cf. Smith,* 455 U.S. at 217 ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."). The Supreme Court has stated that the remedy for allegations of juror partiality based on unauthorized juror contacts is a hearing in which the defendant has the opportunity to prove actual juror bias. *Smith,* 455 U.S. at 215 (citing *Remmer v. United States,* 347 U.S. 227, 229 (1954)). A *Remmer* hearing is required "in all cases involving an unauthorized communication with a juror or the jury from an outside source that presents a likelihood of affecting the verdict." *United States v. Rigsby,* 45 F.3d 120, 123 (6th Cir.), *cert. denied,* 514 U.S. 1134 (1995).

A *Remmer* hearing is not constitutionally required in every circumstance where allegations of jury misconduct are raised. *Id.* at 124 ("not all communications with jurors warrant a hearing for a determination of potential bias") (quoting *White v. Smith,* 984 F.2d 163, 166 (6th Cir.), *cert. denied,* 508 U.S. 920 (1993)). The trial court enjoys wide discretion in determining the amount of inquiry, if any, that is necessary to respond to such allegations. *United States v. Logan,* 250 F.3d 350, 378 (6th Cir.), *cert. denied,* 534 U.S. 895 (2001); *see also Rigsby,* 45 F.3d at 124-25; *United States v. Griffith,* 17 F.3d 865, 881 (6th Cir.) ("While the judge had 'a duty to investigate and to determine whether there may have been a violation of the sixth amendment,' it was within his discretion to determine 'the scope of proceedings necessary.'"), *cert. denied,* 513 U.S. 850 (1994).

In *Tanner v. United States,* 483 U.S. 107, 116-34 (1987), the Supreme Court held that the trial court's failure to hold a post-verdict hearing based on certain jurors' allegations that some jurors consumed alcohol and drugs during the trial did not violate the defendants' Sixth Amendment right to a fair and impartial jury. The Court

distinguished cases involving an "extrinsic influence or relationships" from cases involving a post-verdict inquiry into the "internal processes of the jury." *Id.* at 120. The Court based this distinction on the substantial interest of preserving "one of the most basic and critical precepts of the American justice system: the integrity of the jury." *Logan,* 250 F.3d at 379; *see also Tanner,* 483 U.S. at 119-20. The Supreme Court explained:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process.

*Tanner,* 483 U.S. at 120. On the other hand, the Court found that the defendant's Sixth Amendment interest in an impartial, "unimpaired" jury was protected by "several aspects of the trial process," including voir dire and the opportunity for jurors and court personnel to report observable inappropriate juror behavior before a verdict is rendered. The Court stressed that the distinction made between external and internal influences on the jury is not based on whether the juror was inside or outside the jury room when the alleged misconduct occurred, but rather on the "nature of the allegation." *Id.* at 117-18.

In this case, the allegations contained in Schlicht's affidavit were insufficient to show that "any extraneous influences had been brought to bear on the jury," which would have required a new trial or a *Remmer*-type inquiry into the allegations. *See Rigsby,* 45 F.3d at 123-24 (and cases cited therein). First, the fact that Schlicht may have observed two of the jurors discussing the case away from other jurors and overheard one juror say, "Guilty would be for the best," does not involve any claim of an outside or extrinsic influence, but rather only a potential intra-jury influence not subject to further inquiry by the trial court; moreover, the allegation is insufficient to establish that there was a "reasonable potential" such conversation could have affected any juror's ability to reach an impartial and fair verdict. *Cf. United States v. Briggs,* 291 F.3d 958, 963 (7th Cir.) (affirming district court's denial of motion for post-verdict hearing based on a juror's allegations that jurors and the jury foreman behaved improperly during deliberations, including exerting "extreme and excessive pressure on individuals to change votes"), *cert. denied,* 537 U.S. 985 (2002); *United States v. Prosperi,* 201 F.3d 1335, 1340-41 (11th Cir.) (district court's refusal to grant mistrial or an inquiry into

alleged misconduct by two jurors engaged in a "heated discussion" away from the other jurors did not amount to an abuse of discretion and, in fact, would have "invited reversible error" if a contrary decision had been made), *cert. denied,* 531 U.S. 956 (2000); *see also United States v. Yoakam,* 168 F.R.D. 41, 45-46 (D. Kan. 1996) (denying request for investigation based on allegations of juror misconduct obtained from courthouse guard, who overheard two jurors participating in a "heated discussion" concerning their deliberations, because Fed. R. Evid. 606(b) prohibits inquiry into the validity of the jury's verdict based on "intrajury influences such as discussions among jurors [and] intimidation or harassment of one juror by another;" in addition, denying motion for new trial because the facts established by the courthouse guard's testimony failed to show that "the conversation between the jurors impacted their ability to render an impartial and fair verdict").

Second, as the Ohio Court of Appeals found (Doc. 22, Ex. 35, p. 19), the fact that Schlicht may have observed jurors talking to deputies is insufficient to suggest that juror misconduct occurred. No evidence was presented that the jurors and deputies were engaged in any improper discussion about the case under deliberation. In the absence of any allegation that the deputies brought to bear an outside influence on the jurors regarding the case pending before them, petitioner failed to show the existence of an "extrinsic" influence that had a "reasonable potential for tainting" the jury's verdict. *See Bagley,* 380 F.3d at 945. Therefore, as the Ohio Court of Appeals reasonably concluded, the trial court did not exceed the bounds of its discretion in denying petitioner's motion for new trial. Moreover, the court was not required by the Constitution to conduct a *Remmer*-type inquiry in response to Schlicht's affidavit. *Cf. White,* 984 F.2d at 166 (the trial court was not constitutionally required to hold a hearing to assess juror prejudice arising from an "innocuous" extrinsic contact with the jury); *see also Griffith,* 17 F.3d at 880-81 (citing *United States v. Shackelford,* 777 F.2d 1141, 1144-45 (6th Cir. 1985), *cert. denied,* 476 U.S. 1119 (1986)).

Accordingly, the Court concludes petitioner has not demonstrated he is entitled to habeas relief based on his claim of juror misconduct alleged in Ground Ten.

## I. Petitioner Is Not Entitled To Habeas Relief Based On His Claim Alleged In Ground Eleven Challenging The Sufficiency Of The Evidence

In Ground Eleven of the petition, petitioner claims that insufficient evidence was presented at trial to show that venue was proper in Clinton County or to support petitioner's convictions for kidnapping and aggravated murder. (Doc. 1, pp. 31-31; *see*

*also* Doc. 57, pp. 75-77). This claim was presented by petitioner to the Ohio courts on direct appeal and is thus subject to review on the merits.

The Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense. *In Re Winship,* 397 U.S. 358, 363-64 (1970). When petitioner raises an insufficiency of evidence claim in a petition for a writ of habeas corpus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original). The *Jackson* standard must be applied with explicit reference to the criminal offense as defined by state law. *Scott v. Perini,* 662 F.2d 428, 431 (6th Cir. 1981) (quoting *Jackson,* 443 U.S. at 324 n.16), *cert. denied,* 456 U.S. 909 (1982). Under this standard, the State is not required to rule out every hypothesis except that of guilt beyond a reasonable doubt. *Jackson,* 443 U.S. at 326. Rather, a "federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969-70 (6th Cir.), *cert. denied,* 464 U.S. 951, 962 (1983). It is the jury's responsibility as the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence. *Jackson,* 443 U.S. at 319. Consequently, the reviewing court is not permitted to make its own subjective determination of guilt or innocence or otherwise substitute its opinion for that of the jury which convicted the petitioner. *Id.* at 318-19 & n.13; *see also York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (per curiam), *cert. denied,* 490 U.S. 1049 (1989).

Circumstantial evidence, or proof of certain facts from which the jury may reasonably infer other connected facts, often is presented by the State to establish an element of an offense. *See State v. Gaines,* No. 82301, 2003 WL 22966190, at *10 (Ohio Ct. App. Dec. 18, 2003) (unpublished), *appeal dismissed,* 809 N.E.2d 1158 (Ohio 2004). In assessing the sufficiency of evidence under *Jackson,* circumstantial evidence alone may be sufficient to sustain a conviction. *Dixon v. Miller,* 293 F.3d 74, 81 (2nd Cir.), *cert. denied,* 537 U.S. 955 (2002); *United States v. Jones,* 102 F.3d 804, 807 (6th Cir. 1996); *Jamison v. Collins,* 100 F.Supp.2d 647, 705 (S.D. Ohio 2000), *aff'd,* 291 F.3d 380 (6th Cir. 2002).

In this case, the Ohio Court of Appeals was the only state court to issue a reasoned decision addressing the merits of petitioner's sufficiency of evidence claim. Although

it cited only Ohio case-law, that court correctly identified and applied the clearly-established standards enunciated by the Supreme Court in *Jackson* in addressing the claim. (*See* Doc. 22, Ex. 8, p. 38). The court rejected petitioner's argument that the State had failed to prove venue, which under Ohio law, may be proved by evidence establishing that "at least one element of the crime was committed in" the county within the trial court's jurisdiction. (*Id.*). The court determined that the evidence was sufficient to satisfy the venue requirement because a reasonable trier of fact could conclude from the evidence presented at trial, without stacking inference upon inference, that the victim, Carrie Culberson, was kidnapped in Clinton County. (*Id.*).

In addition, the court determined that "a review of the trial transcript establishes sufficient evidence for a reasonable trier of fact to find appellant kidnapped and murdered Culberson." (*Id.*). In ruling on this question, the court referred to its detailed discussion addressing petitioner's state-law "manifest weight of the evidence" claim raised in a separate assignment of error. (*Id.*). Specifically, in considering the analogous state-law issue, the court made findings of fact which are entitled to a presumption of correctness, *see supra* p. 3 n.2, and ruled as follows:

> In reviewing the trail transcript, a reasonable trier of fact could have concluded, beyond a reasonable doubt, that appellant had abused and threatened to kill Culberson before August 29, 1996. As previously detailed, appellant had a clear motive to control Culberson. Billie Jo Brown's testimony establishes the kidnapping of Culberson. Lori Baker and Watkins' testimony establish appellant arriving at the Baker home wearing only jeans and covered with blood. Appellant then took a shower and he and Trac[e]y Baker left the house with garbage bags and a gun. A reasonable inference is that appellant had murdered Culberson and needed to dispose of the body. After returning at 6:00 a.m., appellant took another shower. A reasonable inference can be drawn here as well.

> Appellant made extremely incriminating statements to Lori Baker and Epperson after the crime was committed. The footprints in the lake could be considered as an attempt to hide, and later remove, evidence. Appellant's obsessive pattern of calling Culberson at work and at the Whittens' business changed the morning after the crime was committed.

> The jury was entitled to conclude that the testimony of the several witnesses who identified Culberson after August 29, 1996 lacked credibility. Most of

these witnesses seemed influenced by the notorious nature of this case and the accompanying publicity. The police officer's identification, arguably the most credible, was compromised by the failure of Culberson to keep the front license plate on her vehicle. In fact, he testified his original identification [of Culberson's license plate number on a car's front license plate] must have been mistaken. The jury could reasonably have concluded the alibi witnesses had an obvious bias as the father and stepmother of appellant.

Overall, the jury was in the best position to evaluate the veracity of all the witnesses and the weight to be given the evidence. . . .

(*Id.,* pp. 36-37).

Petitioner first argues that his conviction for aggravated murder during the commission of a kidnapping is not supported by sufficient evidence, because the prosecution failed to prove for venue purposes that the offense was committed in Clinton County. Ohio law requires that the venue of the crime be shown to be in the county of trial. *See Truesdale v. Dallman*, 690 F.2d 76, 77 (6th Cir. 1982). While venue is not a material element of any offense charged, it is a fact that must be proven beyond a reasonable doubt at trial unless waived. *State v. Jalowiec*, 744 N.E.2d 163, 173-74 (Ohio 2001); *State v. Draggo,* 418 N.E.2d 1343, 1345 (Ohio 1981); *see also Truesdale*, 690 F.2d at 77. It therefore appears that the *Jackson* sufficiency of evidence standard applies to the issue of venue. *See Truesdale*, 690 F.2d at 78-79; *Jalowiec*, 744 N.E.2d at 173-74.

Upon review of the trial transcript, this Court concludes the state appellate court's decision that there was sufficient evidence presented to establish Clinton County's venue neither is contrary to nor involves an unreasonable application of *Jackson*, and is not based on an unreasonable determination of the facts in light of the evidence presented at trial. *See supra* p. 19. Petitioner argues in his "traverse" brief that "Clinton County's only connection to this case was that Carrie was last seen fighting with Doan in Blanchester in the early morning hours of August 29, 1996," which was based solely on Billie Jo Brown's testimony that was "insufficient to [establish] the kidnapping element of aggravated murder." (Doc. 57, pp. 75-76). Petitioner specifically contends that "[a] kidnapping cannot be shown from Brown's testimony" because, in order to reach such a conclusion, the jury would have had to make an inference (i.e., that petitioner forced Culberson into her car and drove away with her against her will) from another inference

(i.e., that petitioner caught Culberson a second time after she was last seen escaping from petitioner's grasp and running behind a car in Brown's driveway) in violation of Ohio law. (*Id.,* p. 76).

However, viewing the evidence in the light most favorable to the prosecution in accordance with *Jackson,* a rational trier of fact could have reasonably inferred that petitioner caught Culberson and drove away with her in her car against her will from direct evidence established by Brown's testimony. Brown testified that she first observed petitioner chasing Culberson, who was running away from him and screaming for help; next witnessed petitioner catch Culberson, punch her in the face and say to Culberson, "I told you the next time I'd kill you, you fucking bitch;" and observed Culberson struggling and screaming for help. (*See* Vol. 8, Tr. 1485-90). Brown testified further that before she left the living room to get her husband, she last saw Culberson escape from petitioner and run behind a car in Brown's driveway. (*Id.,* Tr. 1490). Soon thereafter, while she was talking with her husband, Brown heard "squealing tires;" when she returned to the living room to see what had happened, Brown noticed that petitioner and Culberson were no longer around and Culberson's car was "gone." (*Id.,* Tr. 1491). As the Ohio Court of Appeals found, various witnesses at trial consistently testified that petitioner "routinely 'peeled out'" and "would squeal his tires" when driving his car. (*See* Doc. 22, Ex. 8, p. 3). Brown was the last person to see Culberson before she was reported "missing" the next day by her family. Moreover, Lori Baker testified that only a few hours after Brown observed Culberson and petitioner fighting, petitioner appeared at Baker's house covered in blood. Contrary to petitioner's contention, from all this evidence, a reasonable juror could have found beyond a reasonable doubt without making any inferences based on other inferences that during the brief interval of the time Brown was in the bedroom talking with her husband, petitioner caught Culberson and drove away with her in her car against her will. Therefore, it was reasonable for the Ohio Court of Appeals to conclude that sufficient evidence was presented to establish the kidnapping element of the aggravated murder offense was committed in Clinton County and thus that venue was proper in Clinton County.

Petitioner also contends the evidence was insufficient to support his convictions for kidnapping and aggravated murder because the State failed to prove "the crime of kidnapping [was] separate from," or more than incidental to, "the underlying crime of murder." (Doc. 1, pp. 31-32; Doc. 57, p. 76). This argument is not premised on sufficiency of evidence concerns, but rather on the prohibition against multiple punishments that is embodied in the Fifth Amendment's Double Jeopardy Clause. For the reasons discussed above, *see supra* pp. 103-04, as well as for the reasons given by the

Ohio Court of Appeals in its direct appeal decision, *see supra* p. 102, this Court concludes there was sufficient evidence presented at trial to establish petitioner's guilt beyond a reasonable doubt for kidnapping under Ohio Rev. Code § 2905.01 and aggravated murder under Ohio Rev. Code § 2903.01(B).  The Ohio Court of Appeals did not address petitioner's specific argument, which is based on double jeopardy concerns.  However, under Ohio law, aggravated murder and kidnapping are not "allied offenses of similar import," and separate, cumulative punishments for both offenses are permitted.  *See* Ohio Rev. Code § 2941.25; *see also State v. Coley,* 754 N.E.2d 1129, 1143 (Ohio 2001) (and cases cited therein) ("the constitutional protection against double jeopardy does not preclude a defendant from being separately punished for an aggravated murder and for felonies involved in that murder," including kidnapping); *State v. Keenan,* 689 N.E.2d 929, 948-49 (Ohio) (holding "aggravated murder and kidnapping are not allied offenses of similar import under R.C. 2941.25," and rejecting the defendant's double jeopardy claim that sentencing him on both counts imposed multiple punishments for the same offense on the ground that "R.C. 2941.25 authorizes the imposition of punishment for both offenses"), *cert. denied*, 525 U.S. 860 (1998).  Therefore, petitioner is unable to prevail on any claim that he was convicted and subjected to multiple punishments for the same offense.  *See, e.g., Ohio v. Johnson,* 467 U.S. 493, 499 & n.8 (1984); *Missouri v. Hunter,* 459 U.S. 359, 368-69 (1983).

In sum, upon viewing the evidence in the light most favorable to the prosecution, this Court concludes that any rational trier of fact could have found beyond a reasonable doubt that venue was proper in Clinton County and that petitioner kidnapped and murdered Culberson in the early morning of August 29, 1996.  The Ohio Court of Appeals' adjudication of petitioner's sufficiency of evidence claim comports with and involves a reasonable application of the Supreme Court's *Jackson* standard and was based on a reasonable assessment of the facts in light of the record evidence.  Moreover, to the extent petitioner contends the evidence is insufficient to support his separate convictions for kidnapping and aggravated murder based on multiple-punishment double jeopardy concerns, his claim lacks merit.  Therefore, petitioner is not entitled to habeas corpus relief based on his sufficiency of evidence claim alleged in Ground Eleven.

## J. Petitioner Is Not Entitled To Habeas Relief Based On His Ineffective Assistance Of Counsel Claim Alleged In Ground Twelve

In Ground Twelve of the petition, petitioner alleges he was denied effective assistance of counsel in violation of the Sixth Amendment when his trial attorney (1) failed to initially object to the civil jury instruction challenged in Ground One of the

petition; (2) failed to request to participate in the review of witness statements prior to cross-examination pursuant to Ohio R. Crim. P. 16(B)(1)(g), thereby prejudicing the defense as alleged in Ground Eight of the petition; (3) failed to object to the prosecutor's misconduct in closing argument as alleged in Ground Seven of the petition; and (4) failed to renew his motion for acquittal at the end of the defense case based on sufficiency of evidence grounds as alleged in Ground Eleven of the petition.  (Doc. 1, pp. 32-34; *see also* Doc. 57, pp. 77-79).  The claim, which was presented by petitioner  to the Ohio courts on direct appeal, is subject to review on the merits.

The Ohio Court of Appeals ruled that each of petitioner's claims of ineffective assistance lacked merit because petitioner was unable to show his counsel's actions prejudiced the defense under the second prong of the *Strickland* test discussed above, *see supra* p. 46. (*See* Doc. 22, Ex. 8, pp. 34-35).  The court reasoned as follows in addressing each of petitioner's ineffective assistance claims:

> Appellant argues his trial counsel failed to object to the erroneous jury instruction discussed in the first assignment of error before the instruction was read to the jury.  However, as we discussed in the first assignment of error, in light of the jury instructions as a whole, the mistake did not prejudice appellant's trial. . . .
>
> Appellant argues his trial counsel failed to personally review potentially inconsistent out-of-court statements pursuant to Crim.R. 16(B)(1)(g) and instead deferred to the trial court's review. Having reviewed the statements, the trial court's rulings were substantially correct.  Therefore, appellant was not prejudiced.   Appellant argues his trial counsel failed to object to prosecutorial misconduct during closing argument.   However, we have overruled the sixth assignment of error which addressed alleged prosecutorial misconduct during closing argument.
>
> Appellant argues trial counsel failed to renew a Crim.R. 29 motion at the end of trial and, therefore, this court must review appellant's sufficiency of the evidence assignment of error under a more deferential standard of review.  However, as discussed below, we reviewed the tenth assignment of error under the normal sufficiency of the evidence legal standard and found it without merit.  There is also no reasonable possibility the motion would have been granted.  Therefore, appellant was not prejudiced. . . .

(*Id.*).

The state appellate court's adjudication of petitioner's ineffective assistance claim neither contravenes nor involves an unreasonable application of the Supreme Court's clearly-established *Strickland* standard. In order to demonstrate "prejudice" under the second prong of the *Strickland* test, petitioner must show that the result of his trial would "reasonably likely have been different absent the errors" of his counsel. *Strickland*, 466 U.S. at 695. This Court has addressed the substantive issues underlying petitioner's ineffective assistance claims and has concluded that (1) the Ohio Court of Appeals reasonably determined in accordance with applicable Supreme Court precedents that the civil jury instruction given in this case at most constituted "harmless error" because the instructions as a whole correctly conveyed the concept of reasonable doubt to jury, *see supra* pp. 19-27; (2) petitioner has not made a plausible showing that any failure by his counsel to request to personally review witness statements under Ohio R. Crim. P. 16(B)(1)(g) resulted in the non-disclosure of information that would have reasonably likely changed the outcome of petitioner's trial, *see supra* p. 85; (3) the prosecutor's closing argument did not amount to misconduct that prejudicially affected the jury's verdict, *see supra* pp. 73-75; and (4) the evidence was sufficient under the "normal . . . legal standard" set forth in *Jackson* to establish venue in Clinton County and to support petitioner's convictions for kidnapping and murder, *see supra* pp. 103-05. Therefore, as the Ohio Court of Appeals reasonably determined, petitioner has not demonstrated as required under *Strickland* that it is reasonably likely the outcome of his trial would have been different if his counsel had not committed the alleged errors of omission.

Accordingly, because petitioner has not demonstrated "prejudice" under the second prong of the *Strickland* test, he is not entitled to relief based on his claim alleged in Ground Twelve that he was denied effective assistance of counsel at trial.

### K. Petitioner Is Not Entitled To Relief Based On His Claim Alleged In Ground Thirteen That The Cumulative Effect Of The Constitutional Errors Alleged In Grounds One Through Twelve Deprived Him Of A Fair Trial

In Ground Thirteen of the petition, petitioner alleges that he was denied a fair trial as a result of the "cumulative effect of the constitutional errors set out in this petition." (Doc. 1, p. 34; *see also* Doc. 57, p. 79). This claim was never raised by petitioner to the Ohio courts and should be deemed waived. In any event, "[t]he Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo,* 302 F.3d 598, 607 (6th Cir. 2002)

(citing *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir.), *corrected on other grounds on denial of petition for rehearing,* 307 F.3d 459 (6th Cir. 2002), *cert. denied,* 538 U.S. 947 (2003)), *cert. denied*, 537 U.S. 1192 (2003).  As a result, cumulative error is not a basis for granting habeas corpus relief in non-capital cases.  *Davis v. Burt,* 100 Fed.Appx. 340, 351 (6th Cir. Apr. 9, 2004) (not published in Federal Reporter); *Eskridge v. Konteh,* 88 Fed.Appx. 831, 836 (6th Cir. Feb. 3, 2004) (not published in Federal Reporter).

Petitioner has not demonstrated that any of his individual claims for habeas corpus relief have merit.  Therefore, petitioner is not entitled to such relief based on his claim of cumulative error alleged in Ground Thirteen of the petition.

## IT IS THEREFORE RECOMMENDED THAT:

1.  Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be DENIED with prejudice.

2.  A certificate of appealability should issue with respect to the constitutional claims alleged in Grounds One through Five, Eight, and Ten through Twelve, because reasonable jurists could debate whether these claims should have been resolved in a different manner and, alternatively, whether the issues presented in these grounds for relief are "adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (in turn quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)). A certificate of appealability should not issue with respect to the claims alleged in Grounds Six, Seven, Nine and Thirteen, which also have been addressed on the merits, because petitioner has failed to make a substantial showing of the denial of a constitutional right based on these claims. *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3.  With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and therefore GRANT petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

12/18/2004                              s/Timothy S. Hogan

Date: _____        _____

     cbc                                Timothy S. Hogan
                                        United States Magistrate Judge

J:\BRYANCC\2004 habeas orders\00-727doancase.wpd

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

---

Vincent Doan,
     Petitioner,

                                 Case No. 1:00cv727

       v.                            (Beckwith, J.; Hogan, M.J.)

James Haviland,
     Respondent.

## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Hogan, United States Magistrate Judge, in the above-entitled habeas corpus action. Pursuant to Fed. R. Civ. P. 72(b), which may be applied in this action under Rules 1 and 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof. Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s). Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections. *See* Fed. R. Civ. P. 72(b). A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).