

399 F.3d 1010     Page 1

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

▷

**Briefs and Other Related Documents**

United States Court of Appeals,
Ninth Circuit.
Marvin Howard BOCKTING, Petitioner-Appellant,
v.
Robert BAYER, Respondent-Appellee.
**No. 02-15866.**

Argued and Submitted Jan. 14, 2004.
Filed Feb. 22, 2005.

**Background:** Following affirmance of petitioner's conviction for sexual assault with a minor under the age of 14 years, 847 P.2d 1364, petitioner sought writ of habeas corpus. The United States District Court for the District of Nevada, Edward C. Reed, Jr., J., denied the petition, and petitioner appealed.

**Holdings:** The Court of Appeals, McKeown, Circuit Judge, held that:
(1) *Crawford* decision applied retroactively, and
(2) admission of victim's hearsay statement to detective in violation of petitioner's Confrontation Clause rights was not harmless beyond reasonable doubt.
Judgment reversed and petition granted.

Noonan, Circuit Judge, filed concurring opinion.

Wallace, Senior Circuit Judge, filed concurring and dissenting opinion.

West Headnotes

**[1] Courts** ⚷100(1)
106k100(1) Most Cited Cases
New rules apply retroactively only where they place certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, or where the new rule is implicit in the concept of ordered liberty.

**[2] Habeas Corpus** ⚷461
197k461 Most Cited Cases
A federal court considering a habeas petition must conduct a threshold *Teague* analysis when retroactivity issue is properly raised by the state. 28 U.S.C.A. § 2254(d).

**[3] Courts** ⚷100(1)
106k100(1) Most Cited Cases
*Crawford* decision holding that Confrontation Clause required opportunity to cross-examine before testimonial hearsay could be admitted against criminal defendant was both a "watershed rule" and one without which the likelihood of an accurate conviction was seriously diminished, and therefore applied retroactively in pending habeas proceeding. U.S.C.A. Const.Amend. 6.

**[4] Courts** ⚷100(1)
106k100(1) Most Cited Cases
New rules that are properly considered retroactive are those that alter the understanding of the bedrock procedural elements essential to the fairness of a proceeding.

**[5] Courts** ⚷100(1)
106k100(1) Most Cited Cases
For purposes of retroactivity inquiry, whether a new rule is a bedrock rule of procedure depends on whether it increases the likelihood of accurate conviction; whether a rule of constitutional law is subject to harmless error review does not answer the question whether it is a bedrock rule of procedure.

**[6] Criminal Law** ⚷662.8
110k662.8 Most Cited Cases

**[6] Habeas Corpus** ⚷481
197k481 Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                Page 2

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

In child sexual abuse trial, admission of victim's hearsay statement to detective in violation of petitioner's Confrontation Clause rights was not harmless beyond reasonable doubt, and thus warranted habeas relief; testimony regarding victim's interview with detective was a critical piece of evidence, particularly in view of victim's inconsistent testimony at the preliminary hearing, and detective's description of victim's interview was so significant that the error could have materially affected the verdict. U.S.C.A. Const.Amend. 6.

*1011 Franny A. Forsman, Federal Public Defender, Las Vegas, NV, for the appellant.

Victor-Hugo Schulze II, Deputy Attorney General, Las Vegas, NV; Rene L. Hulse, Deputy Attorney General, Las Vegas, NV, for the appellee.

Appeal from the United States District Court for the District of Nevada; *1012Edward C. Reed, District Judge, Presiding. D.C. No. CV-98-00764-ECR.

Before: WALLACE, NOONAN, and McKEOWN, Circuit Judges.

Opinion by Judge McKEOWN; Concurrence by Judge NOONAN; Concurrence and Dissent by Judge WALLACE.

McKEOWN, Circuit Judge:

Marvin Bockting's conviction for sexual abuse and life sentences stem from a trial in which the only witness to the conduct, his six-year old stepdaughter, Autumn Bockting, did not testify at trial, but whose interview with a detective was admitted as key evidence. Autumn's statements at the interview contradicted her testimony at a preliminary hearing where she claimed not to remember what happened with her father. Admission of the interview evidence without cross-examination violated Bockting's constitutional right "to be confronted with the witnesses against him." U.S. Const. amend. VI.

Although this case has been before the Nevada Supreme Court twice and before the United States Supreme Court on one occasion, resolution now rests on interpretation of an intervening Supreme Court case: *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In *Crawford,* the Court definitively held that "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable and only where the defendant has had a prior opportunity to cross-examine." 124 S.Ct. at 1369. Because the little girl's testimony, which was not subject to cross-examination, was central to the conviction, its admission can hardly be classified as harmless error. *Crawford* dictates reversal.

[1] The thorny issue is whether *Crawford* applies retroactively to this state habeas appeal. In an earlier case, we reserved this question for future consideration. *See Leavitt v. Arave,* 383 F.3d 809, 830 n. 22 (9th Cir.2004) (per curiam). If, as Judge Noonan argues, *Crawford* simply reiterates a longstanding rule and does not announce a new rule, then retroactivity falls out of our analysis. If, on the other hand, *Crawford* is characterized as a "new rule," then we are faced with analyzing the retroactivity of *Crawford* in the framework of yet another recent Supreme Court case, *Schriro v. Summerlin,* --- U.S. ----, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). New rules apply retroactively only where they place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," or where the new rule is "implicit in the concept of ordered liberty." *Teague v. Lane,* 489 U.S. 288, 307, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The latter category is "reserved for watershed rules of criminal procedure." *Id.* at 311.

The threshold question is whether *Crawford* constitutes a "new rule" under *Teague.* Judge Noonan's approach--namely that *Crawford* does not announce a new rule but rather is a "correction of a misinterpretation," Concurrence at 2015--has a certain appeal in light of the Court's historical emphasis in *Crawford.* Indeed, one can read *Crawford* as intimating that the rule is longstanding. Unfortunately, Justice Scalia's analysis is not entirely consistent with that viewpoint. Nonetheless, characterizing *Crawford* as something

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                Page 3

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

(Cite as: 399 F.3d 1010)

less than a new rule, as Judge Noonan does, is one legitimate way of interpreting *Crawford.* To do so leads to the same result here--the application of *Crawford* to Bockting's pending habeas claims.

Despite the appeal of Judge Noonan's reasoning, application of the Supreme Court's guidance in *Teague* leads to the conclusion that *Crawford* announces a "new rule." Because the *Crawford* rule is both a "watershed rule" and one "without *1013 which the likelihood of an accurate conviction is *seriously* diminished," *Summerlin,* --- U.S. at ----, 124 S.Ct. at 2523, the rule is retroactive.

### I. FACTUAL BACKGROUND

Marvin Bockting lived with his wife, Laura, and his two daughters, Autumn and Honesty, in a motel in Las Vegas. Autumn had taken showers together with Laura and Bockting. She had also seen them having sex, and she was accustomed to the use of sexual language.

One Saturday night, when Laura was at home alone with the children, Autumn Bockting woke up crying. Her mother observed that "she looked like she had just woken up from a bad dream and she was quite upset." At first she refused to tell Laura what was wrong. Laura asked why she wouldn't tell. Autumn told her, "Because daddy said that you would make him leave and that he would beat my butt if I told you." After reassurance from her mother, Autumn said "daddy put his pee-pee in her pee-pee, and that daddy put his pee-pee in her butt, and daddy made her suck on his pee-pee like it was a sucker."

The next day, Laura confronted Bockting. She asked him to leave, which he did. Two days later, a Tuesday, Laura called the rape crisis hotline and was told to take Autumn to the hospital, where they were met by Detective Zinovitch. Zinovitch tried to interview Autumn, but she was too upset. A rape examination was performed. The doctor found that Autumn's rectal sphincter had been torn within the past week. She also found that Autumn's hymenal ring was wide open, a rarity in a six-year old. The doctor determined that although she "couldn't determine what kind of instrument or foreign body was used to cause the laxness of the hymen and the fissure of the rectum," it had been caused by a blunt force. Two days later, Autumn was again interviewed by a detective. She repeated what she had told her mother, accurately describing the positions of the sex acts. She also demonstrated the acts with anatomically correct dolls.

At Bockting's preliminary hearing, Autumn was able to answer questions about the difference between the truth and a lie, but became upset when she was asked about being touched by Bockting. Upon further questioning, she said she could not remember what occurred with her father and did not remember whether she had talked with the detective about the claimed assault. The judge declared Autumn an unavailable witness, and the preliminary hearing proceeded with the testimony of Laura and Zinovitch. At trial, the judge found that Autumn's hearsay statements were admissible because she was effectively unavailable for trial. Without having the opportunity to cross-examine Autumn, Bockting was convicted and sentenced to life in prison.

Bockting appealed to the Nevada Supreme Court, which dismissed his claims. The United States Supreme Court later vacated the Nevada Supreme Court's decision, remanding for consideration in light of *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). In 1993, the Nevada Supreme Court affirmed Bockting's conviction. He filed a second petition for postconviction relief, which the state district court denied in 1994.

Three years later, the Nevada Supreme Court again dismissed the appeal. Bockting then sought relief in federal court. He timely filed a habeas petition in 1998, which he amended in 2000. The district court denied the petition, and Bockting filed the present appeal.

### II. DISCUSSION

Because Bockting filed his petition after the effective date of the Antiterrorism and *1014 Effective Death Penalty Act of 1996 ("AEDPA"), its provisions apply. *See Woodford v. Garceau,* 538 U.S. 202, 207, 123 S.Ct. 1398, 155 L.Ed.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                                     Page 4

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

363 (2003). Under AEDPA, habeas relief to a state prisoner is available only if the state court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

[2] The Supreme Court also directs us that "in addition to performing any analysis required by AEDPA, a federal court considering a habeas petition must conduct a threshold *Teague* analysis when the issue is properly raised by the state." See *Horn v. Banks*, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002). Indeed, as the Court noted, "if our post-AEDPA cases suggest anything about AEDPA's relationship to *Teague*, it is that the AEDPA and *Teague* inquiries are distinct." *Id.*

In explaining *Teague's* application, the Supreme Court recently explained that there are three steps to determining whether a rule of criminal procedure applies on collateral review:
> First, the court must determine when the defendant's conviction became final. Second, it must ascertain the legal landscape as it then existed, and ask whether the Constitution, as interpreted by precedent then existing, compels the rule. That is, the court must decide whether the rule is actually "new." Finally, if the rule is new, the court must consider whether it falls within either of the two exceptions to nonretroactivity.

*Beard v. Banks*, --- U.S. ----, ----, 124 S.Ct. 2504, 2510, 159 L.Ed.2d 494 (2004) (internal citations omitted). Because Bockting's conviction became final in 1993, we must evaluate whether any subsequent rule of constitutional law is new against the benchmark of that year.

**A. CRAWFORD ANNOUNCED A NEW RULE**

[3] The question before us is whether the Confrontation Clause principles stated in *Crawford* amount to a new rule. In *Crawford*, the Supreme Court considered whether Washington State's use at trial of a witness's tape-recorded statement to a police officer violated the Confrontation Clause. 124 S.Ct. at 1357. Writing for the Court, Justice Scalia engaged in a lengthy historical analysis of the Confrontation Clause, noting that "the principal evil at which the Confrontation Clause was directed was the *civil-law mode of criminal procedure,* and particularly its use of *ex parte* examinations as evidence against the accused." *Id.* at 1363 (emphasis added). He went on to emphasize "that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, *and* the defendant had had a prior opportunity for cross-examination." *Id.* at 1365 (emphasis added).

Whether the rule in *Crawford* is new depends on whether it "was *dictated* by the then-existing precedent." *Beard*, --- U.S. at ----, 124 S.Ct. at 2511. To be sure, the majority in *Crawford* is somewhat opaque as to the categorization of its ultimate holding. As the Court noted, "[a]lthough the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales." 124 S.Ct. at 1369. The puzzler is whether the "results of [the Supreme Court] decisions" are coextensive with the rules of those decisions. If so, then the *Crawford* pronouncement could be legitimately **\*1015** viewed as a continuation of Supreme Court jurisprudence. Careful scrutiny of the *Crawford* opinion suggests otherwise for at least two reasons: (1) *Crawford* deviates from the test announced in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); and (2) simply reaching the right "result" does not mean that the result flowed from a constant rule.

As the Court observed, "*Roberts* conditions the admissibility of all hearsay evidence on whether it falls under a 'firmly rooted hearsay exception' or bears particularized guarantees of trustworthiness." *Crawford,* 124 S.Ct. at 1369 (quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531). *Roberts* rests on evidentiary principles of reliability and trustworthiness rather than on the constitutional principle of confrontation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010 Page 5

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

The *Crawford* majority quite clearly states that the *Roberts* "test departs from the historical principles" in that it is both "too broad" and "too narrow." *Crawford,* 124 S.Ct. at 1369. *Crawford* did not announce the same rule as *Roberts*. Whereas *Roberts* countenanced the admission of witness testimony if trustworthy, under *Crawford* the testimony is admitted only if the witnesses are subject to cross-examination. The Court concluded that the cases applying *Roberts* have "remained faithful to the Framers' understanding," *id.* at 1369, that testimonial statements are admissible only when two criteria are met: unavailability and opportunity for cross-examination. In other words, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 1374. Although historical principles are the bedrock for the *Crawford* decision, getting back to the bedrock required the Court to disavow the *Roberts* test. The dissent in *Crawford* mirrors this view by concluding that "the Court of course overrules *Ohio v. Roberts,* " *id.* at 1378, and criticizing the "Court's adoption of a new interpretation of the Confrontation Clause ....," *id.* at 1374.

To say that the outcomes or "results" have been generally "faithful to the original meaning" is not the same as saying that there has been a consistent rule throughout our history. Indeed, the *result* in an individual case may well be consistent with the Supreme Court's new interpretation of *Crawford*, but that does not mean that the rule that dictated the prior result is necessarily consistent with *Crawford*. The majority in fact underscores the dichotomy between outcomes and rules in announcing that, "[i]f nothing else, the test we announce is an empirically accurate explanation of the results our cases have reached." *Id.* at 1369 n. 9. Rules and outcomes are neither the same nor wholly overlapping.

Finally, the Court in *Crawford* pinpointed a situation that was, in fact, "arguably in tension with the rule requiring a prior opportunity for cross-examination when the proffered statement is testimonial." *Id.* at 1368 n. 8. Citing *White v. Illinois,* 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), the Court described a case remarkably similar to ours, in which "statements of a child victim to an investigating police officer [were] admitted as spontaneous declarations." *Id. White* rested on the issue of the unavailability requirement under the Confrontation Clause; had *Crawford* been the rule at the time, the lack of cross-examination would have been fatal to the admission of the evidence.

Although the long line of Confrontation Clause cases is "faithful to the original meaning" of the clause, *id.* at 1369, we cannot overlook *Roberts* and *White*. On balance, an analysis of the historical application of the Confrontation Clause cases ***1016** leads to the conclusion that *Crawford* announces a new rule that must be put through the *Summerlin* strainer. If, on the other hand, *Crawford* does not announce a new rule--the position taken by Judge Noonan--then the *Summerlin* analysis is not required. Either way, the result in this case is the same. Bockting's petition should be granted.

**B. SUMMERLIN CONTROLS THE RETROACTIVITY ANALYSIS**

Because *Crawford* announces a new rule, we must ask whether it falls into one of the two *Teague* exceptions to the bar on retroactivity. The first *Teague* exception is for primary conduct that cannot be criminalized. The second is for bedrock rules of criminal procedure. *Teague,* 489 U.S. at 307, 109 S.Ct. 1060. It is the second exception that is at play in this case.

The *Crawford* rule does not narrow the scope of a criminal statute by interpreting its terms, nor is it a constitutional determination that places particular conduct or persons covered by the statute beyond the State's power to punish. *Summerlin,* --- U.S. at ----, 124 S.Ct. at 2522. Rather, the rule in *Crawford* is procedural. *See also Crawford,* 124 S.Ct. at 1370 (stating the Confrontation Clause provides "a procedural rather than a substantive guarantee"). Therefore, *Crawford* merits retroactive application only if it implicates "the fundamental fairness and accuracy of the criminal proceeding," *Saffle v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010 Page 6

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

*Parks,* 494 U.S. 484, 495, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), and reworks our understanding of bedrock criminal procedure, *Sawyer v. Smith,* 497 U.S. 227, 242, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990).

To be sure, under *Summerlin,* the lower courts are tightly constrained in determining whether a new rule is a "watershed rule" that is not only fundamental, but one "without which the likelihood of an accurate conviction is seriously diminished." *Summerlin,* --- U.S. at ----, 124 S.Ct. at 2523 (quoting *Teague,* 489 U.S. at 313, 109 S.Ct. 1060). Viewing *Crawford* and *Summerlin* together poses a conundrum. Justice Scalia wrote for the majority in both cases. In *Summerlin,* the Court admonished that "[t]his class of [retroactive] rules is extremely narrow, and it is unlikely that any ... ha[s] yet to emerge." --- U.S. at ----, 124 S.Ct. at 2523 (quoting *Tyler v. Cain,* 533 U.S. 656, 667 n. 7, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001)) (internal quotations omitted). Nonetheless, the bar is not absolute and the *Crawford* rule meets the Court's criteria. Admonitions such as in *Summerlin* offer discouragement but no guidance. Because our job is not to conjure up hidden meaning, we simply heed the warning and our analysis thus adheres faithfully to the holding and rationale of *Summerlin.* Viewing *Crawford* in light of *Summerlin* leads to the conclusion that the *Crawford* cross-examination requirement merits retroactive application.

That the *Crawford* requirement is fundamental to our legal regime is beyond dispute. Justice Scalia's eloquent recitation of the history, purpose, and place of the Confrontation Clause and cross-examination answers this question. *Crawford,* 124 S.Ct. at 1359. Hundreds of years of tradition have embedded this notion as a fundamental role. Indeed, "[t]he Framers would be astounded to learn that *ex parte* testimony could be admitted against a criminal defendant because it was elicited by 'neutral' government officers." *Id.* at 1373.

The question next posed is whether the rule implicates the accuracy of the criminal proceeding. Juxtaposed, *Summerlin* actually underscores why the *Crawford* rule implicates the "fundamental fairness and accuracy of the criminal proceeding," *Saffle,* 494 U.S. at 495, and alters our understanding *1017 of bedrock procedural principles, whereas the sentencing scheme in *Summerlin* did not. In *Summerlin,* the Court concluded that *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which held that aggravating factors in a death penalty case must be proved to a jury rather than to a judge, was not a retroactive rule. *Summerlin* asked "whether judicial factfinding so *seriously* diminishe[s] accuracy that there is an impermissibly large risk of punishing conduct the law does not reach." *Summerlin,* --- U.S. at ----, 124 S.Ct. at 2525 (citations and quotations omitted). The answer was no because "[t]he evidence is simply too equivocal to support that conclusion." *Id.*

In *Summerlin,* the Court observed that "for every argument why juries are more accurate factfinders, there is another why they are less accurate." [FN1] In contrast, the evidence that cross-examination seriously decreases the possibility of inaccurate conviction is unequivocal.

> FN1. The Court rejected the notion that the jury trial right seriously impacted accuracy in part because the jury-free civil law system is so prevalent:
> "[T]he mixed reception that the right to jury trial has been given in other countries ... surely makes it implausible that judicial factfinding so *seriously* diminishe[s] accuracy as to produce an impermissibly large risk of injustice." --- U.S. at ----, 124 S.Ct. at 2525 (internal quotations omitted).
> Unlike the "mixed reception that the right to jury trial has been given in other countries," *id.,* the right of confrontation is well established in international practice. Justice Scalia noted in *Crawford* that "the right to confront one's accusers is a concept that dates back to Roman times." *Crawford,* 124 S.Ct. at 1359. He then went on to chronicle the history in England. Although not mentioned in *Crawford,* it bears noting that the right of confrontation is firmly implanted in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 8 of 28

Case 1:00-cv-00727-SSB-TSH    Document 62-2    Filed 07/22/2005    Page 7 of 14

399 F.3d 1010                                                                 Page 7

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

(Cite as: 399 F.3d 1010)

jurisprudence of other European countries. For example, the European Convention on Human Rights, articles (6)(1) and (6)(3)(D), give the right "to examine or have examined witnesses against him." The European Court of Human Rights has established a right of confrontation: *Saïdi v. France,* 17 Eur. Ct. H.R. 251, 270 (1993) ("Neither at the stage of the investigation nor during the trial was the applicant able to examine or have examined the witnesses concerned. The lack of any confrontation deprived him in certain respects of a fair trial"). *See also Van Mechelen v. Netherlands,* 25 Eur. Ct. H.R. 647, 673 (1997); *Lüdi v. Switzerland,* 15 Eur. Ct. H.R. 173 (1992); *Windisch v. Austria,* 13 Eur. Ct. H.R. 281 (1990); *Delta v. France,* 16 Eur. Ct. H.R. 574 (1990); *Kostovski v. Netherlands,* 12 Eur. Ct. H.R. 434, 448-49 (1989).

The Supreme Court has repeatedly and without deviation held that the purpose of the Confrontation Clause is to promote accuracy. *See, e.g., Crawford,* 124 S.Ct. at 1370 ("This open examination of witnesses ... is much more conducive to the clearing up of truth.") (quoting 3 Blackstone, Commentaries * 373); *White v. Illinois,* 502 U.S. 346, 355, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (evaluating a Confrontation Clause claim against the benchmark of accuracy); *Tennessee v. Street,* 471 U.S. 409, 415, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985) (describing the "Confrontation Clause's very mission" as "to advance the accuracy of the truth-determining process in criminal trials") (internal quotation omitted); *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (stating the purpose of the Confrontation Clause is to "augment accuracy in the factfinding process"); *Parker v. Randolph,* 442 U.S. 62, 73, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979) (plurality) ("The right of confrontation conferred by the Sixth Amendment is a safeguard to ensure the fairness and accuracy of criminal trials."); *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("The right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy *1018 of the truth-determining process.' "); *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) (plurality) ("The decisions of this Court make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials...."); *Pointer v. Texas,* 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) ("[P]robably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case."); *Mattox v. United States,* 156 U.S. 237, 242-43, 15 S.Ct. 337, 39 L.Ed. 409 (1895) (describing the "primary object" of the Confrontation Clause as "to prevent depositions or ex parte affidavits ... being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief"). *See also* M. Hale, History and Analysis of the Common Law of England 258 (1713) (adversarial testing "beats and bolts out the Truth much better") (quoted in *Crawford,* 124 S.Ct. at 1370).

But accuracy and reliability do not exist in a vacuum. Rather, "[t]he central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." "The word 'confront,' after all, also means a clashing of forces or ideas, thus carrying with it the notion of adversariness." *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). Even more to the point, the Court wrote, "[t]he combined effect of these elements of confrontation--physical presence, oath, cross-examination, and observation of demeanor by the trier of fact--serves the purposes of the Confrontation Clause by *ensuring that evidence*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 9 of 28

Case 1:00-cv-00727-SSB-TSH    Document 62-2    Filed 07/22/2005    Page 8 of 14

399 F.3d 1010                                                                                                Page 8

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

*admitted against an accused is reliable* and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Id.* at 846, 110 S.Ct. 3157 (emphasis added).

*Crawford* itself answers the question of whether the absence of cross-examination "so *seriously* diminishe[s] accuracy that there is an impermissibly large risk of punishing conduct the law does not reach" *Summerlin,* --- U.S. at ----, 124 S.Ct. at 2525 (internal quotations omitted):

- "The framework is so unpredictable that it fails to provide meaningful protection from even core confrontation violations." *Crawford,* 124 S.Ct. at 1371.
- "[T]he [general reliability] test is *inherently,* and therefore *permanently,* unpredictable." *Id.* at 1374 n. 10. "It is difficult to imagine [the general reliability framework] providing any meaningful protection in [politically charged cases]." *Id.* at 1374.
- "[W]e view this as one of those rare cases in which the result below is so improbable that it reveals a fundamental failure on our part to interpret the Constitution in a way that secures its intended constraint on judicial discretion." *Id.* at 1373.

Thus, at the heart of the Court's concerns in *Crawford* was the *reliability* of admitted evidence. Where admitted evidence is unreliable, the accuracy of convictions is seriously undermined. That the rule in *Crawford* is one without which the accuracy of convictions would be seriously undermined is further born out by the Court's own *1019 description of its prior doctrine as a "rare case" of "fundamental failure." *Id.* at 1373. The difference between pre- and post-*Crawford* Confrontation Clause jurisprudence is not the sort of change that can be dismissed as merely incremental. Instead, it is an "absolute pre-requisite to fundamental fairness." *Sawyer,* 497 U.S. at 244, 110 S.Ct. 2822.

In *Crawford,* the Court itself faults the previous regime under *Roberts. Crawford,* 124 S.Ct. at 1371-73. Indeed, to benchmark reliability against *Roberts* would undermine *Crawford's* central thesis. Reliance on *Roberts'* judicially-administered reliability test gives illusory comfort, as "[t]he [Confrontation] Clause ... reflects a judgment ... about how reliability can best be determined," *id.* at 1370, and "[t]he legacy of *Roberts* in other courts vindicates the Framers' wisdom in rejecting a general reliability exception," *id.* at 1371. [FN2]

> FN2. Judge Wallace's effort to rest the analysis on the reliability test under *Roberts* forces a false dichotomy between reliability and cross-examination and overlooks the fact that "some of the courts that admit untested testimonial statements find reliability in the very factors that *make* the statements testimonial." *Id.* at 1372.

The retroactivity inquiry is not conducted in a vacuum. Rather, the analysis is modeled on the *Summerlin* requirements. But even if a "look back" to *Roberts* were appropriate, as Judge Wallace suggests, *Crawford* would be retroactive.

[4] Rules that are properly considered retroactive are those that "alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Sawyer v. Smith,* 497 U.S. 227, 242, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (internal quotations omitted). As the Court recently stated, "[i]n providing guidance as to what might fall within this exception, we have repeatedly referred to the rule of *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)." *Beard,* --- U.S. at ----, 124 S.Ct. at 2514 (citing *Saffle,* 494 U.S. at 495, 110 S.Ct. 1257, *Gilmore v. Taylor,* 508 U.S. 333, 364, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993) (Blackmun, J., dissenting)). Recognizing that bedrock procedural rules are very few in number, it is no leap to conclude that the right of cross-examination as an adjunct to the constitutional right of confrontation joins the very limited company of *Gideon.*

We join one other circuit that has concluded that *Crawford* announces a new rule, although its retroactivity analysis differs from ours. *See Brown v. Uphoff,* 381 F.3d 1219 (10th Cir.2004). The Second Circuit did not directly address the new rule issue but concluded that even if *Crawford* did announce a new rule, it would not be retroactive.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                                Page 9

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

*Mungo v. Duncan,* 393 F.3d 327, 336 (2d Cir.2004).

Addressing the question of a new rule, the Tenth Circuit reasoned as follows:
> As we explained above, prior to the decision in *Crawford, Roberts* provided the appropriate framework for determining whether the admission of hearsay statements violated the Confrontation Clause. The Supreme Court itself noted that the logic of *Roberts* was inconsistent with the Court's conclusion in *Crawford* that the Confrontation Clause requires an opportunity to cross-examine before testimonial hearsay may be admitted against the defendant. *Crawford,* 541 U.S. at ----, 124 S.Ct. at 1369. Thus, *Roberts* and its progeny did not dictate the result in *Crawford* and we conclude that it announces a new rule of constitutional law. *See Crawford,* at ----, 124 S.Ct. at 1374 (Rehnquist, C.J., dissenting) (referring to the majority's holding *1020 as a "new interpretation of the Confrontation Clause").

*Brown,* 381 F.3d at 1226. Our analysis is in accord.

But the Tenth Circuit diverges from us in holding that *Crawford* is not retroactive because it does not set forth a watershed rule of criminal procedure. *Id.* Stating that unless 2008 a new rule is "on the magnitude of the rule announced in *Gideon v. Wainwright,*" it will not fit within the *Teague* watershed rule exception, the court explained:
> Unlike *Gideon, Crawford* does not 'alter[ ] our understanding of what constitutes basic due process,' but merely sets out new standards for the admission of certain kinds of hearsay. Confrontation Clause violations are subject to harmless error analysis and thus may be excused depending on the state of the evidence at trial. It would, therefore, be difficult to conclude that the rule in *Crawford* alters rights fundamental to due process.

*Id.* at 1226-27 (internal citations omitted).

The Supreme Court's Confrontation Clause jurisprudence in *Crawford* cannot be dismissed as a mere tweak on the admissibility of hearsay. *See Brown,* 381 F.3d at 1226. The Supreme Court surely did not conceive of it as such. Rather, the Court describes the right of confrontation as a "bedrock procedural guarantee," notes that it "dates back to Roman times" and was part of the common law known to the founding generation. *Crawford,* 124 S.Ct. at 1359. The Court also contrasts "exclusion under the hearsay rules" with "the civil-law abuses the Confrontation Clause targeted." *Crawford,* 124 S.Ct. at 1364. In a rare *mea culpa,* the Court faults itself for not enunciating the *Crawford* rule earlier, stating that "it reveals a fundamental failure on our part to interpret the Constitution in a way that secures its intended constraint on judicial discretion." *Id.* at 1373. There is nothing "mere" about the *Crawford* rule.

[5] The Tenth Circuit mistakenly concluded that rules of constitutional law subject to harmless error review can never be considered bedrock rules of procedure. The two inquiries hinge on different questions. Whether a rule is a bedrock rule of procedure depends on whether it increases the likelihood of accurate conviction. *Summerlin,* --- U.S. at ----, 124 S.Ct. at 2523. Whether a rule is subject to harmless error analysis depends on whether the impact of the error can be measured. *See Arizona v. Fulminante,* 499 U.S. 279, 307-08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Therefore, a rule of constitutional law could be essential to promote accurate convictions, but still subject to harmless error review if the impact of misapplication of the rule were easily measurable. In short, because accuracy and measurability are different concepts, whether a rule of constitutional law is subject to harmless error review does not answer the question whether it is a bedrock rule of procedure.

After assuming that *Crawford* announced a new rule, the Second Circuit rejected retroactivity, reasoning that the *Crawford* rule would not improve overall accuracy because "it is likely to improve accuracy in some circumstances and diminish it in others." *Mungo,* 393 F.3d at 335. The flaw in this analysis is that the Second Circuit has substituted its judgment of whether the *Crawford* rule is one without which the accuracy of conviction is seriously diminished, for the Supreme Court's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                               Page 10

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

(Cite as: 399 F.3d 1010)

considered judgment. The Court has found repeatedly that the purpose of the Confrontation Clause is to promote accuracy, *see, e.g., Tennessee v. Street,* 471 U.S. 409, 415, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985), and thus *Crawford* rejected the *Roberts* framework as reflective of "a fundamental *1021 failure on our part to interpret the Constitution in a way that secures its intended constraint on judicial discretion," *Crawford,* 124 S.Ct. at 1373. Viewing these holdings together leads to the conclusion that the *Crawford* rule is one without which the likelihood of accurate conviction is seriously diminished.

C. BOCKTING MERITS RELIEF UNDER AEDPA

[6] Having determined that *Crawford* is retroactive, the remaining task is to determine whether, under AEDPA, the Nevada Supreme Court's analysis was either "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1)-(2). The Supreme Court has yet to address directly whether AEDPA was intended or should be read to adopt the *Teague* exceptions. *Williams v. Taylor,* 529 U.S. 362, 380, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (Stevens, J., for four justices) ("AEDPA codifies *Teague* to the extent that *Teague* requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state conviction became final."). Application of *Teague* is the means by which new rules are made retroactive. As noted earlier, the Court has clarified that the *Teague* and AEDPA inquiries are separate. *Horn,* 536 U.S. at 272, 122 S.Ct. 2147. But in directing us to undertake both inquiries in an AEDPA case, the Court has impliedly endorsed the application of *Teague* in the AEDPA context. Further, it appears that Congress intended to preserve the *Teague* exceptions because AEDPA explicitly provides for their application in proceedings involving state habeas petitions. *See* 28 U.S.C. § 2254(e) ("If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that ... the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court.") But even if Congress' intent is unclear, the constitutional doubt canon of construction mandates that we read the statute to incorporate the *Teague* exceptions to avoid the serious constitutional problem raised by depriving individuals of bedrock principles of Due Process. *Ferguson v. Palmateer,* 321 F.3d 820, 823 (9th Cir.2003).

The Nevada Supreme Court relied on *Roberts* to conclude that Autumn was "unavailable" and that her statements bore the requisite "particularized guarantees of trustworthiness." *Bockting v. State,* 109 Nev. 103, 847 P.2d 1364, 1367-70 (1993). As we now know, but the Nevada Supreme Court could not have divined, *Crawford* dictates the right to cross-examine the witness. The progeny of *Roberts,* such as the multi-factor reliability test developed in *Idaho v. Wright,* 497 U.S. 805, 821-22, 110 S.Ct. 3139, 111 L.Ed.2d 638 (9th Cir.1990), cannot override the right of confrontation. Thus, the Nevada Supreme Court's decision was "contrary to" established Supreme Court precedent in *Crawford,* as made retroactive under *Teague* and *Summerlin.*

It bears noting that *Crawford* requires not only cross-examination but unavailability. We have long acknowledged the sensitive situation presented by the child witness. *See, e.g., Tome v. United States,* 513 U.S. 150, 166, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995). Indeed, prosecutions for child abuse often rely heavily on such testimony. Here, the trial court's inquiry into Autumn's unavailability was truncated and conclusory at best. When she refused to cooperate, the court simply declared her unavailable. Although this issue is troubling, it is not necessary to reach this question because of the constitutional error *1022 related to the lack of cross-examination.

The final question is whether admission of Autumn's statement is harmless beyond a reasonable doubt. *See Neder v. United States,* 527 U.S. 1, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). The detective's testimony regarding Autumn's interview was a critical piece of evidence, particularly in view of Autumn's inconsistent testimony at the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                         Page 11

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

preliminary hearing. Even if her statement to the mother was, for argument's sake, considered admissible, the detective's description of Autumn's interview was so significant that the error could have materially affected the verdict. Thus, admitting Autumn's statement was not harmless beyond reasonable doubt.

### III. CONCLUSION

Because a majority concludes that *Crawford* must be applied in this pending habeas case, Bockting's petition for a writ of habeas corpus is GRANTED. [FN3]

> FN3. I join part II of Judge Wallace's concurring and dissenting opinion with respect to admission of prior misconduct, vouching, and ineffective assistance of counsel.

NOONAN, Circuit Judge, concurring:

The trial court, the state supreme court, and the federal district court believed that the statute was constitutional, the procedure followed to have been proper, and Bockting's conviction valid. It is now apparent that each of these courts was mistaken and that the statute and the procedure under it are unconstitutional. *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Bockting is entitled to a writ of habeas corpus. The misunderstanding of the law governing the case is comprehensible in the light of the history set out in *Crawford;* nontestimonial hearsay is not subject to an absolute bar. "Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 1374.

Autumn was not found to be as unavailable as a witness. She was in fact present at the trial. At most, the Nevada courts determined that Autumn was not willing to be a witness against Bockting. The reasons for her unwillingness were not explored. The possibility of measures short of appearance on the stand in open court were not explored. The fact that she had testified at Bockting's preliminary hearing and had denied the accusations against him was ignored. On the mere ipse dixit of a prosecutor already disappointed by Autumn's testimony at the preliminary hearing, she was disqualified as a witness and the hearsay introduced. The Confrontation Clause of the Sixth Amendment to the Constitution of the United States, applicable by virtue of the Fourteenth Amendment, was violated.

No opportunity for cross-examination by Bockting ever existed. He was, of course, not present when Autumn spoke to her mother or when she spoke to Detective Zinovitch. Totally untested by the method constitutionally required, the two testimonial tales, retold by Laura and the detective, confronted Bockting at his trial. The Confrontation Clause demanded that he be confronted with the witness against him. U.S. Const. amend. VI.

It is a work of supererogation to praise the wisdom of the Founders and to celebrate the enforcement of a "bedrock procedural guarantee." *Crawford,* 124 S.Ct. at 1359. Nonetheless, the circumstances of this case demonstrate how wise it is to exclude testimony untested by cross-examination. Autumn's first declaration, reported **\*1023** only by her mother, was made at night after Autumn awoke from sleep crying and was questioned by her mother. It may have been an excited or spontaneous utterance but one made under circumstances rendering it less, not more credible. In her mother's words, "She looked like she had just woke up from a bad dream and she was quite upset." It is a commonplace phenomenon for people of all ages to have nightmares and to awake in distress. What they then say was bothering them carries no guarantee of trustworthiness; they are coming out of sleep, still responding to their sleeping state impressions. Autumn's second declaration was made to a police officer in the presence of her mother; she was under psychological compulsion not to let her mother down. As to her play with the dolls and her sexual experience, her mother testified that Autumn had observed her and Bockting having sexual intercourse in the one bedroom trailer in which the family lived and where Autumn slept in a closet

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                                  Page 12

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

area off the bedroom. The language Autumn used in reference to the sexual organs was language her mother testified that she used in discussion with her. Autumn had no motive to accuse her stepfather of criminal assault and, in fact, demonstrated affection for him; she did have a motive to account for her nightmare and to tell the same story the second time when she met the police.

Autumn's statements were further put in doubt by her repudiation of any accusation against Bockting at his preliminary hearing. Further, the report of her statement of her mother must be contextualized by these facts: her mother was an exotic dancer, who sometimes performed in front of Autumn; her mother was in conflict with Bockting and on the brink of leaving him; her mother did not report Autumn's nighttime declaration until two days after she said she heard it.

It is argued that to apply *Crawford* is to apply it retroactively. To the contrary, the Supreme Court, after reviewing its own decisions, declared:
> Our cases have thus remained faithful to the Framers' understanding: Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.

*Crawford,* 124 S.Ct. at 1369. *Crawford,* therefore, does not announce a new rule. Retroactivity is not an issue.

True, the chief justice's dissent declared that *Crawford* was "a new interpretation" that overruled *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). *Id.* at 1374. But as the Court pointed out, *Roberts* itself only admitted testimony that had been subjected to cross-examination. *Id.* at 1368. Undoubtedly, a number of courts misinterpreted the Confrontation Clause in the same way as the Nevada courts did. But correction of a misinterpretation does not create a new rule. It is dangerous to take literally a dissent. The authentic interpretation of what the Court is doing comes from the Court itself. If there were any doubt in this case (which I deny there is), it is completely dispelled by the Court, again speaking through the author of *Crawford* in the same term in which *Crawford* was decided. Addressing new procedural rules without which the likelihood of an accurate conviction is seriously diminished, the Court declared: "This class of rules is extremely narrow and it is unlikely that any ... has yet to emerge." *Schriro v. Summerlin,* --- U.S. ----, ----, 124 S.Ct. 2519, 2522, 159 L.Ed.2d 442 (2004) (quoting *Tyler v. Cain,* 533 U.S. 656, 667 n. 7, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001)) (alterations and quotation marks omitted). This declaration is *1024 an authoritative determination, delivered less than four months after *Crawford,* that *Crawford's* bedrock procedural rule was not a new rule. A change in rationale is not treated by the Supreme Court as a change in rules. *Crawford,* 124 S.Ct. at 1369. All along, the bedrock was there.

As an alternative to the foregoing analysis and in order to provide a precedent for this court, I also concur in Judge McKeown's analysis and opinion.

Because the action of the Nevada Supreme Court resulted in a decision that was contrary to established federal law as determined by the Supreme Court of the United States, 28 U.S.C. § 2254(d)(*l* ), the writ of habeas corpus should issue to free Bockting from his unconstitutional confinement.

WALLACE, Senior Circuit Judge, concurring and dissenting:

Both Judges McKeown and Noonan conclude that the Supreme Court's recent landmark decision, *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), governs our consideration of Bockting's Confrontation Clause claim, although for different reasons. While Judge Noonan would hold that retroactivity is "not an issue" because *Crawford* did not establish a "new rule" within the meaning of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), *Ante* at 1023, I concur with that part of Judge McKeown's opinion holding that *Crawford* established a new rule that does not apply retroactively to state convictions on habeas review unless it satisfies one of two narrow exceptions.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                 Page 13

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

However, I do not agree that *Crawford* fits within either of those exceptions. Guided by the principles outlined in *Schriro v. Summerlin,* --- U.S. ----, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), I would hold that *Crawford's* new procedural rule does not qualify for retroactive application and would analyze Bockting's Confrontation Clause claim under pre-*Crawford* jurisprudence. In doing so, I would reject that claim, as well as Bockting's remaining claims, under the deferential standards of review embodied in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), and affirm the district court's denial of Bockting's habeas petition. [FN1] I therefore respectfully dissent.

> FN1. Judge McKeown concurs in part II of this opinion. *See* Ante at 1022 n. 3. Therefore, a majority of the court agrees that Bockting's challenges to (a) the admission of evidence of prior misconduct, (b) vouching, and (c) effective assistance of counsel, do not warrant habeas relief.

### I.

I consider first Bockting's contention that the state trial court violated his rights under the Confrontation Clause by admitting Autumn's out-of-court statements.

### A.

Several weeks after this case was argued before us and submitted for decision, the Supreme Court issued *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Parting ways with the constitutional test formulated in *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), *Crawford* held that in criminal proceedings, "[t]estimonial statements of witnesses absent from trial [are admissible] only where the defendant is unavailable, and *only where the defendant has had a prior opportunity to cross-examine.*" *Crawford,* 124 S.Ct. at 1369 (emphasis added).

Bockting argues--and Judge Noonan agrees--that *Crawford* does not raise retroactivity concerns at all because it does *1025 not qualify as a "new rule" under *Teague*. Although the Supreme Court took great pains to harmonize *Crawford's* result with previous Sixth Amendment decisions, I agree with Judge McKeown that *Crawford's* ratio decidendi effected a clear and decisive break from prior precedent. *See Crawford,* 124 S.Ct. at 1369 (observing that "[a]lthough the results of our decision have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales"). Before *Crawford,* controlling precedent permitted courts to admit hearsay evidence against a criminal defendant whenever the declarant was "unavailable" and the evidence had "adequate 'indicia of reliability,' " i.e., fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531. *Crawford,* however, emphatically rejected *Roberts's* approach to testimonial evidence, arguing that its test demonstrated an "unpardonable ... capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude." 124 S.Ct. at 1371. As the Court in *Crawford* explained:

> [*Roberts* ] is too broad: It applies the same mode of analysis whether or not the hearsay consists of *ex parte* testimony. This often results in close constitutional scrutiny in cases that are far removed from the core concerns of the Clause. At the same time, however, the test is too narrow:
> It admits statements that *do* consist of *ex parte* testimony upon a mere finding of reliability.

*Id.* at 1369. Responding to these concerns, the Court limited *Roberts's* reach to cases "[w]here nontestimonial hearsay is at issue." *Id.* at 1374. In cases involving "testimonial evidence," the Court replaced *Roberts* with a new test that has two requirements: "unavailability and a prior opportunity for cross-examination." *Id.* Thus, since *Crawford* overruled *Roberts's* test for the admission of testimonial evidence, the decision also represents a "new rule" for retroactivity purposes. *See id.* at 1378 (Rehnquist, C.J., concurring) (characterizing the majority's opinion as a "new rule"); *Graham v. Collins,* 506 U.S. 461, 467, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993) ("[T]here can be no dispute that a decision announces a new rule if it expressly overrules a prior decision...."); *Teague,* 489 U.S. at 301, 109 S.Ct. 1060 ("[A] case announces a new rule if the result was not *dictated* by precedent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                         Page 14

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

existing at the time the defendant's conviction became final.").

*Crawford's* "new" constitutional rule would only apply retroactively to final convictions on collateral review if it falls within certain categories of rules. The Supreme Court recently clarified the nature and scope of these categories in *Summerlin:*

> New *substantive* rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish. Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal' " or faces a punishment that the law cannot impose upon him.
> New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of " 'watershed *1026 rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding."

--- U.S. at ---- - ----, 124 S.Ct. at 2522-23 (citations omitted), *quoting Bousley v. United States,* 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998), *and Saffle v. Parks,* 494 U.S. 484, 495, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

Measured against *Summerlin's* standards, *Crawford* is best classified as a procedural rule. The rule does not "narrow the scope of a criminal statute by interpreting its terms"; nor does it "place particular conduct or persons covered by the statute beyond the State's power to punish." *Id.* at 2522. Rather, by renegotiating the boundaries between admissible and inadmissible evidence, *Crawford* operates solely on a defendant's criminal *proceedings. Crawford's* characterization as a procedural rule is further supported by the *Crawford* decision itself.

By labeling the Confrontation Clause as "a procedural rather than a substantive guarantee ... [that] reflects a judgment ... about how reliability [of testimonial evidence] can best be determined," the Court endeavored to reinstate "the constitutionally prescribed *method* of assessing reliability." *Crawford,* 124 S.Ct. at 1370 (emphasis added). While, the line between "substance" and "procedure" may not always be crystal-clear, there can be no serious dispute that *Crawford's* restriction on testimonial evidence is a "procedural" rule.

Bockting contends that *Crawford* merits retroactive application here because it is a " 'watershed rule[ ] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle,* 494 U.S. at 495, 110 S.Ct. 1257, *citing Teague,* 489 U.S. at 311, 109 S.Ct. 1060; *see also Teague* 489 U.S. at 307, 109 S.Ct. 1060 (describing this exception as applying to "those procedures that ... are implicit in the concept of ordered liberty" (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937))). This argument--which Judge McKeown finds persuasive--admittedly has some intuitive appeal; as Bockting observes, the Supreme Court has described "the Sixth Amendment's right of an accused to confront the witnesses against him" as "fundamental," *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), and *Crawford* purports to effectuate the Confrontation Clause's original design and thereby enhance the fairness and accuracy of defendants' criminal proceedings. *Crawford,* 124 S.Ct. at 1373. However, the fact that *Crawford* is " 'fundamental' in some abstract sense is not enough" to entitle Bockting to habeas relief. *Summerlin,* --- U.S. at ----, 124 S.Ct. at 2523. Under *Teague* and its progeny, *Crawford* does not constitute a "watershed rule" suitable for retroactive application unless the *Roberts* test "so '*seriously* diminishe[s]' accuracy that there is an 'impermissibly large risk' of punishing conduct the law does not reach." *Id.* at 2525, *quoting Teague,* 489 U.S. at 312-13, 109 S.Ct. 1060; *see also id.* at 2523 ("This class of rules is extremely narrow, and 'it is unlikely that any ... ha[s] yet to emerge.' " (quoting *Tyler v. Cain,* 533 U.S. 656, 667 n. 7, 121 S.Ct. 2478, 150

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.