399 F.3d 1010                                                                                                    Page 15

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

L.Ed.2d 632 (2001)) (internal quotation marks and citation omitted)).

In evaluating the *Roberts* test, the Supreme Court's analysis in *Summerlin* is instructive. The question presented there was whether *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the Court's decision that juries must determine the existence of any aggravating factor necessary for imposition of the death penalty, applied retroactively to cases already final on direct review. In assessing whether *Ring* represented a true *1027 "watershed" procedural rule, the court reviewed scholarly commentary relating to the accuracy of judicial factfinding and concluded that the evidence was "simply too equivocal" to justify *Ring's* retroactive application: "[w]hen so many presumably reasonable minds continue to disagree over whether juries are better factfinders ..., we cannot confidently say that judicial factfinding *seriously* diminishes accuracy." *Summerlin*, --- U.S. at ----, 124 S.Ct. at 2525. The Court also stressed that this conclusion followed logically from its observation in *DeStefano v. Woods*, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) (per curiam), "that, although 'the right to jury trial generally tends to prevent arbitrariness and repression [,] ... [w]e would not assert ... that every criminal trial--or any particular trial--held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury.' " *Summerlin*, --- U.S. at ----, 124 S.Ct. at 2525, *quoting DeStefano*, 392 U.S.at 633-34, 88 S.Ct. 2093 (internal quotation marks omitted). The Court reasoned that if "a trial held entirely without a jury was not impermissibly inaccurate, it is hard to see how a trial in which a judge finds only aggravating factors could be." *Id.* at 2526. *Summerlin* thus did not extend *Ring* retroactively to cases on habeas review notwithstanding the Court's recognition that "[t]he right to jury trial is fundamental to our system of criminal procedure." *Id.*

Although *Summerlin* does not directly control the outcome of this case, the close similarities between the two cases are compelling. As in *Summerlin*, there is no clear consensus over the comparative effects *Roberts* and *Crawford* might have on the accuracy of jury verdicts, *see Crawford*, 124 S.Ct. at 1377-78 (Rehnquist, C.J., concurring), much less any evidence that *Roberts* "so '*seriously* diminishe[s]' accuracy that there is an 'impermissibly large risk' of punishing conduct the law does not reach," *Summerlin*, --- U.S. at ----, 124 S.Ct. at 2525, *quoting Teague*, 489 U.S. at 312-13, 109 S.Ct. 1060. Nor am I prepared to assert that all testimonial hearsay evidence admitted without the opportunity for cross-examination necessarily renders a criminal trial "impermissibly inaccurate," *id.* at 2526, or otherwise "unfair," *id.* at 2525, *quoting DeStefano*, 392 U.S. at 634, 88 S.Ct. 2093. Even assuming *Crawford's* reinterpretation of the Confrontation Clause is in some sense "fundamental" and accuracy-enhancing, it does not follow that "[t]he values implemented by [that] right ... would ... measurably be served by requiring retrial of all persons convicted in the past by procedures not consistent with the Sixth Amendment right" as it is currently understood. *Summerlin*, --- U.S. at ---- - ----, 124 S.Ct. at 2525-26, *quoting DeStefano*, 392 U.S. at 634, 88 S.Ct. 2093. There is simply no solid evidence that *Roberts* has so seriously undermined the accuracy of criminal proceedings as to discredit the host of final convictions generated pursuant to its authority.

Judge McKeown, however, concludes that *Crawford* is retroactive, because "the evidence that cross-examination seriously decreases the possibility of inaccurate conviction is unequivocal." *Ante* at 1017. In her view, "*Crawford* itself answers the question of whether the absence of cross-examination" "so *seriously* diminishe[s] accuracy that there is an impermissibly large risk of punishing conduct the law does not reach." *Ante* at 1017, *quoting Summerlin*, --- U.S. at ----, 124 S.Ct. at 2525. But that is the wrong question. Prior to *Crawford*, courts may not have been required to exclude an unavailable witness's out-of court testimonial statement that was not was subject to cross-examination, but they were required to exclude statements that did not have "adequate indicia of reliability." *1028 *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. Thus, the question is not whether testimony that has been subject to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 17 of 28

Case 1:00-cv-00727-SSB-TSH    Document 62-3    Filed 07/22/2005    Page 2 of 14

399 F.3d 1010                                                                                                Page 16

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

cross-examination is more likely to be reliable than testimony that has not. Rather, the question is whether testimony admissible under *Roberts* is so much more unreliable than that admissible under *Crawford* that the *Crawford* rule is "one without which the likelihood of an accurate conviction is *seriously* diminished." *Summerlin*, --- U.S. at ----, 124 S.Ct. at 2523 (internal quotation marks omitted).

The Supreme Court's decision in *Sawyer v. Smith,* 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) illustrates the principle that a new rule qualifies as a "watershed rule[ ] of criminal procedure," *Teague,* 489 U.S. at 311, 109 S.Ct. 1060, only if it represents a substantial improvement over the previously existing rule. In *Sawyer,* the Court addressed the question whether a habeas petitioner could claim the benefit of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which was decided after the petitioner's conviction became final and which "held that the Eighth Amendment prohibits the imposition of a death sentence by a sentencer that has been led to the false belief that the responsibility for determining the appropriateness of the defendant's capital sentence rests elsewhere." *Sawyer,* 497 U.S. at 233, 110 S.Ct. 2822. After concluding that *Caldwell* established a "new rule," *id.* at 233-41, 110 S.Ct. 2822, the Court addressed whether *Caldwell* fit within either of *Teague's* exceptions. But, in addressing whether *Caldwell* qualified as a " 'watershed rule[ ] of criminal procedure,' " *id.* at 241, 110 S.Ct. 2822, *quoting Saffle,* 494 U.S. at 495, 110 S.Ct. 1257, the Court did not simply ask whether sentences imposed in violation of *Caldwell* were much less accurate than those imposed in compliance with *Caldwell.* Rather, the Court compared *Caldwell* against "the rule of [*Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), which] was in place [at the time of the petitioner's trial and appeal] to protect any defendant who could show that a prosecutor's remarks had in fact made a proceeding fundamentally unfair." *Sawyer,* 497 U.S. at 243, 110 S.Ct. 2822. Although the Court's "concern in *Caldwell* was with the 'unacceptable risk' that misleading remarks could affect the reliability of the sentence," *Caldwell* had merely been "added to an existing guarantee of due process protection against fundamental unfairness." *Id.* at 244, 110 S.Ct. 2822. Thus, the Court in *Sawyer* could not say that *Caldwell's* "systemic rule enhancing reliability is an 'absolute prerequisite to fundamental fairness,' of the type that may come within *Teague's* second exception." *Id., quoting Teague,* 489 U.S. at 314, 109 S.Ct. 1060.

Here, too, *Crawford's* new rule must be judged against the background in which it was decided, by comparing it to the rule of *Roberts*. Although certain language in Judge McKeown's opinion suggests that she purports to do so, *see Ante* at 1018-19 ("The difference between pre- and post-*Crawford* Confrontation Clause jurisprudence is not the sort of change that can be dismissed as merely incremental."), she never actually asks the question upon which *Crawford's* retroactivity turns: Does the admission of testimony which has been judicially determined to bear "adequate indicia of reliability" (as *Roberts* required), but which has not necessarily been subject to cross-examination (as *Crawford* requires), "so *seriously* diminish[ ] accuracy that there is an impermissibly large risk of punishing conduct the law does not reach"? *Summerlin,* --- U.S. at ----, 124 S.Ct. at 2525 (internal quotation marks omitted). *1029 As explained above, the answer to that question should not be in the affirmative.

Yet another flaw in Judge McKeown's analysis is her focus on language in *Crawford* suggesting that the new rule announced in that case is truer to the Framers' design. For example, she quotes the Court's statement that "[t]he Framers would be astounded to learn that *ex parte* testimony could be admitted against a criminal defendant because it was elicited by 'neutral' government officers." *Crawford,* 124 S.Ct. at 1373. *See Ante* at 1016. "The question here is not, however, whether the Framers believed that [cross-examination provides a] more accurate [means of testing the reliability of testimony] than [judicial determinations of 'reliability' pursuant to *Roberts* ]," but "whether [the *Roberts* test] so *seriously* diminishe[s] accuracy that there is an impermissibly large risk of punishing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                                         Page 17

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

conduct the law does not reach." *Summerlin,* --- U.S. at ----, 124 S.Ct. at 2525 (internal quotation marks omitted). That the Framers made a particular judgment about the best way to ensure the reliability of testimony does not mean that any rule other than the one they envisioned creates an impermissibly high risk of inaccurate conviction.

The focus of Justice Scalia's analysis in *Crawford* was on *Roberts'* fidelity to the Framers' intentions, rather than the accuracy of convictions obtained under the *Roberts* regime. *See, e.g., Crawford,* 124 S.Ct. at 1359 ("Petitioner argues that [the *Roberts* ] test strays from the original meaning of the Confrontation Clause and urges us to reconsider it."); *id.* at 1369 ("Although the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales."); *id.* at 1370 ("Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' "). True, the Court stated that "[t]he [Confrontation] Clause ... reflects a judgment ... about how reliability can best be determined," *id.* at 1370; that "[t]he legacy of *Roberts* in other courts vindicates the Framers' wisdom in rejecting a general reliability exception," *id.* at 1371; and even that "[r]eliability is an amorphous, if not entirely subjective, concept." *Id.* But, even if one assumes that the Framers were correct as an empirical matter that cross-examination is the best way to ensure the reliability of testimony, that does not mean that any other method impermissibly threatens punishing the innocent.

Finally, Judge McKeown's analysis is contrary to that of three other circuits that have held that *Crawford's* rule does not fit within either of *Teague's* exceptions. *See Brown v. Uphoff,* 381 F.3d 1219, 1225-27 (10th Cir.2004); *Evans v. Luebbers,* 371 F.3d 438, 444-45 (8th Cir.2004); *Mungo v. Duncan,* 393 F.3d 327, 335-36 (2d Cir.2004). Although Judge McKeown criticizes *Brown* on the ground that "[t]he Tenth Circuit mistakenly concluded that rules of constitutional law subject to harmless error review can never be considered bedrock rules of procedure," *see Ante* at 1020, that attack is not well-founded. Our own decision in *United States v. Sanchez-Cervantes,* 282 F.3d 664 (9th Cir.2002), which held that *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) does not apply retroactively, employed the very reasoning that Judge McKeown finds objectionable. *See Sanchez-Cervantes,* 282 F.3d at 670 ("By applying harmless error analysis or plain error review to *Apprendi* claims, we have necessarily held that *Apprendi* errors do not render a trial fundamentally unfair. Therefore, it would seem illogical to hold that such an error is a watershed rule that *1030 'implicate[s] the fundamental fairness of the trial' " (quoting *Teague,* 489 U.S. at 312, 109 S.Ct. 1060) (footnote omitted)). The Tenth Circuit's reasoning in *Brown* is entirely consistent with our own in *Sanchez-Cervantes,* and provides yet another reason why Judge McKeown's analysis is unpersuasive.

For the foregoing reasons, I conclude that *Crawford* does not qualify as a "watershed rule[ ] of criminal procedure" appropriate for retroactive application to convictions already final on direct review. *Teague,* 489 U.S. at 311, 109 S.Ct. 1060. Like the Second Circuit in *Mungo, see* 393 F.3d at 334-35, and unlike Judge McKeown, *see* Ante at 2010-11, I therefore would not reach the question whether AEDPA "nullifies" the *Teague* exceptions, such that no "new rule"--even one fitting within one of those exceptions--may serve as the basis for habeas relief.

Nonetheless, to determine whether I can concur in the result, I must evaluate Bockting's Confrontation Clause claim according to the standards articulated in *Roberts* and our own pre-*Crawford* decisions.

B.

Because Judge McKeown's opinion does not get to the application of pre-*Crawford* law to Bockting's Confrontation Clause claim, it was not necessary for her to go into detail regarding the facts of this case that are relevant to such analysis, therefore I add them here.

At Bockting's March 30, 1988, preliminary hearing, Laura described Autumn's abuse

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                                    Page 18

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

allegations and other events leading up to Bockting's arrest. Prosecutors then called Autumn to the stand. Autumn testified that she knew the difference between the truth and a lie and answered preliminary questions about the alleged assault and subsequent rape examination. As the prosecutor probed more deeply into the details of Bockting's alleged assault, Autumn began to cry and averred that she could not remember basic facts such as what occurred in the bathroom with her father and whether she discussed her father's alleged assault with Detective Zinovitch. The judge asked Laura to take a seat next to Autumn on the witness stand, and Laura encouraged Autumn to "be honest" and "tell the truth." Responding that "[y]ou already told them," Autumn refused to answer any further questions. The judge declared Autumn unavailable as a witness.

Bockting's jury trial commenced on August 15, 1988. The government, represented by Deputy District Attorney John Lukens, called Autumn as its first witness. The trial transcript reads as follows:

> The Court: Very good then. Mr. Lukens, your first witness.
> Mr. Lukens: Autumn Bockting.
> * * *
> The Court: How are you doing, Autumn? Autumn, you okay? All right. Continuation of case C83110, State of Nevada versus Marvin Howard Bockting. The record will reflect the presence of defendant; his counsel, Mr. Blaskey; Mr. Lukens representing the State[;] the absence of the jury. And we have on the stand Autumn Jean Tresler Bockting.
> All right. Go ahead, counsel.
> Mr. Lukens: Autumn, this is when you have to stand up to be sworn.
> The Court: Can you stand up, Autumn? Can you stand up and raise your hand for me?
> Autumn, stand up now and raise your hand for us, okay.
> *1031 Mr. Lukens: Your Honor, I think under these conditions, I think that the witness is unable to testify.
> The Court: Well, I think it is apparent without the jury if we can't get anything more than this, it is not likely when the jury is here we will do any better. Go ahead and assist, will you please.
> Counsel approach the bench, please.
> (Discussion at the bench which was not reported.)
> Mr. Lukens: Your Honor, at this time since the Court has observed for itself the inability of Autumn Bockting to testify due to the emotional conflict that goes on within her, the State intends pursuant to [Nevada Revised Statute] 51.385 to offer into evidence the statements made by Autumn Bockting to both her mother, Laura, and Detective Zinovitch and, to a more limited extent, Diane Donovan.
> This offer is made pursuant to [Nevada Revised Statute] 51.385 which states in pertinent part that, "In addition to any other provision for admissibility, a statement made by a child under the age of 10 years, describing any act of sexual conduct performed with or on the child, is admissible in a criminal proceeding regarding that sexual conduct if, A, the Court finds in hearing outside the presence of the jury that the time, content and circumstances of the statement provides sufficient circumstantial guarantees of trustworthiness, and, B, the child testifies at the proceeding or is unavailable or unable to testify."
> I submit that portion B has been met.
> And, in addition, under [the provision formerly designated] Subsection [2], it says, "If the child is unavailable or unable to testify, written notice must be given to the defendant 10 days before the trial if the prosecution intends to offer the statements in evidence."
> I would submit that the State has complied with that and that such notice was filed on August 2nd, 1988 and is styled Notice Pursuant to [Nevada Revised Statute] 51.385 wherein I gave notice of the three individuals who I intend to call as to Autumn's statements.
> The Court: Very well....

After hearing testimony from Laura and Detective Zinovitch outside the presence of the jury, the judge concluded that Autumn's hearsay statements were admissible under Nevada Revised Statutes 51.385 because Autumn was effectively unavailable for questioning:

> The very purpose of this statute was to avoid the problem we have here today where a little girl either is not willing to testify or for some reason

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                      Page 19

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

is unable to or testifies in such an inconsistent manner that it means, in essence, that their testimony is worthless; and because of the fact that she is testifying in open court in front of strangers with all the things that surrounds that kind of a setting.... The little girl is obviously unavailable. And as far as these two statements, I am meaning the one to the mother and the one to Detective Zinovitch, I think they are allowed--they are credible enough to be allowed to be related to the jury.

*Roberts* outlines two preconditions for the introduction of out-of-court statements against a criminal defendant. First, the government must establish the declarant's "unavailability" to testify as a witness at trial. *Bains v. Cambra,* 204 F.3d 964, 973 (9th Cir.2000), *citing Roberts,* 448 U.S. at 65-66, 100 S.Ct. 2531. Second, the government must demonstrate that the hearsay statements bear "adequate indicia of reliability" by showing that they either fall "within a firmly rooted hearsay exception" or contain "particularized guarantees of trustworthiness." *1032*Roberts,* 448 U.S. at 65-66, 100 S.Ct. 2531. In Bockting's state proceedings, the Nevada Supreme Court determined that the government satisfied these two requirements, *see Bockting v. State,* 109 Nev. 103, 847 P.2d 1364, 1366-70 (1993) (per curiam), and Bockting challenges these determinations on federal habeas review. Mindful of a federal court's duty to defer to the state supreme court's factual determinations and reasonable applications of Supreme Court precedent, 28 U.S.C. § 2254(d)(1)-(2), I consider each *Roberts* requirement in turn.

1.

Bockting first asserts that the Nevada Supreme Court's decision is not entitled to deference under AEDPA because the court failed to review whether Autumn was available to testify at trial. The record does not support this characterization of the state supreme court's findings. When Autumn refused to cooperate as a trial witness, the prosecution moved to introduce her hearsay statements through the testimony of her mother, Detective Zinovitch, and Doctor Donovan pursuant to Nevada Revised Statute 51.385, which provides for the introduction of a child's hearsay statements if they are "unavailable or unable to testify." NEV. REV. STAT. 51.385. Before granting the prosecution's motion, the trial court made a clear, particularized finding that Autumn's refusal to cooperate on the stand had rendered her "obviously unavailable." The Nevada Supreme Court, while observing that Nevada Revised Statute 51.385 "does not require the unavailability of a hearsay declarant as a prerequisite to the admissibility of the declarant's statements," nonetheless explicitly affirmed the trial court's determination "that the child was unavailable as a witness." *Bockting,* 847 P.2d at 1366 n. 4; *see also* NEV. REV. STAT. 51.385 (allowing the introduction of hearsay statements when "[t]he child testifies at the proceeding" in addition to when the child "is unavailable or unable to testify"). I would therefore reject Bockting's argument that the state supreme court's unavailability determination is not entitled to deference because the trial court failed to ascertain whether Autumn was available to testify at trial.

A more difficult question is whether the Nevada Supreme Court's substantive unavailability determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In past decisions, the Supreme Court has not found it necessary to decide whether a child witness is "unavailable" for Confrontation Clause purposes when the child is merely emotionally or developmentally incapable of testifying in that forum. *See Idaho v. Wright,* 497 U.S. 805, 815-16, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). As a general matter, however, the Court held in *Roberts* that "a witness is not 'unavailable' ... unless the prosecutorial authorities have made a *good-faith effort* to obtain [her] presence at trial." *Roberts,* 448 U.S. at 75, 100 S.Ct. 2531, *quoting Barber v. Page,* 390 U.S. 719, 724-25, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968) (emphasis added).

Seizing on *Roberts's* good faith requirement, Bockting makes a plausible argument that child witnesses who refuse to testify in a courtroom setting should not be considered "unavailable"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                                Page 20

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

unless the government first makes a good-faith attempt to secure their testimony through closed circuit television or some other medium amenable to cross-examination. I need not consider the merits of Bockting's proposal, however, because my task here is not to decide what might be best; instead, my review is limited to whether the Nevada Supreme Court's application of *Roberts* was *unreasonable.* See *1033 28 U.S.C. § 2254(d). On its face, *Roberts* requires no more than "a good-faith effort to obtain [a witness's] presence at trial," *Roberts,* 448 U.S. at 75, 100 S.Ct. 2531 (emphasis removed), *quoting Barber,* 390 U.S. at 724- 25, 88 S.Ct. 1318, and the government arguably satisfied this requirement here by (1) securing Autumn's physical "presence" at trial and (2) making "a good-faith effort" to elicit her testimony in that forum.

The Supreme Court's more recent decisions dealing with alternative procedures for obtaining trial testimony do not materially advance Bockting's habeas petition. Although the Supreme Court has permitted states to substitute one-way closed circuit television for in-court child testimony under certain circumstances, *see Maryland v. Craig,* 497 U.S. 836, 855, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), it has never intimated that the Constitution *requires* the government to attempt such alternative procedures as a precondition for an unavailability finding. *Cf. Wright,* 497 U.S. at 818, 110 S.Ct. 3139 ("Out-of-court statements made by children regarding sexual abuse arise in a wide variety of circumstances, and we do not believe the Constitution imposes a fixed set of procedural prerequisites to the admission of such statements at trial."). To the contrary, the Court has emphatically rejected the assertion that *Craig,* 497 U.S. at 855, 110 S.Ct. 3157, and *Coy v. Iowa,* 487 U.S. 1012, 1021, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), require the government to demonstrate "necessity" before introducing pretrial hearsay statements. *See White v. Illinois,* 502 U.S. 346, 358, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) ("There is ... no basis for importing the 'necessity requirement' announced in [ *Craig* and *Coy* ] into the much different context of out-of-court declarations ...."). I would hold, therefore, that the Nevada Supreme Court's failure to insist upon alternative procedures for procuring Autumn's contemporaneous testimony did not involve an unreasonable application of *Roberts, Craig,* or *Coy.*

Setting aside Bockting's assertions of legal error, I must decide whether the Nevada Supreme Court's unavailability finding "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Taylor v. Maddox,* 366 F.3d 992, 999 (9th Cir.2004) (holding that subsection 2254(d)(2) "applies ... to situations where petitioner challenges the state court's findings based entirely on the state record"). Under this deferential standard of review, I may not "determine that the state-court factfinding process is defective in some way" unless I am "satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Taylor,* 366 F.3d at 1000.

The record does not support Bockting's claim that the Nevada Supreme Court's reliance on the trial court's unavailability finding "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Gill v. Ayers,* 342 F.3d 911, 917 n. 5 (9th Cir.2003) (explaining that when a state supreme court summarily adopts a lower court's finding of fact "we look through the unexplained ... decision to the last reasoned decision ... as the basis for the state court's judgment" (internal quotation marks, brackets, and citation omitted)). At Bockting's preliminary hearing, Autumn initially responded to the prosecution's inquiries with incomplete or evasive answers, then quickly broke into tears and refused to answer any further questions. Efforts to elicit her testimony at trial were even less fruitful, as she *1034 refused so much as to stand or to raise her hand to be sworn in as a witness. The trial transcript does not paint a detailed portrait of Autumn's demeanor on the latter occasion, but there are strong hints that Autumn was distraught and uncommunicative from the start, leading the state trial court to conclude that there was no use

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                                                   Page 21

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

pursuing further questioning before the jury. I therefore am not "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude" that Autumn was emotionally incapable of testifying at trial. *Taylor,* 366 F.3d at 1000. To the contrary, deference to state courts is particularly appropriate in a case such as this, where findings of fact turn on a trial court's eyewitness evaluation of a child witness's demeanor. *Cf. Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) ("[D]eterminations of demeanor .... [are] entitled to deference even on direct review; '[t]he respect paid such findings in a habeas proceeding should be no less.' ") (quoting *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)). As Bockting did not present any evidence in federal district court to challenge the state trial court's findings, I presume that the trial court's findings are correct. *See* 28 U.S.C. § 2254(e)(1); *Taylor,* 366 F.3d at 1000 ("Once the state court's fact-finding satisfies this intrinsic review [on the record,] ... the state court's findings are dressed in a presumption of correctness....").

In sum, Bockting has not established that the Nevada Supreme Court's unavailability determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

2.
Turning to *Roberts's* "adequate indicia of reliability" requirement, the Nevada Supreme Court acknowledged that Autumn's hearsay statements did not fit within any "firmly rooted hearsay exception" but held that her statements bore the requisite "particularized guarantees of trustworthiness" for admission under *Roberts. Bockting,* 847 P.2d at 1367-70. Applying the multifactor test outlined in *Wright,* 497 U.S. at 821-22, 110 S.Ct. 3139, the court identified several circumstances which, in its view, buttressed the "trustworthiness" of Autumn's abuse allegations, including: (1) the "spontaneity and consistent repetition" of her statements, (2) the "agitation and fear" before first recounting the experience to her mother as evinced by "the fact that she was visibly shaken and crying," (3) her apparent "knowledge of sexual conduct not present in most children six years of age," (4) her "child-like terminology" which "was reflective of candor rather than coaching," and (5) her "display of affection for Bockting ... indicative of love rather than hate." *Bockting,* 847 P.2d at 1369.

Bockting argues that the Nevada Supreme Court evaluated the trustworthiness of Autumn's statements based on an unreasonable application of Supreme Court precedent, because it mistakenly interpreted *Wright* to prohibit consideration of any evidence that did not support trustworthiness. *Wright* held that in evaluating whether a declarant's statement bears " 'particularized guarantees of trustworthiness[,]' ... relevant circumstances include only those that surround the *making* of the statement," not evidence corroborating the *substance* of a declarant's hearsay statements (e.g., physical evidence of sexual *1035 abuse). *Wright,* 497 U.S. at 819, 110 S.Ct. 3139 (emphasis added). Although *Wright* did not decide whether courts may consider noncorroborating evidence that refutes the substance of a declarant's statements (e.g., physical evidence contradicting an accuser's abuse allegations), *see Swan v. Peterson,* 6 F.3d 1373, 1381 (9th Cir.1993)--an issue not before us here--the Court's reasoning strongly suggests that courts must at least consider any circumstances surrounding the making of an out-of-court statement that challenge the statement's trustworthiness (e.g., inconsistencies, motives to fabricate). *See Wright,* 497 U.S. at 825-27, 110 S.Ct. 3139; *Webb v. Lewis,* 44 F.3d 1387, 1392 (9th Cir.1994) (holding that *Wright* "does not forbid recourse to other evidence that confirms the presumptive unreliability of the hearsay"); *Swan,* 6 F.3d at 1381 n. 7 (reasoning in dicta that "[b]ecause *Wright* holds that the consistency of a child witness's allegations bears on the reliability of an initial hearsay statement, arguably a later *inconsistent* statement should also be evaluated in making the reliability determination").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                                    Page 22

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

I need not decide, however, if a categorical refusal to consider evidence challenging the trustworthiness of Autumn's out-of-court statements would constitute an objectively unreasonable application of *Wright,* for the record does not support Bockting's assertion that the Nevada Supreme Court "explicitly refused to consider evidence" establishing the unreliability of Autumn's accusations in this case. Footnote 8 of the state supreme court's opinion characterizes *Wright* as excluding "corroborative evidence ... in determining the reliability of hearsay statements" and hypothesizes that *Wright* might require courts "to exclude evidence of marital discord on the part of the parents as a possible motive in the mother for having the child fabricate charges of sexual abuse against the husband." *Bockting,* 847 P.2d at 1369 n. 8. Although these statements suggest the court might have *misinterpreted Wright* to some degree, they do not clearly establish that the court *misapplied Wright* in this case by refusing to consider critical, admissible evidence such as the marital discord between Bockting and Laura. In the body of its opinion, the court stated it reached its trustworthiness determination based on "*the totality of the circumstances* surrounding the child's out-of-court statements" and asserted that "[n]either the [five] factors [listed above] *nor any other aspect of the record evidence* provides insights into a motive for dissembling on the part of the child." *Id.* at 1369-70 (emphasis added). True, the court did not expressly discuss the Bocktings' marital discord and certain other evidence damaging to the trustworthiness of Autumn's statements, but it did refer to Laura's testimony that Autumn "had seen adult sexual organs in the past, had showered with both her mother and Bockting, and had seen her mother and stepfather having intercourse after entering the bedroom unnoticed by the adults." *Id.* at 1369 n. 7. Given the Nevada Supreme Court's assertion that it considered all the "record evidence" in assessing Bockting's claims, it would appear that its "totality of the circumstances" analysis did, in fact, embrace the Bocktings' marital problems and other relevant circumstances surrounding Autumn's out-of-court statements. I would thus reject Bockting's contention that the Nevada Supreme Court unreasonably applied *Wright's* restrictions on corroborating evidence.

The ultimate determination "[w]hether [Autumn's] hearsay statements were sufficiently reliable to be admitted without violating [*Roberts* ] is a mixed question" of law and fact, *Swan,* 6 F.3d at 1379, so I review the Nevada Supreme Court's reliability *1036 determination to ascertain whether it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Davis v. Woodford,* 333 F.3d 982, 990 (9th Cir.2003) (stating that subsection 2254(d)(1) applies "to mixed questions of law and fact") (citing *Williams v. Taylor,* 529 U.S. 362, 407-09, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2001)). To the extent the Nevada Supreme Court's "particularized guarantees of trustworthiness" rest on findings of fact, I must decide whether the determination "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Bockting argues that neither the spontaneity and emotional intensity of Autumn's allegations nor her apparent lack of motive to fabricate are indicative of truthfulness, because they can easily be explained away by one of two alternative theories. First, he observes that Autumn delivered her original abuse account shortly after arising from sleep and contends that she could have been recounting a fantastical nightmare. This "nightmare" theory is entirely speculative and appears implausible given the graphic specificity of Autumn's allegations. Second, Bockting posits that Laura might have fabricated the abuse allegations herself and coached Autumn through the police interviews. Like the "nightmare" theory, this "coaching" theory is utterly unsubstantiated by the record, and it fails to account for Autumn's spontaneous use of dolls to describe the assault during her interview with Zinovitch and the child-like terminology Autumn used to describe her abuse. *See Bockting,* 847 P.2d at 1368. Because Bockting's speculation and conjecture do not establish that the Nevada Supreme Court's factual findings were "unreasonable" with respect to Autumn's spontaneity, mental state, and motive, 28

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                                Page 23

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

U.S.C. § 2254(d)(2), I presume these findings are correct, id. § 2254(e)(1). See Taylor, 366 F.3d at 1000.

Somewhat more compelling is Bockting's challenge to the Nevada Supreme Court's reliance on Autumn's "knowledge of sexual acts that a child of six would not usually be aware of absent personal experience." Bockting, 847 P.2d at 1369. Laura conceded at trial that Autumn had seen adult sexual organs, had showered with each of her parents, had watched her mother practice exotic dancing, and had observed her parents engaging in sexual intercourse after entering the bedroom unnoticed. Bockting elaborated on Laura's testimony, alleging that Autumn had witnessed her parents engage in oral sex and was herself "interested" in sex. For these reasons alone, the state supreme court had reason to suspect that Autumn's familiarity with adult sexual acts would exceed that of the average six-year-old. On the other hand, the state supreme court concluded that the testimony of Autumn's parents did not adequately account for Autumn's ability to "demonstrate[ ] through the use of the dolls the positions that would have been necessary for the acts to take place between a large adult male and a small female child" and to describe "how she held onto the [bathroom] sink while Bockting was behind her and 'would press real hard and it hurt.' " Id. The substance of Autumn's allegations disclosed knowledge of sexual acts gained from direct personal experience, not remote observation. Thus, it was not unreasonable for the state supreme court to find, as it did, that Autumn's prior exposure to adult sexual acts did not adequately explain her familiarity with the specific acts described in her abuse allegations.

Arguably the weakest link in the Nevada Supreme Court's "particularized guarantees *1037 of trustworthiness" determination is its finding that "sufficient ... consistent repetition existed in [Autumn's] various statements." Id. Autumn's abuse allegations to her mother and Detective Zinovitch were substantially identical, so it was not unreasonable for the state supreme court to conclude that Autumn's "restatement of her travails [to Detective Zinovitch] was consistent with the details she had previously told to her mother." Id. at 1368. On the other hand, the court did not mention that Autumn's out-of-court statements contradicted her testimony at the preliminary hearing in several material respects. The Nevada Supreme Court's inattention to these inconsistencies in Autumn's statements is potentially significant under AEDPA; as the Supreme Court has observed and we have held, section 2254(d)(2) allows habeas relief "where the state has before it, yet apparently ignores, evidence that supports [a] petitioner's claim." Taylor, 366 F.3d at 1001 (paraphrasing Miller-El v. Cockrell, 537 U.S. 322, 346, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)).

Although the Nevada Supreme Court did not expressly discuss Autumn's statements at the preliminary hearing when evaluating the consistency of her out-of-court statements, it did not ignore these statements altogether. The court clearly recognized the inconsistencies in Autumn's statements, because the "Facts" section summarized Autumn's relevant testimony at the preliminary hearing. See Bockting, 847 P.2d at 1365 ("At the preliminary hearing,.... [Autumn] stated that her pants were never removed [during the alleged abuse] and that she could not remember how Bockting touched her."). Thus, this testimony was an "aspect of the record evidence" that the state supreme court incorporated into its evaluation of the "totality of the circumstances surrounding the child's out-of-court statements, as defined in Wright. " Id. at 1369-70. As such, I would reject Bockting's assertion that the state supreme court "fail[ed] to consider and weigh relevant evidence that was properly presented." Taylor, 366 F.3d at 1001.

Moreover, Autumn's testimony at the preliminary hearing does not compel the conclusion that the Nevada Supreme Court's reliability analysis runs "contrary to, or involve[s] an unreasonable application of," Roberts or Wright. 28 U.S.C. § 2254(d)(1). As we recently explained, "the Supreme Court has specifically 'decline[d] to endorse a mechanical test for determining 'particularized guarantees of trustworthiness' under [ Roberts ],' " and " 'courts have considerable leeway in their consideration of appropriate factors.' "

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                                              Page 24

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

*Parle v. Runnels,* 387 F.3d 1030, 1039 (9th Cir.2004), *quoting Wright,* 497 U.S. at 822, 110 S.Ct. 3139. In this case, the state supreme court had good reason to focus on the consistency of Autumn's statements to her mother and Detective Zinovitch and discount the reliability of her in-court statements as factors in its reliability analysis. Autumn's testimony at the preliminary hearing was patently evasive, perhaps reflecting her emotional state, her desire to minimize harm to her stepfather, and her embarrassment at being asked to discuss the assault's graphic details in an open public forum. Doctor Donovan's expert testimony also indicated that Autumn's equivocation at the preliminary hearing was consistent with the denial phase child abuse victims commonly endure after a sexual assault. Considering the totality of the circumstances surrounding Autumn's hearsay statements, *see id.* at 820, 110 S.Ct. 3139, I am not persuaded that the Nevada Supreme Court applied *Roberts* and *Wright* unreasonably by holding that Autumn's testimony at the preliminary hearing does not singlehandedly tip **\*1038** the scale of reliability against the admission of her out-of-court statements.

Since the Nevada Supreme Court's "unavailability" and "adequate indicia of reliability" determinations satisfy AEDPA's stringent standard of review, Bockting's Confrontation Clause claim fails.

II.

In addition to his Confrontation Clause claim, Bockting raises several other claims in support of his habeas petition. Although neither Judge McKeown nor Judge Noonan discuss these issues, I explain why these arguments should not require reversal.

A.

Bockting contends that the state trial court violated his right to due process by admitting witness testimony regarding a prior accusation of sexual misconduct. Bockting takes issue with the following exchange between Deputy District Attorney Lukens and Laura, which took place during the state's rebuttal to defense character evidence:
Q: Without going into the details underlying this, I am going to ask you the following question. Between July of 1987 and October of 1987, did you have occasion to confront the defendant with allegations of sexual contact between him and Autumn?
A: Yes.
Q: What was his response at the time?
A: He denied it, said he wouldn't do anything like that, he was crying so at that time I didn't believe what she said.

Bockting did not object to these questions or request a limiting instruction, and the state trial court did not give such an instruction. During his "post conviction relief" hearing, Bockting argued that Laura's testimony impermissibly allowed the jury to consider past allegations of sexual assault as evidence that he committed the subsequent sexual assault for which he was convicted. The state trial court and supreme court upheld the evidence's admission, holding that the trial court's decision was consistent with state evidence law. *See* NEV. REV. STAT. 48.045(1) ("Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except ... [as] offered by an accused, and similar evidence offered by the prosecution to rebut such evidence ...."); *id.* 48.055 ("In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or in the form of opinion. On cross-examination, inquiry may be made into specific instances of conduct.").

I do not consider at this stage whether the Nevada Supreme Court misinterpreted Nevada law by refusing to grant post-conviction relief based on the trial court's decision to admit Laura's testimony without providing a limiting instruction sua sponte. "Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." *Whelchel v. Washington,* 232 F.3d 1197, 1211 (9th Cir.2000) (internal quotation marks and citation omitted). Thus, my task is limited to deciding whether the evidence's admission violated Bockting's clearly established *federal* rights as defined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                     Page 25

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

The Supreme Court has never decided whether due process prohibits the admission of prior bad acts evidence, *see Estelle v. McGuire,* 502 U.S. 62, 75 n. 5, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (declining to decide whether due process prohibits prior bad acts evidence to show propensity to *1039 commit a crime); *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir.2003), *cert. denied,* 540 U.S. 930, 124 S.Ct. 345, 157 L.Ed.2d 236 (2003) (mem.) ("There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."), but it has said that defendants who challenge a state court's admission of relevant evidence on due process grounds "must sustain the usual heavy burden that a due process claim entails: ... 'it [must] offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' " *Montana v. Egelhoff,* 518 U.S. 37, 43, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality), *quoting Patterson v. New York,* 432 U.S. 197, 202, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (internal footnote omitted).

In this case, the admission of Laura's unobjected-to testimony did not meet this "heavy burden" for a valid due process claim. The trial court admitted Laura's testimony during the state's rebuttal case as a response to the testimony of three defense witnesses who testified concerning Bockting's alleged good reputation and character. Laura's rebuttal testimony was relevant to impeach the defense's reputation evidence. The prosecutor touched on Laura's previous allegations only briefly, deliberately skirted the allegations' underlying details to minimize prejudice, and fully disclosed Bockting's vehement denial of the allegations. Moreover, the testimony arguably advanced Bockting's defense by introducing his emotional denial of the previous allegations, as well as Laura's concession that she "didn't believe" the allegations. Given that this evidence came in response to defense character evidence and taking into account the lack of objection, the brevity, and limited scope of the government's questioning relating to Laura's previous confrontation with Bockting, it was not unreasonable for the Nevada Supreme Court to conclude that the admission of this evidence did not transgress a "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (internal quotation marks omitted).

B.

Bockting asserts that the government violated his due process right to a fair trial by vouching for Laura's credibility during closing argument. *See United States v. Necoechea,* 986 F.2d 1273, 1276 (9th Cir.1993) ("Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony."). As examples of vouching, Bockting cites the prosecutor's statements that Laura "testified as candidly as I think is possible" and "had one motive and it was to tell you the truth." He also faults the prosecutor for characterizing Laura's testimony as "unembellished, ... straightforward, and ... candid."

Even if these statements arguably constituted "vouching," Bockting does not qualify for habeas relief under AEDPA's deferential standard if the Nevada Supreme Court's failure to grant post-conviction relief on this basis was neither "contrary to," nor "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). According to the Supreme Court, "[t]he relevant question" in evaluating a prosecutorial vouching claim "is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *1040*Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

Several factors work to Bockting's disadvantage here. First, the prosecutor did not ask the jury to accept Laura's credibility based on his endorsement alone; rather, he explained that "[t]he *evidence* shows that [Laura] was candid" (emphasis added), and he identified several specific instances where Laura made no attempt to conceal facts damaging to Autumn's allegations (e.g., Autumn observing her parents engaged in sexual relations) or to her own

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                           Page 26

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

reputation and credibility as a government witness (e.g., her drug and alcohol problems, her occupation as a nude dancer). See *Necoechea*, 986 F.2d at 1276 (recognizing "that prosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence, including that one of the two sides is lying"). Second, the trial court significantly diminished the risk of prejudice by instructing the jury that "[s]tatements, arguments and opinions of counsel are not evidence in the case." As in *Davis v. Woodford*, 333 F.3d 982 (9th Cir.2003), "[t]his was not a case in which there was an 'overwhelming probability that the jury [would] be unable to follow the court's instructions' and 'a strong likelihood that the effect of the [vouching] would be devastating to the defendant,' " *id.* at 997 (second alteration in original), quoting *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). Third and perhaps most important, the prosecutor's statements did not render the trial fundamentally unfair because the record confirmed Laura's testimony, including: testimony by Doctor Rivers (who conducted Autumn's rape examination) that Autumn had suffered penetration injuries to her vagina and rectum during the previous week, Bockting's admission that he was the only adult male who was alone with Autumn during the week when she sustained her injuries, and Detective Zinovitch's testimony substantially corroborating Laura's description of Bockting's sexual assault. In sum, under the circumstances of this case, Bockting has not demonstrated that the Nevada Supreme Court applied the principle in *Darden* unreasonably by holding that the prosecutor's vouching did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Davis*, 333 F.3d at 996-97, quoting *Darden*, 477 U.S. at 181, 106 S.Ct. 2464.

C.

Lastly, I consider Bockting's assertion that his representation at trial was constitutionally deficient. The Supreme Court has held that a claimant "must show that counsel's performance was deficient" and that such "performance prejudiced the defense" to prevail on a Sixth Amendment ineffective assistance of counsel claim. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish prejudice, a claimant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. The question to be answered is whether the Nevada Supreme Court's denial of post-conviction relief was "contrary to, or involved an unreasonable application of," these principles. 28 U.S.C. § 2254(d)(1).

I confine my ineffective assistance analysis to the three issues addressed in our October 16, 2002 order granting Bockting's first motion to broaden the Certificate of Appealability (COA): (1) trial counsel's failure to object to inadmissible hearsay evidence at trial, (2) trial counsel's failure *1041 to object to repeated instances of prosecutorial vouching, and (3) appellate counsel's failure to research adequately and present these appealable issues to the Nevada Supreme Court. Bockting's second motion to broaden the COA, which is currently before this court, raises a fourth ineffective assistance of counsel issue: his "trial counsel's failure to conduct any investigation of the facts which would undermine the reliability of the child's hearsay statements." The second motion for broader certification was filed on June 17, 2003--more than a year after the district court declined to certify Bockting's ineffective assistance of counsel claim and eight months after we granted his first motion to broaden the COA. Pursuant to Circuit Rule 22-1(d), Bockting should have raised any and all grievances relating to the COA's scope "within thirty-five days of the district court's entry of its order denying[, in part, his] certificate of appealability." 9TH CIR. R. 22-1(d). His "[f]ailure to comply with the Circuit Rule's procedure is a ground for denying" the second motion, "which [I would] do here." *Griffin v. Johnson*, 350 F.3d 956, 960 (9th Cir.2003).

With respect to the remaining Sixth Amendment claims, the Nevada Supreme Court invoked *Strickland's* standard and held that Bockting "has not demonstrated that counsel's performance was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

399 F.3d 1010                                                                                Page 27

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**(Cite as: 399 F.3d 1010)**

unreasonable, or that counsel's errors were so severe that they rendered the jury's verdict unreliable." I need not consider the first part of this holding, because the record as a whole does not support Bockting's claim that the state supreme court unreasonably applied *Strickland's* prejudice inquiry. *Cf. Kennedy v. Lockyer,* 379 F.3d 1041, 1053 (9th Cir.2004) (observing that "[i]n making a harmless error determination in a habeas case," federal courts have "an obligation" to consult the full record), *quoting O'Neal v. McAninch,* 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

Bockting faults his trial counsel for failing to object to the government's prior bad acts evidence, but he has not demonstrated that he suffered any prejudice from his counsel's allegedly deficient performance. A timely objection by Bockting's counsel likely would have been futile, because Laura's testimony was admissible under state law. In addition, even setting aside Laura's testimony concerning Bockting's prior bad acts evidence, the evidence against Bockting was overwhelming. Similar logic dooms Bockting's other arguments. His trial counsel's failure to register a timely objection to the prosecutorial vouching did not clearly prejudice his defense, because the trial court gave a cautionary instruction and there was overwhelming evidence corroborating Laura's testimony.

In sum, Bockting has not shown that the Nevada Supreme Court applied *Strickland* unreasonably to the facts of this case by holding that his "counsel's errors were [not] so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. I would therefore hold that we lack authority under AEDPA to grant Bockting's petition for habeas relief on this ineffective assistance of counsel claim.

For the foregoing reasons, I would affirm the district court's denial of Bockting's petition for habeas corpus. I therefore respectfully dissent.

399 F.3d 1010, 66 Fed. R. Evid. Serv. 637, 05 Cal. Daily Op. Serv. 1529, 2005 Daily Journal D.A.R. 2061

**Briefs and Other Related Documents (Back to top)**

• 2004 WL 1252066 (Appellate Brief) Appellees' Supplemental Brief (May. 03, 2004)Original Image of this Document (PDF)

• (Appellate Brief) Appellant's Reply Brief (Jun. 09, 2003)Original Image of this Document (PDF)

• (Appellate Brief) Appellees' Answering Brief (May. 07, 2003)Original Image of this Document (PDF)

• (Appellate Brief) Appellant's Opening Brief (Mar. 24, 2003)Original Image of this Document (PDF)

• 02-15866 (Docket) (May. 03, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



408 F.3d 1127                                                                 Page 1

408 F.3d 1127, 05 Cal. Daily Op. Serv. 4592, 2005 Daily Journal D.A.R. 6316

**(Cite as: 408 F.3d 1127)**

H

**Briefs and Other Related Documents**

United States Court of Appeals,
Ninth Circuit.
Marvin Howard BOCKTING, Petitioner-Appellant,
v.
Robert BAYER, Respondent-Appellee.
**No. 02-15866.**

Argued and Submitted Jan. 14, 2004.
Filed Feb. 22, 2005.
Amended June 1, 2005.

Franny A. Forsman, Federal Public Defender, Las Vegas, NV, for the appellant.

Victor-Hugo Schulze II, Deputy Attorney General, Las Vegas, NV; Rene L. Hulse, Deputy Attorney General, Las Vegas, NV, for the appellee.

Appeal from the United States District Court for the District of Nevada; Edward C. Reed, District Judge, Presiding. D.C. No. CV-98-00764-ECR.

Before WALLACE, NOONAN, and McKEOWN, Circuit Judges.

**ORDER**

The opinion filed February 22, 2005, slip op.1991, and appearing at 399 F.3d 1010 (9th Cir.2005), is amended as follows:

At 399 F.3d 1022, slip op.2012, strike the last paragraph of Part II. Substitute the following paragraph:

> The final question is whether admission of Autumn's statement "had substantial and injurious effect or influence in determining the jury's verdict." See Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). The detective's testimony regarding Autumn's interview was a critical piece of evidence, particularly in view of Autumn's inconsistent testimony at the preliminary hearing, and weaknesses in Laura Bockting's testimony. Even if Autumn's statement to the mother was, for argument's sake, considered admissible, the detective's description of Autumn's interview was so significant as corroborating evidence that its admission had a substantial and injurious effect or influence in determining the jury's verdict. Thus, the admission of Autumn's statement requires reversal.

The petition for panel rehearing is DENIED. The petition for rehearing en banc is pending before the Court. No further petitions may be filed.

408 F.3d 1127, 05 Cal. Daily Op. Serv. 4592, 2005 Daily Journal D.A.R. 6316

**Briefs and Other Related Documents (Back to top)**

• 2004 WL 1252066 (Appellate Brief) Appellees' Supplemental Brief (May. 03, 2004)Original Image of this Document (PDF)

• 02-15866 (Docket) (May. 03, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.