1 of 1 DOCUMENT

**Kenneth Brandt, Petitioner-Appellant, v. Bruce Curtis, Warden, Respondent-Appellee.**

No. 04-1449

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

05a0572n.06;

*2005 U.S. App. LEXIS 13662*

July 7, 2005, Filed

**NOTICE:** [*1] NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner inmate petitioned for a writ of habeas corpus pursuant to *28 U.S.C.S. § 2254*, challenging his conviction for first-degree criminal sexual conduct. The United States District Court for the Eastern District of Michigan denied the petition. The inmate appealed, asserting a judicial misconduct claim and an ineffective assistance of counsel claim.

**OVERVIEW:** The inmate was convicted of sexually assaulting a five-year-old girl he baby-sat. The inmate alleged that his trial counsel provided ineffective assistance by failing to object to the admission of hearsay statements made at trial by the victim's parents and treating physician. All of the hearsay evidence involved statements originally made by the child-victim soon after the assault. The inmate also alleged that he was denied a fair trial, in violation of due process under the Fourteenth Amendment, by the trial judge's "prejudicial remarks" and his frequent interruptions and scolding of the defense counsel in front of the jury. The court determined that the inmate was not entitled to habeas relief. Counsel was not ineffective, because the victim's statements to the physician, that the inmate had caused her injuries, was clearly admissible under Michigan's "firmly rooted" exception under Mich. R. Evid. 803(4) for statements made for the purpose of medical treatment. The victim's statements to her parents were admissible under the excited utterance exception under *Fed. R. Evid. 803(2)*. Finally, the judge's conduct was inappropriate, but the state courts' decisions were reasonable.

**OUTCOME:** The appellate court affirmed the district court's denial of the inmate's petition for writ of habeas corpus.

**LexisNexis(R) Headnotes**

**COUNSEL:** For KENNETH BRANDT, Petitioner - Appellant: Chari Grove, State Appellate Defender Office, Detroit, MI.

For BRUCE CURTIS, Warden, Respondent - Appellee: Brenda E. Turner, Office of the Attorney General, Habeas Corpus Division, Lansing, MI.; Debra M. Gagliardi, Asst. Atty General, Office of the Attorney General, Habeas Corpus Division, Lansing, MI.

**JUDGES:** BEFORE: MERRITT and DAUGHTREY, Circuit Judges, and PHILLIPS, n1 District Judge.



> n1 The Honorable Thomas W. Phillips, United States District Judge for the Eastern District of Tennessee, sitting by designation.

**OPINIONBY:** MERRITT

**OPINION:**

**MERRITT, Circuit Judge.** This is a habeas case involving a brutal sexual assault against a five-year-old girl. The petitioner, Kenneth Brandt, was convicted by a Michigan jury and [*2] sentenced to two concurrent terms of 20-40 years. He has maintained his innocence and now raises two claims of constitutional error, both of which have been fully exhausted in the Michigan state courts. First, he claims his trial counsel provided ineffective assistance by failing to object to the admission of hearsay statements made at trial by the victim's parents and treating physician and by introducing additional hearsay statements made by an investigating police officer. All of the hearsay evidence involved statements originally made by the child-victim soon after the assault. Second, he claims he was denied a fair trial, in violation of due process, by the trial judge's "prejudicial remarks" and his frequent interruptions and "scolding [of the] defense counsel in front of the jury." For the reasons set forth below, we affirm the District Court's denial of the writ.

**Facts**

On Sunday, December 21, 1997, Brittany Bowles, a five-year-old girl, was living with her unmarried parents, Sherry Faes and Tommy Bowles, in Detroit, Michigan. Faes testified at trial that she bathed Brittany that morning, around 11:00 a.m., and did not notice any injuries or abnormal behavior. Bowles [*3] had left home early that morning to participate in court-mandated community service for a past offense. Around 2:00 p.m., petitioner Brandt, who often babysat Brittany at his apartment a few blocks from the victim's home, arrived to pick-up Brittany. n2 It is unclear if he requested to babysit that day or if Faes asked him to babysit so she could have a "break" to clean the house and do laundry.

> n2 In a post-conviction hearing, the trial judge described Brandt's home as a "boarding house for men. There were no women and no families living there." J.A. at 127a.

Brandt testified that he took Brittany to his apartment and played video and board games with her in his bedroom, and that nothing untoward or inappropriate occurred. Steven James, Brandt's housemate, testified that he saw Brandt take Brittany into Brandt's bedroom, where they remained for most of the afternoon with the door closed. During his testimony, Brandt accused no one. He simply claimed that, while he had custody of Brittany, she was not harmed [*4] by him or anyone else.

Bowles returned home from community service around 4:30 p.m. By about 7:30, he told Faes to retrieve Brittany from Brandt's, since it was getting late. She began walking to Brandt's and encountered Brandt, James and Brittany walking back to the Bowleses' residence. n3 Faes testified that she quickly noticed Brittany was walking "weird" but she did not question her about it at the time. All four returned to the Bowles home and visited in the living room for approximately twenty minutes. There was conflicting testimony about whether, when Brandt was ready to leave, he hugged and kissed Brittany or vice versa, but there was some contact between the two shortly before Brandt and James left the home. Brittany then quickly went into the bathroom.

> n3 Although the residence in question was actually occupied by Tommy Bowles, Sherry Faes and Brittany Bowles, for the sake of simplicity we will use only the Bowles last name when referring to it.

When her mother checked on her, she found Brittany standing [*5] in front of the mirror with her shirt off. Based on her own experiences and "mother's intuition," Faes concluded that Brittany had been molested and hysterically said to Bowles that "Kenneth done [sic] something to the baby," and "that sick bastard touched that baby." J.A. at 225a & 235a. Bowles took Brittany into her bedroom and questioned her, asking, "Did Kenny touch you in any way?" She denied that he had touched her and replied that she was simply tired. Bowles asked her several more times with the same result, before eventually asking her "did Kenny ever tell you that he would hurt mommy or daddy if you told us something?" Brittany replied that Brandt had said he would kill them. She then responded that he had touched her and indicated where by pointing down, toward her genital area.

Faes ran to a neighbor's home to use the phone to call the police. The neighbor, in turn, went to the Bowles home to try and help with Brittany. When the neighbor arrived, Bowles left, walked to Brandt's, and reportedly threatened to kill him if he had molested his daughter. Bowles's testimony does not specify the time of this encounter, but we can infer from his timeline of events that it occurred [*6] approximately an hour after Brandt dropped Brittany off. In his testimony, Brandt reported a

longer period of time, approximately three hours, between his dropping Brittany back at home and Bowles's arrival at Brandt's residence. Brandt's implied defense was that someone else, presumably one of Brittany's parents, actually molested Brittany during this period.

After both Bowles and Faes had returned home, the police arrived and advised them to take Brittany to the hospital, which they promptly did.

Dr. Earl Hartwig was Brittany's treating physician in the emergency room. His first contact with Brittany occurred around 12:50 a.m. on December 22, 1997. He physically examined her and interviewed her with her mother, Ms. Faes, present. When he had Brittany remove her underwear he noticed "a large wad of some type of either tissue or paper towel type of material that was within her underclothes that also contained a significant amount of blood and again, some type of discharge ... that we didn't know the nature of at the time." J.A. at 367a. His physical examination revealed very serious injuries to Brittany's vaginal and anal areas.

> As far as the genital examination is concerned [*7] Brittany presented with significant injuries to her vaginal area, to the hymenal area and to the urethra area which is where you urinate from. There were gross abnormalities there with significant amount of bleeding, swelling, abrasion and bruising. As far as examination of her anal area she showed significant redness as well, along with abrasion or essentially raw skin, laxity or [sic] rectal tone and also a discharge of blood and some other type of discharge going from the anal area as well as from the vaginal area.

J.A. at 173-74. In response to questioning about the relative severity of Brittany's injuries, Dr. Hartwig stated that of the several hundred children he had examined for sexual assault, Brittany's case was "clearly one of the worst I've seen." J.A. at 185. Although he could not determine what object or body part had penetrated her, the doctor did testify that her injuries were "consistent with penetration." As to the timeframe of the injuries, he testified that her parents indicated a time of injury between six and eight p.m. the previous day. He found the injuries to be consistent with that approximation. In addition, however, he could not determine whether [*8] some of the injuries had occurred earlier.

> I would speculate that there were previous injuries, - there was a large amount of injuries present here, - the degree of injury, I wouldn't expect to see on one, one penetrating traumatic event. However, I couldn't tell you with certainty that there was previous or not [sic]. The discharge also would suggest that there was some type of previous irritation that allowed time for the discharge to build up but again, I wasn't certain of what type - if this was a semen discharge or puss from an infection or perhaps some type of cream that was put down. I didn't know what type of discharge we were looking at entirely.

J.A. at 183. The forensic serologist who testified regarding all the lab work done on the samples taken from Brittany was also unable to identify this discharge. *See* J.A. at 350a-351a. Semen was not identified on any of the samples, but there was testimony that this fact did not rule out a male perpetrator.

Dr. Hartwig first questioned Brittany about who had injured her during his initial interview and evaluation. He testified that Brittany was at first unwilling to share any information with him, that she "clammed [*9] up" and that this is not uncommon in child victims of abuse. After Dr. Hartwig left Brittany and her mother alone for a period of time while he attended to another emergency, he returned and began the physical evaluation. "Specifically when we found the wad of toilet tissue ... in her underclothes I asked her who put that tissue there and she indicated, Kenneth, Kenny." J.A. at 378a. Defense counsel did not object to the introduction of this testimony, nor did he object to the testimony of Brittany's parents recounting similar statements she made to them at her house, before going to the emergency room.

A jury convicted Brandt of two counts of first-degree criminal sexual conduct. The presiding judge, Warfield Moore, of the Wayne County Circuit Court, sentenced him to two concurrent terms of 20-40 years each.

Represented by new counsel, Brandt filed a motion for a new trial, based on the same ineffective assistance of counsel claim presented here. Judge Moore also presided over the post-conviction hearing to consider the motion. Brandt argued that the Supreme Court case of *Idaho v. Wright, 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990)*, would have applied to exclude Brittany's statements had [*10] Brandt's trial attorney objected and cited the case. At the hearing, Brandt's trial counsel testified that his theory of the case, developed in consultation with Brandt, was that Brittany's mother was the actual perpetrator. He also testified that his opinion at

the time was that the questionable hearsay statements fell within either the medical treatment exception or the excited utterance exception and therefore were not objectionable under Michigan law. Further, he believed that, if they did fall within those exceptions, then the *Confrontation Clause*, as interpreted in *Idaho v. Wright*, would not exclude them either. After making that decision, he decided to introduce additional hearsay evidence through the testimony of Ramona Bennett, the officer in charge of Brittany's case, in an effort to impeach and undermine prosecution witnesses. He did say that, but for his determination that Brittany's statements to her parents and Dr. Hartwig were admissible, he would probably not have introduced Officer Bennett's hearsay evidence.

The judge denied the motion for a new trial, finding that trial counsel had made reasonable strategic choices that should not be second guessed and agreeing [*11] with trial counsel's original assessment that there were no *Confrontation Clause* issues raised by the introduction of Brittany's statements.

Brandt's subsequent state court appeals were denied. The District Court denied his petition for writ of habeas corpus, granting a certificate of appealability ("COA") as to the judicial misconduct claim only. The Sixth Circuit later expanded the scope of the COA to cover both the judicial misconduct claim and the ineffective assistance of counsel claim.

### Analysis

I. Ineffective Assistance of Counsel Claim for Failing to Object to Hearsay and for Offering Otherwise Inadmissible Hearsay

Brandt claims that his trial counsel was ineffective for failing to object when Brittany's parents and Dr. Hartwig testified that Brittany told them "Kenny" had touched her. In addition, he claims it was ineffective assistance of counsel for his lawyer to elicit hearsay statements from Officer Bennett that also identified "Kenny" as the perpetrator and provided some details of the abuse.

The Supreme Court established the governing test for ineffective assistance of counsel in *Strickland v. Washington, 466 U.S 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)*. The two prongs [*12] of *Strickland* are, 1) counsel's performance was deficient, and 2) this deficient performance prejudiced petitioner. Under the *Anti-Terrorism and Effective Death Penalty Act of 1996* ("AEDPA"), we must determine if the Michigan courts' decisions were contrary to or were an unreasonable application of *Strickland*. *See 28 U.S.C. § 2254(d)*.

In *Ohio v. Roberts, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980)*, n4 the Supreme Court held that, when the prosecution seeks to admit a statement from an out-of-court declarant, it has two options to satisfy the *Confrontation Clause*. It can either demonstrate that the statement falls within a "firmly rooted hearsay exception" or that it shows "particularized guarantees of trustworthiness." *Roberts, 448 U.S. at 66*. In the instant case, Brandt has stipulated that both the medical treatment and the excited utterance exceptions are "firmly rooted" but denies that the statements in question are properly included in their scope. *See White v. Illinois, 502 U.S. 346, 356 n.8, 116 L. Ed. 2d 848, 112 S. Ct. 736 (1992)* ("There can be no doubt that the two exceptions we consider in this case [for spontaneous declarations and statements made [*13] for purposes of medical diagnosis or treatment] are 'firmly rooted.'").

---

n4 In spite of petitioner's efforts to argue otherwise, the *Confrontation Clause* analysis from *Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004)*, does not govern this case since *Crawford* was decided long after petitioner's trial, and this Court has ruled that *Crawford* does not apply retroactively. *See Dorchy v. Jones, 398 F.3d 783, 788 (6th Cir. 2005)* ("*Teague* thus prohibits Dorchy from availing himself of the new rule articulated in *Crawford*.").

---

On direct appeal, the Michigan Court of Appeals considered this claim and held that all relevant statements did fall within either the medical treatment exception or the excited utterance exception.

A. *Medical Treatment Exception*

The Michigan Rules of Evidence include the following hearsay exception for "Statements Made for Purposes of Medical Treatment or Medical Diagnosis in Connection with Treatment."

> Statements made for purposes of [*14] medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment.

*See* Mich. Ct. Rules Prac., *Evid. R. 803(4)*. This rule is virtually identical to the federal hearsay exception for statements made for the purpose of medical diagnosis or treatment. *See Fed. R. Evid. 803(4)*. The Michigan

Supreme Court has explicitly held that "identification of the assailant [in child abuse cases] is necessary to adequate medical diagnosis and treatment." n5 *People v. Meeboer, 439 Mich. 310, 322, 484 N.W.2d 621 (1992)*. This holding is consistent with the comments to Federal Rule 803(4), which state "[the exception] also extends to statements as to causation, reasonably pertinent to the same purposes, in accord with the current trend." *Fed. R. Evid. 803(4)*, Note to Paragraph (4). Because the United State Supreme Court has found the medical treatment exception to be "firmly rooted," *see White, 502 U.S. at 356 n.8*, [*15] and the Michigan version of that rule is consistent with the federal version as well as with the "current trend" among the states, then if Brittany's statements fit under the Michigan rule, their admission is also presumptively appropriate under the *Confrontation Clause*.

> n5 Consistent with that ruling, Dr. Hartwig testified regarding the medical bases for determining a perpetrator's identity. "We want to make sure we're not sending a child home or back to an environment where the perpetrator may be... It's also helpful to know if there are sexually transmitted diseases found."

Brittany's statement to Dr. Hartwig, that "Kenny" had caused her injuries, is clearly admissible under Michigan's "firmly rooted" exception for statements made for the purpose of medical treatment. Brandt attempts to undermine this testimony by pointing out that she only made the statement after she was left alone with her mother, who had indicated her belief that Brandt was the perpetrator. But this point goes only to the weight that [*16] the jury assigns the testimony, not to its admissibility. Since the statement clearly qualifies under a "firmly rooted" exception, we need not analyze other indicia of reliability. n6

> n6 In trying to demonstrate a lack of reliability, Brandt also points out that Brittany was found by the trial judge to be not competent to testify. Citing the Michigan statute on competency, he attempts to equate this finding to an inherent lack of trustworthiness in anything Brittany might have said. But during the post-conviction hearing on the motion for a new trial, Judge Moore clarified the basis for his original incompetency ruling. "I might come to the conclusion that that child does not have sufficient recall of those circumstances that time ago to testify. So, therefore, she's incompetent but that would not have meant that she didn't have sufficient recall the day it happened." J.A. at 167a.

B. *Excited Utterance Exception*

As for Brittany's statement to her parents, the Michigan Court of Appeals provided a reasonable [*17] analysis for its conclusion that it qualified as an excited utterance.

> An excited utterance is a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. In order to fall within the excited utterance exception, a statement must meet the following criteria: (1) it must arise out of a startling occasion; (2) it must be made before there has been time to contrive and misrepresent; and (3) it must relate to the circumstances of the startling occasion. In this case, complainant was sexually assaulted, and this is a startling event. Complainant made her statements within hours of the attack. Moreover, the evidence showed that the complainant [sic] was under the sway of excitement precipitated by the assault. Thus, complainant's statements were also admissible as excited utterances.

The Michigan version of this exception is, again, very similar to the Federal one. *See Fed. R. Evid. 803(2)*. While we agree with the Michigan court's conclusion that Brittany's statements to her parents were properly admitted as excited utterances, we also find, in [*18] the alternative, that the admissibility of Dr. Hartwig's testimony regarding the identity of the assailant makes admission of the parents' statements merely duplicative and, at most, harmless error. *See Schneble v. Florida, 405 U.S. 427, 432, 31 L. Ed. 2d 340, 92 S. Ct. 1056 (1972)* ("Thus, unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required. In this case we conclude that the 'minds of an average jury' would not have found the State's case significantly less persuasive had the testimony as to [co-defendant's] admission been excluded. The admission into evidence of these statements, therefore, was at most harmless error.").

The admissibility of Brittany's statements under these two "firmly rooted" hearsay exceptions causes a domino effect, with the result that all variations of Brandt's ineffective assistance of counsel claim must fail.

First, under the Michigan rules of evidence, the statements were admissible, and Brandt was therefore not prejudiced by his counsel's failure to object.

Second, under the *Confrontation Clause* jurisprudence as it existed at the time, the admission of any statement that fell within a [*19] "firmly rooted" exception was, by definition, not a violation of the *Confrontation Clause*, meaning that a failure to object on constitutional grounds did not prejudice Brandt. In *Idaho v. Wright, 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990)*, on which Brandt relies heavily in his argument, the Supreme Court was faced with a state ruling that a physician's hearsay testimony, regarding a child abuse victim's statements, fell within the state's *residual* hearsay exception. Since that exception was not "firmly rooted," the Court, following *Ohio v. Roberts*, engaged in a more exacting analysis of the statements to determine their trustworthiness. The current situation involves "firmly rooted" exceptions and is therefore clearly distinguishable from *Wright*.

Finally, because Brittany's identifying statements were admissible, trial counsel's decision to introduce additional hearsay statements by Officer Bennett was a reasonable strategic decision designed to impeach prosecution witnesses and mitigate the damage done by the original hearsay identifications by showing that Brittany had been coached. Defense counsel pointed out that, in her statements to Officer Bennett, Brittany did not mention [*20] anal penetration and she used the "sophisticated" biological term vagina. These efforts at mitigation were reasonable and therefore did not violate the *Strickland* standard.

## II. Judicial Bias and Judicial Misconduct Claim

Brandt also claims that he was denied his right to a fair trial by several of Judge Moore's preliminary comments to the jury, which allegedly indicated bias in favor of the prosecution, and by the judge's numerous interruptions and "scolding" of defense counsel during his questioning of witnesses.

The Supreme Court's standard for claims of judicial misconduct, which are grounded in the *Due Process clause of the Fourteenth Amendment*, is found in *Liteky v. United States, 510 U.S. 540, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994)*. In that case, the Court announced an exacting standard.

> Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving [*21] of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Liteky, 510 U.S. at 555*.

In this case, the judge's pre-trial comments to the jury were, while sometimes imprecise, clearly not prejudicial. Taken in isolation, several statements do appear problematic, but when read in context it is clear that no serious errors were made. For example, Brandt points to the following statement by the judge.

> You're looking at [the defendant] and he is charged with penetrating - I don't know whether he - what he penetrated her with, it isn't necessarily his penis, but it might be his penis, I don't know. But I'll leave that to the proofs, I'll leave that to the prosecution, because the law doesn't require that penetration be about a penis. It simply means that the person was penetrated for sexual purposes or gratification.

J.A. at 59a. This statement is troubling because it implied that [*22] the defendant did, in fact, penetrate the victim with something. But again, the surrounding statements demonstrate that the judge was speaking hypothetically and that he expected the jury to presume innocence until proven guilty by the prosecution. In explaining the roles of the various parties, Judge Moore also described himself, along with all the people in the room and in the state, as the "clients" of the prosecutor. Brandt frames this as an expression of bias in favor of the prosecutor. Finally, in discussing the presumption of innocence, the judge said, "Kenneth Brandt, being accused of a crime, even this crime, is presumed innocent, ladies and gentlemen, and you must in your mind say you're able to presume him innocent to sit here as a juror." Brandt claims that this "wholly inappropriate comment... focused the jury's attention on the nature of the crime, rather than on the presumption of evidence [sic]."

When the judge's preliminary comments to the jury are read in their entirety, it is clear that he spent a great deal of time explaining the trial process, the roles of the parties, the presumption of innocence and the burden of

proof. His explanations are lengthy and involved, [*23] and peppered with personal anecdotes, but they are also very accurate, except arguably for the few isolated statements identified by petitioner. These statements may appear to be inappropriate when viewed in isolation, but they are inconsequential when viewed as part of the larger context in which they were presented.

The judge's frequent interruptions of defense counsel during his questioning of witnesses, however, are more troubling. Brandt claims that the judge interrupted him "at least eight times during counsel's questioning of various witnesses." Many of these were *sua sponte*. But more important than the number of interruptions, Brandt argues, was the negative and harsh tone used by the judge during these interruptions. A review of the roughly 300 pages of transcript provided in the appendix corroborates these concerns. Judge Moore was particularly protective of the victim's mother, Sherry Faes, during defense counsel's cross-examination, which was significant given the defense's theory that Ms. Faes was the real perpetrator.

As pointed out in the District Court's opinion, this is not the first time our Court has addressed the conduct of this particular trial judge. In [*24] *Allen v. Hawley, 74 Fed. Appx. 457, 2003 WL 21911327 (6th Cir. 2003)* (unpublished), a divided panel affirmed the denial of a prisoner's habeas petition, which was based on the claim that he did not receive a fair trial due to Judge Moore's bias and misconduct. In that case, Judge Clay wrote a scathing and detailed dissent addressing a great deal of Judge Moore's behavior and comments, some of which were very similar to what we face in the current case.

Similarly, neither the Michigan Court of Appeals nor the District Court was entirely comfortable with how this trial was conducted, in spite of the fact that both ultimately denied petitioner's claim for relief. The Michigan court described the judge's conduct as "skirting the edge" of appropriate behavior. *See* J.A. at 24a. The District Court went even farther, stating its opinion that "the Michigan Court of Appeals reached an incorrect result" in dismissing petitioner's claim. But, applying federal habeas law, the District Court did not believe the Michigan court's decision was an *unreasonable* application of federal law and therefore dismissed the petition. *See* J.A. at 45a.

We agree that Judge Moore's [*25] conduct in this case was, at times, quite inappropriate. But we also agree with the District Court's application of AEDPA, which requires that we not grant the writ of habeas corpus unless the state court's decision represents an unreasonable application of Supreme Court precedent. Given the very high standard articulated in *Liteky*, we do not find the Michigan decision to be unreasonable.

For the reasons discussed above, we affirm the District Court's denial of Brandt's petition for writ of habeas corpus

1 of 1 DOCUMENT

JAMES OREYE, Petitioner, v. H.J. MARBERRY, Respondent.

Case Number: 05-70918

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

2005 U.S. Dist. LEXIS 9166

April 22, 2005, Decided
April 22, 2005, Filed

**PRIOR HISTORY:** [*1] At a session of said Court, held in the U.S. District Courthouse, City of Detroit, County of Wayne, State of Michigan, on April 22, 2005. PRESENT: THE HONORABLE PATRICK J. DUGGAN U.S. DISTRICT COURT JUDGE.

**COUNSEL:** For James Oreye, Petitioner, Pro se, Federal Correctional Institution - Milan, Milan, MI.

**JUDGES:** HONORABLE PATRICK J. DUGGAN.

**OPINIONBY:** PATRICK J. DUGGAN

**OPINION:**

OPINION AND ORDER DENYING PETITIONER'S MOTION FOR RECONSIDERATION

Petitioner James Oreye is a federal inmate currently incarcerated at the Federal Correctional Institution in Milan, Michigan. He filed a *pro se* petition for a writ of habeas corpus pursuant to *28 U.S.C. § 2241*, alleging that he is incarcerated in violation of his constitutional rights, which this Court summarily dismissed on April 7, 2005. Petitioner filed a motion for reconsideration on April 19, 2005. For the following reasons, the motion for reconsideration will be denied.

Rule 7.1(g) provides that a motion for reconsideration only should be granted if the movant demonstrates that the Court and the parties have been misled by a palpable defect and that a different disposition of the case must result from a correction of such [*2] a palpable defect. *Id.* A motion that merely presents the same issues already ruled upon by the Court shall not be granted. *Id.* Citing cases from the Second, Seventh, and Ninth Circuits, Petitioner argues that the Court committed a palpable error in finding that the Supreme Court's decision in *Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004)*, is not retroactive to cases on collateral review.

As the Court stated in its April 7, 2005 Opinion and Order, the law in the Sixth Circuit (which controls) is that *Crawford* is inapplicable to cases on collateral review. *See Dorchy v. Jones, 398 F.3d 783, 788 (6th Cir. 2005)*. In any event, the cases Petitioner cites in his motion for reconsideration did not involve habeas petitions but rather direct appeals. The Court therefore concludes that it did not commit a palpable error in dismissing the Petition.

Accordingly,

**IT IS ORDERED** that Petitioner's motion for reconsideration is **DENIED.**

04-22-05

s/PATRICK J. DUGGAN

UNITED STATES DISTRICT JUDGE



LEXSEE 2005 OHIO APP. LEXIS 2910

**STATE OF OHIO, Plaintiff-Appellee -vs- PAUL ART TARVER, Defendant-Appellant**

**Case No. 2005-CA-00019**

**COURT OF APPEALS OF OHIO, FIFTH APPELLATE DISTRICT, STARK COUNTY**

*2005 Ohio 3119; 2005 Ohio App. LEXIS 2910*

**June 20, 2005, Date of Judgment Entry**

**PRIOR HISTORY:** [**1] CHARACTER OF PROCEEDING: Criminal appeal from the Stark County Court of Common Pleas, Case No. 2002CR0892. *State v. Tarver*, 2004 Ohio 5508, 2004 Ohio App. LEXIS 4993 (Ohio Ct. App., Stark County, Oct. 12, 2004)

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** After defendant's convictions for complicity to aggravated murder and complicity to felonious assault were affirmed, he petitioned the Stark County Court of Common Pleas (Ohio) for post-conviction relief. The trial court denied the petition and granted the State's motion for summary judgment. Defendant appealed.

**OVERVIEW:** Defendant got someone to shoot his girlfriend to end her pregnancy. He said the State kept him from finding the address of a non-appearing witness whose statements were offered at trial. The appellate court held defendant's petition was untimely under *Ohio Rev. Code Ann. § 2953.21(A)(2)*, and it could not be considered under *Ohio Rev. Code Ann. § 2953.23(A)*. The witness's statements were not presented in the State's case. Authority barring use of a non-appearing witness's statement did not apply retroactively. Res judicata barred considering any error in admitting the witness's statements, as it could have been raised on direct appeal. Any error in admitting a detective's testimony about discussions with the witness was harmless beyond a reasonable doubt because the witness's affidavit showed he provided the weapon used in the crimes to defendant's co-worker, so the trial's result would not have changed had the witness testified. Inconsistencies between the affidavit and the detective's testimony were credibility matters, and, given other evidence, clear and convincing evidence did not show no reasonable person would have convicted defendant had the witness testified.

**OUTCOME:** The trial court's judgment was affirmed.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Plaintiff-Appellee: JOHN FERRERO, STARK COUNTY PROSECUTOR, Canton, OH.

For Defendant-Appellant: GREGORY J. RUFO, Canton, OH.

**JUDGES:** Hon: John F. Boggins, P. J., Hon: W. Scott Gwin, J., Hon: William B. Hoffman, J. By Gwin, J. Boggins, P.J., and Hoffman, J., concur.

**OPINIONBY:** W. Scott Gwin

**OPINION:** *Gwin, P.J.*

[*P1] Defendant-appellant Paul Art Tarver appeals the December 28, 2004 Judgment Entry entered by the Stark County Court of Common Pleas, which denied his petition for post-conviction relief. Plaintiff-appellee is the State of Ohio.

[*P2] Appellant was indicted on one count of complicity to aggravated murder and one count of complicity to felonious assault. On October 21, 2002, a jury trial commenced, lasting until October 24, 2002.

EXHIBIT C

The jury returned a verdict of guilty on both counts. A sentencing hearing was conducted on November 1, 2002. Appellant filed a notice of appeal on November 25, 2002. This Court affirmed the conviction but reversed in part appellant's sentence. For a detailed recitation of the underlying facts of appellant's case [**2] see *State v. Tarver, 5th Dist. No. 2002CA00394, 2003 Ohio 6840.* The case was remanded to the trial court and appellant was re-sentenced on December 29, 2003.

[*P3] On April 30, 2004 appellant filed a Petition for Post Conviction Relief under *R.C. 2953.21.* Appellant argued that due to the actions of the State appellant was unavoidably prevented from discovering the fact that a witness, Frank L. Wilson, III's, address was known, and that he was available for testimony at trial. Appellant further argued that the statements made by Mr. Wilson during the police investigation, and testified to at trial by Detective Dittmore, were admitted in violation of appellant's Sixth Amendment right to confrontation as described in *Crawford v. Washington (2004), 541 U.S. 36, 158 L. Ed. 2d 177, 124 S.Ct.1354.* The appellee responded with a reply and a Motion for Summary Judgment. Appellee argued that the petition was not timely filed. Appellee further argued that no hearsay statements were admitted at appellant's trial and that the outcome of the trial would not have been different had Mr. Wilson testified at appellant's trial. On December 28, 2004, the trial [**3] court denied appellant's petition and granted the appellee's Motion for Summary Judgment.

[*P4] Appellant timely appeals and has raised as his sole assignment of error:

[*P5] "I. THE TRIAL COURT ERRED IN GRANTING THE MOTION FOR SUMMARY JUDGMENT AS TO THE PETITION FOR POST-CONVICTION RELIEF."

I.

[*P6] Appellant maintains that the trial court erred in denying his petition for post conviction relief and in granting summary judgment in favor of the appellee. We disagree.

[*P7] *R.C. 2953.21(A)* states, in part, as follows: "(1) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief." Appellant, in his April 30, 2004, motion before the trial court, did argue that there was such a denial or infringement of his rights [**4] so as to render his conviction void or voidable.

[*P8] Pursuant to *R.C. 2953.21(A) (2),* a petition for post-conviction relief "shall be filed no later than one hundred eighty days after the date on which the trial transcript is filed in the court of appeals in the direct appeal of the judgment of conviction or adjudication or, if the direct appeal involves a sentence of death, the date on which the trial transcript is filed in the supreme court. If no appeal is taken, the petition shall be filed no later than one hundred eighty days after the expiration of the time for filing the appeal."

[*P9] The record indicates appellant did file a direct appeal in this matter with a transcript. The transcript was filed in this Court on February 14, 2003. Therefore, under *R.C. 2953.21(A) (2),* appellant was required to file his petition "* * * no later than one hundred eighty days after the expiration of the time for filing the appeal."

[*P10] The appellant's transcript was filed on February 14, 2003. However, appellant did not file his petition for post-conviction relief until April 30, 2004, which is well beyond the time period [**5] provided for in the statute. Because appellant's petition was untimely filed, the trial court was required to entertain appellant's petition only if he could meet the requirements of *R.C. 2953.23(A).* This statute provides, in pertinent part:

[*P11] * * [A] court may not entertain a petition filed after the expiration of the period prescribed in division (A) of that section or a second petition or successive petitions for similar relief on behalf of a petitioner unless both of the following apply:

[*P12] "(1) Either of the following applies:

[*P13] "(a) The petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief.

[*P14] "(b) Subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.

[*P15] "(2) The petitioner shows by clear and convincing [**6] evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the claim challenges a sentence of death that, but for constitutional error at the sentencing

hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence."

[*P16] Appellant did argue in his petition before the trial court that the United States Supreme Court has recognized a new *Sixth Amendment* confrontational right in *Crawford v. Washington (2004), 541 U.S. 36, 158 L. Ed. 2d 177, 124 S.Ct.1354* after the time in which he could timely have filed his petition. Appellant further argued that the State did not provide him with a correct address for Mr. Wilson even though Mr. Wilson claims that Detective Dittmore knew where he was at the time of appellants' trial. Finally, appellant argued that but for these violations the jury would not have found him guilty. Appellant attached an affidavit from Frank L. Wilson, III in support of his petition.

[*P17] At appellant's trial, the State theorized that appellant had hired a gunman to stage a robbery of appellant and his girlfriend [**7] in order to terminate the girlfriend's pregnancy. The girlfriend was shot resulting in the loss of the unborn child. The State attempted to trace the gun used in the shooting in order to connect appellant in the scheme. The gun was traced from Larry Lombardi to Omar Gomez to Frank L. Wilson, III, and then to Tyrone Howard. Howard was a co-worker of appellant. Mr. Howard testified at trial that he bought the gun from Frank Wilson at the request of appellant and gave the gun to appellant prior to the shooting. Lombardi, Gomez and Howard testified at trial. Frank Wilson was subpoenaed by both the State and the appellant, but did not appear at the trial.

[*P18] Appellant's arguments concerning the admission of hearsay statements made by Frank Wilson is misplaced. In *Crawford v. Washington (2004), 541 U.S. 36, 158 L. Ed. 2d 177, 124 S.Ct.1354*, the United States Supreme court held that testimonial statements of a witness who does not appear at trial may not be admitted or used against a criminal defendant unless the declarent is unavailable to testify, and the defendant has had a prior opportunity for cross-examination. A thorough review of the record reveals that no statements attributable [**8] to Frank Wilson were presented in the State's case-in-chief.

[*P19] During appellant's trial, Detective Dittmore testified that as part of his investigation of the shooting he was able to trace the weapon to Mr. Wilson. Detective Dittmore testified that he spoke with Mr. Wilson and based upon that conversation, he was able to trace the weapon to Tyrone Howard. The actual statement of Frank Wilson to Detective Dittmore was not introduced at trial; nor did Detective Dittmore testify as to what Frank Wilson had told him. Detective Dittmore testified at trial that he did not know the whereabouts of Mr. Wilson at the time of appellant's trial, and further that there was a warrant for Mr. Wilson's arrest on an unrelated matter.

[*P20] As no out of court statements made by Frank Lewis were admitted by the trial court, no hearsay problem is presented.

[*P21] In any event, the ruling in *Crawford* is not retroactive to a case that is final on direct review. *See State v. Cutlip, 9th Dist. No. 03CA0118-m, 2004 Ohio 2120 at P15; Mungo v. Duncan (2d Cir. 2004), 393 F.3d 327, 334-36; Dorchy v. Jones (6th Cir. 2005), 398 F.3d 783, 788;* [**9] *Murillo v. Frank (7th Cir. 2005), 402 F.3d 786; Evans v. Luebbers (8th Cir. 2004), 371 F.3d 438, 444; Brown v. Uphoff (10th Cir. 2004), 381 F.3d 1219, 1227; Haymon v. New York (W.D.N.Y. 2004), 332 F.Supp.2d 550, 557; People v. Edwards (Colo.Ct.App. 2004), 101 P.3d 1118.* As appellant's appeal was finalized prior to the March 8, 2004 decision in *Crawford,* appellant cannot avail himself of the new rule articulated in *Crawford.*

[*P22] Further any claim that the court erred in admitting out of court statements made by Frank Wilson could have been assigned as error in appellant's direct appeal.

[*P23] As stated by the Supreme Court of Ohio in *State v. Perry (1967), 10 Ohio St.2d 175, 226 N.E.2d 104,* paragraphs eight and nine of the syllabus, the doctrine of res judicata is applicable to petitions for post-conviction relief. The *Perry* court explained the doctrine at 180-181 as follows:

[*P24] "Under the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense [**10] or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment."

[*P25] The issue herein was clearly available on direct appeal and therefore res judicata applies.

[*P26] Finally, the affidavit of Frank L. Wilson, III submitted in support of appellant's petition verifies that Mr. Wilson did indeed provide the weapon that was used in the shootings to Tyrone Howard. Accordingly, any error in the admission of testimony via Detective Dittmore that he learned that Mr. Howard had obtained the weapon from Mr. Wilson was harmless beyond a reasonable doubt.

[*P27] The central crux of appellant's petition was that had Frank Wilson testified he would have contradicted Tyrone Howard's testimony.

[*P28] At appellant's trial, Tyrone Howard testified that on the way home from work the appellant drove Mr. Howard in a Ford Ranger truck to Frank Wilson's apartment. The appellant then gave Mr. Howard money to buy the gun, and Mr. Howard went inside the apartment and purchased the weapon. Mr. Howard testified that the weapon was wrapped in a peach tank top. [**11] Mr. Howard returned to the car and gave the weapon to appellant.

[*P29] The affidavit of Frank Wilson states that Tyrone Howard drove a blue Ford Focus to Mr. Wilson apartment to purchase the weapon. Mr. Howard arrived alone. Finally, Mr. Wilson claims that the weapon was wrapped in a yellow bag.

[*P30] We believe that the trial court correctly ruled that had Mr. Wilson testified the result of appellant's trial would not have been altered. The crucial element was that Mr. Wilson did provide the gun to Mr. Howard. The inconsistencies are matters of credibility of each witness. However, in light of the other evidence presented by the State, we find that appellant has failed to establish by clear and convincing evidence that no reasonable person would have found him guilty but for the fact that Frank L. Wilson, III did not testified at appellant's trial.

[*P31] Appellant's sole assignment of error is overruled.

[*P32] The judgment of the Court of Common Pleas of Stark County, Ohio is hereby affirmed.

By Gwin, J.,

Boggins, P.J., and Hoffman, J., concur

JUDGMENT ENTRY

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court [**12] of Common Pleas of Stark County, Ohio is hereby affirmed. Costs to appellant.