## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| Vincent Doan, | ) |
| | ) |
| Petitioner, | ) Case No. 1:00-CV-727 |
| | ) |
| vs. | ) |
| | ) |
| Edwin C. Voorhies, Jr.,[1] | ) |
| Warden, | ) |
| | ) |
| Respondent. | ) |

O R D E R

This matter is before the Court on Petitioner Vincent Doan's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. No. 1), Magistrate Judge Hogan's Report and Recommendations of December 20, 2004 and January 19, 2006 (Doc. Nos. 59 & 66) and Petitioner's objections to those Report and Recommendations (Doc. Nos. 61 & 67). For the reasons set forth below, Petitioner's objections to Magistrate Judge Hogan's Report and Recommendation of January 19, 2006 are well-taken and are **SUSTAINED.** The Court does not adopt that Report and Recommendation. Because the Court has conducted a de novo review of the record in this case, the Court declines to adopt or reject Magistrate Judge Hogan's Report and Recommendation of December 20, 2004. Accordingly, Petitioner's objections to that Report and Recommendation are **MOOT**. On de novo review, however, the Court finds that Petitioner has failed to demonstrate any denial

---

[1] Case caption changed from the original pursuant to Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts to reflect that Edwin C. Voorhies, Jr. is now the prison warden who has custody of Petitioner.

of a federal constitutional right.  Accordingly, Petitioner's
petition for a writ of habeas corpus is not well-taken and is
**DENIED.**

### I. Procedural and Factual Background

The Court will provide the specific procedural and
factual details of Petitioner's case as needed.  The Court,
therefore, will only set forth a general statement of the case at
this time.

Carrie Culberson disappeared from Blanchester, Ohio
some time after 11:30 p.m. on the night of August 28, 1996.
Although Culberson's body has never been recovered, the grand
jury in Clinton County, Ohio charged Petitioner Vincent Doan with
her aggravated murder.  The grand jury also charged Petitioner
with four counts of kidnapping Culberson.

The prosecution's evidence admitted at trial showed
that Petitioner and Culberson were in a relationship in which
Petitioner was both jealously obsessed with Culberson and
physically abusive to her.  For instance, Petitioner would call
Culberson at work as many as four times a day and seemed to show
up where Culberson was if he was not already with her.  Much of
the evidence concerning Petitioner's abuse of Culberson consisted
of Culberson's hearsay statements presented to the jury through
the testimony of other witnesses.  Three of these incidents stand
out from the others.  In April 1996, Culberson came to work with
swollen and blackened eyes and a split lip and told her boss,
Desiree Gruber, that Petitioner had hit her and threw her to the

ground repeatedly.  On July 28, 1996, Culberson filed a criminal complaint against Petitioner after he struck her in the head with a space heater, an injury which required five staples to close the wound.  On August 27, 1996, just one day before she disappeared, Culberson told both her friend, Tonya Whitten, and her cousin, Shannon Culberson, that the night before Petitioner held her at gunpoint in his car for four and a half to five hours.  The witnesses testified that during this time, Culberson told them that Petitioner stated that he was not going to go to jail and threatened to kill her and her family.

Under the prosecution's theory of the case, the last person to see Culberson alive, other than Petitioner himself, was Petitioner's neighbor, Billie Jo Brown.  Brown testified that at around 12:30 a.m. on August 29, 1996, she saw Petitioner chasing Culberson through her yard while she yelled for help.  Petitioner caught Culberson after she tripped in a hole in the yard, grabbed her arm, and after punching her in the face, said, "I told you the next time I'd kill you, you fucking bitch."  Culberson escaped momentarily, but as Brown turned away to wake her husband, Petitioner apparently managed to subdue Culberson and drive her away in her red 1989 Honda CRX.

Lori Baker, who was married to Petitioner's half-brother Tracey Baker, testified that Petitioner came to their home on Supinger Street in Blanchester at about 3:15 a.m. asking to speak to Tracey.  Baker testified that Petitioner looked disheveled, was shirtless and shoeless and had blood smeared on

3

his chest, arms, and jeans.  Petitioner and Tracey spoke alone in the bedroom for a few minutes.  Petitioner then took a shower and Tracey asked Baker for garbage bags.  After Petitioner showered and changed clothes, he and Tracey left with the garbage bags and a gun.  They returned to the house at about 6:00 a.m.  Tracey asked Baker for bleach and a scrub brush which in turn he gave to Petitioner, who was taking another shower.  Baker further testified that she observed drops of blood on Tracey's boots, which he wiped off with a rag or paper towel.  Baker also testified that while she was sitting with Petitioner on the deck of her house at some point during the weekend immediately following Culberson's disappearance, Petitioner stated that he "couldn't imagine hurting someone and holding her until she died."

Another important witness for the prosecution was jailhouse informant Mitchell Epperson.  Epperson testified that he and Petitioner became acquainted when they were incarcerated together at the Queensgate Correctional Facility.  At the time, Petitioner was in jail on an unrelated charge but was under investigation for Culberson's disappearance.  Epperson testified that during a discussion concerning whether their girlfriends had ever been unfaithful, Petitioner said that "you can't let them walk on you, you got to make them pay."  Petitioner also stated that "he would lie awake at night and think of a hundred different ways to kill her before he did it."

4

Petitioner's theory of the case was that Culberson was not dead at all, but rather was alive and still in the area or that she was alive but had left the area.  In support of the former theory, Petitioner put on a number of witness who purportedly saw Culberson, or a woman fitting Culberson's description, or her car, in the days and weeks following her disappearance.  Petitioner also adduced evidence from Cicely Kukuk, Culberson's best friend, that Culberson had discussed moving to North Carolina.  Petitioner also put on alibi witnesses in the form of his father and step-mother, who both testified that they stopped by Petitioner's house at around 1:30 a.m. on the morning of August 29, 1996 and found Petitioner sleeping on the sofa.

The jury returned guilty verdicts on the aggravated murder charge and three of the four kidnapping charges. Following the mitigation stage of the trial, the jury recommended that Petitioner be sentenced to life imprisonment without the possibility of parole.  The trial judge sentenced Petitioner to life imprisonment without the possibility of parole on the aggravated murder conviction and to consecutive nine year terms of imprisonment on the kidnapping convictions.

Petitioner's convictions and sentences were affirmed on direct appeal.  State v. Doan, No. CA97-12-014, 2000 WL 221963 (Ohio Ct. App. Feb. 28, 2000), discretionary appeal not allowed, State v. Doan, 731 N.E.2d 1139 (Ohio 2000).  Petitioner commenced post-conviction relief proceedings in state court on December 31,

5

1998.  On August 29, 2001, the Clinton County Court of Common Pleas denied Petitioner post-conviction relief.  Petitioner appealed that decision to the Ohio Court of Appeals, which issued a decision affirming the judgment of the court of common pleas on June 28, 2002.

In the interim, on August 31, 2000, Petitioner filed with this Court a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent moved to dismiss Petitioner's petition on the grounds that he had failed to exhaust available state remedies.  Petitioner argued that exhaustion should be excused because of the state's unjustified delay in acting on his petition for post-conviction relief.  The Court agreed, Doc. No. 15, and referred the matter to Magistrate Judge Hogan for issuance of a report and recommendation on the merits of the petition.

On December 20, 2004, Magistrate Judge Hogan issued a report and recommendation (Doc. No. 59) recommending that Petitioner's petition be denied.  Petitioner filed timely objections to Magistrate Judge Hogan's report and recommendation, arguing in part that he should not have granted deference to state court findings of fact because the Court had excused the exhaustion requirement.  The Court sustained Petitioner's objections pursuant to the Sixth Circuit's opinion in Turner v. Bagley, 401 F.3d 718 (6th Cir. 2005).  Turner, this Court stated, stood for the proposition that state court findings of fact are not entitled to deference if the district court has excused the

6

exhaustion requirement, even if the state court subsequently issues a ruling in the petitioner's post-conviction relief proceedings. Accordingly, the Court remanded the case to Magistrate Judge Hogan to review <u>de novo</u> those portions of his report and recommendation which gave deference to the state court findings of fact and issue a supplemental report and recommendation.

Magistrate Judge Hogan issued his supplemental report and recommendation on January 19, 2006. Doc. No. 66. However, the bulk of the report and recommendation is devoted to his disagreement with this Court's analysis of <u>Turner</u>. Magistrate Judge Hogan ended his report and recommendation with a conclusory statement that he had reviewed the record <u>de novo</u> and that Petitioner is not entitled to relief for the reasons stated in his original report and recommendation. Petitioner then objected to the supplemental report and recommendation (Doc. No. 67), arguing that the supplemental report and recommendation is not in compliance with the remand order. The Court agrees with Petitioner's assessment of the supplemental report and recommendation. Accordingly, it has reviewed Petitioner's claims for relief and the entire record <u>de novo</u>.

Petitioner raises thirteen grounds for relief in his petition. The Court will review Petitioner's claims for relief seriatim.

## II. <u>Standard of Review</u>

7

A federal court may issue a writ of habeas corpus to correct a state trial or other proceeding that has placed the petitioner in state confinement if the state proceeding was rendered fundamentally unfair by a violation of the Constitution, the laws, or the treaties of the United States. See Estelle v. McGuire, 502 U.S. 62, 68 (1991); Clemmons v. Sowders, 34 F.3d 352, 354 (6th Cir. 1994); 28 U.S.C. § 2254(a). In general, such a writ will not be issued unless actual prejudice is shown. See Clemmons, 34 F.3d at 354. Actual prejudice results when the constitutional error has a "substantial and injurious effect or influence in determining the jury's verdict." Id. (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

III. Analysis

A. First Ground for Relief

Petitioner's first claim for relief states:

> **PETITIONER WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS AND THE RIGHT TO A FAIR TRIAL, UNDER THE FIFTH AND FOURTEENTH AMENDMENTS, WHEN THE TRIAL COURT GAVE THE JURY AN IMPROPER, MISLEADING, AND CONFUSING INSTRUCTION WHICH LESSENED THE STATE'S BURDEN OF PROOF FOR A CONVICTION. THE TRIAL COURT'S ERRORS ARE STRUCTURAL, NOT SUBJECT TO HARMLESS ERROR ANALYSIS**

During the charge conference to develop final instructions for the jury, trial counsel for Petitioner requested the court to instruct the jury that it was not permitted to draw an inference from another inference. Tr. at 3157. In response, the assistant prosecutor suggested that the court give the pattern instruction from § 5.10 of the Ohio Jury Instructions. Id. at 3158. As it turns out, this pattern instruction is for

8

civil trials and, accordingly, the burden of proof is lower.[2]
The trial court agreed, however, to give this instruction to the
jury without objection from Petitioner's counsel.

During the second day of deliberations, the jury sent a
note to the trial judge asking him to reread the instructions
concerning direct and circumstantial evidence.  Tr. at 3374.  The
trial judge repeated the pertinent instructions, including the
civil instruction concerning drawing inferences.  Id. at 3375.
After the jury returned to continue its deliberations, trial
counsel for Petitioner realized for the first time that the jury
had been given the preponderance of the evidence instruction on
inferences instead of the beyond a reasonable doubt instruction.
Id. at 3376.  Counsel, therefore, requested that the jury be
recalled and the error corrected.  Id. at 3378-79.  The trial
court, however, declined to reinstruct the jury because he did
not want to draw attention to the instruction.  Id. at 3380.

Petitioner contends that the trial court's instruction
on drawing an inference from an inference impermissibly lowered
the prosecution's burden of proof on each element of the offense.

---

[2]      The instruction states:

You may (infer a fact or facts)(reach a reasonable
conclusion about a fact or facts) only from other
(facts)(circumstances) that have been proved by the
greater weight of the evidence, but you may not (infer
a fact or facts)(make inferences)(reach a conclusion
about a fact or facts) from a speculative or remote
basis that has not been established by a greater weight
of the evidence.

Ohio Jury Instructions § 5.10 (Anderson 1995) (emphasis added).

Petitioner further argues that this error is structural, requiring automatic reversal, and, therefore, not subject to harmless error review.

Initially, the Court disagrees with Petitioner that the trial court's use of the civil pattern instruction resulted in a structural error requiring automatic reversal. In support of this argument, Petitioner relies on Sullivan v. Louisiana, 508 U.S. 275 (1993). In Sullivan, the trial court's reasonable doubt instruction was a structural error, not subject to harmless error analysis, because it permitted the jury to find the defendant guilty on a degree of proof less than a reasonable doubt. The Court, however, had already reviewed a substantially similar instruction in another case, Cage v. Louisiana, 498 U.S. 39 (1990), and concluded that the instruction permitted the jury to convict the petitioner on a lower degree of proof. Thus, as the Eight Circuit has pointed out, in Sullivan, the Court "started with the proposition that the instruction at issue constituted error, i.e., there was a reasonable likelihood that the jury applied the challenged instruction in an unconstitutional manner." United States v. West, 28 F.3d 748, 751 (8th Cir. 1994). In this case, the problem is not that the trial court's instruction on the government's burden of proof was erroneous. Indeed, the trial court repeatedly instructed the jury that the prosecution was required to prove Petitioner guilty beyond a reasonable doubt and that it was required to prove each element of the offense charged beyond a reasonable double. Instead, the

10

problem is this case was commingling, for lack of a better word, a proper instruction on proof beyond a reasonable doubt with an instruction stating that the jury could draw an inference based on facts proved by a greater weight of the evidence.  That type of error does not constitute a structural error.  <u>Victor v. Nebraska</u>, 511 U.S. 1 (1994).  The Court's inquiry, therefore, is whether there is a reasonable likelihood that the jury applied the instruction in question in an unconstitutional manner, i.e., whether there is a reasonable likelihood that the jury understood the instructions to allow conviction on proof less than a reasonable doubt.  <u>Id.</u> at 6.  The ultimate question is whether the instructions, taken as a whole, correctly conveyed the concept of reasonable doubt to the jury.  <u>Id.</u> at 23.

     <u>West</u> is a factually similar case in that the trial court, in instructing the jury on the difference between direct and circumstantial evidence, stated that "[t]he law makes no difference between direct and circumstantial evidence but simply requires that the jury find the facts in accordance with the preponderance of all the evidence in the case, both direct and circumstantial." <u>West</u>, 28 F.3d at 749.  Applying the <u>Victor</u> standard, the Eighth Circuit held that it was not reasonably likely that the jury improperly applied this instruction to impermissibly lower the prosecution's burden of proof in the context of the entire instructions.  The Court noted that this instruction did not purport to define the prosecution's burden of proof; rather it was an ancillary instruction explaining that

direct and circumstantial evidence are treated the same under the law.  The Court also observed that from the beginning of voir dire through the final instructions, the trial court repeatedly and accurately defined the prosecution's burden of proof as being beyond a reasonable doubt.  The Court also believed that the statements of counsel reinforced that the prosecution's burden was beyond a reasonable doubt.  Id. at 752.

In Coleman v. Mitchell, 268 F.3d 417 (6th Cir. 2001), a capital case, the trial court in part instructed the jury that "[r]easonable doubt is present when after you carefully consider and compare all evidence, you can not say you are firmly convinced of the truth of the charge." Id. at 436.  During his habeas proceedings, the petitioner argued that this instruction permitted the jury to find aggravating circumstances under the clear and convincing evidence standard.  The Sixth Circuit, however, rejected this argument pursuant to Victor, noting that "[t]he jury instructions actually provided, both at the beginning and end of the particular instruction at issue, that 'the State has the burden of proving by proof beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing is [sic] sufficient to outweigh the factors in mitigation.'" Id. at 437.  Thus, the Court concluded that the jury instructions did not violate due process.

In this case, as noted, the trial court repeatedly instructed the jury that the prosecution was required to prove Petitioner guilty beyond a reasonable doubt and that it was

required to prove each element of each offense beyond a
reasonable doubt.  Tr. at 3329, 3336, 3338, 3339, 3343, 3344,
3345-46, 3347, 3349, 3350, 3351.  Moreover, in final arguments,
Petitioner's defense counsel emphasized that it was the
prosecution's burden to prove Petitioner guilty on each offense
beyond a reasonable doubt.  Id. at 3233, 3235, 3239, 3248, 3249,
3255, 3267, 3279.  In rebuttal argument, the prosecution told the
jury that its burden was to prove Petitioner guilty beyond a
reasonable doubt.  Id. at 3310-12; 3326.  The prosecution also
implicitly, if not explicitly, explained that its burden of proof
was greater than the preponderance standard.  Id.[3]  Like the
instruction in West, the instruction at issue in this case did
not purport to define the prosecution's burden of proof.  Rather,
the purpose of the instruction was to caution the jury that it

---

[3]    This case, therefore, is distinguishable from Gibson v.
Ortiz, 387 F.3d 812 (9th Cir. 2004), cited by Petitioner.  In
Gibson, California law at the time permitted the prosecution to
put on evidence of prior sex offenses to establish that the
defendant was disposed to committing sex offenses.  The pattern
jury instruction allowed the jury to find that the defendant was
disposed to commit sex offenses if the prosecution proved by a
preponderance of the evidence that he had committed sex offenses
in the past. The jury was so instructed. In his closing argument,
the prosecutor stressed to the jury  that he was only required to
prove disposition evidence by a preponderance of the evidence.
Id. at 823-24.  Although the trial court properly instructed the
jury on the prosecution's burden of proof elsewhere in the jury
instructions, the prosecutor's closing argument seems to have
been the tipping point in the Court's due process analysis:
"Because it is as likely, if not more so in light of the closing
argument, that the jury relied on facts found by a preponderance
of the evidence to find Gibson guilty of the charged offenses,
his conviction cannot stand."  Id. at 825.  As previously stated,
in contrast, in Petitioner's case, the prosecution's burden of
proof was overwhelmingly emphasized by both the Court, defense
counsel, and the prosecution.

was not permitted to draw an inference solely from another inference.  Under all of the circumstances, the jury instructions as whole properly conveyed that the prosecution's burden was to prove Petitioner guilty of each element of each offense by proof beyond a reasonable doubt.

The Court finds that it is not reasonably likely that the jury applied the jury instructions in an unconstitutional manner, i.e., relieved the prosecution of its burden to prove Petitioner's guilt beyond a reasonable doubt.  Accordingly, Petitioner's First Ground for Relief is not well-taken.

B. Second, Third and Fourth Grounds for Relief

Petitioner's second, third and fourth claims for relief concern the prosecution's duty to disclose exculpatory and impeachment information to the defendant as required by Brady v. Maryland, 373 U.S. 83 (1963), and its progeny:

**SECOND GROUND FOR RELIEF**

**THE STATE VIOLATED PETITIONER'S RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT AND THE RIGHT TO COUNSEL CLAUSE OF THE SIXTH AMENDMENT BY SUPPRESSING EVIDENCE MATERIAL TO THE ISSUE OF GUILT**

**THIRD GROUND FOR RELIEF**

**PETITIONER'S CONVICTIONS WERE OBTAINED IN VIOLATION OF HIS FEDERAL CONSTITUTIONAL RIGHTS BECAUSE, CONSIDERED COLLECTIVELY, THE STATE SUPPRESSED MATERIAL EXCULPATORY EVIDENCE**

**FOURTH GROUND FOR RELIEF**

**THE GOVERNMENT'S FAILURE TO DISCLOSE MATERIAL IMPEACHMENT AND EXCULPATORY EVIDENCE RENDERED PETITIONER'S COUNSEL UNABLE TO PROVIDE EFFECTIVE ASSISTANCE OF COUNSEL AT HIS TRIAL IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS**

14

Petitioner contends that the prosecution failed to disclose eight material items of impeachment or exculpatory evidence: 1) prior statements of witness Billie Jo Brown in which she said that she was unable to positively identify Petitioner from a photo-array as the man she saw assaulting Culberson in her yard. Additionally, the prosecution failed to disclose a statement in which Brown stated that Culberson's attacker was wearing a ball cap, t-shirt and jeans, whereas at trial Brown stated that the assailant was wearing shorts and a muscle shirt; 2) prior inconsistent statements of witness Lori Baker concerning whether she saw Petitioner smeared with blood; 3) evidence that the prosecution would not prosecute witnesses Lori Baker and Vicki Watkins if they implicated Petitioner in Culberson's murder; 4) statements of Culberson that she had confided to a friend that she was considering leaving Blanchester; 5) statements from two witnesses who claimed to have seen a man and woman generally fitting Petitioner's and Culberson's descriptions at times immediately after the prosecution contended that Culberson was already dead; 6) evidence that Clinton County Sheriff Detective Brian Edwards had been disciplined in 1987 for lying to a supervisor and abusing sick time; 7) evidence that Vicki Watkins was hypnotized in order to refresh her memory and given a voice stress test to assess her veracity; and 8) evidence that the prosecution promised Mitchell Epperson that he would be eligible for a reward for giving testimony against Petitioner and

that the prosecution intervened on behalf of Epperson in other
pending criminal matters.

There are three elements to establishing a <u>Brady</u> claim:
1) the evidence at issue must be favorable to the accused because
it is exculpatory or impeaching; 2) the evidence must have been
suppressed by the prosecution, either willfully or inadvertently;
and 3) prejudice must have resulted from the suppression of
evidence. <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).
Prejudice results if the suppressed evidence is material, i.e.,
there is a reasonable probability that the outcome of the
proceeding would have been different had the evidence been
disclosed to the defense. <u>Id.</u> at 280. In <u>Kyles v. Whitley</u>, 514
U.S. 419 (1995), the Supreme Court emphasized four important
points concerning application of the <u>Brady</u> materiality standard.

First, a showing of materiality does not require a
demonstration by a preponderance that disclosure of suppressed
evidence would have resulted in the defendant's acquittal. <u>Id.</u>
at 434. Rather, the inquiry is whether in light of the
suppressed evidence the defendant received a fair trial, defined
as "a trial resulting in a verdict worthy of confidence." <u>Id.</u>
Thus, materiality is demonstrated when the suppressed evidence
"undermines confidence in the outcome of the trial." <u>Id.</u>
(quoting <u>United States v. Bagley</u>, 473 U.S. 667, 678 (1985)).

Second, the materiality standard is not a sufficiency
of the evidence test. <u>Kyles</u>, 514 U.S. at 434. "A defendant does
not need to demonstrate that after discounting the inculpatory

16

evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. at 434-35. Again, the Court emphasized, the question is whether the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435.

Third, once the reviewing court has determined that the suppressed evidence is material, there is no need for harmless error review. Id. In other words, the prosecution's failure to disclose material exculpatory or impeachment evidence can never be harmless.

Fourth, in assessing materiality, the reviewing court must consider the effect of the suppressed evidence collectively, not item by item. Id. at 436. Stated another way, the reviewing court must assess the effect of the suppressed evidence as a whole, not whether an individual piece of evidence undermines confidence in the verdict. See id. at 441 ("The result reached by the Fifth Circuit is compatible with a series of independent materiality evaluations, rather than the cumulative evaluation required by Bagley[.]").

With this materiality standard in mind, the Court concludes that the evidence undisclosed by the prosecution, considered collectively, does not establish a reasonable probability that the outcome of the trial would have been different. In other words, the undisclosed evidence does not undermine confidence in the jury's verdict.

17

The prosecution's case was built around Petitioner's jealously and obsession with Culberson, his persistent and increasingly severe abuse of her, Lori Baker's account of Petitioner arriving at her house disheveled and smeared with blood, and Petitioner's incriminating statements. Although the case was circumstantial, the evidence adduced by the prosecution was compelling. By contrast, Petitioner's theory of the case, that Culberson had left town or in fact was still alive, was weak and not credible.

On the former theory, Culberson had no money with which to leave town. Kenneth Larrick, the vice president of the bank where Culberson kept her checking account, testified that the day before her disappearance, August 28, 1996, Culberson's account showed an overdraft of $3.09. Tr. at 2178. In fact, one of Culberson's friends, Tonya Whitten, testified that she played volleyball with Culberson on the evening of August 28, and that before the game she and Culberson had to scrape change out of the ashtray of her car to have enough money to buy beer. Id. at 1983. Culberson had recently refused an offer from her boss, Desiree Gruber, to give her money for an opportunity to relocate from Blanchester. Id. at 2093-94. Culberson rejected a similar offer from her mother. Id. at 2425-26. Two days before she disappeared, Culberson took an entrance examination for nursing school at Southern State Community College, located in nearby Hillsboro. Id. at 2096; 2397. In addition, Culberson had stated that she wanted to remain in town because her younger sister was

18

going to have some important events upcoming, such as the prom, for which she wanted to remain in Blanchester. Tr. at 2425-26. Culberson also expressed fear that if she left Blanchester Petitioner would do harm to her family.  Id. at 2094-95. Furthermore, at trial, Petitioner did not adduce any evidence which indicated that Culberson would have suddenly decided to leave town sometime between 11:30 p.m. on August 28, the last time Tonya Whitten saw her, and 6:00 a.m. on August 29, when her mother discovered she was missing.  Id. at 2427.  None of Culberson's clothes were missing.  Id.  Thus, there was powerful evidence that Culberson had neither the means nor the intention to leave Blanchester.

Similarly, Petitioner's second theory of the case, that Culberson was still alive and in the area, was not persuasive to the jury.  This theory was supported by a series of witnesses who claimed to have seen Culberson and/or her car in the weeks following the report of her disappearance.  A number of these witnesses testified that they were positive they had seen Culberson.  The Court will only summarize the testimony of a few of these witnesses.

Gabrielle Jones knew Culberson and testified that on morning of August 29, between 11:00 a.m. and 11:30 a.m., she saw Culberson driving on Fancy Street in Blanchester.  Jones testified that Culberson's car was packed with clothing.  She further testified that she honked at Culberson and that Culberson waved at her as she drove by.  Tr. at 2512.  Witnesses Helen

19

Hedrick, Nancy Cecil, and Patricia Little were driving together from Sardinia, Ohio to Williamsburg, Ohio on State Route 32 during the early evening of August 31, 1996.  Outside of Mt. Orab, Ohio, they picked up a young woman hitchhiking who said that she had been in Maysville, Kentucky and wanted to get to Bethel.  They drove the hitchhiker to a convenience store at the intersection of a road leading into Bethel.  Later the same night, Hedrick saw a picture of Culberson on television during the evening news.  Hedrick, Cecil, and Little each testified that Culberson was the hitchhiker they picked up.  The clerks at the convenience store, Sheri Jackson and Cathy Hackney, identified Culberson as the person who came into the store on the evening of August 31.  Id. at 2523-80.

Tina Haight testified that she saw Culberson at a gas station in Colerain Township on September 9, 1996.  Tr. at 2615-30.  Mary Danbury testified that on the afternoon of September 5, 1996 she saw a young woman driving a red Honda CRX along State Route 32.  The license plates on the CRX had the same first four characters as the plates on Culberson's car.  Id. at 2645-59.  Tammie Brummett, who knew Culberson through her husband's cousin, testified that around September 6, 1996, she saw Culberson walking along Mad River Road between Hillsboro, Ohio and Owensville, Ohio carrying a suitcase.  Id. at 2672-90.  Charles Sharp testified that at about 3:00 a.m. on the morning of September 10, 1996, he saw Culberson driving her CRX in Blanchester.  Id. at 2727-50.

It is against this evidentiary backdrop that the Court must assess the impact of the undisclosed evidence. In order to gauge the cumulative effect of the undisclosed evidence, the Court must first arrive at some conclusion concerning the weight or importance of an individual piece of evidence before plugging it into the materiality calculus.

The Court begins its analysis of the undisclosed evidence out of the sequence presented by Petitioner. The Court starts with impeachment evidence regarding Lori Baker because her testimony, in the Court's view, was the lynchpin of the prosecution's case. If the undisclosed prior statements of Baker would not likely have further affected her credibility, then the prosecution's case was very strong considering Petitioner's obsession with Culberson, his escalating pattern of abuse of Culberson, and the overall weakness of his theory of defense.

As stated earlier, during the trial Lori Baker testified that Petitioner came to her house at around 3:15 a.m. on August 29, 1996. Baker testified that Petitioner was disheveled, shirtless and shoeless, and had blood smeared on his chest, arms, and jeans. According to Baker's testimony, Petitioner spoke with his brother, Tracey Baker, for a few minutes, showered, and changed clothes. Petitioner and his brother left with garbage bags and a gun. They returned several hours later. Lori Baker gave Tracey Baker some bleach, which he gave to Petitioner. Petitioner then took another shower. Baker testified that she noticed blood on Tracey's boots.

21

Additionally, Baker testified to Petitioner's "near confession"[4] of guilt in which he stated that "he couldn't imagine hurting someone and holding her until she died."  Tr. at 1705-06.

Vicki Watkins, Lori Baker's twin sister, was at the house at the same time.  Watkins testified that she was sleeping in a bedroom adjacent to the door when Petitioner arrived.  She was awakened when Petitioner knocked on the door.  Watkins looked through the Venetian blinds and recognized Petitioner standing there.  Petitioner was shirtless, his hair was "messed up" and he was "dirty and disheveled looking."  Watkins also recognized Petitioner by a Grim Reaper tattoo, which she testified was on his left shoulder.  After about a half hour, Petitioner and Tracey Baker had a conversation on the deck outside the Watkins' bedroom.  Although she did not hear the conversation, Watkins testified that she heard Petitioner giggle.  Then Petitioner and Tracey Baker left, apparently in separate vehicles.  Watkins also testified about hearsay statements made to her by Lori Baker, which the trial judge admitted under the excited utterance exception, concerning Petitioner being smeared with blood and he and Tracy Baker leaving the house with garbage bags.  Tr. at 1539-1580.

Lori Baker's testimony obviously was very critical to the prosecution because, in addition to the "near confession," it

_____

[4]    As characterized by the state court of appeals in Petitioner's post-conviction relief proceedings.  See State v. Doan, No. CA2001-09-030, 2002 WL 1396874, at *6 (Ohio Ct. App. June 28, 2002).

was very compelling proof that Petitioner killed Culberson and
then he and Tracey Baker disposed of her remains somehow.
Watkins' testimony was less powerful than her sister's, but it
did corroborate Baker's testimony as to Petitioner's arrival at
the house, the time of his arrival, and his general disheveled
appearance.

Petitioner argues that the prosecution committed a
Brady violation by failing to disclose that during interviews
with the investigators and the assistant prosecutor on November
7, 1996 and November 12, 1996, Baker stated that she did not see
Petitioner smeared with blood on the morning of August 29.  The
prosecution also failed to disclose a statement Baker made to
police investigator Brian Edwards denying having any knowledge
concerning Culberson's disappearance.  The prosecution also did
not disclose that the day after Culberson's disappearance, Baker
told the wife of a Clinton County Sheriff's deputy that she had
seen Petitioner at her house with blood on him.  Thus, Petitioner
contends that the prosecution failed to disclose that Baker made
a series of self-contradictory statements about Petitioner.

The Court notes, however, that on direct examination
Baker admitted that she had previously given Petitioner's trial
counsel a false statement under oath concerning her knowledge of
Culberson's disappearance.  Tr. at 1716-17.  Baker admitted on
cross-examination that she lied to Detective Edwards about the
case.  Id. at 1733-34.  Baker also admitted on cross-examination
that she lied in a statement she had given to the assistant

23

prosecutor when she told him that she had not said to Diana Shelton that she had seen Petitioner covered in blood. Id. at 1746-47; 1748.[5]  Baker also admitted on cross-examination that she had given a prior inconsistent statement concerning whether she observed Petitioner wearing shoes and socks on the morning of August 29.  Id. at 1756-57.  Baker admitted lying to the assistant prosecutor in late October or early November of 1996. Id. at 1757.  Baker was cross-examined concerning her marijuana and cocaine use.  Id. at 1766; 1774-76.  Counsel's cross-examination also implied that Baker was motivated to lie because she was bitter or angry at her husband, Tracey, for having affairs with other women.  Id. at 1732; 1751-52, 1753-55.

This record indicates that Baker's credibility was thoroughly impeached.  She admitted giving a number of false or contradictory statements to the police, to the assistant prosecutor, to Petitioner's trial counsel, and to other persons.

---

[5]    Indeed, contrary to Petitioner's assertion that the prosecution failed to disclose Baker's statement to Diana Shelton, she admitted at trial that she made the statement to Shelton, but lied to the prosecutor so that Shelton would not become involved:

> Q. And this statement says that you told Diana, no, he wasn't covered in blood?
>
> A. Well, I know that I told Diana that he was covered n blood because I had written a letter.
>
> Q. So then, you lied to Mr. Moyer [the assistant prosecutor] when you said that you told Diana no?
>
> A. Well, yes, because I didn't want to bring Diana into it.

Tr. at 1747.

Baker admitted to drug use.  Baker's credibility was further probed on cross-examination for a motivation to lie.  The fact that Baker lied or gave inconsistent statements concerning her knowledge of Culberson's disappearance on two additional occasions could only have had a de minimis effect on the jury's assessment of her credibility.[6]  In other words, revelation of these two additional prior inconsistent statements would not likely have caused the jury to determine that Baker was not a credible witness.

The next item of undisclosed evidence concerns Billie Jo Brown's testimony.  As indicated, Brown was not able to positively identify Petitioner from a photo-array as Culberson's assailant.  She also gave a prior inconsistent statement about what Petitioner was wearing that night.  Thus, these prior statements would have been useful to impeach Brown and her perception of the event that took place in her yard.  On the other hand, Brown testified that she saw Petitioner nearly every day during the summer.  Tr. at 1471.  Therefore, Brown obviously was quite familiar with Petitioner.  Admittedly, this cuts both ways.  Since Brown was familiar with Petitioner, the fact that she was not able to identify him from a photo array would have been damaging to the prosecution's case.  Conversely, the fact that she was familiar with Petitioner makes it less likely that she misidentified the person she saw attacking Culberson in her

---

[6]    As stated, Baker actually testified about the third alleged inconsistent statement (to Diana Shelton) which Petitioner complains the prosecution failed to disclose.

yard.  In fact, however, one of Petitioner's witnesses actually corroborated Brown's testimony on this point.  Bonnie Davis, another neighbor of Petitioner's, testified that she saw Petitioner and a woman she later came to believe was Culberson arguing outside of her house around midnight on August 28.  Id. at 2904-06.[7]  In fact, Davis and Brown discussed the incident the following morning and Brown related to Davis then that it was Petitioner and Culberson who were fighting.  Id. at 2912.  Thus, the prosecution's witness, Brown, and Petitioner's witness, Davis, were in agreement on the point on which the undisclosed statements would have been relevant – whether it was Petitioner, and not someone else, who was arguing with Culberson around midnight on August 28, 1996 at or near Brown's house.  With this fact essentially undisputed between prosecution and defense witnesses, Brown's prior undisclosed statements likely would not have affected the jury's assessment of the accuracy of Brown's perception of the event.

The next piece of evidence concerns what Petitioner calls a promise by the prosecution to Lori Baker and Vicki Watkins that they would not be prosecuted if they implicated Petitioner.  The claim arises out of a memorandum of interview written by Detective Edwards following questioning of Baker and

---

[7]    On direct examination by defense counsel, Davis testified that she assumed that the man arguing with Culberson was Petitioner because of his height and the car he was driving. Tr. at 2906, 2908.  Defense counsel's questioning, however, assumed for a fact that the man Davis saw arguing with Culberson was Petitioner.  See, e.g., id. at 2909 ("So, Vince went off in this direction?").

Watkins on November 7, 1996.  Doc. No. 22, Ex. 19D.  The
interview centered on Baker and Watkins's account of the events
of August 28-29, 1996 and the few weeks thereafter.  Petitioner
focuses on the following passage of Edwards' memorandum: "Moyer
[the assistant prosecutor] reassured Lori and Vicky that they
would not be charged unless they flat-out lied to us."  Id. at 2.
Petitioner contends that this sentence indicates that the
prosecution promised not to charge Baker and Watkins if they
provided testimony against Petitioner and Tracey Baker.  Putting
this sentence in context, however, the next portion of the
memorandum reads: "Moyer then pointed out a couple of lies that
Lori had already told and she admitted same and that she wouldn't
hold anything back in the future."  Id.

        A promise by the prosecution that a witness will not be
prosecuted in exchange for providing testimony against the
defendant is material evidence that must be disclosed pursuant to
Brady.  Giglio v. United States, 405 U.S. 150, 154 (1972).  In
context, however, the Court does not find that Detective Edwards'
memorandum of interview discloses a promise not to prosecute the
witnesses in exchange for providing testimony.  Rather, the
memorandum indicates that the assistant prosecutor essentially
admonished Baker and Watkins that they needed to be truthful in
their statements, as indicated by the fact that he pointed out
several prior instances where Baker had not been truthful.  The
Court does not view the assistant prosecutor's statement as the

kind of quid pro quo to the witnesses which would require disclosure under Brady and Giglio.

The next item of undisclosed evidence is a statement from Mandy Bogan, one of Culberson's customers from the salon where she worked. According to Bogan's statement, Culberson had once confided to her that she had to get away from Petitioner because of his abuse and that "maybe the only way out was to just leave everything behind and start over." Doc. No. 22, Ex. 19F, at 3. Additionally, according to Bogan's statement, Culberson mentioned a man named Frisch who owned some rental properties and discussed calling to see him about one of them. Id. Petitioner argues that Bogan's statement supports his theory that Culberson left Blanchester and should have been disclosed by the prosecution.

Although the Court agrees with Petitioner that the prosecution should have disclosed Bogan's statement, her testimony likely would have only had a negligible effect on the jury. As reflected in Bogan's statement, Culberson's state of mind regarding leaving Blanchester was equivocal. This was more of a musing rather than a definite statement of intention by Culberson to leave town. Moreover, the statement is without a timeframe. There is no information about who Frisch is or where his properties are located. On the other hand, as discussed above, Petitioner's theory that Culberson left Blanchester was not plausible. Culberson had no money and had recently rejected offers from her mother and her employer to pay for her

28

relocation.  Additionally, Culberson had expressly stated that she did not want to leave Blanchester.  Culberson's contemporaneous actions, such as taking the test to enroll in nursing school, belie any contention that she was planning to leave Blanchester.  Therefore, Bogan's statement, if disclosed to the jury, likely would have had little effect on the trial.

The next pieces of evidence that the prosecution failed to disclose are the statements of witnesses Christa Lynn Pendleton and Karrie Donovan.  Doc. No. 22, Exs. 19J and 19K. According to Pendleton's statement, at around 3:12 a.m. on the morning of August 29, 1996, she was driving to work in Blue Ash, Ohio along Glady Road when she saw a man and woman walking on the road toward Hunt Road.  Pendleton further stated that the woman was wearing shorts and a dark long-sleeved t-shirt and had long brown hair - a description that generally matches Culberson. Pendleton also stated that the man was wearing a black shirt and a ball cap, was approximately 5' 10" and weighed between 175 and 180 pounds.  This description generally matches Petitioner.  This statement is significant, Petitioner contends, because it potentially places him and Culberson on Glady Road at the time Baker said he was at her house covered in blood.  In her statement, Donovan said that on Friday morning, August 30, 1996, between 1 a.m. and 3 a.m. she was driving home along Hunt Road after going to the movies with Pendleton and saw a man and a woman at a junk yard.  According to Donovan's statement, the woman's description generally matches Culberson.  Petitioner

29

contends that Donovan's statement is important because it indicates that Culberson was alive the day after the prosecution contends he killed her.

The Court finds that, if disclosed, Pendleton's and Donovan's testimony would have had little effect on the jury. The jury likely would not have found it plausible that two women, who just happen to be friends, would have each seen a woman matching Culberson's description on successive nights, both times with a man in apparently remote areas near Blanchester, immediately after she disappeared.  Furthermore, since the jury obviously rejected the testimony of defense witnesses who claimed to have definitely seen Culberson alive after August 29, it is not likely that the jury would have credited the more general descriptions proffered by Pendleton and Donovan.  Moreover, Donovan's statement would have been at least as inculpatory as it was exculpatory, since it potentially placed Petitioner and Culberson at or near Petitioner's father's junkyard, which is on Hunt Road, where the police conducted a search for Culberson's body.  Tr. at 2335-36.[8]

Pendleton's statement would have tended to rebut Baker's testimony that Petitioner was at her house about 3:15 a.m. on the morning of August 29.  However, if the jury believed Baker's testimony despite the significant impeachment of her credibility on cross-examination, it likely would not have given

_____

[8]    Evidence adduced by the prosecution suggested that Petitioner hid Culberson's body in a pond located on his father's junkyard and then moved it before the search took place.

30

Pendleton's testimony much credence. In addition, it would have been difficult if not impossible for Petitioner to reconcile Pendleton's statement with Petitioner's father's testimony that he found Petitioner asleep on his couch at home between 1:30 a.m. and 2:00 a.m. If Petitioner was supposed to have been asleep alone at his house at this time, the jury was unlikely to conclude that an hour later he was awake and walking along the road with Culberson. Moreover, any evidence that tended to place Petitioner with Culberson that late on the night she disappeared would not have been helpful to his defense, particularly in light of the fact that the following day, Petitioner was denying that he had seen Culberson after 12:30 a.m. on August 29. Tr. at 2442. Finally, it would have been especially harmful to Petitioner's defense to suggest to the jury that he was with Culberson at 3:15 a.m. with no explanation for her whereabouts afterward. Therefore, Pendleton's statement, if disclosed to the jury, likely would have been as harmful to Petitioner's defense as it would have been helpful.

Next, Petitioner complains that the prosecution failed to disclose that Detective Edwards had been disciplined in 1987 for abusing sick time and lying to a supervisor. Petitioner contends that this evidence could have been used to impeach Edwards' credibility. The Court disagrees. This disciplinary action occurred ten years before the trial and would have had only minimal impeachment value.

Petitioner argues that the prosecution should have disclosed that Vicky Watkins was hypnotized to refresh her memory and that she was given a voice stress analysis.  Petitioner also claims that Watkins made two statements during the hypnosis session which could have been used to impeach her.  First, Watkins testified differently concerning on which shoulder Petitioner's tattoo is located.  Second, during hypnosis, Watkins stated that she thought her discussion with her sister, Lori Baker, about "parting Carrie out" was completely "harebrained."

As for voice stress analysis, the results of voice stress analysis and polygraph tests generally are not considered reliable and have limited impeachment value.  United States v. Brown, 289 F.3d 989, 994 (7th Cir. 2002); United States v. Miller, 874 F.2d 1255, 1261 (9th Cir. 1989).  In King v. Tripett, 192 F.3d 517 (6th Cir. 1999), the Court held that the Petitioner's Confrontation Clause rights were not violated when the trial court refused to allow the petitioner to impeach a witness with the results of a polygraph test.  Id. at 524. Moreover, as Petitioner knows from his state post-conviction proceeds, under Ohio law the results of voice stress analysis may not be used even for impeachment purposes, unless both sides agree to their use.  State v. Doan, No. CA2001-09-030, 2002 WL 1396874, at *6 (Ohio Ct. App. June 28, 2002).  Finally, and importantly, Petitioner's contention that the prosecution failed to disclose that Vicki Watkins was given a voice stress analysis is flatly contradicted by the record.  The trial judge had a side

32

bar conference with counsel on this very topic in the midst of
the prosecution's redirect examination of Watkins.  Tr. at 1614.
Thus, the prosecution did not fail to disclose that Watkins had
been given a voice stress analysis.

The tape of Watkins' hypnosis session would not have
provided any meaningful impeachment material.  Watkins'
inconsistencies concerning the location of Petitioner's tattoo
are minor since the transcript is clear that it is the
distinctive nature of the tattoo, rather than its location, that
assisted Watkins in identifying Petitioner.  Tr. at 1548-50.[9]
Watkins' statement or characterization of her discussion with her
sister about "parting Carrie out" as being "harebrained" is
essentially irrelevant.  It would have been helpful to Petitioner
to know that Watkins' memory had been hypnotically refreshed from
the standpoint of arguing that her testimony was the product of
hypnosis rather than her genuine recollection of the event.
Nevertheless, the main value of Watkins' testimony was that she
corroborated Lori Baker's testimony as to the fact that
Petitioner showed up at Baker's house at around 3:15 a.m.[10]  On
cross-examination, Watkins was  impeached on her prior untruthful
statements to the police and failure to come forward earlier with
her evidence.  The fact that Watkins' memory had been

---

[9]    In fact, Petitioner's trial counsel argued that
evidence of Petitioner's tattoo should not be admitted at all
because "[i]dentification is not an issue."  Tr. at 1548.

[10]    Watkins also testified about hearsay statements made to
her by Lori Baker, but this evidence came in from Baker as well.

hypnotically refreshed would have added only incremental impeachment value.

The final items of alleged undisclosed evidence concern jailhouse informant Mitchell Epperson.  As indicated, Epperson testified as to incriminating statements that Petitioner made to him while they were locked up together at the Queensgate detention facility.  At trial, Epperson testified that he did not receive any time off of his sentence for providing testimony against Petitioner.  Petitioner now contends that the prosecution failed to disclose that a prosecution investigator, William Hidy, promised Epperson that he would be eligible for a reward in exchange for his testimony.  Petitioner also claims that the prosecution failed to disclose that Epperson did in fact receive time off of his sentence for testifying against him.  Petitioner notes that, according to state court documents, Doc. No. 22, Ex. 19O, on November 20, 1996, Epperson was sentenced to 180 days of incarceration, with credit for 49 days for time served and, according to his trial testimony, was released from Queensgate on January 27, 1997.  Petitioner thus points out that Epperson's release date was about two months early.  Petitioner contends that this is evidence of a deal between the prosecution and Epperson because Epperson was released about three weeks after he came forward about the statements Epperson attributed to him. These arguments are also supported by Epperson's affidavit, in which he details his interactions with Hidy concerning the award. Additionally, Epperson claims that while he was in the custody of

the Norwood police he saw a note in his file which indicated that
Clinton County law enforcement officials had requested that he
not be arrested until after he testified at Petitioner's trial.
Petitioner also supports this claim with court records showing
that on November 12, 1997 Hidy appeared as a witness in
proceedings concerning an indictment for burglary against
Epperson.

Starting with the latter items of evidence first,
Petitioner has failed to demonstrate that any of this evidence
constitutes exculpatory or impeachment material.  The note that
Epperson claims he saw in his file at the Norwood police station
at most reflects an agreement between law enforcement officials
in Clinton County and law enforcement officials in the City of
Norwood concerning arresting Epperson.  This note, however, does
not constitute any promise or agreement between the prosecution
in Petitioner's case and Epperson.  From reading his affidavit,
Epperson was obviously unaware of this agreement between law
enforcement agencies before he was taken into custody in Norwood.
Therefore, the existence of the agreement could not have been
used to impeach him at Petitioner's trial.

With regard to the court record, although it is true
that Hidy appeared as a witness during a proceeding concerning
Epperson, there is no evidence in this record whether Hidy
appeared at Epperson's request or subpoena or the prosecution's
request or subpoena.  Moreover, there is no evidence in this
record whether Hidy testified in this proceeding, and if he did,

35

what he said.  This court document simply does not constitute any
proof of an agreement between Hidy and Epperson.  Finally,
although the Court agrees with Petitioner that the court records
indicate that Epperson was released from Queensgate approximately
two months early, he has not submitted any evidence which
suggests that Epperson's early release was the result of a deal
between him and the prosecution.  Prisoners are released from
jail early for many reasons, such as overcrowding and receipt of
credit for good behavior.  It would be speculation to conclude
that Epperson was released early from jail as a result of an
agreement he reached with the prosecution to testify in
Petitioner's trial.

The most significant piece of evidence concerning
Epperson is his claim that he expressed interest in the reward on
several occasions and that Detective Hidy stated that he would be
eligible to receive it.  Assuming that Epperson's affidavit is
truthful, his interest in the reward could have been used to
impeach his credibility.  The Court notes, however, that it was
apparently well-known that a private reward had been offered in
connection with Culberson's disappearance.  See Tr. at 3464,
3467-68, 3478-79 (indicating that reward posters had been placed
around Blanchester and that Petitioner's trial counsel had asked
to have them removed before the trial started).  There is no
Brady violation, however, if the defendant knew or should have
known of the essential facts permitting him to take advantage of
the information, or, if the information was available to him

36

through another source.  Carter v. Bell, 218 F.3d 581, 601 (6th
Cir. 2000).  In this case, Petitioner's counsel knew or should
have known that a reward had been offered for information
relating to Culberson's disappearance.  On cross-examination,
therefore, Petitioner's trial counsel could have asked Epperson
whether he was motivated to testify against Petitioner because of
the reward.  Thus, Petitioner could have learned of the alleged
undisclosed information from Epperson himself.  In fact,
Petitioner's trial counsel touched briefly on whether Epperson
had any pecuniary interest in his story but then moved on to
other areas.  See Tr. at 2326 (asking Epperson whether he refused
to give a news interview unless he was paid).

In any event, assuming that Epperson's affidavit is
truthful, and assuming that the prosecution should have disclosed
these statements to Petitioner, knowing that Epperson had
expressed interest in the reward likely would not have had a
significant effect on the jury's assessment of his credibility.
Epperson had an extensive criminal record on which he was
impeached.  Id. at 2324-25; 2328-2329.  Epperson was also
impeached on his drug abuse and drug addiction.  Id. at 2325,
2329.  Therefore, it is likely that evidence concerning the
reward would have only been cumulative on the issue of Epperson's
credibility.

After assessing the collective impact of the
undisclosed evidence, as is required, Kyles, 514 U.S. at 436, the
Court's confidence in the jury's verdict is not undermined.

37

Although circumstantial, the prosecution's case was strong,
anchored by evidence of Petitioner's jealousy and escalating
abuse of Culberson.  Petitioner's theory of defense, that
Culberson was alive or had left Blanchester, was weak,
particularly in light of the strength of the prosecution's
evidence that Culberson had neither the means to nor the
intention of leaving Blanchester.  For the same reason, Mandy
Bogan's undisclosed statement would not have meaningfully
bolstered Petitioner's defense.  The jury obviously rejected the
testimony of the witnesses who were positive they saw Culberson
in and around Blanchester after August 29, 1996.  Therefore, the
jury would not have found credible the testimony of Pendleton and
Donovan, who gave only general descriptions of the man and woman
they claim to have seen.  Moreover, as stated, their statements
actually tended to inculpate Petitioner.  Although Billie Jo
Brown failed to pick Petitioner out of a photo-array, her trial
testimony identifying Petitioner was actually corroborated by
Petitioner's witness, Bonnie Davis.  The credibility of the
lynchpin witness, Lori Baker, had already been impeached by her
admissions that she had given a number of conflicting statements
to the police and others.  Evidence of voice-stress analysis
would not have been admissible at trial, so suppression of this
information could not have affected Petitioner's trial.
Detective Edwards' disciplinary matter was ten years old and
would not have affected the jury's assessment of his credibility.
Petitioner failed to demonstrate that there was any deal or

agreement between Mitchell Epperson and the prosecution and the evidence concerning his interest in the reward was essentially cumulative of other impeachment evidence. Petitioner failed to show that the prosecution promised not to charge Lori Baker and Vicki Watkins with perjury in exchange for testifying against Petitioner.

Considered cumulatively, it is not reasonably likely that this evidence would have affected the outcome of Petitioner's trial. Accordingly, Petitioner has failed to demonstrate a <u>Brady</u> violation. Because there was no <u>Brady</u> violation, Petitioner has failed to demonstrate that his trial counsel was ineffective. Therefore, Petitioner's Second, Third, and Fourth assignments of error are not well-taken.

### C. <u>Fifth Ground for Relief</u>

Petitioner's Fifth Ground for Relief alleges that his Sixth Amendment confrontation rights were violated by the trial court's admission of hearsay statements:

> **PETITIONER WAS DEPRIVED OF HIS FEDERAL CONSTITUTIONAL RIGHTS TO CONFRONTATION, CROSS-EXAMINATION AND A FAIR TRIAL BECAUSE THE TRIAL COURT ALLOWED THE STATE TO ADMIT UNRELIABLE HEARSAY STATEMENTS WHICH DID NOT CONFORM TO THE HEARSAY EXCEPTIONS IN THE RULES OF EVIDENCE**

During Petitioner's trial, the judge permitted several witnesses to testify about statements that Culberson had made to them detailing specific incidents of Petitioner's abuse of her. Additionally, as indicated above, the trial judge allowed several witnesses to testify about statements made to them by Lori Baker. The trial judge typically allowed these statements to come into

evidence under the excited utterance exception.  Petitioner
contends that these evidentiary rulings violated his Sixth
Amendment confrontation rights as well as the Ohio Rules of
Evidence.  Initially, the Court points out that to the extent
that Petitioner's claim argues that the trial court's rulings
violated the Ohio Rules of Evidence, it is not cognizable in this
habeas proceeding.  Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir.
2003).

        The right to confront and cross-examine witnesses
provided by the Sixth Amendment is not absolute.  United States
v. Atisha, 804 F.2d 920, 929 (6th Cir. 1986).  An exception to
the Sixth Amendment right of confrontation which survives the
Supreme Court's recent decision in Crawford v. Washington, 541
U.S. 36 (2004), is the doctrine of forfeiture by wrongdoing.  Id.
at 62.  Pursuant to the forfeiture by wrongdoing exception, the
defendant forfeits his confrontation rights where he is
responsible for the witness's unavailability.  United States v.
Garcia-Meza, 403 F.3d 364, 370 (6th Cir. 2005).  This is an
equitable rule which prevents the defendant from taking advantage
of his own wrongful conduct.  Id.  The defendant's motive for
procuring the witness's unavailability is not relevant in
determining whether the doctrine applies.  Stated another way,
application of the exception does not depend on a showing that
the defendant wished to prevent the witness from testifying at
trial.  Id.  Moreover, the exception may be applied even where
the defendant is on trial for the murder of the hearsay

declarant.  United States v. Mayhew, 380 F. Supp.2d 961, 967
(S.D. Ohio 2005) (Marbley, J.).  In order for the statements to
be admissible under this exception, the prosecution need only
prove by a preponderance of the evidence that the defendant is
responsible for the declarant's unavailability.  Id. at 967-68;
see also Davis v. Washington, 126 S. Ct. 2266, 2280 (2006)
(suggesting, but not holding, that the prosecution need only
prove forfeiture by wrongdoing by a preponderance of the
evidence).  In Davis, the Supreme Court also appeared to endorse
the idea that in determining whether the defendant forfeited his
confrontation rights, the trial court is permitted to consider
the out-of-court statements of the unavailable witness.  See
Davis, 126 S. Ct at 2280.

        The record in this case easily establishes by a
preponderance of the evidence that Petitioner was responsible for
Culberson's unavailability at trial.  Petitioner's jealously and
obsession with Culberson, and his persistent and increasingly
severe abuse of her, was well-documented by several witnesses.
Furthermore, as stated above, Lori Baker provided important
circumstantial evidence that Petitioner killed Culberson and that
he and his brother disposed of her remains.  Additionally,
Petitioner made several incriminating statements suggesting that
he killed Culberson.  Because a preponderance of the evidence
demonstrates that Petitioner is responsible for Culberson's
unavailability as a witness, he forfeited his Sixth Amendment

confrontation and cross-examination rights as to Culberson's out-of-court statements.

The remaining hearsay statements about which Petitioner complains are out-of-court statements that Lori Baker made to Vicki Watkins and Carla Williams. Petitioner, however, had the ability to cross-examine Baker at trial. Thus, while Petitioner is arguably correct that the trial judge should not have allowed Watkins and Williams to testify about Baker's out-of-court statements to them, such error, if indeed the judge erred, was harmless given that Petitioner had the ability to cross-examine Baker on these statements.

In summary, Petitioner has failed to demonstrate that the trial court violated his Sixth Amendment rights to confront and cross-examine witnesses against him. Accordingly, Petitioner's fifth assignment of error is not well-taken.

D. <u>Sixth Ground for Relief</u>

Petitioner's Sixth Ground for Relief argues that he was deprived of his right to due process because the trial court permitted testimony concerning his abuse of Culberson:

> **PETITIONER WAS DEPRIVED OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL BECAUSE THE TRIAL COURT ALLOWED THE STATE TO ADMIT REPEATED TESTIMONY ABOUT ALLEGED PRIOR ABUSIVE ACTS BY PETITIONER DOAN AGAINST CARRIE CULBERSON**

This assignment of error is without merit. As the Sixth Circuit noted in <u>Bugh</u>, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." 329 F.3d at 512. Thus, the prosecution did

not violate Petitioner's right to due process by putting on
evidence of his abuse of Culberson.  In any event, evidence of
the defendant's prior abuse or assaults of the victim has
legitimate probative value, such as proving motive or intent.
See, e.g., Garcia-Meza, 403 F.3d at 368 ("The assault went to
prove motive since the government offered evidence to show that
the assault, like the murder, was a product of the Defendant's
jealousy."); United States v. Wynn, 987 F.2d 354, 356-57 (6th
Cir. 1993)(intent).

     Accordingly, this assignment of error is not well-
taken.

## E. Seventh Ground for Relief

     Petitioner's Seventh Ground for Relief alleges
prosecutorial misconduct tainted his trial:

> **REPEATED MISCONDUCT OF THE PROSECUTION THROUGHOUT
> PETITIONER'S TRIAL DEPRIVED HIM OF THE RIGHT TO A
> FUNDAMENTALLY FAIR TRIAL GUARANTEED BY THE DUE PROCESS
> CLAUSE OF THE FOURTEENTH AMENDMENT**

     Petitioner claims that the prosecution engaged in
several instances of misconduct during his trial: 1) repeatedly
introducing hearsay and other acts evidence; 2) giving an
improper closing argument; 3) introducing photographs of his
tattoo; 4) introducing photographs of Culberson taken after an
alleged incident of abuse committed by Petitioner; 5) failure to
disclose exculpatory and impeachment evidence; and 6)
"gratuitously introduc[ing] a form of sexism through argument and
its witnesses that 'Baker' women were supposed to do what the
'Baker' men told them to do."  Doc. No. 57, at 57.

With regard to Petitioner's first claim of
prosecutorial misconduct, the Court has already determined that
Petitioner's confrontation and due process rights were not
infringed by the introduction of hearsay and prior acts evidence.
It follows, therefore, that the prosecution did not engage in
misconduct by introducing this evidence at trial.  Similarly,
with regard to Petitioner's sixth claim of prosecutorial
misconduct, the Court has already determined that the
prosecution's failure to disclose exculpatory and impeachment
evidence does not undermine confidence in the verdict, and,
therefore, no violations of <u>Brady</u> were committed.  Again it
follows that the prosecution's alleged misconduct in this regard
did not violate Petitioner's right to a fair trial.

With regard to the closing argument, Petitioner
contends that the prosecutor repeatedly asked the jury to
speculate, assumed facts not in evidence, expressed his personal
beliefs to the jury, and made an improper religious reference to
the jury.  Petitioner, however, did not lodge contemporaneous
objections to any of the alleged improper statements by the
prosecutor.  Accordingly, Petitioner has waived review of these
claims of prosecutorial misconduct by the Court unless he can
establish that trial counsel was ineffective for failing to
object.  <u>Hinkle v. Randle</u>, 271 F.3d 239, 244 (6th Cir. 2001).  As
the Court discusses further, <u>infra</u>, in analyzing Petitioner's
Twelfth Ground for Relief, trial counsel was not ineffective for
failing to object to this alleged misconduct.

44

Petitioner next challenges the admission of two enlarged photographs at trial.  One of the photographs depicted Petitioner's "Grim Reaper" tattoo.  The second photograph was taken of Culberson in April 1996 after she was allegedly beaten by Petitioner.

The "admission of likely prejudicial, and only distantly relevant, evidence" does not necessarily give rise to a constitutional violation.  Givens v. Yukins, No. 98-2429, 2000 WL 1828484, at **4 (6th Cir. Dec. 5, 2000).  Therefore, in order to prevail on this issue, Petitioner must show that the admission of the photographs, even if erroneous, "rendered his trial so fundamentally unfair as to violate federal due process."  Butcher v. Marquez, 758 F.2d 373, 378 (9th Cir. 1985).  The issue of fundamental fairness in habeas corpus petitions should be analyzed with "considerable self-restraint."  Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999).  Consequently, habeas petitions claiming a violation of an individual's constitutional rights because of the admission of potentially prejudicial photographs have almost always failed without much discussion by the court.  See, e.g., Wheeler v. Jones, 59 Fed. Appx. 23, 30 (6th Cir. 2003) (holding that the admission of a potentially prejudicial photograph "was not fundamentally unfair and did not violate petitioner's due process rights."); see also Gerlaugh v. Stewart, 129 F.3d 1027, 1032 (9th Cir. 1997) (holding that the admission of admittedly gruesome photos of a decedent was not cognizable in a habeas corpus petition because the

allegation did not raise "the spectre of fundamental unfairness such as to violate federal due process of law."). Moreover, a criminal defendant's constitutional rights are not violated by the introduction of photographic evidence on a material issue, "even if the issue is not in dispute." Dowthitt v. Johnson, 180 F. Supp.2d 832, 880 (S.D.Tex. 2000).

In this case, Petitioner has failed to produce any evidence to show that the admission of the two photographs at issue, even if they were admitted in error, raises the spectre of fundamental unfairness such that his constitutional rights were violated. Therefore, Petitioner's request for habeas relief based on the admission of the above-mentioned photographs is without merit.

Finally, Petitioner claims that the prosecution engaged in sexism that constituted misconduct by introducing evidence that Baker women do what Baker men tell them to do. This was not misconduct. Indeed, this Court agrees with the Ohio Court of Appeals' assessment that this "was a reasonable effort, supported by Lori Baker's testimony, to explain why Lori Baker initially did not reveal what she knew about the crime." Doan, 2002 WL 221963, at *14.

In summary, for the reasons stated, Petitioner Seventh Ground for relief is not well-taken.

### F. Eighth Ground for Relief

Petitioner's Eight Ground for Relief contends that his rights under the Sixth and Fourteenth Amendments were violated

because the trial court refused to allow him to review witness statements for inconsistencies prior to trial:

> **PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO CONFRONTATION, CROSS-EXAMINATION, AND DUE PROCESS WHEN THE STATE COURTS REFUSED TO ALLOW TRIAL OR APPELLATE COUNSEL TO VIEW WITNESS STATEMENTS FOR INCONSISTENCIES PRIOR TO CROSS-EXAMINATION AND ON DIRECT APPEAL**

This assignment of error is based on the trial court's alleged misapplication of Ohio Rule of Criminal Procedure 16(B)(1)(g), which relates to review of a witness's pretrial statements for inconsistencies.[11] Petitioner argues that the trial court erred in applying Rule 16(B)(1)(g) by limiting review of the witness statements for inconsistencies. This alleged

---

[11]    This rule states:

> In camera inspection of witness' statement. Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.
>
> If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies.
>
> If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-examine or comment thereon.
>
> Whenever the defense attorney is not given the entire statement, it shall be preserved in the records of the court to be made available to the appellate court in the event of an appeal.

Ohio R. Crim. P. 16(b)(1)(g).

violation of a state rule of criminal procedure, however, is not cognizable on habeas review.  Lorraine v. Coyle, 291 F.3d 416, 441 (6th Cir. 2002).

        The Court has already addressed Petitioner's claims of Brady violations and has rejected them.  Nevertheless, in this assignment of error, Petitioner identifies three more alleged prior inconsistent statements made by Billie Jo Brown.  First, Brown previously stated that she did not know whether the incident that occurred in her yard happened on Tuesday, August 27, 1996 or Wednesday, August 28, 1996.  This is a minor point, however.  Had this prior statement been disclosed to the jury, it likely would not affected its assessment of Brown's perception of the event.  Brown testified that Petitioner assaulted and punched Culberson in her yard.  The record does not reflect that during the day of Wednesday, August 28 Culberson showed any visible signs - such a bruises resulting from a punch in the face - that she had been in an altercation or assaulted in any fashion. Consequently, the incident would have had to occurred after August 27.  Therefore, the jury would likely have concluded that Brown was simply mistaken to the extent she thought the incident occurred on August 27.

        Petitioner next argues that in a prior statement, Brown stated that Petitioner said to Culberson that he was going kill her "the next time", as opposed to her trial testimony in which she testified that he said "I told you next time I'd kill you, you fucking bitch."  Petitioner argues that Brown's trial

48

testimony indicated that the incident in her yard was "the next time" whereas her prior statement indicates that the next time would be "the next time." Petitioner overlooks, however, that Brown also testified consistently with the undisclosed statement. Later in her direct examination, Brown testified that Petitioner said, "You fucking bitch, I'll kill you next time." Tr. at 1489. Therefore, to the extent that Brown's version of the events was inconsistent, the inconsistency was exposed during the course of her direct examination and was available for Petitioner to exploit. Therefore, this alleged non-disclosure would not have affected Petitioner's trial.

Finally, Petitioner complains that during trial Brown said that after she heard tires squealing, she looked out the window and saw that Culberson's car was gone and his car was still there. In a prior statement, Brown said that Petitioner's car was gone about a half hour later. Petitioner argues that it would have been impossible for him to kidnap Culberson in her car while simultaneously driving his own car a half-hour later. This statement, however, is not inconsistent with Brown's trial testimony. Furthermore, the fact that Petitioner's car was gone from his house approximately a half-hour later does mean that it was impossible for Petitioner to have kidnapped Culberson in her car. Petitioner could have returned at some point in the interim to retrieve his car.

None of these undisclosed statements, considered collectively with the other <u>Brady</u> material previously discussed, likely would not have affected the outcome of Petitioner's trial.

Therefore, Petitioner's Eighth Ground for Relief is without merit.

G. <u>Ninth Ground for Relief</u>

Petitioner's Ninth Ground for Relief that pretrial publicity denied him a fair trial:

**PETITIONER WAS DEPRIVED OF HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS AND A FAIR AND IMPARTIAL TRIAL WHEN MEDIA COVERAGE SO PERMEATED THE COMMUNITY THAT VENUE SHOULD HAVE BEEN CHANGED SINCE A FAIR AND IMPARTIAL JURY COULD NOT BE SEATED AND THE TRIAL COURT'S HANDLING OF VOIR DIRE ONLY MAGNIFIED THE PREJUDICE**

There is no question that the pretrial publicity of Petitioner's trial was extensive, in the print media and on radio and television. A summary of the media coverage of the case is found in Petitioner's traverse, at 64-69. Nevertheless, on review of the record, this case does not establish a case of either presumed prejudice or actual prejudice resulting from pretrial publicity.

The voir dire proceedings are contained in Volumes 2 through 7 of the trial transcript. While it is true, as Petitioner contends, that virtually of all the 120 member jury panel had heard something in the media about the case, most of the veniremen could not recall any of the significant details of the case. Moreover, almost all of the panel stated that they could set aside what they had heard about the case and render

verdicts based on the evidence presented during the trial.  None of the final pool of jurors had formed any opinion concerning Petitioner's guilt or innocence.  The trial court placed no time limitations on Petitioner's ability to voir dire the panel on media bias.

The Sixth Circuit has indicated that "unless the materials submitted to the trial judge demonstrate an utter corruption by the press of the trial atmosphere, the actual voir dire becomes the center piece of attention on the motion to change the venue."  See Ritchie v. Rogers, 313 F.3d 948, 955 n.11 (6th Cir. 2002).  Although media coverage of Petitioner's case was extensive, review of the record does not demonstrate "an utter corruption by the press of the trial atmosphere."  In Irvin v. Dowd, 366 U.S. 717 (1961), the Court found presumptive prejudice as a result of pretrial publicity.  In the case, the petitioner was charged with murdering a family of six in a small community.  There was extensive pretrial publicity, including reports that the crime had been solved but that petitioner had refused to confess and that he had offered to plead to a sentence of 99 years.  Of the 430 member venire panel, 268 had fixed opinions as to the petitioner's guilt.  Overall, 90% of the panel had some opinion as to the petitioner's guilt and eight of the twelve eventually seated thought that the petitioner was guilty. Id. at 725-727.

In contrast to Irvin, as stated before, here, although almost all of the panel had heard something about the case, those

51

who stated that they could not be fair and impartial were
dismissed for cause.  None of the remaining panel had formed any
opinions concerning Petitioner's guilt and each testified that he
or she could set aside anything they had heard in the media in
deciding the case.  This indicates that the jury pool was not
tainted by the media.  <u>See</u> <u>DeLisle v. Rivers</u>, 161 F.3d 370, 382
(6th Cir. 1998)("[I]t is beyond question that mere prior
knowledge of the existence of the case, or familiarity with the
issues involved, or even some preexisting opinion as to the
merits, does not in and of itself raise a presumption of jury
taint[.]").  Moreover, in further contrast to <u>Irvin</u>, for the
majority of the jury panel, their knowledge of the case from the
media was scant.  Petitioner passed the first panel[12] of jurors
for cause, and, according to the Court's review of the record,
only 5 of the 120 member panel (about %4) were excused because of
preconceived opinions about the case.  Tr. at 322; 246, 592, 595,
596, 598; <u>see</u> <u>Delisle</u> 161 F.3d at 383 (presumed prejudice not
established where 21 of 68 potential jurors had preconceptions of
the defendant's guilt).  "The fact that petitioner did not
challenge for cause any of the jurors . . . selected is strong
evidence that he was convinced the jurors were not biased and had

_____

[12]    The trial judge conducted voir dire for knowledge of
the case, knowledge of the parties, knowledge of the witnesses,
etc., in three separate pools or panels.  The jurors were then
voir dired individually on whether they would be able to impose
the death penalty.  In addition to the jurors who were excused
because of media exposure, other potential jurors were excused
for cause because of their knowledge of the parties and/or the
witnesses.

52

not formed any opinions as to his guilt." Beck v. Washington, 369 U.S. 541, 557-58 (1962). Although Petitioner did not pass the remaining panels for cause, by the same token he did not move to strike any specific juror for cause on the grounds of a preconceived opinion about the case. The record simply does not reflect a corruption of the trial atmosphere by the press.

Finally, the Court must presume that the jurors were being truthful when they stated that they could be impartial. When a juror's impartiality is at issue, the relevant question is "did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." Patton v. Yount, 467 U.S. 1025, 1036 (1984). A trial court's determination of a juror's credibility is entitled to "special deference." Id. at 1038; Wainwright v. Witt, 469 U.S. 412, 426 (1985) (noting that in determining whether a juror is biased, "deference must be paid to the trial judge who sees and hears the juror"). In this case, the trial judge found that the jury pool from which the jurors who tried Petitioner's case were eventually selected could be fair and impartial and would base their verdicts on the evidence in the case and the court's instructions on the law. Tr. at 1242-43. The record fully supports the trial judge's findings on the jury's ability to be impartial.

In summary, the trial judge's conduct of voir dire was entirely appropriate and did not infringe on Petitioner's right to a fair trial. Media coverage of Petitioner's case did not

taint the entire jury pool.  Accordingly, there is no presumed prejudice from pretrial publicity.  Petitioner failed to demonstrate that actual prejudice resulted from pretrial publicity.

Accordingly, Petitioner's Ninth Ground for Relief is not well-taken.

## H. <u>Tenth Ground for Relief</u>

Petitioner's tenth assignment of error argues that the evidence was insufficient to find him guilty and that juror misconduct tainted his trial:

> **MISCONDUCT BY MEMBERS OF THE JURY DENIED PETITIONER HIS RIGHTS TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AND HIS RIGHT TO A DETERMINATION BY A FAIR AND IMPARTIAL JURY UNDER THE SIXTH AND FOURTEENTH AMENDMENTS**

Petitioner's claim that the evidence was insufficient to support his convictions is based on two items of alleged newly discovered evidence.  The first item is the affidavit of Carolyn Evans, who claims that a close friend of Culberson told her that on the night of August 28, 1996, Culberson was angry because Petitioner was seeing someone else and that she was looking for a man who drove a black pickup truck.  Petitioner notes that Evans's affidavit corroborates the testimony of witness Bonnie Davis, who testified that she saw Culberson get into a black pickup truck the night she disappeared.  The second affidavit is from Tony Frazier.  Frazier is a cousin of Doan's who was living with him at the time of the incident on July 28, 1996 when Culberson alleged that Petitioner hit her in the head with a

space heater.  Frazier claims that Petitioner did not hit
Culberson; instead, he claims that Culberson hit her head on a
guardrail on the back porch of Petitioner's home.  Neither of
these affidavits demonstrates that the prosecution failed to
carry its burden.

Sufficient evidence exists where, "after viewing the
evidence in the light most favorable to the prosecution, any
rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443
U.S. 307, 319 (1979).  Although Petitioner argues that the
evidence was insufficient to sustain his convictions, he has not
actually identified any elements of the offenses on which the
prosecution failed to sustain its burden of proof.  He simply
claims that these affidavits support his contention that
Culberson was not murdered.

The Court disagrees.  Neither of these affidavits
undermines the prosecution's evidence.  Evans did not have first
hand knowledge of Culberson's state of mind on the night of
August 28, 1996.  She learned of Culberson's state of mind from
someone else.  Therefore, Evans's affidavit is hearsay and almost
certainly would have not been admitted at trial.  Frazier's
affidavit is not newly-discovered evidence.  According to the
affidavit, Frazier was living with Petitioner at the time of the
July 1996 incident.  Presumably, therefore, Petitioner was aware
at the time of trial that Frazier had witnessed the incident and
could have so testified at trial.  Therefore, Petitioner failed

to exercise due diligence in procuring Frazier's evidence.  In
any event, Frazier's affidavit would only have set up a conflict
in evidence between his testimony and the evidence that
Petitioner did hit Culberson with a space heater.  Thus,
construing the evidence in the light most favorable to the
prosecution, Frazier's affidavit is not entitled to any
consideration.  Consequently, Petitioner has not demonstrated
that the evidence supporting his convictions was insufficient.

        Petitioner's claim of juror misconduct lies in the
affidavit of Woody Schlicht.  According to his affidavit,
Schlicht was staying at the hotel where the jury was sequestered
and overheard one juror saying to another that a verdict of
"guilty would be for the best."  Doc. No. 22, Ex. 16.  Accepting
Schlicht's affidavit as being truthful, Petitioner is not
entitled to relief on this claim because the affidavit does not
demonstrate that the jury was subject to any extraneous
influences or information.  United States v. Lloyd, 462 F.3d 510,
518-19 (6th Cir. 2006).  At most Schlicht's affidavit reflects
premature deliberations among the jurors.  However, this type of
alleged misconduct is an internal influence not subject to post-
verdict review by the Court.  Mason v. Mitchell, 320 F.3d 604,
637 (6th Cir. 2002)(juror prejudging petitioner's guilt an
internal influence; trial court should not have held evidentiary
hearing on claim) (citing Tanner v. United States, 483 U.S. 107
(1987)); United States v. Logan, 250 F.3d 350, 381 (6th Cir.
2001) (jurors prematurely deliberating an internal influence;

defendant not entitled to post-trial hearing); <u>Greene v. LaFler</u>, 447 F. Supp.2d 780, 789 (E.D.Mich. 2006)("The mere possibility of a juror's preconceived notion of the guilt or innocence of an accused is insufficient to undermine a court's confidence in the outcome of a case.")(citing <u>Lordi v. Ishee</u>, 384 F.3d 189, 195 (6th Cir. 2004)).

Accordingly, Petitioner's Tenth Ground for Relief is not well-taken.

## I. <u>Eleventh Ground for Relief</u>

Petitioner's eleventh assignment of error argues that the evidence was insufficient to sustain his convictions for aggravated murder because the prosecution failed to establish venue:

> **WHEN THERE IS INSUFFICIENT EVIDENCE TO SHOW PROPER VENUE AND NO EVIDENCE TO SHOW THAT THE ALLEGED KIDNAPPING WAS MORE THAN INCIDENTAL TO THE CHARGED CRIME OF AGGRAVATED MURDER, PETITIONER'S CONVICTIONS FOR KIDNAPPING AND AGGRAVATED MURDER ARE NOT SUFFICIENTLY PROVED IN ACCORDANCE WITH THE DUE PROCESS CLAUSE**

Petitioner contends that the prosecution failed to show that Culberson died in Clinton County.  Petitioner argues that Clinton County's only connection to the case is that Billie Jo Brown last saw Culberson fighting with Petitioner in her yard. Petitioner contends, however, that Brown last saw Culberson breaking free from Petitioner and running away.  Then, Brown heard tires squealing and Culberson's car was gone.  Petitioner claims that kidnapping cannot be inferred without impermissibly stacking inferences.

In Ohio, venue is not an element of the offense but nevertheless is a material fact which must be proved beyond a reasonable doubt.  State v. Headley, 453 N.E.2d 716, 718 (Ohio 1983).  "In the prosecution of a criminal case, it is not essential that the venue of the crime be proved in express terms, provided it be established by all the facts and circumstances, beyond a reasonable doubt, that the crime was committed in the county and state as alleged in the affidavit."  State v. Gribble, 263 N.E.2d 904, 904 at syl. 2 (Ohio 1970).  Venue is satisfied if the offense or any element of the offense was committed in the county of prosecution.  State v. Draggo, 418 N.E.2d 1343, 1345-46 (Ohio 1981).  As stated above, in considering a claim concerning the sufficiency of the evidence, the court reviews the evidence in the light most favorable to the prosecution to determine whether any rational person could have found the essential elements of the crime proved beyond a reasonable doubt. Sufficient evidence in this case existed for the jury to find beyond a reasonable doubt that venue was proper in Clinton County.

Petitioner was charged with kidnapping, in violation of Ohio Rev. Code § 2905.01(A)(3) - "No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: To terrorize, or to inflict serious physical harm on the victim or

another[.]"  Petitioner was also charged with aggravated murder
with a kidnapping specification, in violation of Ohio Rev. Code §
2903.01(B) - "No person shall purposely cause the death of
another . . . while committing or attempting to commit, or while
fleeing immediately after committing or attempting to commit,
kidnapping, rape, aggravated arson, arson, aggravated robbery,
robbery, aggravated burglary, burglary, terrorism, or escape."
In this case, the venue requirement for both offenses would be
satisfied by proof that the kidnapping occurred in part in
Clinton County because the kidnapping and murder of Culberson
were part of the same course of conduct.  State v. Beuke, 526
N.E.2d 274, 287-88 (Ohio 1988).  Thus, the prosecution was not
required to prove that Petitioner actually murdered Culberson in
Clinton County, as he seems to argue.

        There was obviously sufficient evidence for the jury to
conclude that Petitioner kidnapped Culberson in Clinton County.
Billie Jo Brown's testimony establishes that the kidnapping
commenced in her yard.  While Culberson may have broken free from
Petitioner during the struggle, the jury was entitled to infer
that her escape was only temporary given that she was no longer
present in the yard a few moments later and was never seen again.
Tr. at 1492.  There was substantial evidence in the record that
Petitioner had a habit of squealing his tires or "peeling out"
whenever he drove off from somewhere.  Therefore, the jury could
infer that Petitioner removed Culberson from Brown's yard because
Brown testified that she heard tires squealing just before she

looked out into the yard again. Tr. at 1491.  Finally, given the violent nature of the struggle in Brown's yard, Culberson's cries for help, and the fact that no one was in the yard when Brown looked out again, the jury could infer that Petitioner managed to subdue Culberson and that she did not leave with Petitioner voluntarily.  None of these conclusions requires a stacking of inferences.  Thus, the evidence was sufficient for the jury to conclude that the kidnapping of Culberson occurred in part in Clinton County.  Consequently, the evidence was sufficient to establish venue for both the kidnapping and aggravated murder of Culberson.

Finally, Petitioner contends that the prosecution was required to prove that the kidnapping of Culberson was more than incidental to the aggravated murder of Culberson.  To the extent that this argument is properly raised in a federal habeas proceeding, Petitioner is incorrect.  Under Ohio law, kidnapping and aggravated murder are not allied offenses of similar import, thus the prosecution was not required to prove that the kidnapping was more than incidental to the aggravated murder.  State v. Jells, 559 N.E.2d 464, 474-75 (Ohio 1990).  The kidnapping of Culberson was complete when Petitioner forced her into the car and then drove off.  Id. at 475.

Accordingly, for the reasons stated, Petitioner's Eleventh Ground for Relief is not well-taken.

### J. Twelfth Ground for Relief

60

Petitioner's twelfth assignment of error alleges that his trial counsel was ineffective:

> **PETITIONER DOAN WAS DEPRIVED OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL**

Petitioner asserts that his trial counsel was ineffective in four ways: 1) failure to object to the inclusion of the civil jury instruction on drawing inferences; 2) failure to request to participate in the review of witness statements pursuant to Ohio R. Crim. P. 16(B)(1)(g); 3) failure to object to prosecutorial misconduct during closing argument; and 4) failure to renew a Rule 29(A) motion for judgment of acquittal at the end of the defense case.

To establish ineffective assistance of counsel Petitioner must show that his counsel's performance fell below an objective standard of reasonableness and that his counsel's errors were so serious as to prejudice him. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984). Review of counsel's performance is highly deferential and requires that courts "indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." <u>Id.</u> at 689, To establish prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694. Petitioner's ineffective assistance of counsel claim fails on all fronts.

The Court has already addressed, <u>supra</u>, the effect of the inclusion of the civil jury instruction on drawing inferences and concluded that the instructions as a whole adequately conveyed the concept of reasonable doubt.  Therefore, counsel's failure to object to this instruction did not permit the jury to convict Petitioner on proof less than a reasonable doubt.  Thus, counsel's failure to object to this error does not undermine confidence in the verdict.

Petitioner next argues that trial counsel was ineffective for failing to attempt to enforce compliance with Rule 16(b)(1)(G) of the Ohio Rules of Criminal Procedure.  The Court has already determined, however, that violation of this state rule of criminal procedure is not cognizable in this habeas proceeding.  Since a violation of Rule 16 does not rise to constitutional dimensions, it follows that trial counsel could not have been ineffective for failing to insist on participating in the <u>in camera</u> review of prior witness statements.

Petitioner next contends that trial counsel was ineffective for failing to object to alleged prosecutorial misconduct during the prosecution's closing argument.  Failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel.  <u>Hodge v. Hurley</u>, 426 F.3d 368, 377 (6th Cir. 2005).  Petitioner claims that the prosecutor engaged in misconduct by asking the jury to speculate, injecting his personal beliefs to the jury, assuming facts not in evidence, and making religious references to the jury.  Doc. No. 57, at 54.

After review of the first portion of the transcript
cited by Petitioner (Tr. 3216, ll. 20-25, Tr. 3217, ll. 1-3), the
Court finds that this was an accurate summation by the prosecutor
of witness Jeff Warren's testimony.  Compare with Tr. at 1522-
1538.  The next part of the argument cited by Petitioner (Tr. at
3218, ll. 9-15) was legitimate argument by the prosecutor.  He
was not asking the jury to speculate; rather, the prosecutor was
arguing to the jury that Culberson was dead by the time
Petitioner showed up at Lori Baker's house.[13]  The next segment
cited by Petitioner is the prosecution's argument at Tr. at 3219,
ll. 22-25, 3220, ll. 1-3).  It is not evident to the Court what
the misconduct is supposed to be with regard to this statement
because it appears to be an accurate summation of Lawrence
Baker's and Lori Baker's testimony, and is a fair argument to

---

[13]    In context, with lines 9-15, underlined below, the
prosecutor argued:

> Now, we get to Lori Baker. What does Lori Baker tell
> you?  I go to the door at 3:15 and Vincent Doan is
> standing there.  No shirt.  No shoes.  No sox. [sic]
> Jeans.  Blood on his chest.  Blood on his arms.  Blood
> on his pants.  Whatever happened the last two hours,
> Vincent Doan got bloody.  Comes in, hears him take a
> shower, gets ready to leave.  Seven garbage bags.  Now
> ask yourself this question.  Do you usually go get your
> garbage bags before you make your mess or after you
> make your mess and you want to clean it up?  Do you go
> to your picnic with your garbage bags laying out or do
> you wait till [sic] everybody is done eating and then
> you go find them and you put all the trash in them?
> Ask yourself that question.  Was the mess already made?

infer that Petitioner borrowed Lori Baker's car to move or hide Culberson's body.[14]

  The next portion cited by Petitioner (Tr. at 3225, ll. 1-9) the Court finds was a legitimate argument asking the jury to draw inferences from the evidence, not to engage in speculation, as Petitioner appears to contend. The next portion the argument cited by Petitioner (Tr. at 3227, ll. 14-19) read in its entire context, is again a legitimate argument to draw inferences from the evidence. See Tr. at 3226, ll. 18-25, Tr. at 3227, ll. 1-25, Tr. at 3228, ll. 1-4.

  During the rebuttal argument, Petitioner first cites Tr. at 3286, ll. 1-5. Petitioner apparently contends that the prosecutor injected his personal beliefs here. Again in context, it appears to the Court that despite his phraseology, the prosecutor was legitimately responding to Petitioner's argument

---

[14] The prosecutor argued:

> Didn't cause me any concern. It's really interesting that the man [Lawrence Baker] had no concern about a woman being missing but yet his son calls up and says, Where the hell is dad, he's supposed to be helping me down here. Dad going to help him search those ball diamonds for Carrie, or is something else going on down in Cincinnati that's got nothing to do with playing softball?

Tr. at 3219-20. Lawrence Baker testified that later on August 29, 1996, Petitioner borrowed Lori Baker's car, supposedly to look for Culberson near some ball diamonds in Cincinnati. Tr. at 3021-22. Lori Baker testified, without objection, that during the evening of August 29, 1996, Petitioner's mother, Priscilla Doan came to her house and while there stated, "Vincent called and wanted to know where the hell his dad was at, he was supposed to be down there helping him." Tr. at 1718. Lori Baker's testimony suggested that Petitioner used her car to dispose of Culberson's body. Tr. at 1691-92; 1699-1702.

that if Billie Jo Brown was not credible because she waited four
days to go to the police with her information concerning
Culberson, by arguing that by Petitioner's own standards, defense
witness Gabrielle Jones was not credible because she waited over
nine months before coming forward with her information.[15]  The
next portion of the argument cited by Petitioner (Tr. at 3287,
ll. 1-5) apparently is another example of the prosecutor
injecting his personal beliefs into the case.  Although probably
phrased ineptly, this again was a legitimate argument to
undermine the credibility of the defense witnesses who claimed to
have picked up Culberson hitchhiking because the personal
information given by the hitchhiker to the witnesses did not
match Culberson's personal information.[16]  The next segment cited

---

[15]    In context, with the contested portions underlined, the
prosecutor argued:

>    One other point about Gabrielle Jones, Mr. Rion
>    [Petitioner's defense counsel] tried to hammer this
>    point.  You report this stuff to the police as soon as
>    you became aware of it, Gabrielle Jones testified that
>    her first report was on June 3rd, 1997 to Lawrence,
>    first person she told was Lawrence, June 3rd, 1997.
>    Mr. Rion has a problem with Billie Jo Brown waiting
>    Thursday, Friday, Saturday, Sunday, four days.  If he
>    has a problem with four days, then I think there is a
>    real problem with waiting until June 3rd calling
>    Lawrence Baker instead of the police.

Tr. at 3285-86.

[16]    The argument here states:

>    Whether she experimented occasionally with something
>    recreational, I don't know, but I do know that she
>    didn't have a brother, wasn't broken down, and wasn't
>    headed for Bethel and that was not her.

by Petitioner (Tr. at 3288, ll. 22-23) is a legitimate commentary on the evidence.[17]

Next, Petitioner complains about the prosecutor's arguments concerning Norwood Police Officer Ken Lancaster's testimony (Tr. at 3294, ll. 8-12).[18]  Again, this is apparently another instance where the prosecutor allegedly injected his person beliefs into his argument.  On May 16, 1997, Lancaster ran a license plate check on a speeder and had given Culberson's license plate number by mistake.  Lancaster admitted making a mistake during his testimony.  Tr. at 2753-79.  Thus, the prosecutor's remark at worst was an extraneous editorial comment on how Lancaster must have felt about being mistaken.

The next segment cited by Petitioner contains the alleged improper religious comments (Tr. at 3322, ll. 18-22).[19] The Court finds, however, that this was not a religious reference per se, but rather, as other courts have found, historical references to instances of betrayal.  The Court further notes

---

[17]    Here, the prosecutor stated, "Now the next siting [sic], and this one I find real interesting."

[18]    The prosecutor argued:

Ken Lancaster didn't see a man or woman in the car, he's an officer trained if he sees a speeder whether it's a man or a woman, either one.  I'm sure he must not have had a very good morning that morning.

[19]    The prosecutor stated here:

The history of the world has recorded betrayals. Brutus betrayed Julius Caesar, Judas betrayed Jesus Christ, and those are two very historical times of betrayal.  Vincent Doan betrayed Carrie Culberson of her trust and love too.

66

that Petitioner's counsel probably opened the door to this type
of commentary by the prosecution by making his own references to
Caesar and Christ during his voir dire examination.  <u>See</u> Tr. at
416-17.[20]  Finally, the last segment of rebuttal cited by the
Petitioner (Tr. at 3324, ll. 14-25) is a legitimate argument to
the jury to infer from the evidence that Culberson died from head
injuries inflicted by Petitioner.[21]

---

[20]    Petitioner's trial counsel stated:

> Do you know, in history there have been two figures
> that have trusted a friend when they shouldn't have.
> You have Julius Caesar who trusted his best friend
> Brutus who ended up being part of his downfall, and
> then you have Judas and Christ whom Christ trusted and
> maybe he should not have.

[21]    In context, with the contested portion underlined, the
prosecutor argued:

> And once you have seen the evidence, the evidence that
> came in through this stand, and one of the pieces of
> evidence that is fairly compelling is when Lori Baker
> testified that Vincent was covered with blood, it was
> on his chest, it was on his arms and it was also on his
> pants and she testified he told her, "You don't know
> what it's like to hurt someone and hold them until they
> die."  That is where all the blood from a head injury
> would automatically be.  And so, when Lawrence Baker
> told Deputy Lunsford it was 1:30 that's because the
> call had come in at 1:00 o'clock.  <u>And whether Vincent
> actually had killed her at that point or whether he had
> just knocked her unconscious and hurt her badly in the
> car as he was driving down there, after that telephone
> call he held her in his arms until she died.  And
> whether prior to that she began to bleed out of her
> head and face from the injuries, or whether she was
> able to attempt to defend herself and strike back and
> then received further blows and injuries, it's clear
> that she died and bled to death, if it wasn't just from
> the bleeding, it was from the internal head injuries,
> but she died that night.</u>

67

Thus, on review, the Court does not find that the prosecutor made any improper remarks in his closing argument. Therefore, counsel was not ineffective for failing to object to the alleged misconduct.

Finally, Petitioner contends that counsel was ineffective for failing to renew his Rule 29 motion for judgment of acquittal. In order to prevail on this claim, however, Petitioner must show that there is a reasonable probability that the trial judge would have granted the motion based on the insufficiency of the evidence. United States v. Brown, No. 94-3682, 1995 WL 313728, at **3 (6th Cir. May 22, 1995); see also Maupin v. Smith, 785 F.2d 135, 140 (6th Cir. 1986)("Given our conclusion that there was sufficient evidence to support Maupin's conviction, we conclude that counsel's alleged error [in failing to move for a directed verdict at the close of evidence] did not result in such prejudice as to meet the second part of the Strickland standard."). In this case, a complete review of the record demonstrates that the trial judge would not have granted a Rule 29 motion even if counsel had made one at the close of the defense case. There was more than enough evidence to send this case to the jury. Accordingly, Petitioner has failed to demonstrate prejudice resulting from counsel's error.

For the reasons stated, Petitioner's Twelfth Ground for Relief is not well-taken.

### K. Thirteenth Ground for Relief

Petitioner's thirteenth assignment of error argues that the cumulative effect of the alleged errors denied him a fair trial:

**PETITIONER'S CONVICTIONS ARE INVALID AS A RESULT OF THE CUMULATIVE EFFECT OF THE CONSTITUTIONAL ERRORS SET OUT IN GROUNDS ONE THROUGH ELEVEN**

This assignment of error is not well-taken. Cumulative error is not a basis for habeas relief in non-capital cases. <u>Scott v. Elo</u>, 302 F.3d 598, 607 (6th Cir. 2002); <u>Bradley v. Birkett</u>, 192 Fed. Appx. 468, 480 (6th Cir. 2006).

<u>Conclusion</u>

For the reasons stated, Petitioner's petition for a writ of habeas corpus is not well-taken and is **DENIED.** The Court finds that reasonable jurists could debate whether Grounds Two through Four should have been resolved in a different manner. The Court, therefore, will issue a certificate of appealability on Grounds Two through Four. A certificate of appealability will not issue on Petitioner's remaining claims because he has not made a substantial showing of the denial of a constitutional right in those claims. Pursuant to 28 U.S.C. § 1915(a)(3), the Court finds that an appeal of this judgment would be taken in good faith. Therefore, Petitioner may proceed on appeal <u>in forma pauperis</u> upon a showing of financial necessity.

**IT IS SO ORDERED**.

Date  March 21, 2007                      s/Sandra S. Beckwith
                                  Sandra S. Beckwith, Chief Judge
                                   United States District Court